*United States v. Mark Manuel Angeles Marino*
Case No: 3:20-cr-94(S1)-J-32JRK

# EXHIBIT 1

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

the premises at 6936 Longleaf Branch Dr., Jacksonville, Florida 32222, as further described in Attachment A

)
)
)
)
)

Case No. 3:20-mj- 1218 MCR

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

the premises at 6936 Longleaf Branch Dr., Jacksonville, Florida, 32222, as further described in Attachment A,

located in the _____ Middle _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252 & 2252A | Possession, receipt, transportation, and distribution of child pornography |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Benjamin J. Luedke, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ and 41(d)(3) over the telephone. _____ *(specify reliable electronic means).*

Date: 6/16/20

_____
*Judge's signature*

City and state:  Jacksonville, Florida

Monte C. Richardson, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Benjamin J. Luedke, being duly sworn, hereby state as follows:

1.      I am a Special Agent (S/A) with Homeland Security Investigations (HSI), the investigative arm of Immigration and Customs Enforcement (ICE), formerly known as the United States Customs Service. I have been assigned to the Office of the Assistant Special Agent in Charge, Jacksonville, Florida since August 2007. Prior to that, I was assigned to the Blaine, Washington office, beginning in July of 2002. I am a law enforcement officer of the United States and am thus authorized by law to engage in or supervise the prevention, detection, investigation or prosecution of violations of federal criminal law. I am responsible for enforcing federal criminal statutes under the jurisdiction of HSI, including violations of law involving the exploitation of children. I have attended the Basic Criminal Investigator School and the United States Immigration and Customs Enforcement Academy at the Federal Law Enforcement Training Center in Brunswick, Georgia, and I have received training in the area of Customs laws. In my capacity as a Special Agent, I have participated in numerous types of investigations during which I have conducted or participated in physical surveillance, undercover transactions and operations, historical investigations, extradition cases and other complex investigations. Prior to my employment with HSI, I worked as a federal police officer with the U.S. Capitol Police from June 2000 to March 2002. Since becoming a Special Agent, I have worked with experienced Special Agents and state and local law enforcement

officers who also investigate child exploitation offenses.

2.    I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children that constituted violations of 18 U.S.C. §§ 2251, 2252, 2252A, 2422, and 2423, as well as Florida state statutes that criminalize sexual activity with minors and other methods of child sexual exploitation. In connection with such investigations, I have served as case agent and have served as an undercover agent in online child exploitation cases. During the course of my investigations, I have worked closely with members of the local child exploitation task force comprised of agents and officers from HSI, the Federal Bureau of Investigation (FBI), the Florida Department of Law Enforcement (FDLE), the Jacksonville Sheriff's Office (JSO), the St. Johns County Sheriff's Office (SJSO), and the Clay County Sheriff's Office (CCSO), among other agencies. These agencies routinely share information involving the characteristics of child sex offenders as well as investigative techniques and leads. As a federal agent, I am authorized to investigate and assist in the prosecution of violations of laws of the United States, and to execute search warrants and arrest warrants issued by federal and state courts.

3.    This affidavit is based upon my personal knowledge, experience and training, as well as other information developed during this investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause and securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the

2

facts that I believe are necessary to establish probable cause to believe that contraband, fruits, instrumentalities, other items illegally possessed and evidence of violations of 18 U.S.C. §§ 2252 and/or 2252A, are present in the location to be searched.

4.     I make this affidavit in support of an application for a search warrant for authority to search the premises located at 6936 Longleaf Branch Drive, Jacksonville, FL 32222 (the "Subject Location") as more particularly described in the attached Attachment A, which includes the physical structure, as well as any computer and computer media and electronic storage devices located therein. I also request to seize any and all items listed in Attachment B as evidence, fruits, and instrumentalities of criminal activity specified herein.

### STATUTORY AUTHORITY

5.     This investigation concerns alleged violations of 18 U.S.C. §§ 2252 and 2252A, relating to material involving the sexual exploitation of minors. Based upon my training and experience, as well as conversations with other experienced law enforcement officers, computer forensic examiners, and federal prosecutors, I know the following:

a.     18 U.S.C. § 2252(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing or accessing with intent to view any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce,

3

including by computer or mails.

b.     18 U.S.C. § 2252A(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view any child pornography, as defined in 18 U.S.C. § 2256(8), using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer.

c.     18 U.S.C. § 2252(a)(1) prohibits a person from knowingly transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails, any visual depiction of minors engaging in sexually explicit conduct. Under 18 U.S.C. § 2252(a)(2), it is a federal crime for any person to knowingly receive or distribute, by any means including by computer, any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or that has been mailed or shipped or transported in or affecting interstate or foreign commerce.  That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails. Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to knowingly possess or knowingly access with intent to view, one or more books, magazines, periodicals, films, or

4

other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been mailed, or have been shipped or transported using any means or facility of interstate or foreign commerce or in and affecting interstate or foreign commerce, or which were produced using materials which have been mailed or so shipped or transported, by any means including by computer.

      d.    18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly mailing, transporting, or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography. 18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(3) prohibits a person from knowingly reproducing child pornography for distribution through the mails or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means,

5

including by computer, or that was produced using materials that have been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6.      The following definitions apply to this Affidavit:

a.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, illegal or that do not necessarily depict minors in sexually explicit poses or positions.

b.      "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).  See 18 U.S.C. §§ 2252 and 2256(2).

c.      "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a

6

visual image that has been transmitted by any means, whether or not stored in permanent format.  See 18 U.S.C. § 2256(5).

      d.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See 18 U.S.C. § 2256(2).

      e.    "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical, arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

      f.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware

00008

(including, but not limited to, physical keys and locks).

g.      "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

h.      The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), personal digital assistants (PDAs), multimedia cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

i.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide

8

00009

computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "boobytrap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

        j.      "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet and is associated with a physical address.  IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) may assign a unique and different number to a computer at different times that it accesses the Internet.  IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

        k.      "Wireless telephone" (or mobile telephone, or cellular telephone, or smart phone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of

9

calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Many wireless telephones are minicomputers or "smart phones" with immense storage capacity.

l.     A "digital camera" is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

m.     A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio,

10

video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

        n.    The "dark web," also sometimes called the "dark net" or "deep web," is a colloquial name for a partition of the Internet that includes a number of extensive, sophisticated, and widely used criminal marketplaces operating on the Internet, which allow participants to buy and sell illegal items, such as child sexual abuse material, drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply "web"). These online black-market websites use a variety of technologies, including encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring. A famous dark web marketplace, Silk Road, operated similar to legitimate commercial websites such as Amazon and eBay, but offered illicit goods and services. Law enforcement shut down Silk Road in 2013. However, other, similar dark web marketplaces remain in operation.

o.    The "Tor network," or simply "Tor," is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true

Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users. Tor likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the Tor network. Such "hidden services" operating on Tor have complex web addresses, generated by a computer algorithm, ending in ".onion" and can only be accessed through specific web browser software, including a major dark-web browser known as "Tor Browser," designed to access the Tor network. One of the logos, or "icons," for Tor Browser is a simple image of the Earth with purple water and bright green landmasses with bright green concentric circles wrapping around the planet to look like an onion.

p.    "Cryptocurrency" is an online digital currency that allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems. Cryptocurrency is a decentralized, peer-to-peer form of electronic currency having no association with banks or governments. An example of a popular type of cryptocurrency is Bitcoin. Individuals can acquire cryptocurrencies through cryptocurrency exchanges, cryptocurrency ATMs, and/or directly from other people. Cryptocurrency is digitally recorded in a unique "public address" and accessed using a unique "private key." When cryptocurrency is transferred from one user to another, it moves from the sender's unique public address to the recipient's unique public address. Although cryptocurrencies are legal and have known legitimate uses,

12

cryptocurrencies are believed to be the most oft used means of payment for illegal goods and services on dark web websites.

q.      "Blockchain" refers to a cryptocurrency public ledger that records all cryptocurrency transactions.   Many cryptocurrencies, including Bitcoin, record cryptocurrency transactions in this format.  A cryptocurrency's blockchain essentially provides a list of all transactions that have ever occurred.

r.      "Transaction Hash" is a unique address on a blockchain that records the sender's public address, recipient's public address, transaction amount, and transaction date and time.   Each transaction recorded on a cryptocurrency's blockchain will have a unique transaction hash.

s.      "Cryptocurrency Exchanges" are companies that allow users to trade cryptocurrencies for other currencies, including U.S. dollars.  Although criminals—including dark web vendors and customers of illicit goods and services—may use cryptocurrency exchanges to launder the proceeds of their crimes, many legitimate cryptocurrency exchanges have implemented "Know Your Customer" (or "KYC") protocols and other verification procedures similar to those employed by traditional financial institutions.  For example, Coinbase, Inc. ("Coinbase"), headquartered in San Francisco, California, requires users who want to open or maintain accounts on the exchange to provide information and supporting documentation about their identities, finances, and sources of cryptocurrencies, among other things.

t.      "Cospend Transactions" are transactions that spend Bitcoin

13

from multiple addresses simultaneously, also known as "co-spending". Any time Bitcoin is spent from an address, the person spending it must provide that address's private key in order to cryptographically prove ownership of the address. If addresses are co-spent, it indicates that the person who knows the private key for one also knows the private key for the other, as both private keys must be used to complete the transaction. Thus, co-spending indicates that the co-spent addresses are controlled by the same individual or organization, as s/he is providing the private keys for both at the same time.

u.  "Cluster" - Law enforcement uses sophisticated commercial services offered by several different blockchain analysis companies to investigate bitcoin transactions. These companies analyze the blockchain in an attempt to identify individuals or groups involved with bitcoin transactions. Specifically, these companies create large databases that group bitcoin transactions into "clusters" through analysis of data underlying bitcoin transactions. The service allows law enforcement to identify Bitcoin, also referred to as "BTC," addresses that are included as "inputs" in the same transaction, as described above, and "cluster" these addresses together. Through numerous unrelated investigations, law enforcement has found the information provided by these companies to be reliable. Blockchain analysis software is an anti-money laundering software used by banks and law enforcement organizations worldwide. It has supported many investigations and has been the basis for numerous search and seizure warrants. As such, law enforcement has found the information provided by it to be

14

reliable. Further, computer scientists have independently shown that they can use "clustering" methods to analyze clues in how Bitcoins are typically aggregated or split up to identify BTC addresses and their respective account owners.

## COMPUTERS AND CHILD PORNOGRAPHY

7.     Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other.   In the past, child pornography was produced using cameras and film (either still photography or movies).   The photographs required darkroom facilities and significant skill to develop and reproduce the images.   There were definable costs involved with the production of pornographic images, and to distribute these images on any scale required significant resources and significant risks.   The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public and/or law enforcement.   The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

8.     The development of computers has radically changed the way that child pornographers manufacture, obtain, distribute and store their contraband. Computers basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage.

15

00016

9.    Child pornographers can now convert paper photographs taken with a traditional camera (using ordinary film) into a computer readable format with a device known as a scanner. Moreover, with the advent, proliferation and widespread use of digital cameras, images and videos can now be transferred directly from a digital camera onto a computer using a connection known as a USB cable or other device. Digital cameras, as well as "smart" phones, have the capacity to store images and videos indefinitely, and memory storage cards used in these cameras are capable of holding hundreds of images and videos. A device known as a modem allows any computer, to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

10.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media, that is, the hard disk drive used in home computers has grown tremendously within the last several years. These hard disk drives can store hundreds of thousands of images at very high resolution.

11.    The World Wide Web of the Internet, and especially the dark web, affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

12.    Collectors and distributors of child pornography frequently use online resources to retrieve and store child pornography, including services

16

offered by Internet portals such as Yahoo!, Hotmail, and Google, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

13.    As is the case with most digital technology, communication by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving particular website locations in, for example, "bookmarked" files. Digital information, images and videos can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). Often, a computer will automatically save transcripts or logs of electronic communications between its user and other users that have occurred over the Internet. These logs are commonly referred to as "chat logs." Some programs allow computer users to trade images while simultaneously engaging in electronic communications with each other. This is often referred to as "chatting," or "instant messaging." Based upon my training and experience, as well as conversations with other law enforcement officers and computer forensic

17

examiners, I know that these electronic "chat logs" often have great evidentiary value in child pornography investigations, as they can record communication in transcript form, often show the date and time of such communication, and also may show the dates and times when images of child pornography were traded over the Internet. In addition to electronic communications, a computer user's internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on a computer for long periods of time until overwritten by other data.

### SEARCH AND SEIZURE OF COMPUTER SYSTEMS

14.    Based upon my training and experience, as well as conversations with other experienced law enforcement officers, I know that searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.    Computer storage devices (e.g., hard drives, compact disks ("CDs"), diskettes, tapes, and others) can store the equivalent of thousands of

00019

pages of information.  Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

> b.    Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system, which includes the use of data search protocols, is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password protected, or encrypted files.  Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis. Based on my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that computer forensic techniques can often recover files, including images and videos of child pornography, that have long been "deleted" from computer media by a computer user.

19

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

15. Based on my experience, training, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that certain common characteristics are often present in individuals who collect child pornography. I have observed and/or learned about the reliability of these commonalities and conclusions involving individuals who collect, produce and trade images of child pornography. Based upon my training and experience, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that the following traits and characteristics are often present in individuals who collect child pornography:

a. Many individuals who traffic in and trade images of child pornography also collect child pornography. Many individuals who collect child pornography have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by sexually explicit depictions of children.

b. Many individuals who collect child pornography also collect other sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. Many of these individuals also collect child erotica, which may consist of images or text that do not meet the legal definition of child pornography, but which nonetheless fuel their deviant sexual

20

fantasies involving children.

   c. Many individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest in children and associated behavior. The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to, Peer-to-Peer (P2P), email, email groups, bulletin boards, Internet Relay Chat Rooms (IRC), newsgroups, instant messaging, and other similar vehicles.

   d. Some individuals who collect child pornography maintain books, magazines, newspapers and other writings (which may be written by the collector), in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals often do not destroy these materials because of the psychological support that they provide.

   e. Some individuals who collect child pornography often collect, read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or

commercial profit.  These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

        f.     Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage.  These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet. As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations.  These individuals may protect their illicit materials by passwords, encryption, and other security measures; save it on movable media such as CDs, DVDs, flash memory, thumb drives, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted; or send it to third party image storage sites via the Internet.  Based on my training and experience, as well as my conversations with other experienced law enforcement officers who conduct child exploitation investigations, I know that individuals who possess, receive, and/or distribute child pornography by computer devices using the Internet often maintain and/or possess the items listed in Attachment B.

16.    As stated in substance above and based upon my training and experience, as well as my conversations with other experienced law enforcement

22

officers, I know that individuals who collect and trade child pornography often do not willfully dispose of their child pornography collections, even after contact with law enforcement officials. For example, I learned from HSI S/A Algozzini that he conducted an investigation in 2016 in the Middle District of Florida in which the subject had his residence searched in July 2016 pursuant to a state search warrant and his wireless telephone and computer tablet seized by the Jacksonville Sheriff's Office. The search of these devices revealed the subject knowingly possessed several images of child pornography. The subject retained an attorney, and both were made aware of the ongoing investigation into the subject's commission of child pornography offenses. Approximately two months later, the subject was arrested on federal child pornography charges. On the same day as the subject's arrest, HSI executed a federal search warrant and seized a wireless telephone acquired and used by the subject after the execution of the state search warrant at his residence. Subsequent forensic examination of this wireless telephone revealed that the subject had received, possessed and viewed images of child pornography numerous times on his new device after the execution of the state search warrant and before his federal arrest.

17. Based on my training and experience, I also know that, with the development of faster Internet download speed and the growth of file-sharing networks and other platforms through which individuals may trade child pornography, some individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical

23

and repetitive basis. However, as referenced above, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools. Furthermore, even in instances in which an individual engages in a cycle of downloading, viewing, and deleting images, a selection of favorite images involving a particular child or act is often maintained on the device.

18.    Based on my training and experience, I know that within the last several years, individuals who have a sexual interest in minor children have used the internet and internet-enabled devices with increasing frequency to make contact with and attempt to establish relationships with potential child victims. These individuals may perceive that the internet provides some degree of anonymity and safety from prosecution. Because more and more children are using the internet and internet enabled devices, these individuals potentially expose more and more child victims to online sexual exploitation. These individuals may contact potential child victims through social networking websites such as Facebook and Twitter or may engage in online conversations with children through text messaging and email. During these online conversations, photographic images and links to internet websites can be easily exchanged between the individual and the targeted child. Based on my training and experience, I know that when such an individual uses text messaging, email, or other websites to have online contact with children, the internet-enabled device used, whether it is a computer, a cellular telephone, a "smart" phone or a

24

tablet such as an "iPad," often saves and maintains evidence of such contacts. This evidence can often be extracted and examined by a trained forensic examiner.

## FACTS ESTABLISHING PROBABLE CAUSE

19.     I make this affidavit in support of a search warrant for the Subject Location I believe to be currently occupied by MARK MANUEL ANGELES MARINO and several other family members. This affidavit is based upon information provided to me both verbally and in written documentation from other law enforcement officers and personnel, to include HSI New York Special Agent (S/A) Joshua Croft and New York Police Department (NYPD) Detective (Det.) Damon Gergar, an HSI New York Task Force Officer (TFO), as well as through investigation that I personally conducted as set forth herein. I have personally observed the Subject Location, and it appears as set forth in Attachment A.

20.     HSI is investigating the use of one or more computers, smart phones, and computer media at the Subject Location to commit violations of 18 U.S.C. §§ 2252 and 2252A, which prohibit the transportation, receipt, distribution, possession, and access with intent to view child pornography, that is, visual depictions of one or more minors engaging in sexually explicit conduct as defined in 18 U.S.C. § 2256.

21.     During March 2020, I learned from S/A Croft that HSI New York's Child Exploitation Investigations Unit has been investigating a dark

web user advertising the sale of child sexual abuse material over the internet, as well as offering to provide a child for hands-on sexual abuse.

22.     Based on my conversations with S/A Croft and TFO Gergar, and my review of reports and documents provided by both, I have learned the following, among other things:

a.     In or about September 2019, HSI New York identified a dark web user communicating via email address Philippinegirls@secmail.pro, herein referred to as The Email Account. I am familiar with the email provider "secmail.pro," and have found that it is an anonymous email service that uses private servers to provide its users protection for anonymous use. This dark web user posted advertisements on "DeepPaste" and "ChildAPriori" which are known child exploitation forums on the dark web. These advertisements offered to provide "camshows" and meetings with a child in exchange for Bitcoin. The advertisement invited interested parties to contact The Email Account. TFO Gergar provided me with a copy of the DeepPaste advertisement, which I have reviewed. Specifically, it provided, among other things, "PHILIPPINE GIRLS: Only for serious men with good economy and who know how to be descrete. OFFER 1: Meeting with girls aged 4-12 in Philippines. We provide luxury house with swimming pool. One week including one girl for normal sex (anal/pussy/blowjobs) 8000 Euro. Each additional week or any extra girl is 4000 Euro a week. Rough sex cost more." [sic] Additional offers were also listed to include a "Camshow" and a "Video of the girl," along with an offer to provide

26

"proof of girl."

       b.    Beginning on September 16, 2019, TFO Gergar, using an undercover (UC) email account, initiated communication with The E-mail Account and sent the following message: *Interested in one night with the girl. Would like a pic first.* On the same day, The E-mail Account sent the following response: *Here isa photo.* The response included an attached .jpg image. S/A Croft provided me with documentation of all the UC communications, which I have reviewed in their entirety, and the image of the girl attached to the email, which I have also reviewed. My description of the images is as follows: A totally naked female child is sitting on what appears to be a bed. She has one leg bent with her knee up near her chest and one leg bent lying against the bed thereby exposing her bare vagina. The child is holding a notebook in which the words "Sept 13, 2019" are written in red. Based on my training and experience and my review of this image, I believe it is a female child due to the overall body size, lack of pubic hair, very minor breast development, and child-like facial features. I have probable cause to believe, based on my training and experience, that the image constitutes child pornography, that is, a visual depiction of a minor engaged in sexually explicit conduct as set forth in 18 U.S.C. § 2256.

       c.    On September 17, 2019, TFO Gergar sent the following email to The Email Account: *Definitely interested. She is beautiful. How do I arrange a night with her?* There was no additional communication from The Email Account until December 2019.

00028

d.     On November 12, 2019, TFO Gergar sent the following email to The Email Account: *Is the girl still available? I have 5000 usd in bitcoin*

e.     On December 19, 2019, TFO Gergar received the following message: *PHILIPPINE GIRL 10 YO WITH SMALL BREASTS: She is back to entertain after a break. Just turned 10 yo in desember. Now she is trained in sex and BDSM games. Only for serious men with good economy and who know how to be discreet. All payments in bitcoin.* In addition, included in the same e-mail was a list of services and prices of 150 Euros, 800 Euros, 1200 Euros, and 1600 Euros, paid in Bitcoin (BTC), for various images or videos of "sexy, nude poses of your choice" to "stripping, touching, playing with no penetrations" to a video of "the girl being fucked by a man. Full penetration all wholes," to "rougher sex including BDSM, spanking, clamps, hot wax, tying her up, pee on her and so on." The e-mail contained TOR browser links to preview an image and a video. TFO Gergar was able to access and download the video but was unable to access the image. S/A Croft provided me with the video, and it has been reviewed. My description of the video is as follows: The video is titled "philippine girl 10yo" and is three (3) minutes long. At the beginning of the video the child is fully clothed, and she is standing in front of what appears to be a child's blanket with printed letters, animals, and toys. The child then removes her clothes, lays on the floor and masturbates. The child is acting on instructions received from the person recording the video. Approximately half-way through the video the following text appears at the bottom of the screen "Want to see more?

28

philippinegirls@secmail.pro." I have probable cause to believe this is a child due to the overall body size, very minor breast development, lack of pubic hair, child-like facial features, and overall size of the child's body.

        f.     On January 13, 2020, TFO Gergar sent the following email to The Email Account: *I'm interested but can't seem to get the download of the video. The girl is definitely beautiful. Do you have other girls by chance?* TFO Gergar also sent two additional emails in the following seven (7) days. On January 27, 2020, The Email Account responded with the following: *Video is still there. She come back tomorrow and stay one week if you want to try video and/or cam this time.* Included in this email were instructions similar to the email received on December 19, 2019, and the same two TOR browser links.

        g.     On February 5, 2020, TFO Gergar received the following message from The Email Account: Preview photo: [Three (3) TOR browser links were received followed by instructions similar to the emails received on December 19, 2019 and January 13, 2019]. TFO Gergar downloaded fourteen (14) images from one link, and one (1) video from another. Nothing was downloaded from the third link. S/A Croft provided me with the image and video, and it has been reviewed. My description of the video is as follows: The video is titled "asiancousine" and is seventeen (17) minutes and six (6) seconds in length. At the beginning of the video the child is fully clothed, standing in front of the same child's blanket described above, and is holding a hand written sign that reads "Feb, 4. 2020 Im Ayenah." The child is acting on instructions

29

received from the person recording the video. The child then begins to remove her clothes. Approximately forty (40) seconds into the video, the following text appears across the screen "If you want her, she is available for 4 new customers. Videos/Camshows/Meeting. She do normal sex, BDSM, roleplay and kinky requests.. All paid content is for private use only and comes in 4K resolution. If you share you are out. Only for generous men with good economy. philippinegirls@secmail.pro." The child then lays on the floor and masturbates. The same text appears across the video again and the child is given another sign that reads "Feb 3. 2020 Do you want me? I will do anything for u if you pay me." The child is also given what appears to be a sex toy as well. Approximately four (4) minutes into the video, the video described above is edited in and plays. Approximately 6:46 into the video another video of what appears to be the same girl is edited in and plays. The following text appears across the screen "this is her very first video, right after I met her. She is 9yo here. I like that she is so Young, yet have small tits. She is amazing." The child is clothed, then begins to take off her clothes while dancing, and then lays on the floor and begins to masturbate. During the video, the camera zooms in and focuses on the child's genitalia while she masturbates. The child is given a sex toy and uses it while masturbating. Based on my training and experience and my review of this image, I believe it is the same female child described above. I have probable cause to believe, based on my training and experience, that the image constitutes child pornography, that is, a visual depiction of a minor engaged in sexually explicit

30

conduct as set forth in 18 U.S.C. § 2256.

h.     On February 6, 2020, TFO Gergar requested the Bitcoin address to send a BTC payment. On February 7, 2020, TFO Gergar requested the Bitcoin address again, indicating a desire to "watch the girl getting fucked." On February 8, 2020, TFO Gergar sent the following email to The Email Account: *I want the 20 minute video of the girl. Will pay now. Send me the bitcoin address.* On February 9, 2020, TFO Gergar received the following message from The Email Account: *Bitcoin address is:* [a Bitcoin address was provided in the form of a unique series of letters and numbers, hereinafter referred to as the Target Wallet] followed by, *"As soon as we see the money in, we will make the video. Let us know what you want to see her do and say during the video."*

i.     Using blockchain analysis, HSI New York analysts were able to search for cryptocurrency transactions involving the Target Wallet address listed above. During the analysis it was determined that the Target Wallet was contained in a "cluster" along with a second Bitcoin address, in the form of a unique series of letters and numbers, [hereinafter referred to as the Second Bitcoin Address.. Through their investigation HSI New York analysts identified a transaction that occurred on or about October 29, 2019, involving the Second Bitcoin Address. The associated unique transaction hash ID is f8602486e08327b9f75f5a9fce20b92d991e9f55cf458e689d7a4582f0671459. This transaction hash ID was associated with a payment that converts to approximately $55 U.S. dollars to the Second Bitcoin Address on October 29,

2019. As previously indicated, the Second Bitcoin Address is contained in the same "cluster" as the Target Wallet.

j.      The "cluster" containing the Target Wallet and the Second Bitcoin Address subsequently transferred Bitcoin, in a single cospend transaction, into a single Bitcoin address, identified in the form of a unique series of letters and numbers , indicating that these addresses were controlled by the same user.

k.      The           Transaction           hash           ID f8602486e08327b9f75f5a9fce20b92d991e9f55cf458e689d7a4582f0671459     was linked to an account at Coinbase, a popular cryptocurrency exchange.

l.      On February 24, 2020, Special Agent Croft caused a summons to be issued to Coinbase Inc. requesting records associated to the Transaction hash ID mentioned above. On February 26, 2020, Coinbase Inc. provided the requested information to Special Agent Croft. The information was provided to me on March 12, 2020, and I have reviewed it in its entirety. The information provided by Coinbase Inc. lists "Mark Manuel Marino" with the address of the Subject Location. In addition, MARK MANUEL ANGELES MARINO's Florida driver's license and date of birth were provided. Additional review revealed that the account was created on September 15, 2019, and MARINO sent cryptocurrency on October 29, 2019. In the notes associated with the October 29, 2019 transaction, wherein Coinbase user MARINO sent a .00599236 BTC to the Second Bitcoin Address, a secmail.pro email address is

32

indicated along with the notation "5pics." The equivalent U.S. dollar amount indicated by Coinbase for this transaction is $56.38. Further review of the account documents revealed IP address 75.46.33.87 is associated to MARINO's account, the October 29, 2019 transaction mentioned above, and numerous additional account activity. I conducted open source search and discovered that the IP address above resolves to an AT&T account in Jacksonville, Florida. In addition, MARINO's account opening documents included, among other things, a photograph of his Florida driver's license, which lists the Subject Location as his address.

m.     On February 27, 2020, Special Agent Croft caused a summons to be issued to AT&T requesting information for the subscriber of IP address 75.46.33.87 on October 29, 2019 at 05:50 UTC. On the following day, AT&T provided the requested information to Special Agent Croft. The information was provided to me on March 10, 2020, and I have reviewed it in its entirety. The information provided by AT&T lists "Mark Marino" as the subscriber of service at the Subject Location.

23.     On March 11, 2020, I conducted an address search using the Subject Location within the Florida Driver and Vehicle and Information Database (DAVID) and confirmed that MARK MANUEL ANGELES MARINO lists the Subject Location as his residential and mailing address beginning in December 2018.

## CONCLUSION

24.     Based on the foregoing, I have probable cause to believe that one or more individuals has used and is using one or more computer devices, smart phones, and/or electronic storage media located in the residence located at 6936 Longleaf Branch Drive, Jacksonville, FL 32222, more fully described in Attachment A to this affidavit to, among other things, receive, distribute, and possess child pornography. Therefore, I have probable cause to believe that one or more individuals, using the residence described above has violated 18 U.S.C. §§ 2252 and/or 2252A. Additionally, I have probable cause to believe that fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A, including at least one computer device and/or other electronic storage media containing images and/or video depicting child pornography, and the items more fully described in Attachment B to this affidavit (which is incorporated by reference herein), will be located in this residence.


_____
Benjamin J. Luedke, Special Agent
Homeland Security Investigations


Sworn and subscribed to via telephonic means on this _16_ day of June, 2020, in Jacksonville, Florida:

_____
MONTE C. RICHARDSON
United States Magistrate Judge


34

## ATTACHMENT A

### Premises to be Searched

The premises to be searched is 6936 Longleaf Branch Drive, Jacksonville, FL 32222. It is a one-story residence with tan siding and white trim. It has a two-car garage with a white garage door. The numbers 6936 are in gold over black and are centered directly above the garage door. A black aluminum fence surrounds the back yard. Part of a screened in back porch is visible when viewing the residence from the front and right. The residence has a black front door.





2

00037

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEARCHED AND SEIZED

1.     Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, wireless telephones, "smart" phones, electronic tablets, digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to:  visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.     Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography (any visual depiction of minors engaged in sexually explicit conduct,  as defined in 18 U.S.C. § 2256(2)) or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.    Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.    In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.    Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

2

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

3

11.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.     Any and all cameras, film, videotapes or other photographic equipment capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct,  as defined in 18 U.S.C. § 2256(2).

14.     Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and

4

electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.    Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the premises and capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

17.    Any documents, records, programs or applications relating to the existence of wiping, data elimination, and/or counter-forensic programs (and associated data) that are designed to delete data from the subject computers and computer media.

5

00042

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>the premises at 6936 Longleaf Branch Dr.,<br>Jacksonville, Florida 32222, as further described in<br>Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No. 3:20-mj- *1218 · MCR*

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the     Middle     District of     Florida
*(identify the person or describe the property to be searched and give its location)*:

the premises at 6936 Longleaf Branch Dr., Jacksonville, Florida, 32222, as further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before   *June 30, 2020*   *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Monte C. Richardson     .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   *6/16/20 @ 11:37 a.m.*      _____
*Judge's signature*

City and state:    Jacksonville, Florida      Monte C. Richardson, United States Magistrate Judge
*Printed name and title*

00043

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  3:20-mj- | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

00044

## ATTACHMENT A

### Premises to be Searched

The premises to be searched is 6936 Longleaf Branch Drive, Jacksonville, FL 32222. It is a one-story residence with tan siding and white trim. It has a two-car garage with a white garage door. The numbers 6936 are in gold over black and are centered directly above the garage door. A black aluminum fence surrounds the back yard. Part of a screened in back porch is visible when viewing the residence from the front and right. The residence has a black front door.





2

00046

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEARCHED AND SEIZED**

1.      Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, wireless telephones, "smart" phones, electronic tablets, digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.      Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography (any visual depiction of minors engaged in sexually explicit conduct,  as defined in 18 U.S.C. § 2256(2)) or child erotica, display or access information pertaining to a sexual interest in child

00047

pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons

2

transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning

3

membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

11.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.    Any and all cameras, film, videotapes or other photographic equipment capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

13.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and

4

electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.    Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any

5

electronic storage devices discovered in the premises and capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

17.    Any documents, records, programs or applications relating to the existence of wiping, data elimination, and/or counter-forensic programs (and associated data) that are designed to delete data from the subject computers and computer media.

6