```
1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                 JACKSONVILLE DIVISION

3   UNITED STATES OF AMERICA,        Jacksonville, Florida

4            Plaintiff,        Case No. 3:20-cr-94(S2)-J-32JRK

5   -vs-                            December 10, 2020

6   MARK MANUEL ANGELES MARINO,     9:39 a.m.

7            Defendant.        Courtroom 5D
    _____

8

9              TRANSCRIPT OF MOTION HEARING
           BEFORE THE HONORABLE JAMES R. KLINDT
10              UNITED STATES MAGISTRATE JUDGE

11

12                A P P E A R A N C E S

13  GOVERNMENT COUNSEL:

14       Kelly Karase, Esquire
         United States Attorney's Office
15       300 North Hogan Street, Suite 700
         Jacksonville, FL  32202
16

17  DEFENSE COUNSEL:

18       Thomas Bell, Esquire
         Thomas M. Bell, PA
19       301 West Bay Street, Suite 1460
         Jacksonville, FL  32202
20

21  OFFICIAL COURT REPORTER:

22       Shelli Kozachenko, RPR, CRR, CRC
         221 North Hogan Street, #185
23       Jacksonville, FL  32202
         Telephone:  (904) 301-6842
24
                         (Proceedings reported by stenography;
25                          transcript produced by computer.)
```

# T A B L E   O F   C O N T E N T S

GOVERNMENT WITNESS:                                Page No.

  SPECIAL AGENT DANIEL LUEDKE

    DIRECT EXAMINATION BY MS. KARASE..........        11

    CROSS-EXAMINATION BY MR. BELL.............        53

    REDIRECT EXAMINATION BY MS. KARASE........       105

    RECROSS-EXAMINATION BY MR. BELL...........       118


DEFENSE WITNESS:                                   Page No.

  RICHARD CONNOR

    DIRECT EXAMINATION BY MR. BELL............       124

    CROSS-EXAMINATION BY MS. KARASE...........       150

    REDIRECT EXAMINATION BY MR. BELL..........       177

1        G O V E R N M E N T   E X H I B I T S   R E C E I V E D

2                                                           Page No.

3    GOVERNMENT'S EXHIBIT 1..........................      17

4    GOVERNMENT'S EXHIBIT 2..........................      21

5    GOVERNMENT'S EXHIBIT 3..........................      37

6    GOVERNMENT'S EXHIBIT 4..........................      42

7    GOVERNMENT'S EXHIBIT 5..........................      46

8

9

10

11          D E F E N S E   E X H I B I T S   R E C E I V E D

12                                                          Page No.

13   DEFENDANT'S EXHIBIT 1...........................      125

14   DEFENDANT'S EXHIBIT 2...........................      177

15

16

17

18

19

20

21

22

23

24

25

1    P R O C E E D I N G S

2    December 10, 2020                              9:39 a.m.

3                        -   -   -

4         THE COURT:  This is the case of the United States of

5    America versus Mark Manuel Angeles Marino, Case No.

6    3:20-cr-94(S2)-J-32JRK.

7         Kelly Karase represents the United States.  Tom Bell

8    represents Mr. Marino.  Mr. Marino is present in the courtroom.

9         We're set for a hearing on defendant's motion to

10   suppress physical evidence and statements, request for

11   evidentiary hearing, and memorandum of law.  That's document

12   31.  It was filed on October 9th, 2020.

13        We had a hearing in Mr. Marino's case on November

14   4th, 2020.  The main purpose of the hearing was to hear

15   argument on the defendant's motion for bill of particulars, but

16   we also had a status hearing regarding this motion to suppress

17   physical evidence and statements.

18        And it was determined during that status, as I

19   recall, that we would set the evidentiary hearing over until

20   sometime in December when the parties -- the parties' witnesses

21   were available, and the parties were ready to proceed.

22        And we then did set the evidentiary hearing, by way

23   of an order on November 5th, 2020, for today.

24        The government has not filed a response, and that was

25   really agreed upon at the status hearing, and it is, and has

1  been my practice, to allow the government to either respond

2  prior to the hearing or after the hearing.  So the fact that I

3  didn't reference a response by the government doesn't mean that

4  it's something that hasn't been discussed.

5          In the motion to suppress, the defendant seeks to

6  suppress all physical evidence listed on the inventory receipt

7  for the search warrant executed at 6936 Longleaf Branch Drive,

8  Jacksonville, Florida, on June 18th, 2020.

9          The defendant also moves, in the motion, to suppress

10 any statements he made to Homeland Security agents on June

11 18th, 2020.  And the defendant alleges that the physical items

12 and statements were obtained after a search warrant was

13 illegally executed by law enforcement agents on that residence.

14         A couple of initial matters I think we should take

15 up.  First, let me ask you this, Ms. Karase.

16         Are you challenging Mr. Marino's standing?

17         MS. KARASE:  No, Your Honor.

18         THE COURT:  All right.  So that takes care of one of

19 the initial matters.

20         And then secondly, of course, because there's a

21 search warrant in the case, the burden really falls on Mr. Bell

22 with regard to his motion.

23         But normally, regardless of whose burden it is, we

24 usually have the government go first and then -- and then the

25 defendant, but I'll be glad to hear from either one or both of

1  you how it is you'd like to proceed today.

2          Ms. Karase, why don't I hear from you first.

3          MS. KARASE:  Yes, Your Honor.  I'll be happy to

4  proceed by calling Special Agent Luedke first to start things

5  off.

6          I will raise for the Court, though, it seems that we

7  have a bit of a disagreement.  I advised Mr. Bell that I

8  intended to invoke the rule of sequestration.

9          I see Mr. Connor in the back of the courtroom, and

10  he's an intended witness for the defense, as I understand it.

11  And I would ask that he be required to leave the courtroom

12  while Agent Luedke is testifying.

13          THE COURT:  All right.  Well, Mr. Bell, do you --

14  let's start with this.

15          Do you have any objection to the government going

16  first?

17          MR. BELL:  No, Your Honor.  In fact, I've been

18  accused of always asking leading questions anyway, so it may

19  make more sense for the government to do the direct, and then

20  I'll feel more comfortable doing the cross anyway.  So, no,

21  absolutely not.

22          Two, I do object -- if the Court's prepared for me to

23  go forward, I do object to the invoking the rule.  I'd ask for

24  kind of a quasi case agent exception.

25          Mr. Connor's expected to offer testimony relative to

1  his expertise on forensic-related examination of electronic

2  devices.  I expect the agent will testify about matters

3  contained in the affidavit, asserting essentially matters that

4  relate directly and primarily to the staleness argument and the

5  availability of -- for the preservation of images on electronic

6  devices.

7          I think it would be helpful for the -- for Mr. Connor

8  to hear that portion of the testimony so that -- based on his

9  affidavit and his assertions in the affidavit, he's in a

10 position to kind of assess and kind of respond directly to that

11 if necessary, where I -- and kind of avoid the -- obviate the

12 need for me to go out there and tell him what the agent said

13 and potentially address it there.

14         So that is the limited purpose for which I'd like for

15 him to be present during the testimony.

16         THE COURT:  Well, I'm not going to get into any quasi

17 case agent exception for someone you -- I'm guessing you're

18 going to offer him as an expert in one or more of these areas?

19         MR. BELL:  Yes, Your Honor.

20         THE COURT:  All right.  Well, I wouldn't get into a

21 quasi case agent exception for an expert that you intend to

22 offer.

23         Ms. Karase, let me hear from you.  I do believe that

24 in the past, when someone is offering an expert, if there's

25 going to be testimony that the expert's going to testify about,

1    that he or she should be able to hear the testimony of the

2    government's witness that may address the same thing.

3            But I don't know exactly what Agent Luedke is going

4    to be addressing.

5            MS. KARASE:  Yes, Your Honor.  You may be familiar

6    with Mr. Connor's background, certainly from Mr. Bell's motion.

7    He did attach his extensive curriculum vitae.  And it seems

8    that he's been qualified on numerous occasions to serve as an

9    expert witness in the field of computer forensics.

10           Mr. Connor's not done any computer forensic analysis

11   in this matter, and I submit that he is not within his area of

12   expertise to opine as he did in the affidavit.

13           And I take issues with -- I'm not sure how exactly

14   Mr. Bell intends to qualify him as an expert, but I do not

15   believe that his qualifications provide the basis for him to

16   provide expert testimony on -- on the definition of collector

17   and the things that he's alluded to in his affidavit.

18           So I don't think that the expert exception would

19   apply here.  Certainly, Agent Luedke is not a forensic expert

20   and will not be offering testimony as to any forensic

21   expertise.

22           THE COURT:  All right.  Well, I don't know if

23   Mr. Connor is going to be recognized as an expert in this case

24   or not.  I'll have to see what it is Mr. Bell intends to do.

25           I mean, it's not -- I'm familiar with what has been

1 provided regarding Mr. Connor, and I'm going to have to hear

2 his testimony and make that decision within the context of the

3 issues that we have.

4 But I'm going to allow him to stay.  I don't -- I

5 don't think the government will be prejudiced by it.  And if

6 indeed he ends up being an expert on one of these matters, I

7 think it would be the safer route for him to have been here,

8 because when it comes down to at least a couple of these

9 issues, I don't want the defendant later to be heard that if

10 his expert had been present, then the testimony would have been

11 more on point, more probative, and would have changed the

12 Court's view of things.

13 So I think -- I think the safer route is to allow him

14 to stay, even though I understand your argument.  And I'll want

15 to hear more about -- about your position on that and

16 Mr. Bell's as we go forward.  But I'm going to allow him to

17 stay at this point.

18 MS. KARASE:  And, Your Honor, I'll be happy to move

19 things along and proceed with Agent Luedke, if you prefer that.

20 I would ask the opportunity to voir dire Mr. Connor,

21 and perhaps if Your Honor would make the determination as to

22 his -- whether he's an expert in order to get that out of the

23 way, it may make sense to do that first.

24 But I'll defer to Your Honor's preference.

25 THE COURT:  Well, let's just go ahead with Agent

1  Luedke and move forward with that.

2      I -- I really think, just in terms of looking at all

3  of this, it's going to be best for me to hear all of the

4  evidence and then make a determination as to some of these

5  issues.

6      And I would also probably be aided greatly by a

7  memorandum from you and a response from Mr. Bell on some of

8  these issues as we go forward, because really the -- the issue

9  of whether Mr. Connor is an expert or not really hasn't --

10  hasn't been briefed such that I would want to make that call

11  now.

12      And given that we -- we don't have a jury, and I'm

13  the fact-finder, I feel pretty comfortable that I can separate

14  things out.  But I also know that you-all will be able to help

15  me understand the issues once I hear all the evidence and I've

16  had the opportunity to -- or you've had the opportunity to

17  brief those issues.

18      So if you would, call Agent Luedke.

19      MS. KARASE:  Yes, Your Honor.

20      And may I provide the Court with the Court's copies

21  of the proposed exhibits?  Mr. Bell has a copy as well.

22      THE COURT:  Yes.

23      Do you have any objection to that?

24      MR. BELL:  No, Your Honor.

25      THE COURT:  Yes.  Thank you.

1        All right.  Agent Luedke, if you'd raise your right

2   hand, please, sir.

3        Do you solemnly swear the testimony you're about to

4   give will be the truth, the whole truth, and nothing but the

5   truth, so help you God?

6        THE WITNESS:  I do.

7        THE COURT:  All right.  You may be seated.

8        And let's do this with the masks.  If you -- if the

9   court reporter can understand you and hear you, then I think it

10  probably is best that you keep the mask on, but if she can't --

11  and I'm counting on her to let us know -- then we'll remove the

12  masks.

13        And, Ms. Karase, if you're more comfortable using the

14  bigger podium, you're welcome to do that.  And you can turn it

15  about at an angle so the court reporter can still see you and

16  you're looking at Agent Luedke.

17        MS. KARASE:  Yes, Your Honor.

18        THE COURT:  That's probably good right there.

19        MS. KARASE:  All right.

20        THE COURT:  All right.  Thank you.

21        You may proceed.

22      SPECIAL AGENT DANIEL LUEDKE, GOVERNMENT'S WITNESS, SWORN

23                      DIRECT EXAMINATION

24  BY MS. KARASE:

25  Q.   Good morning.

1    Can you please state your first and last name.

2  A.   Benjamin Luedke.

3  Q.   And, Agent Luedke, tell the Court what it is you do for a

4  living.

5  A.   I'm a special agent with Homeland Security Investigations.

6  Q.   How long have you held this position?

7  A.   Over 18 years.

8  Q.   Do you have previous law enforcement experience prior to

9  becoming a special agent with Homeland Security Investigations?

10  A.   Yes.  Prior to that I was a police officer with the United

11  States Capitol Police for approximately two years.

12  Q.   And as a special agent for Homeland Security

13  Investigations, what are your current duties and

14  responsibilities?

15  A.   I'm currently involved in child exploitation

16  investigations, to include investigations involving possession,

17  receipt, and distribution of child sexual abuse material;

18  production and attempted production of child sexual abuse

19  material; online enticement cases, which involve mainly

20  chatting; as well as undercover investigations involved with

21  chatting online.

22  Q.   And I noticed you used the term "child sexual abuse

23  material."

24    Is that kind of the new way of referring to what you

25  used to call child pornography?

1    A.    Yes.

2    Q.    And has there been a shift in order to describe these

3    files as child sexual abuse material so it's more from the

4    perspective of the victim rather than the consumer of the

5    pornography?

6    A.    Yes.

7    Q.    But for today's purposes, we can assume that the terms, as

8    you use them, are interchangeable?

9    A.    Yes.

10   Q.    As an investigator of child exploitation offenses, do you

11   serve as the affiant on complaints and search warrant

12   affidavits?

13   A.    Yes.

14   Q.    And have you done that throughout the course of your 18

15   years as a Homeland Security Investigations agent?

16   A.    Yes.

17   Q.    Do you also have experience working with state and local

18   partners?

19   A.    Yes.

20   Q.    And do you also work with other Homeland Security

21   Investigation offices throughout the country and world, really?

22   A.    Yes.

23   Q.    Are you familiar with the case of United States versus

24   Mark Marino?

25   A.    Yes.

1  Q.   Are you the case agent in connection with that matter?

2  A.   I am.

3  Q.   And as the case agent, have you come to know -- did you

4  meet Mr. Marino?

5  A.   Yes.

6  Q.   And is he present in the courtroom today?

7  A.   He is.

8  Q.   And can you identify him for the record?

9  A.   Yes.  He's in an orange jumpsuit with a mask on to the

10  left of Mr. Bell.

11  Q.   All right.

12        MS. KARASE:  And let the record reflect that the

13  agent has identified Mr. Marino.

14        THE COURT:  Yes, it shall.

15  BY MS. KARASE:

16  Q.   You mentioned that you've served as the affiant in

17  complaints and search warrants.

18        Did you serve as the affiant in connection with the

19  search warrant for a residence in the case of United States

20  versus Marino?

21  A.   Yes.

22  Q.   And at that time was that simply an investigation at the

23  time that you swore out that search warrant?

24  A.   Yes.

25  Q.   I'm handing you what I've marked as Government's Exhibit 1

1    for identification purposes.

2            Do you recognize that?

3    A.    I do.

4    Q.    What is it?

5    A.    This is the search warrant application and affidavit for

6    search warrant for Mr. Marino's residence.

7    Q.    And the first clipped document there, that's the search

8    warrant itself that you obtained?

9    A.    That is correct.

10   Q.    And what was the date and time that that search warrant

11   was issued?

12   A.    June 16th of this year.

13   Q.    And was it issued by a United States magistrate judge who

14   serves in this building?

15   A.    Yes.

16   Q.    And then the second clipped portion that comprises the

17   second part of Government Exhibit 1, do you recognize that

18   document?

19   A.    I do.

20   Q.    What is that?

21   A.    It's the application and affidavit.

22   Q.    And do you see your signature on that application?

23   A.    Yes.

24   Q.    Is your signature also on the affidavit?

25   A.    Yes -- well, let me flip to it.

1        Yes.

2   Q.   And do you remember signing each of those documents?

3   A.   I do.

4   Q.   In each of those places?

5   A.   Yes.

6   Q.   And have you reviewed what's contained within pages 1

7   through -- through the final page of the document, which is

8   page 34 where you signed, exclusive of the attachments?

9   A.   Yes.

10  Q.   And did you swear to tell the truth when you completed

11  that affidavit?

12  A.   Yes.

13  Q.   And did you tell the truth?

14  A.   I did.

15  Q.   Was that affidavit based upon your training and experience

16  as an HSI special agent --

17  A.   Yes.

18  Q.   -- among other things; is that right?

19  A.   Yes.

20  Q.   What was the property --

21          MS. KARASE:  Well, at this time, Your Honor, I'd move

22  to admit Government's Exhibit No. 1 into evidence.

23          MR. BELL:  No objection.

24          THE COURT:  All right.  Government's No. 1 is

25  received.

1          (Government's Exhibit 1 was received in evidence.)

2   BY MS. KARASE:

3   Q.    What was the property that was to be searched by the --

4   through the search warrant?

5   A.    A residence in Jacksonville, Florida.

6   Q.    What was the address?

7   A.    6936 Longleaf Branch Drive, Jacksonville, Florida 32222.

8   Q.    And did you encounter -- did you execute this search

9   warrant?

10  A.    Yes.

11  Q.    What day?

12  A.    June 17th of this year.

13  Q.    So that was the day after you signed it?

14  A.    Yes.

15  Q.    And just for record purposes, was that kind of in the

16  midst of the pandemic that we're still dealing with today

17  related to the COVID-19 virus?

18  A.    Yes.

19  Q.    When you executed that search warrant, did you encounter

20  Mr. Marino?

21  A.    Yes.

22  Q.    Was he a resident at the property?

23  A.    Yes.

24  Q.    And is that how you very first met him?

25  A.    Yes.

1   Q.   And we'll come back to some specific portions about the

2   search warrant and your affidavit in support of it a bit later.

3        But if you could, tell the Court how it was that this

4   investigation first began.

5   A.   In approximately September of 2019, an HSI New York agent

6   discovered a website -- or, excuse me, discovered an

7   advertisement on a dark website which advertised the sale of

8   child sexual abuse material, as well as access to a child for

9   sexual abuse.

10  Q.   And have you since had multiple communications with that

11  investigator as part of HSI -- who's part of the HSI New York

12  team?

13  A.   Yes.

14  Q.   And did that investigator provide you with a copy of the

15  ad that he had seen?

16  A.   He did.

17  Q.   I'm handing you what's been marked for identification

18  purposes Government's Exhibit 2.

19       Do you recognize that?

20  A.   I do.

21  Q.   What is it?

22  A.   This is the advertisement I just mentioned that was

23  provided to me by that HSI New York undercover agent.

24  Q.   And how many pages is that document?

25  A.   It's two.

1    Q.    And describe that for us.

2    A.    The first one is the ad in its entirety.  The second one

3    is a zoomed-in portion of the ad to be able to read it better.

4    Q.    All right.  And who did the zooming in?

5    A.    I did.

6    Q.    And is that because some of the font was very difficult to

7    read, given the coloring and the size?

8    A.    Yes.

9    Q.    Did you mention this advertisement in your search warrant

10   affidavit?

11   A.    I believe I did, yes.

12   Q.    Specifically, directing your attention to paragraph 22(a),

13   was there a reference to this ad in paragraph 22(a) of your

14   search warrant affidavit?

15   A.    Yes.

16   Q.    Now, did you quote this advertisement in its entirety in

17   22(a)?

18   A.    I did not.

19   Q.    Or anywhere else in the affidavit?

20   A.    I did not.

21   Q.    Did you, however, provide some excerpts in the affidavit

22   that provided some context for what the advertisement was?

23   A.    Yes.

24   Q.    And specifically referencing paragraph 22(a), there's a

25   quote that says, "Philippine girls, only for serious men with

 1    good economy and who know how to be discrete," spelled

 2    incorrectly.

 3            Is that right?

 4    A.   That's correct.

 5    Q.   And then did you continue on to describe what Offer 1

 6    entailed?

 7    A.   Yes.

 8    Q.   Did you go on to quote what Offer 2 or Offer 3 was?

 9    A.   I did not.

10    Q.   Tell us what Offer 2 was, and if you could refer to

11    Government's Exhibit 2, perhaps it's more -- more easy to read.

12            THE COURT:  Did you want to move that into evidence?

13            MS. KARASE:  Yes, Your Honor.  Thank you for the

14    reminder.

15            If I could please move Government's Exhibit 2 into

16    evidence.

17            THE COURT:  Mr. Bell?

18            MR. BELL:  Judge, I don't really have an objection,

19    although it may go more to the weight of the evidence.  He

20    described it in the affidavit.  He didn't produce this actual

21    document in the affidavit, so to the extent it goes to the

22    probable cause, this -- the exhibit itself, I'm not sure it's

23    really relevant to probable cause.

24            But it is relevant to his background, so for those

25    purposes, I don't object.

1      THE COURT:  All right.  Then Government's Exhibit 2

2  will be received, and the purpose of it being received will be

3  developed as we go through.

4      I mean, I understand that in determining whether

5  probable cause exists, the Court's confined to the four corners

6  of the affidavit, so I understand that.  And I'm guessing that

7  it's going to be used for other purposes, but --

8      MR. BELL:  Yes, sir.

9      THE COURT:  So it will be received.

10     (Government's Exhibit 2 was received in evidence.)

11     MS. KARASE:  Yes, Your Honor.

12     And to aid the Court, my intention is to specifically

13  identify areas, throughout Special Agent Luedke's testimony,

14  that were not contained within the affidavit.

15     And, of course, I would be asking the Court to

16  consider that for purposes of *United States versus Leon,* to

17  find that even if the search warrant was invalidated, that

18  Special Agent Luedke did operate using good faith.

19     THE COURT:  All right.  Thank you.

20  BY MS. KARASE:

21  Q.   If you could, please tell us what Offer 2 provided.

22  A.   Offer 2 reads:  "Camshow with a girl from 400 euro."

23  Q.   And Offer 3?

24  A.   Offer 3 reads:  "Video of the girl.  Describe action and

25  length of video and you get a quote in return."

1  Q.   And was there some reference to proof of girl?

2  A.   Yes.

3  Q.   And what was that?

4  A.   It reads:  "Proof of girl will of course be sent once we

5  have the girl you like."

6  Q.   And was there an e-mail address that was provided in the

7  advertisement as well?

8  A.   Yes.  The contact e-mail address is

9  Philippinegirls@secmail.pro, which is S-e-c mail.pro.

10  Q.   And we'll talk more about the secmail.pro service provider

11  momentarily.

12        But sticking with the Offer 3 that you read for the

13  Court, there was not a specific price connected to that offer,

14  right?

15  A.   That's correct.

16  Q.   And what about the proof of girl that would be provided?

17  Was there a price associated with that?

18  A.   There was not.

19  Q.   And if you could turn back to -- it's probably the first

20  page of the exhibit, the date that that exhibit was posted, the

21  date that that advertisement was posted.

22  A.   August 15th of 2019.

23  Q.   And preceding the date, do you see where it says A-n-o-n?

24  A.   Yes.

25  Q.   Are you familiar with that abbreviation?

1   A.    Yes.  It's short for anonymous.

2   Q.    Now, turning back to the secmail.pro, are you familiar

3   with that extension, secmail.pro?

4   A.    Yes.

5   Q.    In fact, did you also reference that in your search

6   warrant affidavit in paragraph 22(a)?

7   A.    Yes.

8   Q.    And what did you inform the issuing magistrate judge about

9   secmail.pro in 22(a)?

10  A.    That it is an anonymous e-mail service that uses private

11  servers to provide its users protection for anonymous use.

12  Q.    And given that this advertisement quoted this e-mail

13  address that seems to have been posted from Anon, was that

14  consistent with your understanding that -- that this was

15  someone who was intending to remain anonymous?

16  A.    Yes.

17  Q.    Also, was it posted on the dark web?

18  A.    It was.

19  Q.    Now, are you an expert in the dark web?

20  A.    I am not.

21  Q.    But do you have some general understanding that it can be

22  utilized to promote anonymity?

23  A.    Yes.

24  Q.    And this advertisement, did you describe in your affidavit

25  that this advertisement was, as you testified here today,

1    posted on the dark web?

2    A.    Yes.

3    Q.    Now, when HSI New York discovered this advertisement

4    that's Government's Exhibit 2, were there communications that

5    began from an undercover in New York?

6    A.    Yes.

7    Q.    And when did those communications begin?

8    A.    September 16th of 2019.

9    Q.    And in September of -- September 16th, 2019, was there a

10   request by the undercover for a picture first?

11   A.    Yes.

12   Q.    And was that sent to the Philippinegirls@secmail.pro

13   e-mail account?

14   A.    Yes.

15   Q.    And was there a response provided?

16   A.    Yes.

17   Q.    Was that response -- what was that response?

18   A.    The response was, "Here is a photo," and a photo was

19   attached to the e-mail.

20   Q.    And was this described in paragraph 22(b) of the search

21   warrant affidavit?

22   A.    Yes.

23   Q.    And based on your training and experience -- well, first,

24   did you review that photo?

25   A.    Yes.

1  Q.    And based on your training and experience, did you find

2  that that was a file that depicted a minor engaging in sexually

3  explicit conduct?

4  A.    Yes.

5  Q.    And is that file, which was an image, described in

6  paragraph 22(b)?

7  A.    Yes.

8  Q.    At this point had the undercover agent or officer in New

9  York sent any money in order to receive that file of child

10  sexual abuse material?

11  A.    No.

12  Q.    There was a request for a picture that's set forth in the

13  italicized portion of 22(b); is that right?

14  A.    That's correct.

15  Q.    And then an image followed; is that right?

16  A.    That's correct.

17  Q.    Was there an additional conversation between the

18  undercover and the Philippine girls e-mail user throughout the

19  course of the next several months?

20  A.    Yes.

21  Q.    And through those communications was there a Bitcoin

22  address that was provided to the undercover in order for the

23  undercover to send money to receive videos?

24  A.    Yes.

25  Q.    Now, did the undercover use one e-mail address and one

1  persona, or were there multiple ways in which the undercover

2  communicated with Philippine girls?

3  A.    The undercover used multiple addresses.

4  Q.    And by multiple, how many were there?

5  A.    Two.

6  Q.    And were those two different e-mail addresses in order to

7  assume two different personas?

8  A.    Yes.

9  Q.    Why?

10 A.    That's a general practice with UC agents, is to use one

11 and then use another to also corroborate that it's not just one

12 person he's talking to; it's multiple people.

13 Q.    And did the undercover in New York receive child sexual

14 abuse material on both of the e-mail addresses that undercover

15 was utilizing?

16 A.    Yes, he did.

17 Q.    I'm turning your attention to paragraph 22(g) of your

18 search warrant affidavit.

19        Were there files that you learned were provided to

20 the task force officer in New York on or about February 5th,

21 2020, that were sent by the Philippinegirls@secmail.pro?

22 A.    Yes.

23 Q.    And did that -- did those files include child sexual abuse

24 material that you have reviewed?

25 A.    Yes.

1   Q.   And were those files sent to both addresses that the

2   undercover was utilizing?

3   A.   Yes.

4   Q.   And up until this point, when files were sent, again, in

5   February -- and I believe that you mentioned in December in

6   your affidavit, there was another file of child sexual abuse

7   material that was sent from the Philippine girls e-mail

8   address -- had any money been sent to the Philippine girls user

9   for the receipt of child sexual abuse material?

10  A.   No.

11  Q.   What was the date that the first contact was made by the

12  undercover using the second e-mail address, the new persona?

13  A.   February 8th of 2020.

14  Q.   And was it the very next day that there was child

15  pornography that was sent, or child sexual abuse material that

16  was sent, to the undercover using the second identity?

17  A.   Yes.

18  Q.   And had money been sent prior to the transfer of

19  contraband images?

20  A.   No.

21  Q.   During this same time frame, did the

22  Philippinegirls@secmail.pro user send the UC, both using UC --

23  I'll call it UC1, the initial e-mail, and the second persona,

24  UC2, a Bitcoin site so that the undercover could send money for

25  the receipt of additional files of child sexual abuse material?

1   A.   Yes.

2   Q.   And was that Bitcoin site or that Bitcoin address the same

3   that was sent to both UC1 and UC2?

4   A.   It was.

5   Q.   Did UC2 indeed initiate a Bitcoin transaction?

6   A.   Yes.

7   Q.   And is that described in paragraph 22(l) -- I'm sorry.

8        I'm sorry.  Let me back up.

9        When we were talking about UC1, had there been

10  additional e-mail contact between Philippine girls and the

11  undercover using the persona of UC1 that -- where Philippine

12  girls was getting prepared to produce files of child sexual

13  abuse material for UC1?

14  A.   Yes.

15  Q.   And does HSI or did the undercover want for this to

16  happen?

17  A.   No.

18  Q.   Why not?

19  A.   Because we don't want any child being abused.

20  Q.   And were the e-mail discussions/conversations about the

21  child that would be abused and filmed specific to what the

22  undercover wanted?

23  A.   Yes.

24  Q.   And transitioning to UC2, then, was there a request simply

25  for pictures, as you describe?

1   A.    The initial -- the initial communication from UC2 was just

2   kind of saying, "Hey, I heard you have some material.  Let me

3   know how much," and talking about Bitcoin.

4   Q.    Okay.  And do you know, from your conversations with

5   analysts and with the investigator in New York, that there was

6   a transaction that took place by HSI New York for the transfer

7   of Bitcoin?

8   A.    Yes.

9   Q.    And how do you know this?

10  A.    I was told by the New York agent, the New York TFO, and

11  the New York analyst.

12  Q.    And did you review e-mails between the New York undercover

13  and Philippine girls?

14  A.    Yes.  I reviewed them all.

15  Q.    And in those e-mails was there reference to a test

16  transfer?

17  A.    Yes.

18  Q.    Describe what that was for us.

19  A.    It was just a small amount of U.S. dollars' worth of

20  Bitcoin for a test transaction to ensure that the Bitcoin

21  address provided by Philippinegirls@secmail.pro was legitimate.

22  Q.    And was that from UC1 or UC2 that the plans were made for

23  a test transfer to take place?

24  A.    Both e-mail addresses were used.

25  Q.    Okay.  But you --

1          MR. BELL:  Judge -- and I'm sorry to interject with

2     an objection here.

3          It -- I understand, from a background point of view

4     maybe, why UC1 and UC2's relevant, but I'm not sure that that

5     information's contained in the affidavit.

6          So, you know, kind of the more references there are

7     to this suggestion that there were multiple UC addresses using

8     the same Bitcoin address, I think it's a little bit misleading

9     in terms of the probable cause for the affidavit and the

10    information the magistrate had available, absent a distinct

11    reference to those facts in the affidavit.

12         THE COURT:  Well, what will happen after the

13    hearing's over, I'm sure at some point there will be a

14    transcript, and I've had to do this a number of times, at least

15    in the last couple of years, and I'll be able to distinguish

16    the testimony given by the agent that's contained in the

17    affidavit and what's not.

18         So as I'm sitting here, I'm trying to follow what's

19    in the affidavit and what isn't in the affidavit just for my

20    own edification, and Ms. Karase is directing us to the

21    affidavit from time to time so we can see what's actually

22    there.

23         But just sitting here listening to it is not going to

24    be the same, because when I go through all of this, what I'll

25    consider in terms of probable cause will be just what's in the

1    affidavit, and I'll be able to distinguish those things.

2            So overruled.

3            Go ahead.

4    BY MS. KARASE:

5    Q.    With respect to the e-mails that you reviewed, was there a

6    reference that UC2 was going to try to send a small amount of

7    Bitcoin before sending a full amount?

8    A.    Yes.

9    Q.    And what date was that?

10   A.    February 10th of 2020.

11   Q.    And what was the small amount?

12   A.    He refers to trying to send $10 at that point.

13   Q.    Did he later confirm that he had, in fact, sent an amount?

14   A.    Yes.

15   Q.    What was the amount that was sent?

16   A.    55.

17   Q.    And was it your understanding that that was $55?

18   A.    That's correct.

19   Q.    And this was contained in e-mails between UC2 and

20   Philippine girls, right?

21   A.    That's correct.

22   Q.    And you reviewed all of those prior to your execution of

23   the search warrant?

24   A.    Yes.

25   Q.    Did UC2 make an excuse as to why he wasn't able to send

1  the full amount?

2  A.   Yes.

3  Q.   What was that?

4  A.   He indicates that he's still waiting on other funds to be

5  made available on Coinbase.

6  Q.   And was there some reluctance to send the full amount to

7  someone who had access to children, or purported access to

8  children?

9  A.   Yes.

10 Q.   What was that?

11 A.   Well, we don't want the child to be abused and end up

12 getting a video for what would amount to the full amount of

13 what they were asking for.

14      THE COURT:  So in other words, if you paid the full

15 amount, you were afraid that a child could have been abused?

16      THE WITNESS:  That's correct.

17      THE COURT:  Okay.

18 BY MS. KARASE:

19 Q.   Up until this $55 transfer, had the UC sent any money to

20 Philippine girls?

21 A.   No.

22 Q.   Once HSI New York had the -- well, or the Bitcoin address

23 that was provided by the Philippine girls e-mail user, what did

24 they do with it?

25 A.   They conducted blockchain analysis.

1    Q.    Now --

2            THE COURT:   What was that called?

3            THE WITNESS:   Blockchain analysis.

4    BY MS. KARASE:

5    Q.    And did you speak with analysts who conduct this analysis

6    in preparation of your affidavit?

7    A.    Yes.

8    Q.    And did they explain to you how they conducted this

9    analysis?

10   A.    They did.

11   Q.    And did you summarize that in paragraph 22(i) --

12   A.    Yes.

13   Q.    -- of the search warrant affidavit?

14   A.    I did.

15   Q.    Were they able to monitor transactions that were

16   associated with the Bitcoin address that was provided to the

17   undercover by the Philippine girls e-mail user?

18   A.    Yes.

19   Q.    And did they identify any related websites that were part

20   of that same wallet?

21   A.    Related Bitcoin addresses, yes.

22   Q.    Okay.   And the related Bitcoin address, was that of

23   interest to the analysts --

24   A.    Yes.

25   Q.    -- in New York?

1   A.   Yes, it was.

2   Q.   Why?

3   A.   Because a transaction was identified that occurred on

4   approximately October 29th of 2019 involving the second

5   attributed Bitcoin address.

6   Q.   And October 29th, just so that we have some context here,

7   that was just about a month after the UC began communication

8   with Philippinegirls@secmail.pro, right?

9   A.   That's correct.

10   Q.   And they were able -- the analysts were able to tell

11   historically that there had been a 56 -- 55, $56 transfer that

12   had come in to a related Bitcoin address?

13   A.   That's correct.

14   Q.   What did HSI New York do next in order to investigate

15   that?

16   A.   At that point they issued a subpoena to Coinbase, or a

17   summons, in fact, to Coinbase, for information on that specific

18   transaction that they identified.

19   Q.   And what did they learn about it?

20   A.   They learned that the account that was responsible for the

21   transaction belonged to Mark Manuel Marino.

22   Q.   And did you describe this in paragraph 22(l) of your

23   affidavit?

24   A.   I did.

25   Q.   And did you review the information that Coinbase provided

1    to HSI New York?

2    A.    Yes.

3    Q.    Specifically, what did you determine, through your review,

4    and what did HSI New York already know who that account

5    belonged to?

6    A.    After my review of the documents, it was clear that

7    Mr. Marino was the owner of the Coinbase account that caused

8    that transaction on October 29th of 2019.

9    Q.    And when you say it was clear, did he provide his true and

10   accurate address to Coinbase?

11   A.    Yes.

12   Q.    And did he provide his date of birth to Coinbase?

13   A.    Yes.

14   Q.    Did he also provide his driver's license number and a

15   photo of his driver's license?

16   A.    Yes.

17   Q.    And did you confirm through your investigative research

18   that that was his actual -- the defendant Marino's actual

19   driver's license?

20   A.    Yes.

21   Q.    Did it also include an IP address that resolved back to

22   the 6936 Longleaf Branch Drive address?

23   A.    Yes.

24   Q.    Did Coinbase provide a history of transactions that

25   Mr. Marino had engaged in in response to the subpoena?

1    A.    Yes.

2    Q.    And did you review those?

3    A.    I did.

4    Q.    I'm handing you what I've marked as Government's Exhibit 3

5    for identification.

6              Do you recognize that?

7    A.    I do.

8    Q.    And what is that?

9    A.    That is a copy of the transactions provided by Coinbase of

10   Mr. Marino's account.

11   Q.    Now, do you see there's some highlighted portion?

12   A.    I do.

13   Q.    Was that highlighted portion there when you requested the

14   results -- or when HSI New York requested the results of the

15   subpoena?

16   A.    I would assume no.

17   Q.    That was something that was done later?

18   A.    Correct.

19   Q.    But otherwise the results were as received from Coinbase?

20   A.    Yes.

21             MS. KARASE:   At this time I'd move for admission of

22   Government's Exhibit 3 into evidence.

23             MR. BELL:   No objection for the purposes of the

24   hearing.   I think the same relevancy as to the probable cause

25   would be there, Your Honor, but for purposes of the hearing, no

 1    objection.

 2          THE COURT:   All right.   Government's Exhibit 3 is

 3    received.

 4          (Government's Exhibit 3 was received in evidence.)

 5    BY MS. KARASE:

 6    Q.   And let's start with the highlighted portion.

 7          What does the highlighted section show?

 8    A.   The highlighted section shows that on October 29th of

 9    2019, Mr. Marino sent what would be equivalent to approximately

10    50 -- $56 worth of Bitcoin to a Bitcoin address, and within

11    notes of that transaction were an e-mail address

12    FHinami@secmail.pro, and then "5 pics," p-i-c-s.

13    Q.   And you mention approximately $56.38.

14          Can you tell us just briefly your understanding of

15    how it works when there is an amount that's in Bitcoin and then

16    that gets converted to U.S. dollars?

17    A.   Generally you have to purchase Bitcoin to be able to send

18    it.

19    Q.   And does the -- I'm sorry.  Go ahead.

20    A.   And then when you decide on what amount you send -- you're

21    going to send, you take that out of your wallet and you send

22    it.

23          And the valuation of the Bitcoin to the U.S. dollar,

24    just like it would be the U.S. dollar to the euro or the peso

25    or the lira, fluctuates on a daily basis.

1  Q.   All right.  And so there's some approximation that goes

2  when we're talking about the amount in U.S. dollars that was

3  sent on October 29th; is that right?

4  A.   That's correct.

5  Q.   And specifically turning back to Government's Exhibit 1,

6  the search warrant affidavit, paragraph 22(i), is there a

7  reference that the amount of the transfer that took place on

8  October 29th was approximately 55 U.S. dollars?

9  A.   Correct.

10  Q.   On the date that the Coinbase subpoena response was

11  provided, though, was that valuation $56.38?

12  A.   That's correct.  That's what the cost of sending that --

13  that's what it cost Mr. Marino to send the specific amount of

14  Bitcoin.  It cost him $56.38 to send the amount of .00599236

15  Bitcoin.

16  Q.   All right.  And to be clear, you are not a Bitcoin expert.

17  A.   I am not.

18  Q.   You've learned about Bitcoin from your discussions with

19  the analyst, correct?

20  A.   That's correct.

21  Q.   And based on those discussions, you have prepared the

22  affidavit and prepared for your testimony here today, right?

23  A.   That's correct.

24  Q.   Once you had what is Government's Exhibit 3, the results,

25  did HSI New York -- well, first, let's talk more about the

1  highlighted portion.

2         You mentioned that there was a timestamp or there was

3  a date of 10/29/19 for the $56.38 transaction, right?

4  A.   That's correct.

5  Q.   What was the Bitcoin website that that money was being

6  sent to?  And you can just give us the first five letters.

7  A.   The Bitcoin address that the money was sent to was 1G7V,

8  as in Victor.

9  Q.   Okay.  And is there a section, when making a transaction

10 over Coinbase, that an individual can enter notes?

11 A.   Yes.

12 Q.   And was there a note associated by -- associated with this

13 transaction entered by the sender?

14 A.   Yes.

15 Q.   What was the note?

16 A.   The note was a secmail.pro e-mail address, which is

17 FHinami@secmail.pro, and then "5 pics," p-i-c-s.

18 Q.   Have you seen the abbreviation pics before?

19 A.   Yes.

20 Q.   And is that through your training and experience working

21 child exploitation offenses?

22 A.   Yes.

23 Q.   And what does pics stand for in your experience?

24 A.   Pictures.

25 Q.   Once you had these results, did HSI New York note any

1  other transactions that also included the secmail.pro extension

2  in the notes section related to transactions?

3  A.    Yes.

4  Q.    And what dates were those transactions made?

5  A.    October 23rd of 2019 and October 25th of 2019.

6  Q.    And looking at the "currency to," did the Bitcoin address

7  match for each of those transactions?

8  A.    Yes.

9         MR. BELL:  I'm sorry, Judge.  Maybe -- was that to

10  the sender or to the receiver or did you -- the Bitcoin address

11  for --

12         MS. KARASE:  The "currency to" column.

13         MR. BELL:  "To."  Okay.

14         THE WITNESS:  The Bitcoin address that the money was

15  sent to on October 23rd and October 25th match.

16  BY MS. KARASE:

17  Q.    And as you were finalizing your preparation of the

18  affidavit, did you discuss what significance, if any, these

19  transactions may have to the Philippine girls e-mail user?

20  A.    Yes.  The Bitcoin that was sent in all those three

21  addresses that I just mentioned was cashed out by the same user

22  at the same place, which indicates that the user -- only that

23  user controls those two separate Bitcoin addresses.

24  Q.    All right.  And so you just said three Bitcoin addresses,

25  so let's see if we can be as clear as possible, and I have a

1   diagram which may help as well, but first let's try it just

2   with our words.

3   A.   The three transactions, October 23rd, October 25th, and

4   October 29th, were sent to two Bitcoin addresses.  That Bitcoin

5   was later cashed out by one user who could only control those

6   two separate Bitcoin addresses.  So they're all attributed to

7   the same person and in control of that person.

8   Q.   Now, with respect to the $55 that was sent by the HSI New

9   York undercover, would that be a third different Bitcoin

10  address?

11  A.   Yes.  That was the original address.

12  Q.   Was that original address in the same Bitcoin wallet, so

13  more closely connected to the October 29th Bitcoin address to

14  which Mr. Marino sent money?

15  A.   That is correct.

16  Q.   And did the analyst prepare a diagram that was useful to

17  you in understanding this?

18  A.   Yes.

19  Q.   I'm handing you what's been marked as Government's Exhibit

20  4 for identification.

21        Is that document what was prepared?

22  A.   Yes.

23        MS. KARASE:  And at this time, Your Honor, I'd move

24  for admission of Government's Exhibit 4.

25        MR. BELL:  No objection for purposes of this hearing,

1    Judge.

2          THE COURT:  Exhibit 4 is admitted.

3        (Government's Exhibit 4 was received in evidence.)

4    BY MS. KARASE:

5    Q.   Okay.  Walk us through this, Agent Luedke.

6    A.   Okay.  On the top portion all the way to the left is the

7    initiation of this whole -- whole deal.  The HSI UC test

8    transaction is sent to the Bitcoin address that was provided

9    during UC communication, which starts with 1GHN, as in Nora.

10          HSI --

11   Q.   And let me stop you there.

12          So the Bitcoin address that was provided to the UC,

13   both UC accounts, was that the 1GHNW address?

14   A.   That's correct.

15   Q.   Okay.  And it ends in the MZG6, it looks like?

16   A.   That's correct.

17   Q.   Okay.  Continue, please.

18   A.   Through blockchain analysis done by HSI New York, they

19   found a second Bitcoin address attributed to the same owner,

20   which begins with 1G7 Victor.

21   Q.   And was a summons issued at -- were they able to determine

22   that -- that there was money sent via Coinbase to that Bitcoin

23   address?

24   A.   Yes, through the second one beginning 1G7 Victor.

25   Q.   And did that result in an administrative subpoena being

1  sent to Coinbase to learn more about that sender?

2  A.   Yes.  With the administrative summons was how we

3  identified Mr. Marino's Coinbase account.

4  Q.   And so comparing side by side Government's Exhibit 3 and

5  Government's Exhibit 4, the address after the slashes, I guess,

6  where you just were is 1G7 Victor, right?

7  A.   That's correct.

8  Q.   And that's the one that shows up in the "currency to"

9  column associated with the 10/29/2019 transaction?

10  A.   That is correct.

11  Q.   And, again, that has the notation "5 pics," which you

12  included in your search warrant affidavit.

13  A.   That's correct.

14  Q.   All right.  Continue onward, please, through the diagram.

15  A.   Okay.  So after receiving the information from Coinbase,

16  the additional transactions on October 23rd and October 25th

17  were identified as similar for a couple of reasons.  No. 1, it

18  has the same secmail.com -- excuse me, dot pro e-mail address

19  of FHinami@secmail.pro on all three transactions.

20          In addition, additional blockchain analysis by HSI

21  New York indicates that the Bitcoin that was sent in those

22  three transactions was cashed out by one person, who could only

23  have control of those Bitcoin addresses.

24  Q.   All right.  And I didn't ask you this before, but what

25  were the dollar equivalents of the Bitcoin transactions that

1    were sent to this other -- the 13T1Z Bitcoin address?

2    A.   The October 23rd amount was $172.09 worth of Bitcoin.   The

3    October 25th amount was $909.07 worth of Bitcoin.

4    Q.   And you had this information prior to your execution of

5    the search warrant; is that right?

6    A.   That is correct.

7    Q.   Now, you didn't reference the other two transactions in

8    your search warrant.   By other two -- let me be clear -- you

9    did not reference the October 23rd or 25th transactions in your

10   search warrant affidavit, did you?

11   A.   I did not.

12   Q.   Why not?

13   A.   At that time -- at the time of the production of the

14   information by Coinbase, it wasn't yet clear what the -- what

15   the relevance of those transactions were.

16   Q.   Were they contained in the same wallet with the Bitcoin

17   address provided to the UC?

18   A.   No, they were not.

19   Q.   And the FH -- or the FHinami, at the time that you

20   executed the search warrant, did you know what FHinami was?

21   A.   I did not.

22   Q.   But the secmail.pro was significant to you; is that right?

23   A.   That's correct.

24   Q.   And just so that there's no confusion, take a look at the

25   notes section connected to the 10/25/19 transaction.

1   A.   Okay.

2   Q.   Do you notice an anomaly there with respect to the e-mail

3   address listed there?

4   A.   Yes.  The one on the 25th says FHinami@secmail.com.

5   Q.   And that's different than the secmail.pro; is that right?

6   A.   That's correct.

7   Q.   And do you know why that is?

8   A.   I do not.

9   Q.   Now, you also discuss in your search warrant affidavit

10  some of the terms that are utilized in interpreting this

11  relationship between the Bitcoin websites, right?

12  A.   Correct.

13  Q.   Specifically, in paragraph 6(p), as in Paul, through (u);

14  is that right?

15  A.   Yes.  Let me just look through.

16       That is correct.

17  Q.   Agent Luedke, did you prepare a very scaled-down

18  chronology at my request for purposes of today's hearing?

19  A.   Yes.

20  Q.   I'm handing you what I've marked as Government's Exhibit 5

21  for identification.

22  A.   Thank you.

23  Q.   Do you recognize that?

24  A.   I do.

25  Q.   What is it?

1    A.   It's the chronology you requested that I create.

2         MS. KARASE:  And at this time, Your Honor, I'd move

3    for admission of Government's Exhibit 5.

4         MR. BELL:  No objection, Your Honor.

5         THE COURT:  Government's Exhibit 5 is received.

6      (Government's Exhibit 5 was received in evidence.)

7    BY MS. KARASE:

8    Q.   And as I'm looking at this, as we had just covered in the

9    testimony about the notes in the section for the 10/25/2019

10   transfer, it actually -- it says FHinami@secmail.com, not

11   secmail.pro, as is indicated in the chronology; is that right?

12   A.   That is correct.  That's my mistake.

13   Q.   Okay.

14        THE COURT:  You want to just have him cross through

15   that?

16        Do you have any objection to that?

17        MR. BELL:  No.  He can correct it.

18        THE COURT:  Just make a --

19        THE WITNESS:  All right.  Initial as well?

20        THE COURT:  Yes, if you would, please.

21        That way it won't get lost in the transcript.

22        THE WITNESS:  (Complies.)

23        THE COURT:  All right.  Thank you.

24        MS. KARASE:  Thank you.

25   BY MS. KARASE:

1    Q.    And this chronology, does it explain the sequence or the

2    proximity of Mr. Marino's transactions in the context of HSI

3    New York's investigation?

4    A.    Yes.

5    Q.    Now, after you receive the lead from HSI New York and you

6    get your investigation under way to supplement what they had

7    done and to keep the investigation moving forward, did you

8    issue a second subpoena to Coinbase?

9    A.    I did.

10   Q.    And were you -- what were you seeking through that second

11   subpoena?

12   A.    Any additional transactions that had occurred from

13   Mr. Marino's Coinbase account.

14   Q.    Okay.  And I keep saying subpoena, but they're actually

15   administrative summonses that you were issuing, correct?

16   A.    That's correct.

17          THE COURT:  And when did you issue that one?  Is it

18   on the . . .

19          THE WITNESS:  I don't have the specific date or the

20   summons in front of me.

21   BY MS. KARASE:

22   Q.    In any event, you did not get results from that summons in

23   advance of your execution of the search warrant, did you?

24   A.    I did not.  I believe I issued the summons in July of this

25   year.

1   Q.   And the date that the warrant was executed was which date?

2   A.   June 17th of this year.

3   Q.   Now, just to call your attention to the second-to-last

4   item on your chronology, what is that item?

5   A.   It reads, "Marino sends Bitcoin twice" on June 16th of

6   2020.

7   Q.   And was that something that was of investigative interest

8   to you?

9   A.   Yes.

10  Q.   However, did you learn of that after you had already

11  executed the warrant?

12  A.   Yes.

13  Q.   All right.  So that was not something that you had access

14  to at the time that you executed the search warrant.

15  A.   That's correct.

16  Q.   However, the other items on the chronology were things

17  known to you in advance; is that right?

18  A.   That's correct.

19  Q.   When you executed the search warrant at Mr. Marino's

20  residence, was there a probable cause arrest made at that time?

21  A.   Yes.

22  Q.   Who was arrested?

23  A.   What's that?

24  Q.   Who was arrested?

25  A.   Mr. Marino.

1  Q.   Was there a complaint affidavit that was prepared in

2  support of that -- of that arrest?

3  A.   Yes.

4  Q.   And did you prepare the affidavit?

5  A.   Yes.

6  Q.   You were the affiant?

7  A.   I was.

8  Q.   Is it common to do an on-site preview when executing a

9  residential search warrant?

10  A.   Yes.

11  Q.   What is an on-site preview?

12  A.   Our forensic -- our computer forensic analysts will

13  preview each and every device, if possible, to see if there are

14  any child sexual abuse material files present on those devices.

15  Q.   And was such a preview done here?

16  A.   Yes.

17  Q.   And were there child sexual abuse material found resident

18  on Mr. Marino's devices?

19  A.   Yes.

20  Q.   Did he also acknowledge that he knowingly possessed child

21  sexual abuse material on his devices?

22  A.   Yes, he did.

23  Q.   And did that factor in to the basis for the complaint

24  affidavit that you prepared?

25  A.   Yes.

1   Q.   Now, this was how many months after the October 29th

2   transaction?

3   A.   Approximately seven-and-a-half months.

4   Q.   Okay.  And have you reviewed the motion to suppress filed

5   in this case?

6   A.   I have.

7   Q.   And there were some references that it was a ten-month

8   discrepancy; is that right?

9   A.   That's correct.

10  Q.   Between the timing of the transfer on October 29th and the

11  execution of the search warrant?

12  A.   That's correct.

13  Q.   Okay.  And -- and you found -- well, did you find a

14  collection of child pornography at Mr. Marino's residence on

15  his devices?

16  A.   Yes.

17  Q.   Now, you mentioned that you have been working child

18  exploitation offenses for the past three years?

19  A.   Approximately three years, yes.

20  Q.   And understanding that you've previously testified that

21  you've worked a myriad of types of offenses, I want to narrow

22  your focus to child pornography investigations.

23          Have you encountered, more often than not, resident

24  files of child sexual abuse material when executing child

25  pornography search warrants?

1  A.    Yes.

2  Q.    And did that factor in to your inclusion of the language

3  that is being challenged here today about collectors of child

4  pornography?

5  A.    Yes.

6          MS. KARASE:  Your Honor, unless the Court has any

7  questions, that's all I have for Special Agent Luedke at this

8  time.

9          THE COURT:  All right.  Well, let me just ask a

10  couple of questions, and then we'll take probably about a

11  ten-minute recess.

12          Agent Luedke, let me ask you this.  Now, when you

13  prepare this affidavit, or you prepared this particular

14  affidavit, does anyone in your office, such as a supervisor or

15  someone else with whom you work, review the affidavit?

16          THE WITNESS:  Not for this particular one, but that

17  is common practice, to have whoever the person that I have

18  spoken to or with or provided me the information to review it.

19          THE COURT:  All right.  And then once you have a

20  draft of your affidavit, do you submit it to someone at the

21  United States Attorney's Office, an assistant U.S. attorney, to

22  review?

23          THE WITNESS:  Yes.

24          THE COURT:  Did you do that in this case?

25          THE WITNESS:  Yes, I did.

1         THE COURT:  And to whom did you -- did you submit it

2  to?

3         THE WITNESS:  AUSA Kelly Karase.

4         THE COURT:  All right.  And so then once Ms. Karase

5  had the affidavit, at some point during your discussions, then,

6  did she indicate to you that she thought there was probable

7  cause?

8         THE WITNESS:  She did.

9         THE COURT:  All right.  Let's go ahead and take a

10  ten-minute recess.

11         COURT SECURITY OFFICER:  All rise.

12    (Recess from 10:50 a.m. until 11:15 a.m.; all parties

13  present.)

14         COURT SECURITY OFFICER:  All rise.  This Honorable

15  Court is now in session.

16         Please be seated.

17         THE COURT:  All right.  We're back in Mr. Marino's

18  case, 3:20-cr-94(S2)-J-32JRK.

19         Mr. Marino's present, and Mr. Bell was just about to

20  cross-examine Agent Luedke, so Agent Luedke is resuming his

21  place on the witness stand.

22         And, Agent Luedke, I'll remind you, sir, you're still

23  under oath.

24         THE WITNESS:  Yes, sir.

25         THE COURT:  All right.  Mr. Bell?

1        MR. BELL:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. BELL:

4    Q.   Agent, if we could, let me start with something relatively

5    easy, if I could direct your attention to Exhibit 4, which

6    would be the chart of the Coinbase transaction.

7    A.   Yes, sir.

8    Q.   And you mentioned that that had been -- you have a copy

9    available?

10   A.   Yes, sir.

11   Q.   All right.  You mentioned the analyst had prepared that

12   for you.

13   A.   Yes, sir.

14   Q.   When was that done?

15   A.   Approximately -- sometime in June, I believe.

16   Q.   Of 2020?

17   A.   Yes, sir.

18   Q.   After the search warrant was executed?

19   A.   No.  I believe just previous to it.

20   Q.   All right.  Well, in other words, did you have it

21   available at the time that the affidavit was prepared?

22   A.   Yes, I believe so.

23   Q.   Okay.  It was not -- it was to help you refer to it in

24   preparation of the affidavit?  In other words, you didn't

25   provide this information to the Court itself in the form of a

1   chart.

2   A.   No, sir.

3   Q.   All right.  Also, I think right at the end of your

4   testimony, you described your experience in the course of

5   executing search warrants for child pornography and indicated

6   that it wasn't uncommon in your experience to find images or

7   files related to child pornography on electronic devices.

8   A.   That's correct.

9   Q.   In other words, they were physically present at the

10  time -- at least according to the forensic people, at the time

11  that you executed the search warrant.

12  A.   Either physically present or present at one point --

13  Q.   All right.

14  A.   -- on that device.

15  Q.   Well, there's a difference between the term, you

16  understand -- resident files, files of images of child

17  pornography, is different from a file that might suggest or be

18  indicative of a collector.  The terms are not synonymous.

19  A.   Can you rephrase that for me?

20  Q.   Essentially, a resident file on a -- a resident file of

21  child pornography on an electronic device that you're examining

22  does not in and of itself constitute a -- evidence that a

23  person is a collector of child pornography.

24  A.   I mean, it depends on how many photos there are, I

25  guess --

1   Q.   Right.

2   A.   -- would be my answer to that.

3   Q.   Well, and it depends on the number of when they got there.

4        For example, a resident file may mean it had been put

5   there yesterday.

6   A.   Could.

7   Q.   Yeah.  So essentially the fact that there is an image of

8   child pornography on a file [verbatim] doesn't make a -- does

9   not make one a collector, necessarily.

10  A.   If you're referring to one single file on a single device,

11  would I characterize that as a collector?  It would really

12  depend on the totality of the circumstances --

13  Q.   Sure.

14  A.   -- of the investigation.

15  Q.   And you mentioned -- I guess you -- the search warrant was

16  executed in June?

17  A.   That's correct.

18  Q.   The Coinbase transaction, which essentially is the essence

19  of the probable cause in this case, was on October 29th.

20  A.   That's correct, of 2019.

21  Q.   2019.

22        So essentially that's about seven-and-a-half months'

23  difference?

24  A.   That's correct.

25  Q.   I may have counted ten in the motion, but it's closer

1  to -- seven-and-a-half months would be a more accurate figure.

2  A.   Yes, sir.

3  Q.   All right.   One other thing I may have mentioned in the

4  motion itself, that the search warrant was executed on June

5  18th.   It was June 17th.

6  A.   That's correct, sir.

7  Q.   All right.   Now, let me turn to a couple other points, if

8  I could.

9       You testified concerning the New York investigation,

10  which essentially the agents in New York communicated all this

11  information to you.

12  A.   That's correct.

13  Q.   And the testimony was that in February -- I believe

14  it's -- just for reference purposes, it's going to be --

15  paragraph -- is it 26(h)?   February 20th is the reference

16  point, the first reference to the UC people in New York trying

17  to initiate a Bitcoin transaction with the

18  Philippinegirls.secpro [verbatim] address?

19       THE COURT:   Which page is that?

20       MR. BELL:   It's page 31 of the -- it's 31 of the

21  search warrant.   I believe it's 26(h).

22       THE WITNESS:   I have it in front of me.

23  BY MR. BELL:

24  Q.   Okay.   And so essentially it's February of 2020.   One of

25  the two UC accounts -- UC -- undercover operations in New York

1    tries to send some money to a Bitcoin address associated with

2    the -- designated by the Philippinegirls.sec whatever address,

3    correct?

4    A.   Correct.

5          THE COURT:   Now, it's 20 -- are you talking about

6    22(h)?  I thought you said 26(h).

7          MR. BELL:   I thought I did too.

8          THE COURT:   It's 22.

9          MR. BELL:   Sorry about that.

10          THE COURT:   Make sure we got the right paragraph.

11          MR. BELL:   22(h).

12          THE COURT:   Page 31, paragraph 22(h).  All right.

13   BY MR. BELL:

14   Q.   February 6th, 2020.

15   A.   That's correct.

16   Q.   All right.  So essentially your testimony here today was

17   that it was for $55.

18   A.   That's the amount of U.S. dollars' worth of Bitcoin that

19   the HSI New York agent sent.

20   Q.   And as you described for the Court, you know, needless to

21   say, law enforcement was not willing to send the full amount

22   to, you know, potentially further an act of sexual child abuse,

23   so they sent what was characterized as a test amount, correct?

24   A.   That's correct.

25   Q.   All right.  And essentially -- and also it's not uncommon,

1   I guess, in dealing with individuals on the dark web that

2   people may not be who they represent themselves to be, and they

3   may rip people off.

4   A.   Correct.

5   Q.   So a test amount would provide some opportunity to (1)

6   make sure the transaction went through as designated.

7   A.   Correct.

8   Q.   And (2), as you described, to essentially deter or prevent

9   an actual act of child abuse from occurring.

10  A.   Correct.

11  Q.   In other words, it wasn't for the exchange of child

12  pornography.

13  A.   The HSI New York transaction was not --

14  Q.   Yeah.

15  A.   -- for the exchange of pornography, that's correct.

16  Q.   All right.  Now, essentially this $55 was the same amount

17  that your investigation revealed that is attributed to

18  Mr. Marino having sent to a site connected with the same user.

19  A.   A second Bitcoin address.

20  Q.   A second Bitcoin address --

21  A.   That's correct, yes.

22  Q.   -- that the investigation reveals is controlled at least

23  by the same entity that controls the Philippinegirls.sec.com

24  [verbatim] e-mail address, correct?

25  A.   That's correct.

1   Q.   Now, just to be a hundred percent clear, the $55 that was

2   attrib- -- that Mr. Marino's money converts to there in U.S.

3   dollars, $56, was essentially the same amount as the test

4   amount.

5   A.   It's the same U.S. dollar amount --

6   Q.   Same thing, yeah.

7   A.   -- or essentially the same, yes.

8   Q.   And the magistrate court was not -- that is not contained

9   in the affidavit, correct?

10  A.   What isn't?

11  Q.   The amount.  The amount of test money sent by the UC to

12  the Bitcoin address provided by the user.

13  A.   That's correct, sir, yes.

14  Q.   And just to be clear from the outset, directing your

15  attention while we're here -- this is going to be 22(i), page

16  31, right at the bottom.

17       The representation to the magistrate judge is, "The

18  transaction hash ID was associated with a payment that converts

19  to approximately $55 to the second Bitcoin address on October

20  29th," is what it says --

21  A.   That's correct.

22  Q.   -- correct?

23       All right.  Essentially that Bitcoin address is

24  different than the one that the UC target -- target or the UC

25  address sent their Bitcoin test money to, correct?

1   A.   That's correct.

2   Q.   And essentially you don't know what the e-mail address or

3   the site -- at the time that the affidavit was done on October

4   29th [verbatim], you don't know that it's -- it's the -- it is

5   not the Philippinegirls.secpro address that the UC people had

6   been communicating with, correct?

7   A.   The Philippinegirls@secmail.pro e-mail address is the only

8   e-mail address that the UC communicated with.

9   Q.   All right.  So in other words, it's -- you didn't know at

10  that time whether -- whether the second Bitcoin address was

11  going to Philippinegirls.secpro or some other e-mail address

12  altogether.

13  A.   They don't -- the e-mail addresses and the Bitcoin

14  addresses have nothing to do with each other.

15  Q.   I understand that.

16         But the testimony -- at least what's contained in the

17  affidavit is that there was a separate Bitcoin address that the

18  money was sent to.

19  A.   Correct.

20  Q.   There's no representation in the affidavit that Mark

21  Marino had had any contact with Philippinegirls.secpro.

22  A.   That is correct.

23  Q.   So let's come back, if I can, to the beginning a little

24  bit, touch on a couple points.

25         You mentioned that when you executed the search

1   warrant on June 17th, the -- you had occasion to interview

2   Mr. Marino during the execution of the search warrant.

3   A.   Correct.

4   Q.   You and, I believe there was one other agent took him in

5   another room and essentially questioned him about the nature of

6   the interview and the nature of the investigation.

7   A.   That's correct.

8   Q.   And he made statements that you would characterize as

9   inculpatory.

10  A.   Yes.

11  Q.   If I could, I'd like to spend a few minutes -- the judge

12  had asked you a few questions, and in general, I want to spend

13  a few minutes talking about the warrant preparation process.

14  A.   Sure.

15  Q.   You didn't draft this entire document from whole cloth.

16  You didn't sit down on your word processor and draft this

17  document.

18  A.   I mean, I wrote the affidavit, correct.

19  Q.   Well, you --

20  A.   It's done with a go-by as a starting point of a previous

21  affidavit.

22  Q.   A template, a --

23  A.   Sure.

24  Q.   A template, a draft, you know, some model for you to use.

25  A.   Sure.

1  Q.    I mean, essentially the structure of it was kind of

2  provided to you, and you, you know, changed -- drafted it

3  according to the specifics of this case, correct?

4  A.    Sure.

5  Q.    All right.  For example -- and you said -- is that

6  provided in your office, or do you get it from the U.S.

7  Attorney's Office, or is it one that's used in your office with

8  the approval of the United States Attorney's Office here?

9  A.    I use -- when I draft an affidavit, I usually go to the

10 most recent one I've done before that and use that as a

11 starting point.  And I have drafted numerous affidavits in my

12 career.

13 Q.    All right.  All right.  But you've got a basic template

14 that you operate from.

15 A.    Correct.

16 Q.    And you know essentially at the end of the process you're

17 going to go to the U.S. attorney -- the assistant AUSA and, you

18 know, seek their approval before you submit it to the judge.

19 A.    It's not at the end of the process; it's at the beginning.

20 It's a collaborative effort with the other agents that I spoke

21 to during that investigation and AU SA Karase or another AUSA.

22 Q.    All right.  But essentially the model's there for you to

23 use, and it's an interactive process between you and the

24 prosecutor.

25 A.    Yes.

1    Q.    And the other agents.

2    A.    Yes.

3    Q.    The first section, the first four pages here of your

4    affidavit, is -- summarizes your experience as a law

5    enforcement officer.

6    A.    Correct.

7    Q.    Maybe it's not in here or -- but anyway, I noticed there's

8    no specific reference that you'd ever been an affiant in a

9    search warrant for a child pornography case prior to this one.

10           Is that -- is that true, or is that a simple

11   omission?

12           Let me rephrase it.  Prior to this affidavit, had you

13   ever been the affiant of a search warrant for a child

14   pornography case?

15   A.    Yes.

16   Q.    Okay.  But that is not in the affidavit.

17   A.    Let me take a quick look, and I will . . .

18           THE COURT:  Take your time.

19   (Pause in proceedings.)

20           THE WITNESS:  There is no specific sentence that says

21   I have been the affiant on a, quote/unquote, child pornography

22   affidavit.

23           But I have -- it says, "I have investigated and

24   assisted in the investigation of criminal matters involving the

25   exploitation of children," and then it lays out the statutes

1  that involved --

2  BY MR. BELL:

3  Q.    Sure.  I --

4  A.    -- including the possession and distribution of child

5  pornography.

6  Q.    Just to clarify, you did mention, in response to Judge

7  Klindt's question, that typically before you approach the

8  magistrate judge for execution of the warrant, you would seek

9  the approval of your supervisor.

10         Is that standard SOP?

11  A.   My supervisor knows what I'm doing, but we don't run a

12  specific affidavit by the supervisor unless they ask.

13  Q.    Okay.

14         THE COURT:  I thought he said he runs it by the other

15  agent that he's working with and getting the information from

16  routinely.  I thought that was his testimony, not that he

17  routinely ran it by his supervisor, but you can ask him about

18  that.

19         MS. KARASE:  Yes, Your Honor.  I would request that

20  clarification as well, as my understanding is the same as

21  yours.

22         MR. BELL:  Well, maybe I'm conflating two answers,

23  Judge.  I thought he answered that he didn't get approval of

24  his supervisor, and then he said he -- and in response to my

25  question, he answered a different -- differently.

1          THE COURT:  You said to him something to the effect,

2  and I could read it here if we want to do it -- why don't I go

3  back and just read to you what you said.

4             "Just to clarify, you did mention, in response to

5  Judge Klindt's question, that typically before you approach the

6  magistrate judge for execution of the warrant, you would seek

7  the approval of your supervisor."

8          That wasn't my recollection of his -- his testimony.

9  My recollection was that he routinely seeks the agent that he's

10  getting the information from or working with and attributing

11  information to that he typically runs it by.

12          MR. BELL:  And --

13          THE COURT:  Not that he typically runs it by his

14  supervisor.

15          MR. BELL:  Judge, I completely agree with you.  That

16  is not the question or the answer that you asked and I thought

17  he answered.  I may have kind of paraphrased it a bit

18  inartfully.

19          I understood him, and I'll ask him directly.

20          THE COURT:  Yeah.  Just go ahead and ask -- just ask

21  him directly.  You don't have to worry about what I asked him.

22          MR. BELL:  Okay.

23          THE COURT:  You just ask him anything you want.

24          Go ahead.

25  BY MR. BELL:

1  Q.   Did you seek the approval of your supervisor before

2  speaking with Ms. Karase and the magistrate judge to sign off

3  on this affidavit?

4  A.   No.

5  Q.   Okay.

6            THE COURT:  Well, now, that -- that was really almost

7  two questions because you said your supervisor and Ms. Karase,

8  I thought.  Let's see what you said.

9            "Did you seek approval of your supervisor before

10  speaking" -- oh, speaking with Ms. Karase.  All right.

11           Go ahead.

12           MR. BELL:  I try to keep -- I do -- well, thank you,

13  Your Honor.

14  BY MR. BELL:

15  Q.   All right.  If I could, moving on a little bit, let's --

16  I'm turning to page 11, paragraph 6, of the affidavit.

17           Nope.  I've actually skipped a page because I want to

18  back up just a minute.

19           The second section, starting at about page 3,

20  contains the relevant statutes that bring us together, correct?

21  A.   Page 3 --

22  Q.   Page 3 of the affidavit.

23  A.   Okay.

24  Q.   Statutory authority?

25  A.   Yes, sir.

1   Q.   All right.  And that runs for a couple of pages.  It

2   provides the basic offenses related to child pornography, some

3   of which Mr. Marino was ultimately charged with violating,

4   correct?

5   A.   Correct.

6   Q.   All right.  Then we get to page 6, paragraph 6, which is a

7   definitions section, and this is pretty standard in -- you

8   know, this is not something you have to go back and rewrite

9   every time you prepare an affidavit.  This comes with the --

10  the template that you use.

11  A.   That's correct.

12  Q.   All right.  The first and foremost is -- the definition at

13  6(a) is child erotica, correct?

14  A.   Correct.

15  Q.   And that has been provided, essentially, by whoever, you

16  know, kind of put these things together originally as -- but

17  essentially, child erotica means materials or items that are

18  sexually arousing to persons having a sexual interest in minors

19  but are -- but that are not, in and of themselves, illegal and

20  do not necessarily depict minors in sexually explicit

21  positions, is the definition, correct?

22  A.   Correct.

23  Q.   And there's probably something in the affidavit -- I don't

24  remember the specific part -- and if not, in your experience,

25  it's not unusual, in child pornography-related investigations,

1   to find individuals that might also have child erotica.

2   A.   Correct.

3   Q.   That's a fairly common experience you've had?

4   A.   I mean, my personal -- in my experience, with the more

5   than 20 cases I have involving kind of specifically child

6   pornography offenses, that is not a common thing.  I have seen

7   it before, but I have not -- I wouldn't classify the images

8   that I have viewed as the majority of them being child erotica

9   in all those cases.

10  Q.   Well, you're aware it's common enough, I guess, to be

11  included in the common template that -- essentially to

12  distinguish that from prohibited items.

13  A.   Correct.

14  Q.   And those that you've spoken with that may have been

15  involved, you know, in investigations of this nature a longer

16  period of time and the forensic people may tell you that they

17  oftentimes find what might constitute child erotica in their

18  examinations of electronic devices.

19  A.   Yes, sir.

20  Q.   Now, page 11, back to where I was, we turn to a

21  definition -- definition section, the dark web, and essentially

22  you lay out for the Court an understanding of -- of what the

23  dark web is and how it can be used to essentially hide one's IP

24  address, is the bottom line, is what people that use the dark

25  web are believed to be doing?

1   A.    No, not necessarily.  It's just if you would like to

2   remain anonymous.  It doesn't necessarily mean it will hide

3   your IP address, I don't believe.  I'm sure it can and it will,

4   and that's part of it, but each person has their own reason for

5   accessing the dark web.

6   Q.    All right.  Many of them perfectly legitimate?

7   A.    Could be, yeah.

8   Q.    Page 12, we have cryptocurrency defined, and essentially

9   what's kind of central to this case is the -- some

10  understanding of the concept of cryptocurrency, blockchain, and

11  cospend transactions are defined over the next couple pages,

12  correct?

13  A.    Yes, sir.

14  Q.    And these are definitions that are contained in the

15  template -- or not in one particular template, but you can find

16  them in some other search warrant that's been issued.

17  A.    Yes, sir.

18  Q.    Now, on page 14 we have the cluster analysis definition,

19  which is something that you come back to when you're talking

20  about the specific -- tying the Bitcoin transactions back to

21  Mr. Marino's IP address.

22  A.    Yes, sir.

23  Q.    Now, we get to the next section, which is -- and it runs

24  three pages.  It's titled, beginning at page 15, Computers and

25  Child Pornography, correct?

1   A.    Correct.

2   Q.    And according, I guess -- as you get -- introduce your --

3   the -- introduce the contents of this paragraph, it's based on

4   your personal training and experience, conversations you've had

5   with other experienced law enforcement officers, and forensic

6   examiners.

7   A.    Correct.

8   Q.    And the information contained in this section could be

9   characterized as kind of generic information about the role of

10  computers and why the seizure of computers might result in

11  evidence of crime if they've been used to effect criminal

12  activity.

13  A.    That's correct.

14  Q.    But not all of this is necessarily directly relevant to

15  what you knew had occurred in this case.  For example, page 17,

16  paragraph 13, there's a reference to chat logs.

17         At the time that you prepared this affidavit, you

18  didn't have any evidence that Mr. Marino had engaged in any

19  chats with anybody.

20  A.    That's correct.

21  Q.    The next section is styled Search and Seizure of Computer

22  Systems, beginning on page 18, paragraph 14, and it runs

23  through -- essentially up to probable cause on page 25,

24  correct?

25  A.    No.

1      THE COURT:  Page 20.

2      THE WITNESS:  Page -- yeah, page 20.

3      MR. BELL:  Oh, I'm sorry.  Did I miss one?

4      THE WITNESS:  Page 20, paragraph 15.

5      MR. BELL:  Okay.

6      THE COURT:  The seizure -- search and seizure --

7      MR. BELL:  All right.

8      THE COURT:  -- of computers ends at 19.

9      MR. BELL:  Very good.  Thank you.

10  BY MR. BELL:

11  Q.    All right.  So you've got two pages on, essentially, the

12  computers and computer forensic.  And specifically directing

13  your attention to 14(b), the very last line of page 19, you

14  represent that you know computer forensic techniques can often

15  recover files, including images and videos of child

16  pornography, that have long been deleted from [verbatim] the

17  computer user.

18  A.    Yes.

19  Q.    Your representation.

20      And you've kind of -- people have told you that over

21  the years?

22      I mean, you're not a forensic examiner yourself.

23  A.    I'm not a forensic examiner.

24  Q.    All right.  So essentially you learned that from what

25  others in the field have told you.

1    A.    Yes, and in cases that I've had.

2    Q.    Any idea how current that information is, I mean, how

3    recent any changes or amendments have been made to this section

4    of the affidavit?

5    A.    The entire section?

6    Q.    Just this section concerning deleted computer media.

7    A.    Are you talking about the -- just referring to the last

8    sentence that we were referring to?

9    Q.    Yeah, just the last sentence.

10   A.    How current that is?

11   Q.    Yeah.  I mean, have any modifications been made to that

12   over the last couple years?

13   A.    To that sentence?

14   Q.    Yes.

15   A.    Not that I know of, no.

16   Q.    Have you had any forensic person or anybody else tell you

17   that computer -- changing computer technology makes that

18   proposition less likely to be true than it has in the past?

19   A.    Which proposition are you referring to?

20   Q.    The proposition that -- that computer forensic techniques

21   can recover files, including images and videos of child

22   pornography, that have long been deleted from computer media by

23   the computer user, that that's less true now than it was a

24   number years ago --

25   A.    No.

1  Q.   -- if it was ever true.

2  A.   No.  I'm not totally sure what you're asking, but that

3  sentence, of itself, has not changed in the three years that

4  I've been doing child exploitation cases.

5  Q.   Okay.

6  A.   Or the belief from that sentence, if that makes more

7  sense.

8  Q.   Yeah.  That anybody's told you, "Hey, you know, computer

9  technology has changed, and it's more difficult and less likely

10  that we'll be able to recover deleted files from computer

11  drives," than it may have been X amount of years ago.

12  A.   I don't recall ever having that discussion with any of my

13  forensic analysts, no.

14  Q.   And essentially, I guess, one of the -- one of the

15  purposes that brings us here together, you're aware of the

16  concept of staleness.

17  A.   I am.

18  Q.   Essentially, one of my contentions, and you've known, is

19  that essentially that the information was too old to

20  essentially lead to probable cause that there was likely to be

21  evidence of a crime on the computer.  That's one of my

22  contentions.

23  A.   That's correct.

24  Q.   Now, essentially -- and this provision here, that if the

25  stuff's been deleted essentially suggests that, "Judge, if you

1   give me this warrant and we go look, we'll be able to find this

2   evidence no matter how old it's there," is the logical

3   conclusion of this sentence, correct?

4   A.   I wouldn't say that, no.

5   Q.   All right.

6         THE COURT:  What would you say?

7         THE WITNESS:  To sum up this sentence, there are -- I

8   know that we have techniques that our analysts have used that

9   have found previously deleted images on electronic devices that

10  were seized.

11  BY MR. BELL:

12  Q.   However, science and technology changes.

13  A.   Technology changes, yes.  I don't know -- science, I'm not

14  sure what that has to do with anything, but, yes, technology

15  changes on a daily basis, correct.

16  Q.   And I guess my question, not to be too repetitive, is

17  based on technology, have any of the forensic people told you

18  that "It's more difficult, and sometimes impossible, for us to

19  get deleted files from computers based on the new technology,

20  with the manufacturing and working of computer drives"?

21  A.   No, I have not been told that.

22  Q.   And if that were true, if it wasn't a true statement

23  that -- that seizing a computer and -- and providing -- because

24  evidence, no matter when it would have been put on the system,

25  is still likely to be there, if the -- if the technology and

1  the science behind that is not true, that makes that

2  proposition less likely to have merit; would you agree?

3  A.   You're asking me to answer a question that starts with

4  "if."  I mean, I can't really answer that question.  Each

5  device we look at is independent of any other device we look

6  at, whether it be the same case or a different case, so

7  you're . . .

8  Q.   Well, that may be, but I guess the question -- well, the

9  legal basis to get it and look at it is what we're talking

10 about now.

11 A.   Right.  But you're asking me to answer a hypothetical

12 question which I don't think I can answer, sir.

13 Q.   All right.  If I could move on a little bit, the next

14 section is at page 20, styled Child Pornography Collector

15 Characteristics.

16 A.   Yes, sir.

17 Q.   And essentially, based on your experience, training, and

18 conversations with other experienced agents who investigate

19 cases involving sexual exploitation of children, there are

20 certain -- I'm paraphrasing a little bit -- certain common

21 characteristics present in individuals who collect child

22 pornography, is most of that statement, correct?

23 A.   Correct.

24 Q.   No specific reference in there to having communicated with

25 forensic examiners.

```
 1              THE COURT:  Is that a question?
 2              MR. BELL:  Yes.  I'm sorry.
 3              THE COURT:  Ask him the question.
 4              MR. BELL:  All right.
 5    BY MR. BELL:
 6    Q.    There's no reference in here that you communicated with
 7    forensic examiners in forming your conclusion about common
 8    characteristics of child -- people who collect child
 9    pornography.
10    A.    Forensics examiners, some of them are agents as well.
11    Q.    Okay.  That's the intent.  I mean, earlier you
12    specifically identified forensic examiners, but you didn't
13    here.
14              I just wanted to be clear.  That is your
15    understanding of who constitutes a collector and hoarder of
16    child pornography based on conversations you've had with
17    forensic examiners, not other agents.
18    A.    It's based on conversations with forensics examiners,
19    agents, detectives, police officers, law enforcement personnel.
20    Q.    You have -- have you ever seen literature -- can you
21    direct my attention to any piece or report by a forensic
22    examiner with Homeland Security, FBI, that, hey, we've
23    reviewed, you know, thousands of -- thousands of electronic
24    devices that have been seized as a result of search warrant
25    applications, and we have concluded that, you know, 50 percent,
```

1  or whatever the percent, would constitute collectors of child

2  pornography as that term is defined in this document?

3  A.   I don't have a specific document to point you to, no, sir.

4  Q.   And just directing your attention -- and this is where I

5  may have gotten off track a little bit earlier.

6          On page 21 and paragraph 15(c), there's a specific

7  reference that it's not unusual, at least in your experience,

8  that individuals -- individuals who share information and trade

9  depictions of child pornography and child erotica as a means of

10  gaining trust, experience, and support.

11          So presumably that means it's not unusual for, you

12  know, agents in this field to find child erotica.

13  A.   I don't quite understand your sentence.  The sentence

14  reads, "Many individuals who collect child pornography often

15  seek out like-minded individuals, either in person or on the

16  Internet, to share information and trade depictions of child

17  pornography and child erotica as a means of gaining status,

18  trust, acceptance, and support."

19          I'm not sure how that correlates with whether or not

20  I'm going to find child erotica on an electronic device.

21  Q.   Well, it implies to me that if a person's a collector and

22  hence that they're likely to hoard and keep their collection,

23  they may have both child pornography and child erotica, is what

24  it means to me.

25          Do you agree?

1          THE COURT:  There's an objection.

2          MS. KARASE:  Yes, Your Honor.  I object to the form

3     of the question.

4          THE COURT:  Yeah.  Well, you're testifying, Mr. Bell.

5          Just ask him what he believes.  Don't -- you don't

6     have to tell him what you believe.

7     BY MR. BELL:

8     Q.   Well, do you believe that individuals who collect and

9     hoard child pornography are likely, as it says here, to also

10    have child erotica as a means of gaining trust, acceptance, and

11    support?

12    A.   Yes.

13    Q.   All right.  Directing your attention to page 22, which

14    would be 15(f), essentially you represent to the Court that

15    people who collect child pornography rarely dispose of their

16    sexually explicit materials and go to great length to conceal

17    it, etc., correct?

18    A.   Correct.

19    Q.   And then down below in that paragraph, we get to the term

20    "they maintain or hoard those visual depictions for long

21    periods of time."

22          And that's consistent, I guess, with what you've

23    learned over the years, correct?

24    A.   Correct.

25    Q.   However, I mean, you've never -- well, that's kind of the

1   point.

2          Has anybody ever produced a study to document this?

3   This is -- or is this kind of -- you know, there's a phrase

4   that's used publicly, you know, "people are saying," and is

5   that what the hoarder definition amounts to, people are saying

6   that people who have child pornography hoard it?

7          MS. KARASE:  And, Your Honor --

8          THE COURT:  There's an objection.

9          MS. KARASE:  -- I'd just ask for a clarification that

10  it be -- that the question be to his knowledge.

11         He's asking whether this exists out in the universe,

12  and I just think it's implied here, but I want the record to be

13  clear that he's asking about Agent Luedke's knowledge.

14         MR. BELL:  I thought I asked him.

15  BY MR. BELL:

16  Q.   But do you know?

17  A.   Do I know of what, sir?

18         THE COURT:  Yeah.  I mean, maybe -- maybe you could

19  break that down a little, because that question got awfully

20  long.

21         MR. BELL:  Yeah.

22         THE COURT:  Because I know you are injecting what

23  your belief and opinion is on some of this, and it -- and in

24  terms of this.  I think you can ask the question more directly

25  and in a shorter version.

1          Why don't you start over with this area.

2          MR. BELL:  Thank you, Your Honor.

3     BY MR. BELL:

4     Q.   Agent, do you have any personal knowledge -- in your

5     personal knowledge as a forensic examiner or somebody who

6     represents that they've studied people who study electronic

7     devices that have been seized by child pornographers -- have

8     produced a written publication that confirms that people who

9     collect these -- who are found in possession of child

10    pornography hoard them?

11    A.   I don't know of any written publication.  I only know that

12    in my training and experience and my review of images found on

13    electronic devices throughout the last three years, in 30-plus

14    cases I've done involving child exploitation, that many times

15    there are collections of child pornography that are maintained

16    on these subjects' devices, if that helps.

17    Q.   All right.  That's your personal view, right?

18    A.   That's just my knowledge, sir.

19    Q.   All right.  And maybe I was mistaken.

20         Did you not say 20 earlier?  You said 30 a minute

21    ago.

22    A.   Overall child exploitation cases, I've done more than 30.

23    Specific to receipt, distribution, and possession, I would say

24    it's approximately 20 to 25.

25    Q.   And this whole -- and you would agree that the concept of

1  hoarding is really central to the concept of the staleness

2  of -- the staleness issue in terms of whether there's going to

3  be evidence of criminal activity on a person's electronic

4  devices if you seize it months or whatever period of time after

5  the suspected bad act would have been.

6  A.   In my opinion, staleness and a collection of images are

7  two separate issues.  I don't see the correlation between one

8  and the other, personally.

9  Q.   Well, you can be a collector when the evidence may or may

10 not be stale, but in order for it to be -- collectors are more

11 likely to have the evidence still there so that if you at least

12 go execute a search warrant years later -- the premise is if

13 they're a collector, the evidence will still be on the system.

14       MS. KARASE:  And, Your Honor, I know Mr. Bell's

15 trying to move the ball forward, but I'm going to object to

16 this commentary back and forth, and I'd ask that he pose

17 questions.

18       THE COURT:  Staleness is a legal issue.  You can make

19 whatever argument you want about why this is here or isn't

20 here.

21       I'm more interested in if you're trying to see what

22 his basis of knowledge for making these claims are rather than

23 if he agrees with you or not that this means something's stale

24 or not stale.

25       That's going to be a legal determination the Court

1    has to make based on facts.  So I'd rather be hearing the facts

2    than I am about your belief about staleness and whether he

3    believes what you believe.

4              MR. BELL:  Yes, Your Honor.

5    BY MR. BELL:

6    Q.    And to be fair, Agent, the language that I'm talking

7    about, this comes in kind of the prepackaged template that

8    you're dealing with.  You didn't kind of write this stuff up

9    yourself.

10   A.    That's correct.

11   Q.    Now, also to be clear, before we turn to the next section,

12   as of June 16th, I guess, when this affidavit was prepared, the

13   information that you had available to prepare for -- the

14   affidavit for the -- for the Court, there was no specific

15   identifiable evidence that Mark Marino fit any of the

16   characteristics of a collector or a hoarder of child

17   pornography.

18   A.    Sure.

19             THE COURT:  Is that yes?

20             THE WITNESS:  Yes, sir.  I'm sorry.

21             THE COURT:  Mr. Bell, I believe, asked you something

22   to the effect of the affidavit being prepared on June 16th.

23             The affidavit was submitted to Judge Richardson on

24   June 16th, but I'm assuming that you worked on preparing that

25   prior to that.  It was signed at 11:37 a.m., so I'm assuming

1    that you didn't just prepare it that morning.

2           Am I right about that?

3           THE WITNESS:  That's correct, sir.

4           THE COURT:  Had you been working on it for a day or

5    days?  How long would you -- would you estimate you had been

6    working on preparing the affidavit?

7           THE WITNESS:  I would say approximately a month,

8    over -- you know, we were in the middle of the pandemic, so

9    there were lots of rules about when you could work and when you

10   couldn't.

11          But there were numerous discussions with myself and

12   the New York agents and AUSA Karase regarding the drafts of the

13   affidavit.

14          THE COURT:  And let me just ask you, when he -- you

15   were asked a question about whether the defendant -- whether

16   there were any -- there was any evidence that the defendant

17   fit -- or there was any evidence of him fitting the

18   characteristics of a collector or had any collector traits.

19          Could you -- could you expound on that?  In other

20   words, was there any direct evidence that he fit any of the

21   collector traits?

22          THE WITNESS:  At that point, no, and strictly because

23   we were investigating a computer that was responsible -- that

24   had been put back to a specific residence.

25          Now, did we have an idea of who the subject might be?

1    Yes.  But as we know nowadays, you can -- there's identity

2    theft and everything else.  So we don't specifically know who

3    the actual subject is until we get to execute the search

4    warrant and interview the occupants at the residence.

5           But in terms of the specific characteristics, at that

6    point, no, we didn't have anything specifically.

7           THE COURT:  All right.

8           MR. BELL:  Can I follow up on that?

9           THE COURT:  Yes, you can, but I think -- I think

10   what -- the way the question was asked -- sometimes a

11   question's asked a certain way, and the answer's given as yes,

12   but if you look at a cold transcript, yes might mean there was

13   evidence.

14          And so that's why I was trying to clarify that so

15   that it's crystal clear.

16          MR. BELL:  Thank you, Your Honor.  I'm not at all

17   offended at you clarifying my questions.  It's oftentimes

18   appropriate.

19          THE COURT:  Go ahead.  You --

20   BY MR. BELL:

21   Q.   But I do want to follow up on that a little bit in the

22   sense of prior to executing the warrant, you do some background

23   checks on the person who's the target of the search warrant.

24   A.   That's correct.

25   Q.   I mean, essentially you'll do whatever intelligence

1   background work that law enforcement has available online.

2            See if the person's a convicted sex offender?

3   A.    Correct.

4   Q.    There was no evidence he was a convicted sex offender?

5   A.    Correct.

6   Q.    There's no evidence that essentially he had any kind of

7   significant criminal history.

8   A.    Correct.

9   Q.    No history of complaints of domestic abuse or any other

10  kind of -- or any other things related to child abuse.

11  A.    Correct.

12  Q.    And those might be clues for you and consistent with other

13  evidence if -- if some -- or had been arrested before for a

14  child pornography case.

15  A.    That's correct.

16  Q.    And -- and none of that information -- your investigation

17  did not reveal any of it.

18  A.    Correct.

19  Q.    I mean, you wouldn't, you know, exhaustively kind of check

20  his history, but on the other hand, you've got to be

21  comfortable enough that (1) he has some contact with the house

22  and (2), you know, essentially who he is and whether he's

23  potentially dangerous.

24  A.    Correct.

25  Q.    And there -- and there -- and essentially there was no

1    information that he fit any of the characteristics of a

2    collector at the time that you walked in to execute that search

3    warrant.

4    A.    That's correct.

5    Q.    I did want to back up and cover one other paragraph here

6    on page 23.  It's paragraph 17.

7          And essentially there's representations here that --

8    and I'm going summarize a little, and you're free to correct me

9    if I don't get it right here.

10         But essentially changing -- faster download speed and

11   file-sharing systems and platforms make it -- make individuals

12   that trade child pornography a little easier in the sense that

13   they can download, view, and delete child pornography on their

14   computers or digital devices on a cyclical and repetitive

15   basis, is the representation in the affidavit, correct?

16   A.    Correct.

17   Q.    And this, again, is based on essentially what you've

18   learned in your experience.

19   A.    That's correct.

20   Q.    And the -- well, I guess the next representation here is

21   that evidence of such activity, deleted child pornography, can

22   often be located on these individuals' computers and digital

23   devices using forensic tools and so forth, correct?

24   A.    Correct.

25   Q.    And I kind come back to the question I had earlier.

1           Are you aware in any fashion of any changes in
2   technology that make that statement more or less true?
3   A.   No, sir.
4           THE COURT:  Let me ask you this, just out of
5   curiosity, and it probably doesn't have anything to do with
6   anything.
7           But how does this paragraph that talks about people
8   deleting child pornography and doing those kinds of things
9   square with the notion that people who collect child
10  pornography are hoarders and that they -- they don't basically,
11  essentially, get rid of child pornography?
12          THE WITNESS:  Well, I guess it actually doesn't.  I
13  guess it's the opposite view of -- of that, which includes our
14  knowledge.
15          And in my training and experience, we've had the ones
16  where you find thousands and thousands of images, and you also
17  find individuals that do this particular situation, but we find
18  the images resident -- were resident on the device at a certain
19  time but aren't necessarily -- or were deleted at some point or
20  another, is what I'm trying to say.
21          THE COURT:  All right.  Go ahead.
22  BY MR. BELL:
23  Q.   And there's also a reference there that -- in that
24  paragraph that -- and recover deleted images of -- deleted
25  images of child pornography and -- and evidence of such

1    activity.

2    A.   Correct.

3    Q.   Now, evidence -- by that, essentially, your understanding

4    of it is that search term names, file names, that type of thing

5    that might be found -- indicative of child pornography might be

6    found on systems even after the images themselves might have

7    been deleted?

8    A.   That's correct.

9    Q.   And, again, I -- the basic question to you is, are you

10   aware of any changing technology that makes that proposition

11   less likely to be true than is represented in here?

12   A.   In my training and experience, I am not aware of any

13   technology that completely prevents any of that.

14   Q.   Okay.  And let me -- another question is this, is you're

15   aware that, you know, the file names and search terms -- or the

16   file names may not always be indicative of the content of the

17   actual image itself.

18   A.   That's correct.

19   Q.   So essentially one of the reasons law enforcement and

20   everybody else relies on SHA values and hash values is that

21   that's a unique identifier of the particular image itself.

22   A.   That's correct.

23   Q.   And essentially better evidence than what a file name may

24   represent, which may not be accurate.

25   A.   Correct.

1          THE COURT:  Let me ask you this.  Mr. Bell was asking

2    you certain things about staleness before and the paragraphs

3    about collectors.

4          And you said something to the effect that -- I think

5    you said, and I'm not trying to quote you, is that you -- you

6    weren't thinking staleness when you put those paragraphs in.

7    That wasn't on your mind when you did that.

8          Is that right?

9          THE WITNESS:  That's correct, because staleness would

10   be a decision that would be made by the AUSA saying, "Hey, this

11   is too old," or something like that.  It's a legal issue, as

12   you stated, Your Honor.

13         THE COURT:  So then the -- why do you include those

14   paragraphs then?

15         THE WITNESS:  The -- which paragraphs?

16         THE COURT:  The collectors paragraphs and the

17   hoarders?

18         THE WITNESS:  That's something that, in my training

19   and experience, we've always done and provided to the

20   magistrate judge to ensure that they're provided with kind of

21   an overview of our experience, our training, and what we've

22   learned as law enforcement in all these investigations.

23         THE COURT:  All right.  Thank you.

24         Go ahead.

25   BY MR. BELL:

1  Q.   And, sir, if I could direct your attention, let's turn to

2  page 25 and the section styled the specific facts establishing

3  probable cause in this case.  Fair enough?

4  A.   Yes, sir.

5  Q.   All right.  Of course, as you've described and as

6  described in the affidavit, the investigation itself originates

7  in New York as an undercover operation.

8  A.   Correct.

9  Q.   And the e-mail address, which is referenced, I believe,

10 on -- 22(a) is the first specific reference that I see to it,

11 is Philippinegirls@secmail.pro, correct?

12 A.   Correct.

13 Q.   And then the next line there is "will be referred to as

14 e-mail account."

15 A.   Correct.

16 Q.   All right.  So -- and you mentioned that there were two UC

17 accounts from the agents in New York, correct?

18 A.   Correct.

19 Q.   But just to be clear, all their communication is with

20 Philippinegirls@secmail.pro, correct?

21 A.   Correct.

22 Q.   Just staying on page 26 here, you refer to this DeepPaste

23 advertisement that was posted on the dark web, and the

24 contact -- do you have Exhibit 2 in front of you?

25 A.   Yes, sir.

1  Q.   I think at the bottom it specifically references

2  Philippinegirls@secmail.pro, correct?

3  A.   Correct.

4  Q.   And you go on to describe what services -- it says,

5  "Specifically, it provided, among other things," and then it's

6  described there.

7        MR. BELL:  If I could have just a minute to look at

8  the exhibit, Judge.

9        THE COURT:  Yes.

10     (Brief pause.)

11 BY MR. BELL:

12 Q.   I believe you read it all, but you say "among other

13 things," so I have written down -- you may have answered this

14 earlier, what other things.

15        But among the other things was, "Offer 3:  Video of

16 girl, describe action and length of video and you get a quote

17 in return," correct?

18 A.   Correct.

19 Q.   All right.  So the next couple pages of the affidavit --

20 we're on page 27 by this point, correct?

21 A.   What --

22 Q.   The next page.  We just finished page 26.

23 A.   Okay.

24 Q.   And so you go back and forth between -- well, the UC --

25 you describe what the UC people do with contacting back and

1   forth the site identified as Philippinegirls.secpro [verbatim].

2        And we get to page 28, and you note a particular

3   exchange on December 19th, 2019, correct?

4   A.   Correct.

5   Q.   And this is when -- and I won't read it here, but in

6   addition, down -- dropping below, there's a set of prices and

7   services that you represent to the Court was in the -- was in

8   the communication, correct?

9   A.   Correct.

10  Q.   And the lowest of those prices, for our purposes, is 150

11  euros, correct?

12  A.   Correct.

13  Q.   Now, you've seen my exchange rate in my motion?

14  Essentially a euro --

15  A.   I don't --

16  Q.   -- is point --

17  A.   I don't remember it, but --

18  Q.   Well, for our purposes, essentially, a euro, back in

19  October of 2019, was -- was a little bit more than a dollar.

20  A.   I believe you, yes.

21  Q.   All right.  That --

22  A.   I don't know for sure, but --

23  Q.   Well, I'm exceptionally bad at math, so . . .

24       But just -- or even if we round it out and just call

25  it one-to-one equivalent, the lowest price for any services

1   here is 150 euros or at least $150.

2   A.   Correct.

3   Q.   And it represents "sexy nude poses of your choice" is,

4   quote/unquote, one of the services, correct?

5   A.   Correct.

6   Q.   Now, that is not explicitly and by its own terms

7   necessarily referring to child pornography, correct?

8   A.   The particular quote "sexy nude poses of your choice"?

9   Are you asking me if it's --

10   Q.   Yes.  That does not -- by its definition, does not

11   explicitly define an act of child pornography.

12   A.   In my training and experience, a nude pose of an

13   underage -- of a minor would --

14   Q.   Well, it doesn't necessarily refer to a minor though.

15   A.   Well, not within that particular quote it doesn't, no.

16   Q.   Okay.  And then there are various other descriptions there

17   that unquestionably do constitute services for child sexual

18   abuse, to put it blunt- -- politely.

19   A.   Well, yes.  The title is "Philippine girl 10 yo with small

20   breasts," which, in my training and experience, would lead me

21   to believe that that's referring to a minor.

22   Q.   Well, and, again, we've talked about this a little bit.

23   It's not uncommon for people to misrepresent.  You might not

24   get a 100 percent honest and accurate account of what's being

25   made or how much it costs from some of these sites, correct?

1    A.    Correct.

2    Q.    Now, I think we're in paragraph (f), which is on page 29.

3    There's a reference to two TOR browser links.

4          Essentially there was -- on January 13th there was an

5    exchange back and forth with the UC, and the UC and the

6    people -- whoever runs Philippinegirls.secpro sent a link to

7    the agents?  Is that how I understand this?

8    A.    At the end of the e-mail, one or however many are

9    represented there, there are links which is either to a video

10   or an image.

11   Q.    Okay.  But that would be a separate site.  You hit the

12   link, and you'd have to go there to get the actual --

13   A.    Yeah.  You click on it, and it opens up a new page.

14   Q.    -- image.

15         All right.  So then paragraph 29, we get to an

16   exchange on the probable cause that --

17   A.    Hold on.  Paragraph 29 or page 29?

18   Q.    No, I'm sorry.  Paragraph (g) on page 29.

19   A.    Yes, sir.

20   Q.    I'm sorry.

21         There's a reference there that TFO -- Gergar, I

22   guess, G-e-r-g-a-r? -- downloaded 14 images from one link and

23   one video from another.

24         Do you see that?

25   A.    Yes.

1  Q.   Okay.  And then you describe the video, and there's no
2  real question that that would constitute child pornography.
3  A.   Okay.
4  Q.   But my question for you is, the 14 images, what did they
5  consist of; do you know?
6  A.   Yes.  I've been provided those images by TFO Gergar.
7        A number of them were regular images of a -- what
8  appeared to be, in my training and experience, a minor.  One
9  was a collage of numerous images, to include images that would
10  be -- that would constitute child sexual abuse material, as
11  well as the video that was mentioned.
12  Q.   All right.  So -- but -- and you had these images, you had
13  these actual images, when you did the affidavit.
14  A.   Correct.
15  Q.   But not all of the images would constitute images of child
16  pornography --
17  A.   Correct.
18  Q.   -- under the definition of the statute there.
19        And you're familiar with the definition of the
20  statute that you described earlier in the -- in the affidavit.
21  A.   Yes.
22  Q.   And you don't specifically describe any of the images for
23  the Court in the affidavit, that they -- that available at this
24  site were images that were not necessarily child pornography.
25  A.   Correct.

1    Q.   Did -- was -- did you ever have any discussion with

2    Ms. Karase or any of your fellow agents about how you should

3    describe -- what you -- what, if anything, you should say about

4    these images?

5    A.   I don't recall specific conversations between myself and

6    Ms. Karase or the other agents, but everybody has seen --

7    everybody involved has seen those photos.

8    Q.   Prior to the execution of the -- prior to the affidavit.

9    A.   Yes.

10   Q.   All right.  Turn to page 31 of the affidavit.

11   A.   (Complies.)

12   Q.   Would you agree with the proposition that this is the

13   critical page of the -- of the search warrant affidavit as to

14   probable cause?

15            MS. KARASE:  Objection, relevance as to his view.

16            THE COURT:  Sustained.

17            Just ask him questions about it.

18            MR. BELL:  Thank you, Your Honor.

19   BY MR. BELL:

20   Q.   Page 31, paragraph 15, I guess it's (h) and (i), are

21   where, essentially, the first indication that Mr. Marino is

22   involved in any of this occurs, correct?

23            MS. KARASE:  I'm sorry.  For record purposes, we're

24   talking about paragraph 22(i) on page 31.

25            THE COURT:  Is that right, Mr. Bell?

1        MR. BELL:  Judge, I -- that presumes I can read my

2  own handwriting.  I'll have to double-check.  I thought it said

3  15, but let me -- let me double-check.  She may very well be

4  correct about that, Your Honor.

5        22(h) and (i) on page 31.

6        THE COURT:  All right.

7  BY MR. BELL:

8  Q.   All right.  The cluster or blockchain analysis reveals a

9  Bitcoin transaction associated with a cluster containing -- the

10  undercover transfer occurs on October 29th, is kind of a

11  summary of what happens here on the early portion of (h) and

12  (i), correct?

13  A.   Correct.

14  Q.   All right.  And the second Bitcoin address is in -- is in

15  the same cluster of the one that's identified with the

16  Philippinegirls.secpro, correct?

17  A.   That's correct.

18  Q.   All right.  Do you know what the second Bitcoin address

19  is?

20  A.   The Bitcoin address?

21  Q.   The Bitcoin address, the second one.

22  A.   Yes.

23  Q.   And what is it?

24  A.   It's the one I earlier described as beginning with

25  1G7 Victor.

1   Q.   All right.  But what's -- does it have a name -- I mean,

2   an e-mail address, or is that under investigation?

3   A.   I think you're confusing e-mail addresses with Bitcoin

4   addresses.  They are completely different.  One has nothing to

5   do with the other.  You don't have to have an e-mail address to

6   have a Bitcoin address.

7   Q.   All right.

8   A.   A Bitcoin address is simply where the Bitcoin is stored --

9   Q.   Okay.

10  A.   -- or where the Bitcoin is held.

11        And then you have the transaction IDs, which are

12  produced anytime there's a transaction with Bitcoin.

13  Q.   Is that -- where the user will gather the cluster and move

14  it back.

15        But essentially the Bitcoin address may go to a

16  different link altogether, may go to a different site.

17  A.   It's -- again, I believe you're confusing it.  There's

18  not -- it has nothing to do with a site or an email address

19  or -- it's not like you can click on this Bitcoin address here

20  that you see and it opens up a web page.  That's not the case.

21        A Bitcoin --

22  Q.   I understand that point.  That point I do get, is the

23  second Bitcoin address.

24        But the point that I'm still a little unclear about

25  from this, and what I think was significant for the

1   magistrate's determination, is the evidence, other than your

2   conclusion, that the people that own Philippinegirls.secpro own

3   the Bitcoin account that is tied to this same advertisement at

4   Philippinegirls.secpro.   Correct?

5   A.   That's essentially correct.

6          The Bitcoin address that was provided by the e-mail

7   address on the advertisement is also attributed to the second

8   Bitcoin address starting 1G -- excuse me -- 7 Victor.   And that

9   was discovered by a blockchain analysis done by the HSI New

10  York analysts.

11  Q.   But you don't know whoever owns or uses or controls -- the

12  Bitcoin address that's associated with Philippinegirls.secpro

13  may have other sites.

14  A.   I don't understand what you -- when you say sites, I'm not

15  understanding what --

16  Q.   Well, they may have other e-mail sites.   They may have

17  other links.   They may have other services they provide.

18          You don't -- you can't tell us that the

19  Philippinegirls.secpro that the UC -- that the UC people in New

20  York were communicating with are the -- are the same people

21  that were communicating with Mr. Marino, other than they

22  controlled the same Bitcoin account.

23  A.   Well, yes, I actually can from evidence we found after

24  executing the search warrant.

25  Q.   And I'm sorry.   I should have prefaced the question with

1    at the time that you did the affidavit.

2            At the time you did the affidavit, you didn't know

3    that -- how many sites or advertisements that the people who

4    may be associated with Philippine pro -- girl dot pro -- dot

5    sec pro may control, correct?

6            MS. KARASE:  And, Your Honor, I'd just lodge an

7    objection as to the relevance of how prolific a distributor of

8    child pornography the Philippine girls is.  I don't see the

9    relevance in that.  We're talking about Mr. Marino and his

10   transaction.

11           THE COURT:  Well, I'll overrule it because I want to

12   see where he's going with it.

13           So go ahead.  Why don't you ask the question again.

14   BY MR. BELL:

15   Q.   At the time you prepared the affidavit, you understood

16   that the Philippinegirls.secpro people -- at least believed

17   they controlled the Bitcoin account that received the money.

18   A.   That is correct.

19   Q.   You didn't know if that account that they controlled might

20   receive money for other services unrelated to whatever they

21   were advertising at Philippine girl dot pro -- dot sec pro.

22   A.   I only know what this advertisement did and what the HSI

23   New York undercover e-mails were.

24           I don't know if the -- if the -- whoever the person

25   was behind that e-mail address has additional e-mail addresses

1  or if he had additional advertisements unrelated to child

2  sexual abuse material.

3  Q.   Okay.

4       THE COURT:  So you don't know if they sell cars on

5  that -- on that website or something like that.

6       THE WITNESS:  Correct.  I do not know.

7       THE COURT:  You just know what's on the

8  advertisement.

9       THE WITNESS:  Yes, sir.

10      THE COURT:  All right.  Thank you.

11 BY MR. BELL:

12 Q.   And, again, the amount of the transaction that occurred on

13 October 29th, which was the basis for the affidavit, was for 5

14 pics or -- 5 pics, which you understand to mean pictures,

15 correct?

16 A.   Correct.

17 Q.   And $56 is considerably less than 150 euros or $150, or

18 whatever the exchange rate would have been, which seemed to be

19 the minimum threshold price for items advertised on the

20 DeepPaste site, correct?

21 A.   Correct.

22 Q.   And there's no representations in the affidavit that --

23 that -- you couldn't say with a reasonable degree of certainty

24 that the Philippine girls dot pro -- that Mr. Marino -- strike

25 that question.

1      Was there any discussion with any of the other agents

2   about how are we going to explain -- or the explanation or any

3   inconsistency between the price for 5 pics and the represen- --

4   the minimum -- the threshold price for advertised items on the

5   site was 150 euros?

6   A.   No.

7           MR. BELL:  Judge, if I could have just a moment.

8           THE COURT:  Yes.

9       (Brief pause.)

10          MR. BELL:  I have nothing further.

11          THE COURT:  All right.  Well, before I turn it back

12   over to Ms. Karase, let me -- Agent Luedke, let me ask you a

13   couple of questions.

14          Going back to page 29, paragraph 22(g) --

15          THE WITNESS:  22(g)?

16          THE COURT:  (g), yes.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  There's a reference to three browser

19   links, and then I believe you set out information about two of

20   the links.

21          What about the third link?  Was that clicked upon, or

22   do you know?

23          THE WITNESS:  Hold on one moment.

24          There was nothing downloaded -- one of the links was

25   a JPG, one link was for a video, and the other link was

1    delineated as a backup link.  And per my conversation with the

2    undercover, nothing was downloaded from that third backup link.

3              THE COURT:  All right.  And then in the -- in the

4    files related to these three links -- I know you were

5    mentioning that some of the images were child pornography; some

6    were not.

7              I believe you said that the video that's referenced

8    did contain child pornography?

9              THE WITNESS:  Yes.  The video, as described in

10   paragraph (g), in my training and experience, is indicative of

11   child sexual abuse material.

12             THE COURT:  And what about the 14 images from the one

13   link?  Do you -- do you know how much -- or how you would

14   quantify the amount of child pornography related to that?

15             THE WITNESS:  I know there are several pictures in

16   which it's the -- the girl that they're referencing just

17   dressed regular, out in public.

18             And then there is a collage in which -- that's where

19   they're counting the number of images within that collage, and

20   some are child sexual abuse material, and some are just of the

21   girl in a regular setting.

22             THE COURT:  Now, you -- you indicated that you had --

23   you worked on the -- I think you said something to the effect

24   that you worked on the affidavit for about a month prior to

25   submitting it to Judge Richardson; is that right?

1         THE WITNESS:  I would summarize that, yes.  We

2    kind -- I kind of submit the first draft to AUSA Karase, and

3    then we make additions and subtractions, and we kind of go over

4    it.  And then when we get closer to the date that we know we're

5    going to be able to submit it, obviously we fine-tune

6    everything, yes.

7         THE COURT:  All right.  And I guess you were -- you

8    were a step ahead of me because I was going to ask you, during

9    that month period, did -- was it an ongoing review process and

10   a back-and-forth with Ms. Karase?

11        THE WITNESS:  Yes, sir.

12        THE COURT:  All right.  Because I had asked you

13   before if she reviewed it prior to you submitting it, and I

14   didn't want that to, on a cold record, look like you just

15   handed it to her, like, the day before and she read it, and I'm

16   assuming she approved it at some point; is that right?

17        THE WITNESS:  Yes.  We go over it on multiple

18   occasions.

19        THE COURT:  But that was an ongoing give-and-take

20   with her?

21        THE WITNESS:  Yes, Your Honor.

22        THE COURT:  Just one second.  I have another

23   question.

24      (Brief pause.)

25        THE COURT:  All right.  Ms. Karase, that's all I

1  have.

2                          REDIRECT EXAMINATION

3  BY MS. KARASE:

4  Q.   Agent Luedke, just to go over where you just left off,

5  have you -- you're aware of the review process, having been the

6  affiant on numerous child exploitation, specifically child

7  pornography-related search warrants, right?

8  A.   Yes.

9  Q.   And the review process at the U.S. Attorney's Office,

10 right?

11 A.   Yes.

12 Q.   And have you heard me tell you that in addition to my

13 review, there's also an upper-level review that has to happen

14 before it goes to the judge?

15 A.   Yes.

16 Q.   So you're aware, as the executing agent, that your search

17 warrant has received multiple levels of review by the time that

18 you go and execute it; is that right?

19 A.   Yes.

20 Q.   Turning to page -- I want to talk to you about some of the

21 specifics that came up during the cross-examination.

22          And, actually, before we cite to specific pages, I

23 want to make sure the record is clear about the minimum amount

24 that was provided for in the advertisement, Government's

25 Exhibit 2.

1    Was there room for negotiation, or was there a

2  hard-and-fast minimum amount that was set?

3  A.    There was room for negotiation.

4  Q.    And was that referenced from the -- in Offer No. 3?

5  A.    Yes.  It specifically says, "Video of the girl.  Describe

6  action and length of video and you get a quote in return."

7  Q.    All right.  So maybe negotiation is the incorrect word,

8  but it would be kind of a tailor-made quote?  Is that how you

9  would interpret that?

10 A.    Yes, depending on what a specific person would ask for.

11 Q.    All right.  And there's also reference to proof of girl,

12 right?

13 A.    Correct.

14 Q.    Okay.  Now, let's just kind of go through what happened

15 here in the -- that's set forth in probable cause in the New

16 York investigation.

17    In 20 -- paragraph 22(b) on page 27, there is

18 reference that TFO Gergar initiates e-mails September 16th,

19 right?

20 A.    That's correct.

21 Q.    Was there a response that same day?

22 A.    There was.

23 Q.    Did the response include child pornography?

24 A.    Yes.

25 Q.    And that was a file that was conclusively child

1   pornography, not child erotica.

2   A.    Correct.

3   Q.    And it was sent for free.

4   A.    Correct.

5   Q.    At the initial response.

6   A.    Yes.

7   Q.    The next time that Philippine girls responded to the UC

8   was on December 19th, as summarized in paragraph 22(e) on page

9   28; is that right?

10  A.    That's correct.

11  Q.    Was there again a file of child pornography that was sent

12  for free to the undercover?

13  A.    Yes.

14  Q.    And this one was a video; is that right?

15  A.    That's correct.

16  Q.    Turning your attention to paragraph 22(f) on page 29, did

17  you inform the magistrate judge that there was additional CP

18  that was provided to the undercover in a January 27th e-mail by

19  the transmission of two TOR browser links?

20  A.    Yes.

21  Q.    Again, on February 5th, 2020, was there a follow-up

22  message received from Philippine girls with links attached to

23  child pornography?

24  A.    Yes.

25  Q.    Now, Mr. Bell had brought up the point that there was a

1  mix in that e-mail of images of a child that would not be

2  contraband and also with child sexual abuse material; is that

3  right?

4  A.    That's correct.

5  Q.    But this was now the fourth separate instance when child

6  pornography was sent to the UC.  Just this time it included

7  some noncontraband evidence as well, right?

8  A.    Correct.

9  Q.    And in that particular video that's described in paragraph

10 (g) that's titled "asiancousine," the child is used to solicit

11 money from the recipient or the viewer, right?

12 A.    That's correct.

13 Q.    And I think you have a quote there in the middle of the

14 page on page 30 that came from some text of the video.

15        Do you see that?

16 A.    I do.

17 Q.    What did the -- well, what did the text say that was

18 supposed to be attributed to the child?  She was holding a sign

19 that said what?

20 A.    There are two different texts that go across the screen,

21 actually.  The first one is approximately 40 seconds in the

22 video.  It says, "If you want her she's available for new

23 customers.  Videos/camshows/meeting."  And then it goes on from

24 there, and at the end of it is the Philippinegirls@secmail.pro

25 e-mail.

1    The same text appears across the video again, and the

2    child is given another sign that reads, "February 3, 2020, do

3    you want me?  I will do anything for you if you pay me."

4    Q.   All right.  And then turning to February 6th of 2020,

5    paragraph (h) of -- 22(h) on page 31, is this where the Bitcoin

6    address was provided?

7    A.   Yes.  It was provided on February 9th.

8    Q.   Thank you for clarifying that.

9        After some exchange back and forth that started on

10   February 6th, it culminated on February 9th with the providing

11   of the Bitcoin address, right?

12   A.   That's correct.

13   Q.   Okay.  Now, you did not include in the affidavit the

14   subsequent communications between UC2 and

15   Philippinegirls@secmail.pro, right?

16   A.   Correct.

17   Q.   But you knew at the time you executed the search warrant

18   that there was an exchange of e-mails between UC2 and

19   Philippinegirls@secmail.pro where child pornography was also

20   provided; is that right?

21   A.   That's correct.

22   Q.   And was the child pornography provided in the first

23   response that UC2 had e-mailed, the first response to UC2?

24   A.   That's correct.

25   Q.   So kind of out of the gate, you have the sending of child

1    pornography when contact is initiated.

2    A.    Correct.

3    Q.    And through the communications that UC1 and UC2 had with

4    Philippinegirls@secmail.pro, is Philippinegirls@secmail.pro

5    trying to sell something to UC1 and UC2?

6    A.    Yes.

7    Q.    What is that?

8    A.    Child sexual abuse material.

9    Q.    And is it customized?  Is it tailored?  What's different

10   about it than what they've already provided?

11   A.    It was customized to whatever that customer would request.

12   Q.    When you get the Coinbase summons results and you see that

13   Mr. Marino had sent approximately 56 U.S. dollars, or the

14   equivalent of 56 U.S. dollars, in Bitcoin with a notation that

15   says "5 pics" and an e-mail address with the secmail.pro in the

16   notes, did you believe that that was for child erotica?

17   A.    No.

18   Q.    Why not?

19        MR. BELL:  Object to the relevance, Your Honor.

20        THE COURT:  Overruled.

21        Go ahead.

22        THE WITNESS:  In my training and experience, you

23   wouldn't pay for child erotica.  You're going to pay for child

24   sexual abuse material or child pornography.

25   BY MS. KARASE:

1  Q.    And what about based on your observations and what you

2  knew about how Philippinegirls@secmail.pro operated?

3  A.    None of the images or videos that were provided by the

4  person behind that address would be what, in my training and

5  experience, would be called child erotica.  It was all child

6  sexual abuse material.

7  Q.    And was the pattern that the Philippinegirls@secmail.pro

8  would send child pornography almost immediately when

9  interacting with UC1 and UC2?

10  A.    Correct.

11  Q.    And further, the reference to 5 pics, did you believe that

12  to be pictures of child pornography?

13  A.    Yes.

14  Q.    You were asked a lot of questions about child pornography

15  collector characteristics, and I -- I don't want to get -- get

16  into the legal matter of staleness, but let me ask you like

17  this.

18        Why do you, as a trained investigator, expect to find

19  child pornography when you go into a house seven, eight months

20  later after the tip was initiated or after there's evidence of

21  a download or after there's some triggering event?

22  A.    Because it's happened a number of times, specifically in

23  several cases that I've had, where I have found child sexual

24  abuse images or videos resident on that person's devices from

25  an investigation that was four years old or a year old.

1    Q.   Well, let's talk some specifics about that, because I

2    think you might have worked some of those with you, Agent

3    Luedke.

4         Can you give us an example?  You mentioned four

5    years, and I'm probably thinking of the same one you are.  Can

6    you give us an example of that?

7    A.   In a recent case from three or four months ago, I executed

8    a search warrant.  As part of that investigation, another law

9    enforcement agency had done an investigation in which child

10   sexual abuse material was downloaded from that subject's

11   computers in a peer-to-peer type investigation.

12        I viewed those images, and those images, four years

13   later when I executed the search warrant, were found on his

14   electronic devices at that time.

15   Q.   All right.  And there was independent probable cause

16   besides the four-year-earlier --

17   A.   Correct.

18   Q.   -- download, just to be sure.

19   A.   Yes.

20        THE COURT:  When did that happen?  Prior to or after

21   this search warrant?

22        THE WITNESS:  After.

23        THE COURT:  Okay.

24        THE WITNESS:  I also have an example of one that was

25   prior to as well.

1          THE COURT:  All right.  Well, when was that?

2          THE WITNESS:  In April of 2019 there was a subject

3     that distributed multiple images of child sexual abuse material

4     using a social media application.

5          By the time I got the information and was able to

6     investigate and apply for, obtain, and execute a search

7     warrant, it was March of 2020.  And that image that had been

8     distributed in April of 2019 was found on the person's devices

9     subsequent to the search warrant in March of 2020.

10         THE COURT:  Go ahead.

11    BY MS. KARASE:

12    Q.   And were there other instances that you're aware of

13    between both your work as a case agent and also in assisting

14    other fellow agents who were serving as case agents for their

15    respective cases?

16    A.   Yes.

17    Q.   Now, in preparation for today, you and I spoke about your

18    examination of your particular cases where you served as the

19    case agent, right?

20    A.   Correct.

21    Q.   So when you mentioned to Mr. Bell that it was 20, 25 cases

22    where you were the affiant on child pornography search warrants

23    in particular, those were ones where you were the case agent,

24    right?

25    A.   Correct.  It was 20 to 25 specific cases that I went over

1  in the last couple days where I know they were specific to

2  possession, distribution, or receipt of child pornography.

3  Q.    All right.

4         THE COURT:   Let me -- can I ask a question right

5  there?

6         I may have misunderstood the question or the answer

7  earlier, and I believe Ms. Karase asked something about when

8  you've executed search warrants where you've obtained a search

9  warrant, that more often than not, you find child pornography

10 when you've executed the search warrant.

11        I'm just curious.  Of the 20 -- let's just say it's

12 20 search warrants where you've been the affiant and you've

13 executed the search warrant -- when I hear "more often than

14 not," I'm thinking, well, maybe about 11 times you found

15 something and 9 times you didn't.

16        But if you -- if you've done 20, how many search

17 warrants -- when you've executed them, out of those 20, how

18 many times have you found child pornography on the items or

19 devices searched?

20        THE WITNESS:   18 out of those 20.

21 BY MS. KARASE:

22 Q.    And did you delve into the couple times where you did not

23 find the child pornography you were expecting to find?

24 A.    Yes.

25 Q.    In one instance -- well, why don't you tell us about those

1 instances briefly.

2 A.   In that particular instance where -- or one of the

3 particular instances where we did not find images of child

4 sexual abuse material was because the individual had purchased

5 a new phone approximately two weeks before we served the search

6 warrant, so we had a brand-new device.  The device that we were

7 expecting to be there and looking for was gone.

8        And in the second instance, it was a -- it was more

9 of an online enticement chat-based search warrant, and we did

10 not find any images of child sexual abuse material.

11 Q.   Okay.  But turning back to child pornography, have you

12 discovered instances -- or have there been -- has there been an

13 instance where a device was destroyed and so you weren't able

14 to recover the reported child pornography?

15 A.   Yes.

16 Q.   Was that one time?

17 A.   Yes.

18 Q.   Okay.  Now, can someone be a collector of child

19 pornography, but then, because of any number of reasons -- they

20 get spooked.  They think they're about to get caught -- they

21 also then delete child pornography?

22 A.   Sure.

23 Q.   And can it be that someone -- someone has a collection but

24 then removes it for guilt or for fear of reprisal?

25 A.   Sure.

1  Q.    When you are executing a search warrant, can that evidence

2  of deletion be important to you?

3  A.    Yes.

4  Q.    Why is that?

5  A.    Well, any evidence that a person possessed child sexual

6  abuse material would be important, but if it shows, you know, a

7  specific date when something was deleted or if it goes in

8  conjunction with search terms that we later found during a

9  forensic analysis, that would be important.

10  Q.    All right.  And you were asked a lot of questions about

11  changes in technology.

12          In the year preceding your execution of the search

13  warrant, have you had success working with your forensic agents

14  or forensic analysts recovering data from cell phones that had

15  been deleted, for instance?

16  A.    Yes.

17  Q.    Have you been made aware of any generalized difficulties

18  that have arisen -- setting aside, you know, specific operating

19  systems, but any kind of overarching generalized "this is a lot

20  more difficult to recover deleted items" than it had been?

21  A.    Not that I can recall specifically, no.

22  Q.    In fact, your experience has taught you that deleted

23  information is still getting recovered; is that right?

24  A.    That is correct.

25  Q.    And then I want to make sure the record's clear about the

1    drafting process for these search warrants, because there were

2    several references to this as a -- that it started as a

3    template.

4           Do you just kind of cut and paste pages 1 through --

5    well, all the way up until your probable cause section from the

6    time before and that's what goes to the judge, or is there

7    back-and-forth and editing and tailoring it to the -- in this

8    instance, it would have been the preceding 18 paragraphs?

9    A.   My common practice is to speak to the AUSA and describe

10   what kind of investigation it is, and then we'll discuss which

11   prior affidavit to go off of.

12          If it's within the last couple months, and I have

13   one, that will be fine.  If it's not recent enough, I might get

14   one from the AUSA.  But it is constantly tailored depending on

15   where the investigation has taken us and how it's laid out in

16   the probable cause section.

17   Q.   For instance, the statutes that you're investigating

18   change depending on the facts known to you at the time, right?

19   A.   That's correct.  Some statutes are removed depending on

20   what kind of case it's on, and then they're added back in if

21   it's -- if it's important to that aspect of the case.

22          THE COURT:  You don't put, like, a definition of

23   Bitcoin in every one of them, do you?

24          THE WITNESS:  Correct.

25          THE COURT:  Okay.

1    BY MS. KARASE:

2    Q.    Same with cryptocurrency and those other series of

3    investigations; is that right?

4    A.    Correct.  And we wouldn't -- we wouldn't define what the

5    dark web is or the TOR, you know, website is if it wasn't a

6    dark-web-based case.

7    Q.    All right.  So despite the use of the word "template,"

8    there's a lot of tailoring that results in the final product

9    that goes to the magistrate judge, agreed?

10   A.    Absolutely.

11             THE COURT:  Do you have much more?

12             MS. KARASE:  I don't think so, Your Honor.  I think

13   I'm actually -- I think I'm there.

14             That's all I have, Your Honor.

15             THE COURT:  Mr. Bell, did you have anything else?

16             MR. BELL:  Five minutes.

17             THE COURT:  How many?

18             MR. BELL:  Five.

19             THE COURT:  Five, okay.  No more than, though.

20             If you need more, we'll just -- you can do it after

21   lunch.  I just want to break for lunch in the next five

22   minutes.  But I'm not trying to limit you to five minutes.

23             MR. BELL:  Yes, sir.  Thank you.

24                         RECROSS-EXAMINATION

25   BY MR. BELL:

1   Q.   Couple of questions for you, Agent.

2          The exchange between the Court and Ms. Karase and

3   yourself about the back-and-forth with the U.S. Attorney's

4   Office about some stuff is taken out, some stuff is added to

5   the -- to these affidavits in the preparation process?

6          There was a back-and-forth between you and Ms. Karase

7   about --

8   A.   Yes.

9   Q.   -- about the preparation of the affidavit, correct?

10  A.   Correct.

11  Q.   Okay.  What was taken out and what was added in this

12  affidavit?

13  A.   I don't recall.  We --

14          MS. KARASE:  And, Your Honor, I would object to the

15  question anyway as work product.

16          THE COURT:  Sustained.

17  BY MR. BELL:

18  Q.   All right.  The -- the last question -- I mean, the last

19  question Ms. Karase asked you was about the cryptocurrency, the

20  Bitcoin stuff is relatively new to the affidavits, at least --

21  and it was specifically put in there in reference to this

22  affidavit, correct?

23  A.   It was specifically put in there for this affidavit.

24  Bitcoin is newer, but it's not brand new.

25  Q.   All right.  And the collector/hoarder section has been in

1    there for many years?

2    A.    Correct.

3    Q.    That's a pretty standard portion of the search warrant

4    affidavits for CP cases?

5    A.    Yes, sir.

6    Q.    Ms. Karase directed your attention to Exhibit 2, which on

7    the second page contains the reference that suggests in some

8    instances prices are negotiable?

9    A.    Correct.

10   Q.    All right.  However, at the affidavit -- in the affidavit

11   that you presented to obtain the search warrant -- I think it's

12   page 28, 22(e).

13   A.    Okay.

14   Q.    The specific reference is, I guess, the minimum price

15   relayed to -- communicated to the Court for any services from

16   Philippinegirls.secpro was 150 euros, correct?

17   A.    Correct.

18   Q.    And Ms. Karase asked you a series of questions,

19   essentially, that all of the communication with whoever was

20   operating the site at Philippine girls dot whatever were a

21   reference for child pornography or sexual abuse items and

22   nothing about child erotica and that type of thing, correct?

23   A.    Correct.

24   Q.    And that the money that was sent -- however, let me ask

25   you this.

1    The undercover operation -- one of the undercover

2 operators paid $55 to the Bitcoin address, correct?

3 A. $55 worth of Bitcoin, yes.

4 Q. $55 worth of Bitcoin.  Excuse me.

5    But that was not for child pornography.

6 A. Correct.

7 Q. It was for a test.

8 A. Correct.

9    MR. BELL:  I have nothing further, Your Honor.

10    THE COURT:  All right.  Ms. Karase, anything else?

11    MS. KARASE:  No, Your Honor.

12    THE COURT:  All right.  Agent Luedke, you may step

13 down.

14    And let's -- let's just be in recess until 1:45.

15    MR. BELL:  Yes, sir.

16    THE COURT:  How long do you think your witness is

17 going to take?

18    MR. BELL:  Half hour, I would --

19    THE COURT:  All right.  Well, I'll take --

20    MR. BELL:  I can't imagine the direct would go more

21 than a half hour.  I'm not sure how much Ms. Karase has.

22    THE COURT:  All right.  Well, when we get back at

23 1:45, we'll have about two hours.

24    COURT SECURITY OFFICER:  All rise.

25   (Recess from 12:53 p.m. until 1:57 p.m.; all parties

 1   present.)

 2            COURT SECURITY OFFICER:  All rise.  This Honorable

 3   Court is now in session.

 4            Please be seated.

 5            THE COURT:  All right.  We're back in the case of

 6   United States of America versus Mark Manuel Angeles Marino,

 7   Case No. 3:20-cr-94(S2)-J-32JRK.

 8            Mr. Marino is present.

 9            Did you have any other evidence that you wanted to

10   present, Ms. Karase?

11            MS. KARASE:  No, Your Honor.

12            THE COURT:  All right.  Mr. Bell?

13            MR. BELL:  Thank you, Your Honor.  I'd call Richard

14   Connor.

15            THE COURT:  All right.  Mr. Connor, if you'd come

16   forward, please.

17            Please raise your right hand, please, sir.

18            Do you solemnly swear the testimony you're about to

19   give will be the truth, the whole truth, and nothing but the

20   truth, so help you God?

21            THE WITNESS:  I do.

22            THE COURT:  All right.  Thank you.  You may be

23   seated.

24            Would you state your first and last name, please.

25            THE WITNESS:  Richard Donald Connor Jr.

 1          THE COURT:  All right.  And would you spell your last
 2     name, please.
 3          THE WITNESS:  C-o-n-n-o-r.
 4          THE COURT:  All right.  And before you get started
 5     with Mr. Connor, I just wanted to address an issue that was
 6     raised earlier about expert testimony, and I believe Ms. Karase
 7     had initially either asked if she could voir dire Mr. Connor,
 8     or there was some discussion about it.  And the issue sounded
 9     familiar to me because I think I've had this come up
10     previously.
11          So I did a little research over the break, and
12     generally speaking, courts have declined to apply Rule 702 and
13     also *Daubert* to exclude expert testimony during suppression
14     hearings and that essentially that what the Court does is the
15     Court hears all of the evidence and then essentially decides
16     what weight to give the evidence, because, as I know you-all
17     know, the Federal Rules of Evidence do not apply with full
18     force at suppression hearings.
19          And the Supreme Court has, in *United States versus
20     Matlock*, 415 U.S. 164, 1974, explained that in proceedings in
21     which the district court is considering the admissibility of
22     evidence, it should receive the evidence and give it such
23     weight as the court's experience and judgment counsel.
24          So my inclination is to -- is to hear whatever
25     testimony Mr. Connor -- whatever testimony of his you offer,

1    the cross-examination of Ms. Karase, and then I'm sure in any

2    memoranda that are filed afterward, you two can address what

3    weight you believe is appropriate for the Court to give all or

4    any parts of his testimony.

5              MR. BELL:  Thank you, Your Honor.

6              THE COURT:  All right.  You may proceed, Mr. Bell.

7              MR. BELL:  Yes, sir.

8              RICHARD CONNOR, DEFENDANT'S WITNESS, SWORN

9                        DIRECT EXAMINATION

10   BY MR. BELL:

11   Q.   Mr. Connor, what you do for a living?

12   A.   I practice computer and digital forensics.

13   Q.   And if I can hand you what has been marked as Defendant's

14   Exhibit 1 for identification, ask you to examine that.

15   A.   (Complies.)

16   Q.   You provided a copy of your professional experience prior

17   to today's testimony.

18   A.   Yes.

19   Q.   And does that, what's Defendant's Exhibit 1, fairly and

20   accurately summarize your professional experience as it relates

21   to both your forensic examination of electronic devices and

22   other professional qualifications?

23   A.   Yes.

24             MR. BELL:  Your Honor, I would move to admit that as

25   Defendant's Exhibit 1.

1          THE COURT:  Is there any objection?

2          MS. KARASE:  No objection.

3          THE COURT:  All right.  Government's -- excuse me,

4    Defendant's Exhibit 1 is received.

5        (Defendant's Exhibit 1 was received in evidence.)

6    BY MR. BELL:

7    Q.   I think everybody's got a copy.  This is an extra up

8    there, so if you want to just use the one you have in front of

9    you as your copy.

10          Included in your CV is a list of cases where you've

11   been qualified as an expert to provide testimony concerning

12   forensic examination of digital and electronic devices?

13   A.   Yes.

14   Q.   Several of those cases were here in Jacksonville.

15   A.   Yes.

16   Q.   You have been qualified, both in the Middle District of

17   Florida and the Jacksonville Division, to provide expert

18   testimony on the subject of forensic review of electronic

19   devices in the past?

20   A.   Yes.

21   Q.   Roughly speaking, how many times?

22   A.   Total, I think it's like a hundred and -- between 150 and

23   170 cases.

24   Q.   And that's independent, separate, and distinct from where

25   you've been qualified as an expert to provide testimony about,

1   let's say, cell phones and that type of thing?

2   A.   No, that's total.

3   Q.   Total.  Okay.

4        And not to be unduly repetitious, given the

5   introduction of Exhibit 1, but if you would, just summarize

6   both your educational and professional qualifications with

7   respect to forensic examination and analysis of electronic

8   devices.

9   A.   I hold a -- in terms of education, I hold a certificate in

10  computer forensics from Oregon State University.

11       I've been doing this full-time since 2006, and since

12  that time I've obtained several certifications.

13       And those are I have an ACE, AccessData Certified

14  Examiner; CCE, Certified Computer Examiner; CFCE, Certified

15  Forensic Computer Examiner; DFCP, Digital Forensic Certified

16  Practitioner; ENCE, EnCase Certified Examiner; and ICMDE, IACIS

17  Certified Mobile Device Examiner.

18       And similar to accountants and attorneys, who have

19  continuing education requirements in Florida, most of these

20  certifications have continuing education requirements.

21       So I basically have to average -- it was 20 hours a

22  year in order to maintain these certifications, so I've gone to

23  numerous education -- gone through numerous education classes

24  to maintain my learning and my certifications.

25  Q.   Let me interrupt you --

1        THE COURT:  Mr. Bell, I just want to interrupt for a

2   second because I didn't realize this before, and I thought

3   Mr. Connor looked familiar.

4        But Mr. Connor and I were actually in the same law

5   firm for a period of probably about two months, maybe

6   two-and-a-half months, in -- from probably, what, September of

7   1988 to December of 1988?

8        THE WITNESS:  That's a long time ago, Judge.  I do

9   remember you from then.

10        THE COURT:  So you may not remember, but --

11        THE WITNESS:  I do.

12        THE COURT:  -- but I do, and -- but I just wanted to

13   call that to your attention.  We were professional associates

14   for a very short period of time, and I don't think it will in

15   any way affect my ability to properly weigh Mr. Connor's

16   testimony.

17        But I thought it was him, and for some reason I had a

18   recollection of him going to Princeton University.  And I think

19   the name of the firm at the time was --

20        THE WITNESS:  Pleus.

21        THE COURT:  Yeah.  Smathers, Adams, Pleus --

22        THE WITNESS:  Yep.

23        THE COURT:  -- and Divine --

24        THE WITNESS:  Yep.

25        THE COURT:  -- was the name of the firm at the short

1    period of time I was there.

2              MR. BELL:  Smathers the former U.S. senator?

3              THE WITNESS:  His brother.

4              THE COURT:  Yeah, his brother, yes.

5              But anyway, Ms. Karase, I just wanted to mention that

6    as soon as I realized it.

7              MS. KARASE:  Thank you for noting that.  It raises no

8    concerns for me, Your Honor, with what you said.

9              THE COURT:  All right.  Mr. Bell?

10             MR. BELL:  I was generally aware of it.  I understood

11   that he'd testified in front of you and that maybe this issue

12   had come up, so I didn't really feel compelled to address it,

13   but --

14             THE WITNESS:  It's the first time I've seen you since

15   you left our firm.

16             THE COURT:  Yes.  This is the first time -- I went

17   from my clerkship with Judge Melton to the firm.  There was a

18   government freeze on at the time, and when the government

19   freeze was lifted, I was offered a position as an assistant

20   U.S. attorney, and I never saw Mr. Connor again until today, I

21   believe.

22             THE WITNESS:  I think that's correct.

23             MR. BELL:  Well, Judge, maybe it's my fault because I

24   noticed a couple of the cases in this district that he

25   testified in were your cases, but I may have made a mistake.

1  He may have only testified in front of the district court and
2  may not have had an opportunity to appear in front of you.
3          THE COURT:  I think that's --
4          THE WITNESS:  First time.
5          THE COURT:  -- probably so.
6          MR. BELL:  Okay.
7          THE COURT:  Do you agree with that?
8          THE WITNESS:  Yes, this is the first time.
9          THE COURT:  Yes.
10         MR. BELL:  All right.
11         THE COURT:  All right.  Well, we've got a full record
12 of that.
13         Go ahead.
14 BY MR. BELL:
15 Q.   And I guess that does bring up, prior to becoming a
16 forensic -- a computer forensic person, you had another life
17 in -- professionally.
18 A.   Correct.  I practiced law full-time for, I think, 12 or 15
19 years before getting into this.  And I still maintain my Bar
20 license, so I'm still a licensed attorney in the state of
21 Florida.
22 Q.   We oftentimes ask experts to explain what a forensic
23 person does, but generally speaking, that would be applying
24 whatever you're investigating to legal principles.
25         Is that a fair summary?

1    A.    Yes.

2    Q.    And as a lawyer, you're generally familiar with legal

3    principles.

4    A.    I hope so, yes.

5    Q.    All right.  Now, a couple questions for you.

6          You did prepare an affidavit at my request, in

7    anticipation of your testimony today.

8    A.    Yes.

9    Q.    All right.  And it -- the affidavit summarizes your

10   analysis and opinions concerning certain assertions that are

11   routinely contained in search warrant affidavits here in the

12   Middle District.

13   A.    Yes.

14   Q.    First, let's address one issue, I guess, whether it's

15   required or not.

16         What qualifies you to offer an opinion on these

17   subjects that I asked you to opine on?

18   A.    That's the thing I do in all these cases.  I've done more

19   than 330 child porn cases.  And, for example, what I hear very

20   often from my clients or their lawyers is, "I didn't do it.  It

21   was somebody else."  So I have to analyze the data to determine

22   was it somebody else using the computer or was this person

23   using it.

24         I also often hear, "Well, it's an accident.  I was

25   looking for adult porn and I got this child porn by accident."

1    So I analyze the data to see are they looking for child porn,

2    or are they looking for adult porn or something else and

3    getting it by accident.

4         I'm asked, "How much does this happen?  Is this a

5    rare thing?  Do they do it, like, once a year?  Do they do it

6    once a month?  Do they do it every day?  How long has it been

7    going on?"

8         So the type of data that I examine and the things I

9    often look for day to day are very similar to what I put in the

10   affidavit, which is simply looking at my cases, looking at the

11   language in the affidavit and saying does this data and this

12   case fit this language, yes or no.

13        And if it's a yes, it goes into this pile.  If it's a

14   no, it goes into this pile.  Then there were some that I could

15   not tell, so it went into a third pile.

16   Q.    Okay.

17   A.    So it's just analyzing the data and looking at the

18   language and saying does it fit.

19   Q.    All right.  And just at kind of a basic level, you know,

20   independent of this case, what you oftentimes do is look at the

21   images that have been recovered from law enforcement-related

22   searches to determine whether they satisfy the statutory

23   definition of child pornography.

24   A.    I don't often make that decision myself, but, yes, I do

25   often look at the files to tell my client and the attorney,

1  "Yeah, there's 10,000 porn files and 8,000 are child porn," or,

2  "8,000 are adult porn, you know, roughly."  So I do do that

3  type of analysis also.

4  Q.   Well, in a sense you're familiar with the statutory

5  definition of child pornography.

6  A.   Yes.

7  Q.   And you're familiar with the definition that's contained

8  in the search warrant for child erotica.

9  A.   Yes.

10 Q.   And you've had the opportunity, I guess, in the course of

11 your employment as a forensic examiner over the years to review

12 search warrants that have been prepared by the Office of the

13 United States Attorney for the Middle District of Florida.

14 A.   Yes.  In every child porn case, the first thing I do is

15 ask my defense attorney to get me the discovery from -- all the

16 government discovery, specifically the search warrant and then

17 police reports and the forensic reports.

18        So I've done 330 cases.  I'd say I've probably

19 reviewed around 300 affidavits for search warrants --

20 Q.   Okay.

21 A.   -- in child porn cases.

22 Q.   Okay.  And essentially you're out of Orlando, as your

23 CV --

24 A.   Yes.

25 Q.   -- says?

1            So your work in the Middle District entails

2    Jacksonville, Orlando, Tampa Division, and --

3    A.    I work a lot of other jurisdictions also, but most of my

4    work is in the Central Florida area.

5    Q.    All right.  But you have a basic familiarity with the -- I

6    guess the structure and contents of many of the search warrants

7    in the Middle District of Florida.

8    A.    Yes.

9    Q.    All right.  And, sir, you had an opportunity, based on

10   your experience professionally and educationally and your own

11   independent analysis of the data, to form opinions on an

12   evidentiary -- on the evidentiary basis for the proposition

13   that people that possess or download child pornography tend to

14   collect it and hoard it.

15   A.    Yes.

16   Q.    And essentially you described earlier that -- what the

17   basis for that was.

18            Before getting into it, Mr. Connor, describe for the

19   Court when you first started to question this proposition about

20   people who download child pornography tend to both collect and

21   hoard it.

22   A.    Yeah.  So at some point -- it may have been a couple years

23   ago; I can't remember -- I actually tried to trace this back to

24   see where it originated.  When was the first citation to it?

25   Was there any factual basis?  Was there a report?  And I could

1    not find the basis for this collector language.

2         And to give you one possibility, HSI is Homeland

3    Security, and I -- they do a lot of child porn cases, and that

4    puzzled me.  Why is HSI doing child porn?

5         And the reason I -- what I was told by an HSI agent

6    is that they started doing these cases back in the precomputer

7    days when magazines were shipped from overseas to the United

8    States through the Postal Service, and that's how they got into

9    the child porn business.

10        So is this collector language based on the magazine

11   days?  I don't know.  I never was able to determine what the

12   basis of it was.  But as I go through 100, 200, 300 cases -- I

13   had never done this analysis before this case, but I had a gut

14   feeling that it was wrong because most of my clients would --

15   that I could think of did not fit that collector language.

16   Q.   All right.  And let me interrupt you.

17        I guess -- so that -- and you and I had discussed

18   this some years ago in a different context.

19   A.   We could have.  It's been on my list of things that bug me

20   for a while.

21   Q.   So in other words, when I contacted you about this

22   particular case, this was something that wasn't the first time

23   you had considered it.

24   A.   That is correct.

25   Q.   Okay.  And --

1          THE COURT:  He was telling a story about how -- this

2    effort to get back to the factual basis of being a collector

3    when you interrupted.

4          MR. BELL:  I did.  I'm sorry.

5          THE COURT:  You think he could finish that?

6          MR. BELL:  Yes.

7    BY MR. BELL:

8    Q.   Would you finish that?

9    A.   Yeah.

10         So I -- I never found the origin of it, and it seemed

11   like to me what happened was at some point a judge cited that

12   language in terms of why child porn search warrants are never

13   stale, and so now they cite to that case and it's become

14   gospel.  It's unchallenged.  It's taken as accepted fact.

15         And I knew deep down, from my 300 cases, that I

16   didn't think that was true.  That collector language did not

17   apply to the majority of my clients.

18         And I do cases, again, all throughout Florida.  I

19   have child porn cases in state court all throughout Florida.  I

20   do cases in other states, Wisconsin, Virginia, Arkansas, and a

21   bunch of other states.

22         It's the same language, the same affidavit.  And it

23   just did not strike me as being accurate.  If it ever was, it

24   did not seem to be accurate as of this day and as -- in part

25   because things may have changed.

1    If it started with the magazines, then you get to the

2  old dial-up Internet with Prodigy and AOL.  And then you get to

3  the LimeWire, and then now you've got high-speed Internet and

4  fiber and peer-to-peer and the dark web.  So things have

5  changed in the 15 years I've been doing this, yet that language

6  is the same.  It's never changed.

7    And so when I was offered this opportunity, I thought

8  it would be a good time to take -- put numbers to it and see

9  what -- see what I found.

10    THE COURT:  Do you, off the top of your head, recall

11  the name of the case you said that was -- that cited that

12  language?

13    THE WITNESS:  No.  I want to say it was from

14  the '90s, though, but I don't remember the first earliest cite

15  that I could find.  And I never got beyond that.  It was as if

16  somebody put it in, the judge cited it, and like I said, that

17  thing has been gospel ever since, from what I can see.

18    THE COURT:  Okay.

19    MR. BELL:  Thank you, Your Honor.

20  BY MR. BELL:

21  Q.   And you have reviewed the specific search warrant in this

22  case.

23  A.   Yes.

24  Q.   And is it similar and consistent with, I guess, the

25  language, particularly on the collector and hoarder and child

1  pornography collector characteristics, to other search warrants

2  in the Middle District of Florida and otherwise?

3  A.   Yes.

4  Q.   And I believe you described you've reviewed hundreds of

5  search warrants?

6  A.   In child porn cases, yes.

7  Q.   In child porn.

8       And essentially are they generally the same structure

9  as the one that you've reviewed in Mr. Marino's case?

10  A.   Yeah.  Everything's the same except for the specific facts

11  of the case at hand.  And like the agent testified, this one

12  involves Bitcoin and the cluster analysis and blockchain, so

13  that gets added in.

14       But other than -- the child porn part is -- it's all

15  the same except for the one section about the specific case at

16  hand.

17  Q.   Okay.  And, sir, also are you familiar with the assertion

18  in paragraph 17 of the search warrant, essentially that with

19  the advent of faster Internet, individuals have been found to

20  download and then delete child pornography, but essentially,

21  nevertheless, the artifacts of that child pornography may

22  remain?

23  A.   I'm familiar with that, yes.

24  Q.   Okay.  And what's your view of, I guess, the truthfulness

25  or the -- oh, did you have the opportunity to test that

1    proposition, or in your experience, has -- is that assertion

2    true?

3    A.    Yeah, especially the first part, the faster Internet.

4    Yeah, it's my experience that it's much -- child porn is much

5    more readily accessible, so people are downloading it and

6    deleting it, and then whenever they want to look at it again,

7    they download it again.  And that's what I experience with --

8    with a lot of my clients.

9    Q.    We'll come back to that in a minute.

10           But after I contacted you and you had the opportunity

11   to review the -- review the search warrant in this case, what

12   did you do to essentially empirically test the propositions

13   that you cited in your affidavit?

14   A.    Yeah.  So I put the search warrant affidavit language that

15   I considered in the affidavit, and it's basically the collector

16   is never going to be without it.  They hoard it.  They never

17   delete it.

18           And so I went and looked at the records, the data I

19   have from my 330 cases, to see if they would be considered a

20   collector.  And I tried to do it in an objective way so that if

21   somebody else ever came and looked at my cases and their data,

22   that they would come to the -- pretty close to the numbers that

23   I got.

24           And when I say data, I have the government discovery.

25   And when I do my examination, I bring back to my office data

1    from -- I can copy anything I want other than child porn files.

2              So I have, like, the Internet history event logs.  I

3    have a full file system list so I can see how much CP there is

4    and stuff like that.  So I have a lot of data from these exams.

5              And so I would go and look and see is this guy

6    downloading and deleting?  Is he -- does he have a ten-year-old

7    collection?  And to try to fit it in and say, yes, he's a

8    collector and, no, he's not.

9              Or (3) some I did not have enough date to make a

10   determination, or the data I had, I could not make a

11   determination.  So I put that in the I don't -- I cannot tell

12   category.

13   Q.   Okay.  And before I get to that, let me interrupt you one

14   more time, and you may have touched on this earlier when you

15   answered the initial question about this proposition.

16             But have you done any -- have you ever surveyed the

17   literature in terms of the forensic community to determine

18   whether anyone else has ever tested this basic proposition of

19   collectors and hoarders, and, you know, whether -- in the

20   defense forensic examiner community or law enforcement

21   community, has anybody ever, to your knowledge, in the

22   literature you reviewed, tested this basic proposition?

23   A.   I've not seen anything like that, no.

24   Q.   All right.  And you mentioned you go to these continuing

25   education classes.  You get 20 hours of CLE every year, so to

1  speak, and that keeps you up to date with both changes in

2  technology and, I guess, updates on whatever findings there may

3  be in the forensic community?

4  A.   Yes.

5  Q.   All right.  So in any event, you're not aware of any

6  literature on this particular subject.

7  A.   Correct.

8  Q.   So you have your professional experience, and you went and

9  you tested the proposition, as you understand it, for 330 child

10  pornography cases since 2016.

11  A.   Since 2006.  That's a typo on there.

12  Q.   Okay.  So essentially that goes back -- that is a typo in

13  your affidavit, the --

14  A.   Yes.

15  Q.   So essentially you worked on 200 and -- 330 child

16  pornography cases since 2006.

17  A.   At the time of that affidavit.  The number is higher now.

18  Q.   Okay.  And if you would, tell us what your findings were.

19  A.   Yes.  So I don't remember the exact number, but I think it

20  was like 17 percent of my cases I would characterize as

21  collectors, and I think there was 14 percent that I could not

22  tell, and I believe 65 percent, I would say, were not

23  collectors.  They were more deleters than collectors.

24          THE COURT:  How many -- what was the last number?

25          THE WITNESS:  65 percent were not -- I would

1   characterize as not being collectors.

2          THE COURT:  Okay.

3          THE WITNESS:  17 percent were, and 14 percent I could

4   not tell.

5          THE COURT:  And how did you define collectors?

6          THE WITNESS:  It's the language in my affidavit,

7   which is taken from the affidavit for the search warrant.

8          I don't have my affidavit in front of me, but the

9   language is right in there.

10  BY MR. BELL:

11  Q.   Would it refresh your recollection to have it?

12  A.   Yes.

13         MR. BELL:  Your Honor, if I could --

14         THE COURT:  Yes.

15         THE WITNESS:  So paragraph 17, "Many individuals who

16  collect child pornography rarely, if ever, dispose of their

17  sexually explicit materials," and then (b), "They intend to

18  maintain and hoard their depictions of child pornography for

19  long periods of time," so that's the criteria I used.

20  BY MR. BELL:

21  Q.   And you may have done the numbers just from your memory,

22  but if you have your affidavit in front of you and it has the

23  precise findings that you made, if I can trouble you to recite

24  those.

25  A.   Yes.  Of the 330 cases, I -- it's my opinion that 58 of

1    those were collectors, which is about 17 percent.  220, or

2    about two-thirds, 65.87 percent, were not collectors.  And 48

3    cases, which is 14 percent, I could not make an accurate

4    determination.

5    Q.   All right.  And as a lawyer and a forensic examiner,

6    you're familiar with the -- I guess the basic definition of

7    probable in probable cause?

8    A.   Yes.

9    Q.   All right.  Would you agree that that generally connotates

10   that something's more likely than not, more likely than random

11   chance?

12          MS. KARASE:  Your Honor, I'm going to object.  This

13   really goes to an ultimate issue, and it's beyond the scope of

14   the forensic examiner's expertise.

15          THE COURT:  I'm not sure what the question is going

16   to be.

17          I'm not sure I agree with your definition of probable

18   cause but go ahead and let's see where it goes.

19   BY MR. BELL:

20   Q.   Well, would you agree that 17 percent is less than more

21   likely than -- than -- that is less than 50 percent?

22   A.   Yes.  Yes.  I'd say the vast majority -- the 58 percent is

23   much -- is a very -- it's a relatively small percentage, 17

24   percent.

25   Q.   Now, it's your contention, based on your examination and

1    analysis in applying the definition that's contained in this

2    search warrant that you examined, that you can empirically test

3    and measure that definition.

4    A.    Yes.

5    Q.    And you may have touched on this again, but just briefly,

6    are you aware that any law enforcement agency -- FBI, Homeland

7    Security, anybody else -- has tested the data that they would

8    have available to measure this definition?

9    A.    I've seen nothing like that in any affidavit for search

10   warrant I've examined, and I've never seen it anywhere else.

11   Q.    And it may be somewhat obvious that they're going to have

12   a lot more data than you are to test this proposition?

13   A.    It depends on -- yes.  I don't know how many child porn

14   cases, say, the Jacksonville division of the FBI or, say, the

15   U.S. Attorney's Office has prosecuted over the last ten years.

16   But if you add up all the different offices and then go to the

17   state also, then, yes, they're going to have a much larger

18   sample -- sample to analyze than -- than mine.

19   Q.    All right.  And the second subject that I asked you to

20   offer an opinion --

21          THE COURT:  Wait just a second.  Can I interrupt you?

22          MR. BELL:  Yes.

23          THE COURT:  But would you say that the broader the --

24   broader the number of cases or the larger the number of cases,

25   the more accurate your -- your figures would be?

1          THE WITNESS:  I would agree.  Like sampling size,

2    correct.

3          THE COURT:  Yes.

4          THE WITNESS:  The more you sample, the more -- better

5    accuracy you should achieve.

6          THE COURT:  Go ahead.

7    BY MR. BELL:

8    Q.   I mean, obviously you only have access to the stuff that

9    you've been hired to review and would have maintained a file

10   on.

11   A.   Correct.  I analyzed what the -- what I had available to

12   me.

13   Q.   All right.  The second subject is the subject of modern

14   Internet usage and delivery systems essentially make it more

15   likely the user will delete images.

16          But as the warrant suggests, nevertheless,

17   there are -- artifacts or evidence of CP can still be found on

18   computers.  That's essentially the kind of proposition here.

19   Are you --

20   A.   No.  That's -- that's true.  There may be artifacts left

21   behind after something is deleted.  It's the recovering of the

22   deleted stuff that is an issue.

23   Q.   Okay.  And -- well, I guess on the artifacts section, I

24   think you offer an opinion on it that a file name and other

25   artifacts may not be indicative of child pornography because --

1  because of why?

2  A.   Yeah.  As the agent testified earlier, they use hash

3  values to identify child pornography.  A hash value is like a

4  digital fingerprint, because names, especially in, like, the

5  peer-to-peer world and probably on the dark net, are often

6  not -- do not accurately depict their contents.

7         You may want to try to download a Frank Sinatra song;

8  it might be Britney Spears.  Somebody just misnamed it to mess

9  with people.  So that's why names, they're indicative but

10 they're not proof that something is child porn.

11        In my analysis, I often go by names because I don't

12 have the hash database that law enforcement has, so I will -- I

13 have a term of common CP names.  And when I label those in any

14 analysis, I don't label them child porn.  I label them PCP,

15 possible child porn, because I don't actually know because I

16 don't have a hash analysis and often don't actually view the

17 files.

18        But it gives me pretty good numbers of what my

19 client's doing.

20 Q.   Now, the subject of, I guess, deleted files and the

21 opportunity to recover -- recover evidence of child

22 pornography -- and you heard me.  You were in court and heard

23 me ask the agent a couple questions about that in terms of

24 changing technology.

25 A.   Yes.  So kind of like going back originally, child

1  pornography was paper-based magazines, and now it's

2  computerized, and the different methods of accessing it,

3  through dial-up Internet and stuff, have changed.

4         Hard drive technology and storage technology has

5  changed -- is changing drastically.  10, 15 years ago when I

6  started, all computer hard drives were spinning disks.

7  Remember, they had the disk inside and the head that spins, the

8  magnetic discs.

9         Those are -- on those hard drives, when you delete a

10  file, like a child pornography file, it stays on the disk until

11  it's overwritten by newer data.  So, yes, it may stay there for

12  years, and when they come out and serve a search warrant three

13  years after the fact, that child porn file may still be there

14  intact on that hard drive.

15         These days more and more drives on computers -- and

16  I'm going to get to phones in a second -- are solid-state

17  drives.  There's no spinning disc.  They're solid state.

18  There's nothing that moves.

19         And the technology, therefore, is much different.

20  There are actually nozzles that open and close to allow

21  electrons to pass through to write to the chip.  And those

22  nozzles are actually the weakest part of the solid-state drive.

23  They're going to wear out before anything else does.

24         And so what happens is there's a thing called trim.

25  So they actually -- they're -- they usually refer to the blocks

1    as -- on these solid-state drives.

2            So say we have a drive that's 10 gigabytes; it's 10

3    blocks of one gigabyte.  So if you just kept writing at the

4    beginning of the drive and you're only using the first block,

5    eventually those nozzles are going to wear out, and that first

6    block is not going to work anymore.

7            So now you're going to have to start writing on block

8    2, and instead of having a 10 gigabyte drive, you now have a 9

9    gigabyte drive.

10           So what people came up with in this technology and

11   decided to do was we're not going to do that.  We're going to

12   write to block 1 one time, then we're going to write to block

13   2, then block 3, all the way to block 10 and then go back to

14   block 1.  So we're going to write an equal amount of times so

15   that all the nozzles will wear out at the same time.

16           And when that happens is -- so you write to block 1.

17   So say on block 1 we download -- my user downloads some child

18   porn and then deletes it.  And so block 1 gets written one

19   time.  So now what the drive does is it takes all the existing

20   files on block 1 and copies them to block 2 and starts writing

21   to block 2.

22           Now, the deleted file on block 1 was deleted, so it's

23   not copied to block 2.  It only sits on block 1, and at that

24   point in time, it's still available to be forensically

25   recovered, just like the old drives.

1           However, when the data is moved from block 1 to block

2     2, the drive knows that I'm going to be coming back to use

3     block 1 again.  So it zeros out block 1, zeros out, wipes it,

4     so that any deleted data that had been on block 1 is now no

5     longer forensically recoverable.  It's all zeros.  There's

6     nothing left to recover.

7           So on newer SSD drives our ability to recover deleted

8     data is greatly diminished.  And so that statement, again, is

9     changing rapidly.  It depends on the technology.

10    Q.    Let me stop you because I have a hard time following.

11          This -- at one point there may have been some truth

12    to those assertions, essentially, that deleted items were

13    recoverable, and hence, you know, if a search warrant's

14    executed for suspected criminal activity months or even years

15    ago, it may still be on -- even if it had been deleted, it may

16    still be there.

17    A.    Yes.  On the spinning hard drives, that is still correct

18    as of today.

19    Q.    With the newer, more modern technology, that is

20    increasingly less true, and it's just simply not a reliable --

21    a reliable assertion.

22    A.    Correct.

23    Q.    All right.  Now, again, generally speaking, the forensic

24    examiners that are employed by the law enforcement community

25    would be aware of the changing technology?

1    A.    I would hope so.

2    Q.    Now, have you had some experience with Bitcoin, cluster

3    analysis, that type of thing?

4    A.    I've never done cluster analysis.  I have had cases

5    involving Bitcoin.

6    Q.    All right.  You are -- you know, you've had experience

7    over the years in, you know, reviewing cases where individuals

8    are accused of having contacted sites that provide child

9    pornography of -- out of the country, whether it be, you know,

10   some foreign source?

11   A.    Yes.

12   Q.    And essentially dark net sites?

13   A.    I have had some of those, yes.

14   Q.    And in your experience, did some of those sites provide

15   things other than child pornography?

16   A.    Yeah.  You can get anything in there.

17   Q.    Well, child erotica or things that may not be criminal.

18   A.    Correct.

19   Q.    All right.  Specifically in this instance.

20   A.    Yeah.

21   Q.    Or things that may -- you know, things that -- images that

22   may be -- constitute the definition of child erotica?

23   A.    Yes.

24   Q.    And you're familiar with that definition from the search

25   warrant.

1    A.    Yes.

2          MR. BELL:  I believe that will do it, Your Honor.

3          THE COURT:  All right.  Thank you.

4          Ms. Karase?

5                          CROSS-EXAMINATION

6    BY MS. KARASE:

7    Q.    We'll kind of start where Mr. Bell ended.

8          The statement that you were discussing with him is

9    the assertion in the affidavit that "Computer forensic

10   techniques can often recover files, including images and videos

11   of child pornography, that have long been deleted from computer

12   media by a computer user," right?

13   A.    Yes.

14   Q.    And that is true.

15   A.    What is true?

16   Q.    That statement.

17   A.    It's less true today than it was ten years ago.

18   Q.    Less true?

19   A.    Yes.

20   Q.    Is it true that it depends on when the files were deleted?

21   A.    It depends on that.  Depends on the usage of the drive.

22   For example, if there's -- if the person filled up the drive

23   with porn or child porn, deletes some, fills it up again, that

24   overwrites it so you're not going to recover anything.

25          And, again, if it's an SSD drive, your chances of

1    recovering deleted pictures or videos is close to nil.  It's

2    very small.  So it depends on a bunch of factors.

3    Q.   Okay.  So it depends on the type of drive.  It depends on

4    the usage.  It also depends on the size of the storage.  It

5    depends on the backup systems that are in place, right?  You

6    would agree with all of that.

7    A.   I do.

8    Q.   Okay.  And you mentioned, during your -- at the beginning

9    of your testimony, that you are often retained when there's an

10   assertion that "I didn't do it" or that "This was an accident,"

11   right?

12   A.   Those are some of the things that I hear from my

13   clients --

14   Q.   Okay.

15   A.   -- after I get hired.

16   Q.   And you said that was often, right?

17   A.   Yeah.  That's probably an accurate word.

18   Q.   Okay.  And that means that you're often retained when

19   there is exploration of a defense, right?

20   A.   You said --

21   Q.   The "I didn't do it" defense or "this was an accident"

22   defense.

23   A.   Well, let me answer it this way.  I get hired in -- I get

24   hired for different reasons.  Very often -- sometimes it's just

25   the CYA.  The attorney doesn't want to be charged with or have

1   the argument made that he didn't hire a forensic expert.

2          Sometimes the client realizes, once he gets arrested,

3   what he's up against in terms of sentencing and the

4   registration requirement, that he'll spend whatever he can to

5   hire somebody like me to try to get him out of it.

6          So I get hired for a lot of different reasons.  I

7   cannot generalize the reason I'm hired.

8   Q.   Okay.  Well, you would agree that there are many cases in

9   which neither you nor any other expert is hired where a

10  defendant is charged with some sort of child pornography

11  offense under 2252 and that there is a plea that results and

12  that an expert is never retained because there's simply an

13  admission and an acceptance of responsibility.

14  A.   Unfortunately, I hear that that is true.

15  Q.   Okay.  Well, with respect to law enforcement, when they

16  are going to execute a search warrant, they are looking for --

17  usually, if it's a residential search warrant that includes

18  electronic devices, they're looking for all of the electronic

19  devices in the house, right?

20  A.   Well, they're specifically looking for the ones associated

21  with child porn, but, yes, they often check everything that

22  they locate or preview everything that they locate.

23  Q.   Okay.  And you said that you've reviewed hundreds of

24  search warrants.

25          And, I'm sorry, what was the geographic region?

1  A.   Well, most of my cases are in Florida, but I've done child

2  porn cases in other states also.

3  Q.   Okay.  And you said that in reviewing these search

4  warrants, that you see some common language included.

5  A.   Yes.

6  Q.   And that -- you mentioned that it's almost all the same as

7  what is -- as what is present here in Government's Exhibit 1,

8  except for, you mentioned, the Bitcoin reference, right?

9  A.   Yes.

10  Q.   And the probable cause section.

11  A.   Correct.

12  Q.   Now, certainly, agents down in Key West aren't citing the

13  Middle District of Florida investigation that Special Agent

14  Algozzini conducted that's referenced specifically in -- I'm

15  looking for the page number.  Bear with me -- page 23 of the

16  search warrant, right?

17  A.   Does that have the operation name on it?

18  Q.   It does not, but I can tell you it's the case of United

19  States versus Michael Williams.

20  A.   Yeah, I don't know.  I'd have to check.  They may put

21  different juris- -- their own jurisdictional case in there.

22        But I'd have -- I have some Key West search warrants

23  I could check, but -- they may have different cases cited, but

24  the language is essentially the same.

25  Q.   Okay.  My point is that there are differences between the

1  warrants that you've reviewed, even in the language leading up

2  to the probable cause section.

3          Would you agree with that?

4  A.   I would -- there may be differences.  I would say that

5  they're minor.

6  Q.   All right.  And you have examined devices in child

7  pornography investigations when you've been retained to do so,

8  right?

9  A.   Yes.

10  Q.   And that's when someone hires you, and it sounds like you,

11  of course, would like to be hired in every single case, but we

12  know that you haven't appeared before Judge Klindt before, and

13  he's been a magistrate judge for a long time.

14  A.   Yes.

15  Q.   And the two of us have not had a case together, right?

16  A.   Correct.

17  Q.   And I've been working child exploitation cases for quite a

18  while.

19          You have had a couple cases with Rodney Brown from

20  our office, right?

21  A.   Yes.

22  Q.   But I believe that's just two in his many years of

23  experience, right?

24          THE WITNESS:  I guess I'm not getting my share of the

25  business in Jacksonville, Judge.

1  BY MS. KARASE:

2  Q.    Is that right, Mr. Connor?

3  A.    Yes.

4  Q.    All right.  So the numbers of devices that you have

5  been -- that you have examined are those when you've been hired

6  to do so for whatever purpose.  It could be to assert a

7  defense.  It could be, as you say, a CYA.  It could be someone

8  has a lot of money to spend.  There are a lot of reasons.

9  A.    Correct.

10  Q.    When agents are preparing affidavits based on their

11  training and experience, they're basing it on their training

12  and experience executing search warrants across the board,

13  right?  It's their investigative experience and their

14  conversations with others?

15  A.    I believe that that's part of what goes into that, yes.

16  Q.    Okay.  And you have seen experienced agents preparing

17  search warrant affidavits where they continue to report that in

18  their experience, they see many individuals who collect child

19  pornography to hoard it, right?

20  A.    I don't think it's worded that way.  The collector

21  language is in every affidavit.  I've never seen it where they

22  basically say, "I" -- "It's my opinion that."  It's more based

23  on convers- -- it's based on this and innuendo and talking to

24  other people and stuff.  It's more generalized.

25           I've never seen anybody put any factual basis there

1    that say, "I've done 40 cases and 35 were collectors," or

2    anything like that.  It's just what you see there.  It's

3    basically the same thing in everything, every affidavit.

4    Q.    Okay.  So this one, the introductory paragraph, paragraph

5    15, "Based on my," Agent Luedke's, "training" -- I'm sorry, "my

6    experience, training, and conversations with other experienced

7    agents who investigate cases involving the sexual exploitation

8    of children, I know that certain common characteristics are

9    often present in individuals who collect child pornography."

10           Do you see that?

11   A.    I've seen that, yes.

12   Q.    Okay.  And that's in this warrant affidavit.

13   A.    Uh-huh.

14   Q.    Do you agree with that?

15   A.    Yes.

16   Q.    And then it goes on.  The paragraph, or at least one of

17   them that you're challenging, is sub (f) that says, "Many

18   individuals who collect child pornography rarely, if ever,

19   dispose of their sexually explicit materials and may go to

20   great lengths to conceal and protect them from discovery,

21   theft, or damage."

22           You'd agree that that's the language that you're

23   challenging.

24   A.    Correct.

25   Q.    And then you do your analysis where you come up with

```
 1   conclusive -- what you can tell, 17.37 percent.  And I have to

 2   take a little bit of -- well, let's use your language first.

 3              17.37 percent of the 330 cases that you examined

 4   could be categorized as collectors, right?

 5   A.   Yes.

 6   Q.   You're using the word "collector."

 7              Are you intending to reference that these are the

 8   types of collectors who rarely, if ever, dispose of their

 9   sexually explicit material?

10   A.   Yeah.  They -- "who collect child pornography rarely, if

11   ever, dispose of their sexually explicit materials," and, "They

12   tend to maintain or hoard their child pornography for long

13   periods of time."

14   Q.   And you say, "Collectors, as defined by the language in

15   the affidavit."  In your affidavit you say, "Collectors, as

16   defined by the language in the affidavit."

17              Collectors is not defined in the search warrant

18   affidavit, is it?

19   A.   That's -- it's under the collector -- what's the head of

20   that section?

21   Q.   Here, let me get you a copy so that we're . . .

22              I'm handing you a copy of Government's Exhibit 1.

23   A.   Yeah.  Where's that page?  Sorry.

24   Q.   20 -- page 20.

25   A.   Yeah.  Child pornography collector characteristics.  I
```

1  call it the collector language.  If you look in my notes in my

2  cases, when I'm going through the search warrant affidavit, I'm

3  going to put, like in this case, page 20, collector language.

4  That's how I refer to it.

5         And the specifics are the ones that we just talked

6  about that are in my affidavit.  So I applied those criteria,

7  and if they met -- if my case -- my client met that criteria, I

8  categorize them as a collector.  That's my term and the term

9  used in the header of that section in the affidavit.

10        So that's how I did it.

11  Q.   Okay.  And can someone who collects child pornography also

12  delete it?

13  A.   Yes.

14  Q.   Can someone be a -- like the reference in paragraph 17,

15  someone who collects child pornography, accumulates it, due to

16  the faster Internet download speed enjoys it, and then deletes

17  it?

18  A.   So you've got to get more specific than that.  Can I give

19  you examples?

20  Q.   Sure.

21  A.   So if I've got somebody who downloads child pornography

22  every Saturday night and deletes it -- looks at it Sunday

23  morning, and deletes it Sunday afternoon, they're not a

24  collector in my book.  I don't care how many times they do it,

25  they're not collecting it; they're not hoarding it; they're not

1  saving it.  They're deleting it every time they download it.

2  Q.   They're seeking it out on Saturday night.

3  A.   Yeah.

4  Q.   And they're possessing it overnight Saturday night.

5  A.   Yeah.

6  Q.   And they're deleting it on Sunday.

7  A.   Yeah.  So are they -- are they rarely, if ever, disposing

8  of their materials?  No, they're disposing of it every day.

9       Are they tending to maintain or hoard their child

10  pornography for long periods of time?  No, they delete it right

11  after they view it.  That, to me, is not a collector.

12       Now, if I've got a guy who has a hundred thousand

13  child pornography files, and he goes in and finds a couple he

14  doesn't like and deletes them, he's still a collector.

15       And I think the thing that came up this morning was

16  if somebody -- say you get a tip that law enforcement's coming

17  out to serve a search warrant, and they delete all this stuff

18  the night before, and we can see from the artifacts or whatever

19  that he had 10,000 files that date back ten years.  Even though

20  it had been deleted the night before, I would say he's a

21  collector.

22  Q.   Okay.  Well, that's helpful.

23       What criteria did you use when you were conducting

24  your case count for the 330?

25  A.   The language in 17(a) and (b) of my affidavit, which was

1    quoted from the search warrant affidavit.

2         THE COURT:  But did you put numbers to those?  Like,

3    in other words, if it says, you know, that -- that the

4    person -- where's the language you were using, you just said

5    that you used?

6         THE WITNESS:  It's -- in my affidavit it's paragraph

7    17(a) and (b).  In the search warrant affidavit, it's . . .

8         MS. KARASE:  Paragraph (f), 15(f).

9         THE COURT:  15(f)?

10        MS. KARASE:  Yes.

11        THE COURT:  All right.  Looking at 15(f), for

12   example, they tend to maintain for long periods of time, did

13   you put, like, a number of months, years, any type of cutoff

14   like this -- this isn't a long period of time.  This is a

15   medium period of time or a short period of time?

16        THE WITNESS:  No.  If they downloaded it and

17   basically maintained it -- say the earliest stuff was six

18   months ago, and then they got busted six months later after

19   their first download, and they hadn't deleted anything.  I

20   would call them a collector.

21        THE COURT:  So you were measuring essentially -- your

22   measuring essentially went backwards from the time they were --

23   they were busted and --

24        THE WITNESS:  Well, that's one of the things I looked

25   at, is the time frame.

1          THE COURT:  Okay.

2          THE WITNESS:  So had they -- for example, in, like,

3   LimeWire, the cases involving the ICAC database, you can see

4   the IP address has been recorded downloading child porn or

5   sharing child porn for maybe going back a year.

6          So if I see that case and the affidavit says that

7   "We've seen this IP address for a year sharing child porn," and

8   I do my exam and there is child porn going back a year, that

9   sounds like a collector.

10         If the child porn on that computer is only from the

11   last two weeks, he's deleted everything from the last 11

12   months, he's not a collector in my book.

13         So it's not solely a function of time or numbers.

14   It's kind of looking at all of it and saying does he fit this

15   language.

16         And it is somewhat subjective, but I did try to do it

17   in as objective a manner as I could so that if somebody else

18   came and did the same analysis of my cases, that they would

19   arrive at the same results.  So that -- that was my goal.

20         THE COURT:  And then what about the -- what about the

21   14 percent that you couldn't tell?  What -- what put -- what

22   put them --

23         THE WITNESS:  By --

24         THE COURT:  -- in that --

25         THE WITNESS:  Yeah.

1          THE COURT:  -- category?

2          THE WITNESS:  So some I may not have done an

3     examination.  They may have pled before I really did any work.

4          I may -- may have been older cases where I do not

5     still have my data.  With my older cases originally, I was just

6     deleting everything when they were done instead of archiving

7     them.

8          Or it may be a situation where they've got stuff for

9     a long period of time, but there's a lot of deletions, and I

10    really couldn't make a judgment call.  I just couldn't go one

11    way or the other.

12         I think most of them were lack of data, but there may

13    have been some in there that I could not put it in one basket

14    or the other.

15         THE COURT:  All right.

16    BY MS. KARASE:

17    Q.   And, of course, if you were to take those that you

18    couldn't put in one basket or the other out of the percentages

19    that you've calculated here, the percentage rate is going to go

20    up, right?

21    A.   Only to a third, 33 percent --

22    Q.   Okay.

23    A.   -- 35 percent.

24    Q.   All right.  And the language in the affidavit is many,

25    right?

1   A.   Yeah.  That's what the language says, but I think it
2   implies a lot more.
3   Q.   And collectors -- well, we'll -- I think we've covered
4   that.
5        Did you also consider cases you've worked on where
6   there was a knock-and-talk, and there was a prosecution that
7   resulted?
8   A.   Yes.
9   Q.   And how did you -- I guess how did you determine -- was
10  this the same way, that if someone had something for more than
11  six months, I think, was the number you used?
12  A.   Yeah.  I did not look to see if there was an affidavit
13  with collector language.  I did all my child porn cases,
14  including knock-and-talks or whether they were originally
15  seized for some other crime.  So, yes, I included everything.
16  Q.   So in knock-and-talk cases where you're retained by the
17  defense, you might have access to more information than the
18  government would if a search warrant didn't result and
19  everything was seized.
20       Would you agree with that?
21  A.   You're going to have to say that again.
22  Q.   In knock-and-talk cases where there's not a search warrant
23  but agents go approach a target, knock on the door -- or a
24  subject, knock on the door, and either a confession or a
25  consent search of a particular device results and a prosecution

1    follows, you're including those, right?

2    A.   Yes.

3    Q.   And you would agree, in those instances, because you

4    worked for the defense, you would have greater access to

5    information than the United States would.

6    A.   No, because in that case the devices would have been

7    seized.

8    Q.   Well, not always, right?

9    A.   They are in my cases.  I've never had them not seized.

10   Q.   In all of your cases?

11   A.   Yes, that I can -- as far as I can remember.

12   Q.   Let's talk about Jason Neiheisel.

13        You testified at trial in that case, right?

14   A.   Yeah.  His computer was seized.

15   Q.   And you're aware that there was a router in the residence

16   that was not searched, right?

17   A.   Yeah.  There's no point in searching a router.  It's got

18   no data.

19   Q.   It was upon your advice for fear of collecting

20   incriminatory information, right?

21   A.   No.  Once you turn it off, it loses -- it's got RAM

22   memory.  Once it's turned off, there's nothing in it anymore.

23   There's no sense in looking at it.

24   Q.   Where did you put Mr. Neiheisel, which category?

25   A.   Oh, I don't remember.  I'd have to go back -- oh, he would

1   definitely not be a collector because there was -- I think

2   there were a handful files in some obscure -- almost like a

3   trash folder, but I'm sure that I would characterize him as not

4   a collector.

5   Q.   Not a collector.

6   A.   Yes.

7        MS. KARASE:   And for the Court's edification, I know

8   Mr. Bell is familiar with this case because he was the defense

9   attorney, and Mr. Connor testified at the trial.  I was not the

10  trial AUSA, but I did -- I was familiar with the prosecution

11  because it happened just a couple years ago.

12       MR. BELL:   I can say probably the representation that

13  the router wasn't seized because I didn't want to know the

14  answer was my representation, not Mr. Connor's.

15       THE WITNESS:   And like I said, there's nothing on it

16  anyway.

17       MS. KARASE:   All right.

18  BY MR. BELL:

19  Q.   Well, you are aware in that instance that Mr. Neiheisel --

20  even though you opined at the trial that the computer that was

21  seized was not used to download child pornography at any

22  time -- you made that conclusion, right?

23  A.   Correct.  There was no data on it indicating that it had

24  ever been used to download child pornography.

25  Q.   Okay.  And what you know from your familiarity with the

1   case and the government's evidence was there was a peer-to-peer

2   download that had happened in advance and then also a

3   confession by the defendant that was introduced at trial,

4   right?

5   A.   Yeah.   That's what nailed him, probably.   That's hard to

6   get around.

7   Q.   Well, and he also had failed a polygraph about

8   distributing child pornography, right?

9   A.   I did not know that.

10   Q.   Okay.   But still, you put him in the deleter category, not

11   in the collection -- collector category.

12   A.   I'm sure that I did that, correct.

13   Q.   Okay.   Even though evidence suggested that he had

14   distributed child pornography but not from the computer that

15   you had examined.

16   A.   I'm not aware of that argument being made by the

17   government because my understanding is there were no other

18   computers.

19        So, you know, if there was another computer of his

20   that's got child pornography on it, I'll be glad to look at it

21   and reevaluate my -- my conclusion.   But my understanding is he

22   had one computer, it was seized, and it was not used to collect

23   child pornography.

24   Q.   And I guess my point in this line of questioning,

25   Mr. Connor, is that you are hired by the defense.   You've not

1   ever done any work for the government, right?

2   A.   Not in child porn cases, no.

3   Q.   Okay.  And so in all your criminal cases, it has been for

4   the defense, in fact, right?

5   A.   That is correct.

6   Q.   All right.  And when you are hired, you have a specific

7   objective in mind, right?

8   A.   What is that?

9   Q.   Well, in the case of Jason Neiheisel, it was to establish

10   that he had not, in fact, distributed child pornography.

11   A.   No, that's not my goal.  When I'm hired I analyze the

12   data, and I report on it to my client, whether it's good, bad,

13   or indifferent.  It's up to them to determine what use to make

14   of it.

15          So I've had cases where, going to trial, I've not

16   been called to testify because my report is the guy's guilty as

17   hell.

18          And in this case they claimed that the download, the

19   peer-to-peer download, had occurred on a certain day, I think

20   it was, in January or February, and the peer-to-peer software

21   on the computer said the last time it had been run was

22   December.

23          So that's why I said that computer was not used,

24   because the peer-to-peer program itself, the data said it had

25   last been run in December, and yet the download occurred in

1    January/February.

2           So that's why I testified like that in that case.

3    It's coming back to me now.

4           But that's not my goal, is to get them off or to say

5    something favorable.  I'm going to look at the data, and if

6    it's bad, I'm going to give my client bad news.  If it's good,

7    I'm going to give him good news.  It may be a combination of

8    the two.

9           But my goal, and I've said this before, is if I get

10   up and testify like this in a hearing or at a trial or

11   something and there's a government forensic examiner sitting at

12   that table listening to what I say, that he never gets up after

13   me and says I was wrong, that he would get up and say, "I agree

14   with what Mr. Connor said."

15          And I have not had somebody do that before, so I --

16   my job is to tell it like it is.  And if it's good, that's

17   great.  If it's bad, that's my client's problem, not my

18   problem.

19   Q.   Okay.

20          THE COURT:  Can you -- do you have the case number on

21   the case you-all have been referring to?

22          MS. KARASE:  Yes.  It's 3:17-cr-89-J-39JBT.

23          THE COURT:  Thank you.

24          MS. KARASE:  All right.

25          MR. BELL:  That was the case tried by Judge Goldberg?

```
 1              MS. KARASE:  Yes.
 2              Well, you would know better, but I'm nodding my head
 3    because I did watch portions of it.  But even though it was
 4    assigned to Judge Davis, he was not the trial judge.
 5    BY MS. KARASE:
 6    Q.   All right, Mr. Connor.  I believe that those are all my
 7    questions -- well, let me just clarify, because in reviewing
 8    that transcript, there must be an error in here because it says
 9    that you were -- you practiced law until about 1998 when you
10    got tired of it?
11    A.   Well, that's a true and accurate statement.  Jim Klindt
12    left so it got boring.
13    Q.   Is that true?  It was just the two years?
14              THE COURT:  No.  No.  '86.
15    BY MS. KARASE:
16    Q.   Oh, okay.
17    A.   12 years.
18    Q.   Well --
19    A.   I said 12 to 15 years, so '86 to -- I practiced
20    beyond '98.  '98 I stopped practicing full-time.
21    Q.   I see.
22    A.   I practiced part-time till 2005.
23    Q.   All right.  And then -- I'm sorry.  I didn't mean to
24    prematurely stop there.  One just last line of questioning.
25              You have your website, ESIConsultingFL.com, right?
```

1   A.   Yes.

2   Q.   And you have your CV linked on the website --

3   A.   Yes.

4   Q.   -- with your experience, you know, 40-some pages, 39

5   pages?

6   A.   Yes.

7   Q.   And in it you have many, many references to recovery of

8   deleted data or deleted Internet history that you've testified

9   about -- about the recovery of deleted files or about wiping,

10  right?

11  A.   Yes.

12  Q.   And you get a lot of business from your website?  That

13  serves as an advertising mechanism for you?

14  A.   I get a few cases.  Most of it's word of mouth.

15  Q.   All right.

16          MS. KARASE:  Thank you, Mr. Connor.

17          THE COURT:  Mr. Connor, let me ask you a few

18  questions about -- about this whole area.  And I was trying to

19  think of a good analogy, and I probably can't think of one.

20  The one that comes to mind I'm not even sure if I should use,

21  but I might as well.

22          I'm just thinking that, for instance, right now

23  there's a lot of people in this country who think the

24  presidential election was rigged.  And at least, just based on

25  what I've read and what I've seen, that belief is based, in

1   their minds, on what is said by people who they think know more

2   about this than they do.

3         It may be based on people in authority who -- who say

4   that and that -- and it might be based on statistics that are

5   thrown about in terms of number of votes that were thrown out

6   or not counted, a whole variety of things.

7         And so it seems to me -- I mean, I really think a lot

8   of people actually believe that.  They think that's true.

9   Whether it is or not, they believe that's true because I guess

10  their frame of reference and the information upon which they

11  base their conclusion is the world they live in.

12        So let's take Agent Luedke, for instance.  I believe

13  you said that you know of no other study like you've done.

14        THE WITNESS:  Correct.

15        THE COURT:  Okay.  And that there are courts that

16  have cited and do rely on this type of language in search

17  warrants -- in search warrant applications to find maybe, for

18  instance, that a search warrant isn't stale because the agent

19  had reason to believe, based on what's in the affidavit, that

20  there would be child pornography on the computer or on the

21  devices.

22        THE WITNESS:  Correct.

23        THE COURT:  And so I guess what I'm trying to get at

24  is in the world -- and I'm just using Agent Luedke as an

25  example.  The world he lives in and what he knows from talking

1  to his peers, what he knows on his experience -- although his

2  number of cases would be 20 where yours would be 330, 330 -- he

3  has -- what I'm asking you, would you -- could you see how he

4  would think that this is accurate?

5          THE WITNESS:  I would love to have heard in detail

6  those conversations with other agents where they discuss

7  collector characteristics and numbers.

8          I -- maybe he's had those conversations.  I kind of

9  doubt it.  On one -- what I'm thinking is he's probably went to

10 these training classes, and they go over this in the training

11 class.

12         I don't know if they sit around and have coffee in

13 the morning and talk about, "Yeah, I got another one."

14         "Is he a collector?"

15         And yes or no.

16         So I -- without knowing more detail about those

17 conversations, I would rather not comment on it.

18         But the other thing is they could easily go back and

19 do the same analysis I did, and so instead of relying on, "Hey,

20 I heard" -- "I heard from New York via California that this is

21 true," look at the cases in their office and see if it's true.

22         If it is, fine, then maybe my cases, my experience,

23 is different, but --

24         THE COURT:  I guess what I'm getting at, though, is

25 he swore under oath that he believed this, and --

1          THE WITNESS:  I'm sure that's what he was taught,
2    yeah.
3          THE COURT:  Well, and I'm -- and absent somebody
4    suggesting that he was purposely lying --
5          THE WITNESS:  I'm not saying -- I'm not saying he was
6    lying.
7          THE COURT:  Right.  No, and I'm not saying you are.
8          THE WITNESS:  Okay.
9          THE COURT:  What I'm saying is that just based on the
10   world he lives in --
11         THE WITNESS:  Yes.
12         THE COURT:  -- and what he knows, he believes this to
13   be absolutely 100 percent true.  And today, or at least when
14   your affidavit was filed, could have been the first time -- you
15   know, it could have been an "oh, whatever" situation --
16         THE WITNESS:  Right.
17         THE COURT:  -- right? -- thinking that "I had never
18   really thought of that and it hadn't been discussed."
19         And it seems to me that the research you're doing and
20   what you're looking into may be something that becomes more
21   widespread, and more people may start looking into it because
22   it does raise an interesting point.
23         Now, you know, how it stands up over time, how it
24   stands up under peer review if there are different, you know,
25   additional studies that are done and all of that would be

1    interesting.

2            But I guess as I sit here, while I find -- I find all

3    of this very interesting and I'm -- and I'm curious about some

4    of it, just in looking in terms of what these agents know and

5    do -- and I know -- and I know how agencies work, and I don't

6    think anybody would dispute this.

7            I mean, one agent or two agents or three agents who

8    have experience, they train the next one --

9            THE WITNESS:  Right.

10           THE COURT:  -- and they tell them, "This is what

11   happens."

12           THE WITNESS:  Right.

13           THE COURT:  And they -- and in some affidavits, there

14   are, you know, the examples that are given.

15           And -- and so it -- and I'm not being critical of

16   Mr. Bell for presenting this evidence, but just in terms of

17   looking at it and I'm trying to see how it -- how it might

18   specifically -- it might under- -- it might undermine what law

19   enforcement believes in general, and maybe it suggests that law

20   enforcement should do more to try to test some of these things.

21           But I'm not sure that, you know, based on the one

22   study of your 330 cases, I would find that he either recklessly

23   or intentionally misled Judge Richardson.

24           THE WITNESS:  I understand what you're saying.

25           THE COURT:  I'm not saying I'm making a

1    determination.

2             THE WITNESS:  Right.

3             THE COURT:  But I'm just saying that that -- that's

4    what I think is -- is this the first time you've testified

5    about this?

6             THE WITNESS:  Yes.

7             THE COURT:  And without -- without breaching any --

8    anything that you think would be breached here, have you

9    suggested that this should be a method of attack in the past?

10            THE WITNESS:  Yes.  I've been trying to -- you know,

11   unfortunately -- well, unfortunately from my standpoint, there

12   are not a lot of motions to suppress filed because generally

13   there's not really good grounds for it.

14            But when I hear somebody talking about that, I do

15   mention this as something that I -- I suggest that they

16   challenge for this reason, is -- and from my point of view,

17   it's to start getting it out there so that people do start

18   questioning it as opposed to accepting it as gospel truth,

19   which seems to be what's been happening for 20-plus years now.

20            So, yes, I am trying to get clients who do this, or

21   file such motions, to include this.

22            THE COURT:  All right.  And I'm not trying to pry

23   into your business here, but how much were you paid in this

24   case?

25            THE WITNESS:  My hourly rate is $300, and so I did

1  receive a retainer.  I don't remember what it was.  It was not

2  as much as my normal retainer is.

3          And so I got up here at 9:30.  I'll probably get out

4  of here at 3:00, 3:30, so what's that, six hours times 300.

5          THE COURT:  All right.  And then whatever it cost you

6  to prepare your affidavit?

7          THE WITNESS:  Yeah.  I think that was minimal, but

8  yes.

9          THE COURT:  All right.

10          MR. BELL:  Judge, I can refresh his recollection

11  if --

12          THE COURT:  No, that's fine.  I just --

13          MR. BELL:  I mean, I --

14          THE COURT:  Whatever he's thinking is what's

15  important anyway, as he sits here.

16          What -- I know the affidavit was filed, attached to

17  the motion, but I was wondering if anyone was thinking that

18  maybe it should be made an exhibit, because it's been referred

19  to and actually quoted from, so that we have a stand-alone

20  record of this hearing.

21          What were you thinking, Mr. Bell?

22          MR. BELL:  I'm happy to do it, Judge.  I was

23  anticipating just relying on his testimony, but I'll put it in.

24  I don't really --

25          THE COURT:  Well, there were just some references to

```
 1   it.  It would -- I think it would make it easier, so instead of
 2   having somebody have to go back through and find the affidavit,
 3   all the exhibits would be together.
 4            MR. BELL:  Yeah.  Sure.  Absolutely, Your Honor.
 5            MS. KARASE:  Yes.  No objection.
 6            MR. BELL:  Defense Exhibit 2?
 7            THE COURT:  Yes.  All right.  That's received without
 8   objection.
 9        (Defendant's Exhibit 2 was received in evidence.)
10            THE COURT:  Let me just see if I have any other
11   notes -- questions from my notes.
12        (Brief pause.)
13            THE COURT:  All right.  That's all I had.
14            Mr. Bell, do you have any additional questions?
15            MR. BELL:  Well, just one follow-up, I guess, on the
16   concept of, you know, the subject that Mr. Connor's been
17   thinking about this subject in the past in terms of the
18   validity of the assertion that we've discussed today and the
19   prior opportunities he's had to raise it.
20                         REDIRECT EXAMINATION
21   BY MR. BELL:
22   Q.   Just to clarify, I guess, you and I -- the last case we
23   had together was Mr. Neiheisel?
24   A.   Yes, I believe so.
25   Q.   And that was several years ago, I guess, the trial.
```

1    A.    Yes.

2    Q.    And that did not involve a search warrant.

3    A.    Correct.  That was a knock-and-talk.

4    Q.    That was a knock-and-talk, and --

5    A.    And he talked.

6    Q.    Let's let that go for now.

7              MR. BELL:  Thank you for your time.  I have no

8    further questions.

9              THE COURT:  Ms. Karase?

10             MS. KARASE:  Nothing further.  Thank you, Your Honor.

11             THE COURT:  All right.  May Mr. Connor be excused?

12             MR. BELL:  He can, Your Honor.

13             THE COURT:  All right.  It was good seeing you.

14             THE WITNESS:  It was good to see you.  Take care.

15             THE COURT:  Thank you.

16        (Witness excused.)

17             THE COURT:  All right.  Let's -- is there any other

18   evidence?

19             MR. BELL:  I don't have any other evidence, Your

20   Honor.

21             THE COURT:  All right.  Why don't we talk about how

22   we should proceed now in terms of the filing of memoranda.

23             I'm thinking that since Ms. Karase hasn't had an

24   opportunity to actually file a written response, that she

25   should -- she should file a response to the motion to dismiss

1    and then -- or, excuse me, to suppress.

2            And then, Mr. Bell, you could -- you could file a

3    reply to that, and then Ms. Karase could file a surreply, and

4    then everybody will have had a chance to address the issues.

5            I did want to ask this, Mr. -- we can talk about the

6    timing of that in a minute.

7            But, Mr. Bell, you -- the only ground upon which

8    you're relying to suppress the statements is fruit of the

9    poisonous tree; is that right?

10           MR. BELL:  Yes.

11           THE COURT:  You're not contesting the voluntariness

12   of the statement or any other of the specifics related to it?

13           MR. BELL:  I say that because I always want to

14   reconsider whether I should or not, but my initial review was

15   no.  We stand or fall on the motion to -- on the Fourth

16   Amendment fruit of the poisonous tree.

17           THE COURT:  All right.  Well, that's what I read, and

18   by the way you questioned Agent Luedke, you didn't really get

19   into any of the areas that I would have expected you to if you

20   were challenging the statement on other grounds.

21           MR. BELL:  I purposely did not do that today, Judge.

22   I mean, I guess analytically, I -- I hate to outright commit to

23   it, but I'm -- my initial analysis was I was not going to.  I

24   can tell you that.

25           THE COURT:  All right.  Well, there was a motion

1   deadline, and --

2           MR. BELL:  Oh, I --

3           THE COURT:  -- and you didn't file one, so I'm going

4   to assume you're not filing one.

5           And if you see something, either in this transcript

6   or something has come up that you think changes that, then all

7   you need to do is -- is confer with Ms. Karase and file a

8   motion to reopen the hearing or file a motion to file a motion

9   to suppress out of time.

10          MR. BELL:  Yes, sir, and I appreciate that.  But I

11  never want to say -- I never want to commit a hundred percent,

12  but I appreciate it's out of time, and I don't want to have to

13  kind of revisit that unless I have to --

14          THE COURT:  Well --

15          MR. BELL:  -- and I don't expect it to happen.

16          THE COURT:  In terms of voluntariness, you know, 18

17  U.S.C. 3500 somewhere specifically there requires a finding of

18  voluntariness of a statement made prior to the admission of a

19  confession at trial.

20          So I think you -- I think you can raise voluntariness

21  all the way to -- I don't know, what is that, *Jackson versus*

22  *Denno*, whatever the -- there's a case that addresses that, that

23  you can challenge the voluntariness of it, I think, during the

24  trial prior to the testimony of a law enforcement officer.

25          So I'm not -- I'm not saying you have to file a

1   motion to suppress --

2           MR. BELL:  Right.

3           THE COURT:  -- in order to argue voluntariness, but

4   there could be other grounds.

5           Maybe you think the *Miranda*, you know, was infirm or

6   something else.  Usually we take up voluntariness in motions to

7   suppress, but as I said, you know, if you -- if you look at

8   3500 and *Jackson versus Denno*, I think that -- I think prior to

9   the admissibility of a confession or a statement by the

10  defendant, the trial judge is really supposed to make a

11  voluntariness determination or inquire if there's a challenge

12  to it.

13          MR. BELL:  And, of course, as the Court indicated,

14  it's always one of those issues that the jury has an

15  opportunity to consider as well, independent of any suppression

16  motions.

17          But I guess my initial response is the motion to

18  suppress is so good on the search warrant that we might not

19  need to get there, Judge, and we'll start out with that

20  proposition.

21          THE COURT:  Okay.  We'll start there.

22          MS. KARASE:  Your Honor, as you're calculating the

23  dates, I just would inform the Court that I intend to order the

24  transcript from the hearing today.  I'll get that order

25  processed as soon as -- as soon as we can, and I'll start that

1    today.

2          THE COURT:  All right.  Well, what we'll do is

3    we'll -- in just a minute we'll time the filing of this based

4    on the availability of the transcript.

5          But I'm looking at 35 -- I said 3500; it's 3501, 18

6    U.S.C. Section 3501:  "In any criminal prosecution, a

7    confession, as defined in subsection (e), shall be admissible

8    in evidence if it is voluntarily given.  Before such confession

9    is received in evidence, the trial judge shall, out of the

10   presence of the jury, determine any issue of voluntariness.

11         "If the trial judge determines that the confession

12   was voluntarily made, it shall be admitted in evidence, and the

13   trial judge will permit the jury to hear relevant evidence on

14   the issue of voluntariness and shall instruct the jury to give

15   such weight to the confession as the jury feels it deserves

16   under all circumstances."

17         So I think that captures what we're all saying

18   here --

19         MR. BELL:  Yes, sir.

20         THE COURT:  -- is that even if you don't file a

21   motion to suppress, it doesn't -- it doesn't prevent you from

22   challenging voluntariness.  And even if the judge, the district

23   judge, finds that the statement was voluntary, it doesn't mean

24   that you can't make the arguments that the statute and the jury

25   instructions allow you to make in that regard.

1        MR. BELL:  That's correct.  That's my understanding.

2        THE COURT:  All right.  All right.  Well, let's do

3   this.  Why don't we -- what would you like -- this is set for

4   March, right?

5        MR. BELL:  (Nods head up and down.)

6        THE COURT:  Did you need to talk to Mr. Bell?  We're

7   not in any hurry.

8        Do you need to talk to him?

9        THE DEFENDANT:  (Nods head up and down.)

10       THE COURT:  Go ahead.  Go ahead.

11    (Pause in proceedings.)

12       MR. BELL:  I think he's had an opportunity to address

13   his question, Your Honor.

14       THE COURT:  Do you need any -- do you need to ask me

15   something or --

16       MR. BELL:  No.  No, no, no.

17       THE COURT:  Okay.

18       MR. BELL:  I think we're done.  I'm just

19   communicating to you that we are finished.

20       THE COURT:  Okay.  All right.  Well, let's do this.

21       Ms. Karase, what are you thinking about the timing?

22   Do you -- would two weeks or three weeks -- whatever amount of

23   time you think you need, then I would tend to think Mr. Bell

24   could have the same amount of time.

25       I don't know how far this will push it, but I don't

1    want to -- to the extent that these are some novel issues for

2    me, in terms of the attack on the search warrant affidavit, and

3    they may be for you-all, that you -- and I want you to take

4    what time you need to address these issues.

5          MS. KARASE:  I think that I can get the papers done

6    in two weeks, but getting the transcript -- I don't know if

7    Your Honor would consider -- so that we don't have to get the

8    rush order for the transcript, it would be helpful to have the

9    transcript in advance.

10          THE COURT:  Yes.  Well, that's what I -- what I was

11   thinking was just saying that -- the transcript will be filed

12   on a certain date, depending on the order and all of that.  And

13   then I was going to say that you would have 14 days from the

14   date of the filing of the transcript to file your response to

15   the motion.

16          And then Mr. Bell would have 14 days to file his

17   reply to your response.  And then you would have 14 days to

18   file your surreply.

19          MS. KARASE:  Yes, Your Honor.  That sounds fine.

20          THE COURT:  Does that work, Mr. Bell?

21          MR. BELL:  Absolutely.  Yes, Judge.

22          THE COURT:  All right.  And then -- and then if

23   anyone needs more time based on that, all you have to do is

24   confer with opposing counsel, and I can be as flexible as

25   you-all need me to be.

1          All right.  I think that -- I think that covers

2    everything that we -- we need to do.

3          Ms. Karase, can you think of anything else that we

4    need to do today?

5          MS. KARASE:  I cannot, Your Honor.

6          THE COURT:  Mr. Bell?

7          MR. BELL:  No, other than -- with one exception.

8          THE COURT:  No, but one exception?

9          MR. BELL:  One exception.  Well, I guess the answer

10   is yes.

11         THE COURT:  The answer is yes.  Go ahead.

12         MR. BELL:  The answer is yes.

13         There was another search warrant issue with respect

14   to Discord, which is some communications service server.  And

15   it would be related to the information they obtained as a

16   result of the search warrant.

17         I've not yet attacked that search warrant, but

18   essentially I would include that, any evidence obtained from

19   Discord, as fruit of the poisonous tree because the basis for

20   that warrant would have been what they learned in the course of

21   executing this search warrant.

22         And I haven't really done anything with that.  I

23   think there's probably a deadline coming up because this is

24   relatively recently discovered evidence.

25         So I would ask the Court to extend the deadline to

1   file anything relative to the Discord stuff.  At least I can

2   include that in my reply?

3            THE COURT:  Well, I -- yeah, but I don't want you

4   moving to suppress something in a reply, because that gets

5   really kind of messy.

6            MR. BELL:  Oh.

7            THE COURT:  So what I'm wondering is how much time do

8   you need right now?  Because what you could do is you could

9   amend this motion.  You could amend the motion that you have

10  and include that.

11           And if we -- if we needed to reconvene for any

12  purpose related to that, we could do it, or you-all could

13  advise me that -- that -- that no additional evidence need be

14  taken.

15           You see what I'm saying though?

16           MR. BELL:  Yeah.  I don't think we need -- I'm sorry

17  to interrupt.

18           I don't think there would be an independent challenge

19  to that warrant.  I think we would just include that as fruit

20  of the poisonous tree of this search.

21           And I could amend the motion to suppress to just add

22  that one -- any evidence derived from that, and that shouldn't

23  affect our deadlines at all.

24           THE COURT:  That's what I was thinking.  Then we'd

25  have -- then Ms. Karase could -- you would have all of

 1  everything that you want to move to suppress in one motion.

 2  She would just have, then, one response to all of that.

 3          Ms. Karase, what do you think of that?

 4          MS. KARASE:  That's fine with me, Your Honor.  I

 5  agree that the Discord warrant was based upon information

 6  obtained from this warrant, so I would think that it would fall

 7  as fruit of the poisonous tree and would agree to treat it as

 8  such.

 9          THE COURT:  All right.  Well, why don't -- just so

10  it's -- I think it's clean and everything's in writing, why

11  don't -- why don't you just -- why don't you amend this motion.

12          What do you need, a week to do that?

13          MR. BELL:  That would be fine.  I've got some other

14  matters that have to be --

15          THE COURT:  Is a week enough?

16          MR. BELL:  A week should be enough, Judge.

17          THE COURT:  All right.  Let's set -- I'll set a

18  deadline.

19          Today is the --

20          MR. BELL:  Next Friday?

21          THE COURT:  Today's the 10th, so what is tomorrow,

22  the 11th.  So the 18th?

23          MR. BELL:  18th will work, yes, sir.

24          THE COURT:  All right.  And then Ms. Karase will just

25  respond to that portion of your motion when she files her

 1    response after the -- and just -- and please note in that
 2    motion that there's no need for an evidentiary hearing --
 3              MR. BELL:  Yes, sir.
 4              THE COURT:  -- in that regard, if that's what you
 5    believe.
 6              MR. BELL:  Yeah.  No, I don't think that it would
 7    address anything that has not been covered today.
 8              THE COURT:  All right.
 9              MR. BELL:  That's it, Judge.
10              THE COURT:  All right.  I think that's -- that's
11    everything, then.
12              Ms. Karase, anything else now, based on Mr. Bell's
13    exception?
14              MS. KARASE:  No, Your Honor.
15              THE COURT:  All right.  Mr. Bell, anything else?
16              MR. BELL:  No, Your Honor.
17              THE COURT:  All right.  Then we're in recess.
18              COURT SECURITY OFFICER:  All rise.
19         (The proceedings were concluded at 3:22 p.m.)
20                              -  -  -
21
22
23
24
25

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3

 4   UNITED STATES DISTRICT COURT )

 5   MIDDLE DISTRICT OF FLORIDA    )

 6

 7          I hereby certify that the foregoing transcript is a

 8   true and correct computer-aided transcription of my stenotype

 9   notes taken at the time and place indicated therein.

10

11          DATED this 7th day of January, 2021.

12

13                              s/Shelli Kozachenko_____
                                Shelli Kozachenko, RPR, CRR, CRC
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```