UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                             Case No. 3:20-cr-94(S2)-J-32JRK

MARK MANUEL ANGELES MARINO

### UNITED STATES' AMENDED RESPONSE IN OPPOSITION TO DEFENDANT'S AMENDED MOTION TO SUPPRESS

The United States of America files this response in opposition to defendant's Amended Motion to Suppress Physical Evidence and Statements (Doc. 47), filed in this case on December 16, 2020. For the reasons set forth below, the Court should deny defendant's motion.

## I.      Background

On June 16, 2020, a United States Magistrate Judge, the Honorable Monte C. Richardson, issued a warrant to search the premises at 6936 Longleaf Branch Dr., Jacksonville, Florida, in Case No. 3:20-mj-1218-MCR ("Premises search warrant") upon an application and supporting affidavit attested to by Homeland Security Investigations ("HSI") Special Agent ("S/A") Luedke ("Premises search warrant package"). HSI executed the Premises search warrant on June 17, 2020, where they encountered and interviewed the defendant.

The defendant was arrested on June 17, 2020, and charged by criminal complaint, in Case No. 3:20-mj-1218-MCR, with one count of receipt of visual

depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2) (Doc. 1) (the aforementioned Premises search warrant package was attached to the Criminal Complaint as Exhibit A).

A federal Grand Jury returned an Indictment on July 8, 2020, charging the defendant with one count of receipt of child pornography, in violation 18 U.S.C. § 2252(a)(2), Count One; and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4), Count Two (Doc. 16).

A federal Grand Jury returned Superseding Indictment on August 19, 2020, charging the defendant with one count of attempted sex trafficking of a child under 14 years of age, in violation of 18 U.S.C. §§ 1591(a)(1) and 1594(a), Count One; three counts of using a child for the purpose of producing child pornography, in violation of 18 U.S.C. § 2251(a) and (e), Counts Two through Four; one count of receipt of child pornography, in violation 18 U.S.C. § 2252(a)(2), Count Five; and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4), Count Six (Doc. 26).

On August 26, 2020, a United States Magistrate Judge, the Honorable Patricia D. Barksdale, issued a warrant to search Discord Incorporated account ID 470038803159973919, unique tag #6482, in Case No. 3:20-mj-1282-PDB, upon an application and supporting affidavit attested to by HSI S/A Luedke ("Discord search warrant"). The Criminal Complaint and the Premises search warrant package were

2

attached as exhibits and incorporated by reference in the affidavit in support of the application for the Discord search warrant ("Discord search warrant package").

On October 9, 2020, defendant filed a motion to suppress physical evidence and statements (Doc. 31), seeking suppression of all physical evidence listed on the inventory receipt for the search warrant executed at 6936 Longleaf Branch Drive, Jacksonville, Florida, on June 18, 2020 [*sic*].[1] On November 19, 2020, a federal Grand Jury returned a Second Superseding Indictment charging the defendant with the same counts as those in the Superseding Indictment, but adding an additional count of receipt of child pornography, in violation 18 U.S.C. § 2252(a)(2) (Doc. 39).

On December 10, 2020, this Court held an evidentiary hearing on defendant's motion ("the Hearing") (Docs. 46 and 48). During the Hearing, the Court permitted the defendant to file an amended motion to suppress. *Id.* On December 16, 2020, defendant filed an amended motion to suppress (Doc. 47).

In his Amended Motion to Suppress, defendant makes several claims that are unsupported in fact or law. As stating in the opening paragraph of the memorandum of law section of his motion, the defendant's claims can be broken down into four categories: first, defendant claims the warrant lacked probable cause. Second, he argues in the alternative that the information upon which the Court relied in issuing the June 16, 2020 warrant, a transaction that occurred on or about October 29, 2019,

---

[1] As set forth above, the search warrant was executed on June 17, 2020, not June 18, 2020, as stated in defendant's motion to suppress.

was stale. Third, the defendant contends that deliberate misrepresentations or falsehoods or omissions materially affected the issuance of the warrant. And lastly, he contends the good faith exception does not apply.

## II.     Memorandum of Law

### A.     There was Probable Cause to Issue the Premises Search Warrant

#### 1.     Legal Standard for Review of Search Warrants

Judicial review of whether there was probable cause to issue a warrant is limited to "the information which was brought to" the issuing judge's attention. *United States v. Hill*, 500 F.2d 315, 318 (5th Cir. 1974). Great deference should be paid to the probable cause determination of the judicial officer who issued the warrant. *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *see also Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S. Ct. 2674, 2684–85, 57 L. Ed. 2d 667 (1978) ("There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant.). "Probable cause to support a search warrant exists when the totality of the circumstances allows the conclusion that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (internal quotation and citation omitted). "[P]robable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, at 232.

## 2.    The Particular Facts Established Probable Cause

The Premises search warrant was signed by U.S. Magistrate Judge Richardson, after submission of a 34-page affidavit, exclusive of attachments, by S/A Luedke in support of the application for the search warrant. (*See* Premises search warrant package, admitted as Exh. 1 to the Hearing). The affidavit includes a description of S/A Luedke's training and experience, his basis for the information contained in the affidavit, and information about child pornography investigations and child pornography collectors generally. Exh. 1. It provides pertinent definitions specific to the investigation he conducted. *Id.* at 15. It also includes a detailed section with particularized facts supporting the finding of probable cause.

The probable cause section of S/A Luedke's affidavit summarizes an investigation that began when HSI New York identified an individual on the dark web using the email address Philippinegirls@secmail.pro ("The Email Account") S/A Luedke attested that he knew secmail.pro is an anonymous email service that provides its users protection for anonymous use. The individual under investigation had posted advertisements on known child exploitation forums on the dark web. A portion of one such advertisement was quoted by S/A Luedke in the affidavit. *Id.* at 27. S/A Luedke continued to state "[a]dditional offers were listed to include a 'camshow' and a 'Video of the girl,' along with an offer to provide 'proof of girl.'" *Id.* at 27.

The affidavit provided that an HSI New York TFO engaged in communication with The Email Account on September 16, 2019, indicating interest in "one night with

5

the girl" but requested a "pic" first. The Email Account sent an image of child pornography back to the undercover TFO the same day. *Id.*

Three months later, on December 19, 2019, the TFO received an email message from The Email Account. This time The Email Account user was advertising a specific girl, that is, "PHILIPPINE GIRL 10 YO WITH SMALL BREASTS…" *Id.* at 28. The email message included "a list of services and prices of 150 Euros, 800 Euros, 1200 Euros, and 1600 Euros, paid in Bitcoin (BTC), for various images or videos of 'sexy, nude poses of your choice….'" *Id.* Included in the email was a link to a video of child pornography that is described in the affidavit.

The TFO received an unsolicited message with three links on February 5, 2020. One link included 14 images that are not described in the affidavit, another link contained a video of child pornography that is described in the affidavit, and nothing was downloaded from the third link. *Id.* at 29.

On February 6 and 7, 2020, the TFO requested the Bitcoin address, purportedly to send a Bitcoin payment to pay for a "20 minute video of the girl." On February 9, 2020, The Email Account provided a Bitcoin address. *Id.* at 31.

As is described in the affidavit, HSI New York analysts researched the Bitcoin address provided by The Email Account and found it was part of a "cluster" along with a second Bitcoin address. The transfer of Bitcoin from the first Bitcoin address and the transfer of Bitcoin from the second Bitcoin address in a single transaction indicated that the addresses were controlled by the same user. *Id* at 31-32.

Upon researching the second Bitcoin address, analysts found a transaction to it on October 29, 2019, using Coinbase, by "Mark Manuel Marino," with the defendant's address, Florida driver's license, and date of birth. The account was created the month before, on September 15, 2019. In the notes section of the October 29, 2019 transaction, wherein Marino sent $56.38 in Bitcoin to the second Bitcoin address, there is a secmail.pro email address and the notation "5pics." *Id.* at 32.

HSI New York investigated the location of the Coinbase transaction and learned that it was from an IP address that resolved to 6936 Longleaf Branch Dr., Jacksonville, Florida, and the service was in the name of "Mark Marino." *Id.* at 33.

### 3.   In Totality, the Affidavit Established a Fair Probability that Evidence and Contraband Would Be Found at the Premises

Defendant contends that this single Bitcoin transaction is insufficient cause for the issuance of a warrant. However, in this instance, the affidavit established that the defendant made a financial transaction to send money to an individual who was known to be operating a Bitcoin address used to collect money for the sale of videos of the sexual abuse of a child. Moreover, the notes section of the transaction indicates a secmail.pro email address, which was the same email provider of The Email Account used to send and offer to produce child sexual abuse material, and references "5pics," which is an abbreviation for five pictures.

As detailed in the affidavit, there were a myriad of options for sale at various prices through advertisements using The Email Account. The affidavit outlined some of these specific terms but also generally mentioned, "additional offers." *Id.* at 27-28.

While the $56.38 transaction conducted by the defendant is a significantly lesser amount than the particular prices quoted in the affidavit from the advertisements and emails, there was reference to "additional offers," making clear that other options existed besides the 8000 Euro for one week with one girl for normal sex. It is clear that The Email Account was in the business of selling child sexual abuse material and sexual encounters with minors. Thus, a financial transaction from the defendant's residence to the same person receiving money in connection with these advertisements with a notation of a secmail.pro email account and "5pics," establishes a fair probability that the funds were in relation to child pornography and would lead to evidence and contraband at that same residence.

In *United States v. Touset,* the Eleventh Circuit considered whether the sending of three low money wire transfers to a Western Union account that was associated with a Philippine phone number that was associated with an email account that had been discovered to contain an image of child pornography, amounted to reasonable suspicion for the forensic search of Touset's electronic devices that had been seized at the border. 890 F.3d 1227 (11th Cir. 2018). Relying on this information and considering that the Philippines was a source country for child pornography, a pattern of "frequent low money transfers" is associated with child pornography, and that Touset was

8

traveling with nine electronic devices, the Court found that there was reasonable suspicion for the search of the devices.

While there is a higher standard than reasonable suspicion at issue here, Marino had direct contact with the recipient of money for depictions of children being sexually abused. And he did not require one to guess what the money was for as he described what it was for in the notes—5pics. The affidavit included a statement that The Email Account had sent files of child pornography to the TFO for free on three separate occasions. It is reasonable to conclude, given the totality of the circumstances, that when Marino was paying $56.38 USD for 5pics, it was not to receive legal pictures.

In *Illinois v. Gates*, 462 U.S. 213, 235 (1983), the Supreme Court held that probable cause, "according to its usual acceptation, means less than evidence which would justify condemnation… it imports a seizure made under circumstances which warrant suspicion." The Court further explained that "it is clear that only probability, and not a *prima facie* showing of criminal activity is the standard for probable cause." *Id.* Here, defendant's transfer of funds from his residence establishes probable cause that there would be evidence of violations of 18 U.S.C. § 2252 and contraband at that same location.

**B.      Defendant's Transaction for the Purchase of Child Pornography Seven Months Earlier Was Not Stale**

Courts have consistently rejected staleness challenges in child pornography cases because "pedophiles rarely, if ever, dispose of child pornography." *Touset,* 890

F.3d at 1238, *citing United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002).

Probable cause of involvement in *electronic* child pornography exists even longer as

deleted files can remain on and be recovered from electronic devices. *Id.* "Unlike cases

involving narcotics that are bought, sold, or used, digital images of child pornography

can be easily duplicated and kept indefinitely even if they are sold or traded. In short,

images of child pornography can have an infinite life span." *United States v. Frechette*,

583 F.3d 374, 379 (6th Cir. 2009) (declining to find staleness after 16 months passage

of time); *see also United States v. Sarras*, 75 F.3d 1191, 1197, 1203 (11th Cir. 2009)

(describing how forensic investigators recovered images of child pornography from a

laptop hard drive that were previously deleted). In *United States v. Riccardi*, 405 F.3d

852, 861 (10th Cir. 2005), the Tenth Circuit observed, "Having succeeded in obtaining

images, collectors are unlikely to destroy them. Because of their illegality and the

imprimatur of severe social stigma such images carry, collectors will want to secret

them in secure places, like a private residence. …[C]hild pornography collectors

maintain their materials for significant periods of time."

Given the manner in which child pornography crimes are committed and the

information S/A Luedke advised the Court about child pornography collector

characteristics, a 7-month delay from defendant's financial transaction to the

execution of the Premises search warrant should not be cause for concern.

**C.**     **Defendant Failed to Establish Any Misrepresentations or Falsehoods in the Affidavit**

Defendant claims that the statement in the affidavit "that people who 'collect' child pornography tend to hoard those images is empirically not true." (Doc. 47 at 3). This is presumed to be a reference to page 22 of S/A Luedke's affidavit, which states, "Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage….As such, they tend to maintain or 'hoard' their visual depicts of child pornography for long periods of time in the privacy and security of their homes or other secure locations." Exh. 1, Affidavit at 22, ¶ 15(f). S/A Luedke's specialized training and experience equip him well to make such a statement. His opinions and conclusions are properly considered in determining probable cause. *United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995); *United States v. Slocum*, 708 F.2d 587, 605 (11th Cir. 1983) (the special knowledge and experience of a law enforcement officer is relevant for determining whether probable cause exists).

Defendant asks the Court to take the testimony of his purported expert, Richard Connor, over the affiant, based on Connor's review of over 300 child pornography cases. Effectively, defendant requests the Court to take the opinion of Connor that "less than 20% of the individuals targeted by those searches could be categorized as collectors." (Doc. 47 at 6).

11

At the Hearing, Connor acknowledged that he has only examined devices for child pornography when he has been hired to do so for a particular purpose. (Doc. 48 "Tr." at 155). He also could not tell the Court what timeframe he was using when he drew the line between whether someone was a collector or a deleter of child pornography. Tr. at 160-61. Further, he acknowledged that his determination as to whether one was a "collector" or not was "somewhat subjective." *Id.* at 161. Mr. Connor also acknowledged that his opinion was based on percentages. Using his "somewhat subjective" standard, he categorized 17.37% of the 330 cases he reviewed as collectors of child pornography. He acknowledged that in 14.37% of the cases, he did not have enough information to make a determination. That leaves 65.87% of the cases he reviewed, which again only includes cases in which he was *hired* by the defense, where he determined the client routinely deleted their child pornography.

A defendant is entitled to no relief from an innocent or merely negligent misstatement. *Franks v. Delaware*, at 171-72. Omissions that are not reckless, but are instead negligent, or *insignificant and immaterial*, will not invalidate a warrant. *United States v. Reid*, 69 F.3d 1109, 1114 (11th Cir. 1995).

Even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause. *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990). With regard to alleged *Franks'* omissions, the defendant must prove that the officer acted in a manner "akin to bad faith." The "omission must have been made with the purpose of misleading the judge issuing the

12

warrant… and [the] decision not to include in [the] affidavit is not enough to prove that [the officer] acted 'deliberately' for a *Franks* violation." *United States v. White*, 928 F.3d 1317, 1334 (11th Cir. 2019).

Here, defendant has fallen far below the *Franks* standard to establish an intentional or reckless omission that was made with the purpose of misleading the judge issuing the warrant. To be clear, the language that is being challenged begins with "Many individuals who collect child pornography…." Even using the defendant's expert's own numbers, one could find that 17% of child pornographers are collectors constitutes "many." Further, S/A Luedke testified at the Hearing that, in his experience, he has encountered, more often than not, resident files of child sexual abuse materials when executing child pornography search warrants. Tr. at 50.

D.   **Even if the Court finds Probable Cause Lacking, Overwhelming Evidence Demonstrates the Agents Acted in Good Faith**

1.   **The Magistrate Judge Was Not Misled**

If this Court should determine that probable cause did not exist to justify the search of defendant's residence, then the physical evidence seized during the June 17, 2020, search is still admissible under the good faith exception to the exclusionary rule. The United States Supreme Court, in *United States v. Leon*, 468 U.S. 897 (1984), addressed the Fourth Amendment's exclusionary rule and the admissibility of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate judge. According to *Leon*, "suppression of

evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purpose of the exclusionary rule." *Id.* at 918. Furthermore, since the purpose of the exclusionary rule is to "deter unlawful police conduct," "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may be properly charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Id.* at 919.

Importantly, "it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause, and if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Id.* at 921. Clearly, "penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.*

Before deciding whether the *Leon* good faith exception applies in this case, this Court must first determine whether one of the four exceptions to the good faith rule applies. *See United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (discussing *Leon* analysis).

Defendant contends that the good faith exception does not apply based on the first and the third exceptions. That is, (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew to be false or

14

would have known was false except for his reckless disregard of the truth"; and (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 1313. Defendant asserts that the issuing magistrate was misled by information that the affiant knew was false or would have known was false except for his reckless disregard for the truth. However, as discussed, *supra*, the only information the defendant alleges is false information is the statement in the affidavit that "Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials..." Exh. 1. As stated above, S/A Luedke testified that this has been his experience. Tr. at 50-51, 80. There has been no evidence that this was information S/A Luedke knew to be false. To the contrary, this was information consistent with his experience. Even if defendant's witness had a different experience based on the cases he reviewed, that evidence does not discredit S/A Luedke's testimony to support a finding that S/A Luedke knowingly misled the issuing magistrate judge.

Defendant also contends the third exception to *Leon* applies in this case. Doc. 47 at 20. This exception calls for the exclusion of evidence where the search warrant affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." See *Martin*, 297 F.3d at 1313 (quotations and citations omitted). The affidavit in this case is not so devoid of indicia of probable cause as to make reliance upon it entirely unreasonable as set forth above. Defendant sent a Bitcoin transaction to an individual who was collecting funds for the sale of files

15

depicting the sexual abuse of children. Defendant noted on the financial transaction that the payment was for "5pics" and referenced a secmail.pro email account, the same provider as The Email Account. As discussed *supra*, the information about the investigation that led agents to Marino supported the United States Magistrate Judge's conclusion that a fair probability of criminal activity or contraband was ongoing or present at Marino's residence.

*Leon* dictates that where a search warrant fails to establish probable cause, evidence seized during a search based on such warrant is admissible if a reasonably well-trained officer would have acted in good faith on such warrant. *See Martin*, 297 F.3d at 1318; *United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir. 1990). A reasonably well-trained officer would have exercised good faith in executing the Premises search warrant issued in this case.

### 2. Additional Information Known to the Affiant Justified Execution of the Premises Search Warrant

In addition to the information set forth in the search warrant affidavit, discussed *supra*, S/A Luedke was in possession of other information about the New York investigation and about Marino's Coinbase account. This Court may properly consider such information when determining whether the *Leon* good faith exception applies even though S/A Luedke did not include it in his affidavit. *See Martin* at 1319 ("[W]e find that we can look beyond the four corners of the affidavit and search warrant to determine whether [the law enforcement officer] reasonably relied upon the

16

warrant."). Certainly, a reasonably well-trained officer in possession of a search warrant issued by a detached and neutral magistrate and who has reviewed email correspondence and financial transactions before requesting such warrant could in good faith rely on the warrant to execute the search.

"[T]he good faith exception, turning as it does on objective reasonableness, should not be difficult to apply in practice. When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *Leon*, 468 U.S. at 924. This case is just such a case. S/A Luedke reasonably relied in good faith on the search warrant the U.S. Magistrate Judge issued and should not be penalized for any mistake that could later be found to have been made.

As S/A Luedke testified at the hearing and introduced into evidence as Exhibit 2, he reviewed the dark web advertisement in its entirety prior to executing the Premises search warrant. Though not quoted in the affidavit, the advertisement included, in addition to what was stated in the affidavit, "Offer 2: Camshow with a girl from 400 euro." And "Offer 3: Video of the girl. Describe action and length of video and you get a quote in return." Tr. 19-22; Exh. 2. The advertisement continued to say, "Proof of girl will of course be sent once we have the girl you like." As elicited at the hearing, there was no specific price associated with Offer Three, and there was guidance implying that the price would vary depending on the action depicted and the length of the video. The advertisement was posted on August 15, 2019.

At the Hearing, S/A Luedke also testified that the undercover used multiple email addresses to communicate with The Email Account. Tr. at 26. Though not in his affidavit, at the hearing, S/A Luedke explained that the undercover used two different email addresses, acting as two different people, to communicate with The Email Account, and that he received child sexual abuse material to both email addresses. S/A Luedke also testified that The Email Account provided a Bitcoin address to both of his email addresses, so that the undercover could provide payment for depictions of child sexual abuse. Tr. at 27-28.

S/A Luedke described that the second undercover email address was used to send a request to The Email Account for "material." Tr. at 28-29. S/A Luedke advised that HSI New York actually initiated a Bitcoin transfer transaction to the Bitcoin address provided by The Email Account. S/A Luedke described it as a "test transfer" and it was just a small amount of U.S. dollars' worth of Bitcoin for a test transaction to ensure successful transfer. Tr. at 29; 31. S/A Luedke described that the transfer took place on February 10, 2010, and that the amount sent was $55. S/A Luedke advised that the undercover TFO mentioned this test transaction in emails to The Email Account. S/A Luedke advised he reviewed all of the emails between The Email Account and the undercover prior to the execution of the Premises search warrant. Tr. at 29 and 31.

At the Hearing, S/A Luedke described how he identified the defendant, as is set forth in the affidavit. But he continued to discuss his review of Coinbase records

18

that contained a history of transactions the defendant had conducted. Tr. at 35. Records of transactions received from Coinbase were introduced at the Hearing as Exhibit 3. S/A Luedke described the October 29, 2019 transaction that is described in the affidavit. He continued to describe other transactions that were made by defendant on October 23, 2019, and October 25, 2019, that were included on a diagram admitted as Exhibit 4. S/A Luedke testified that each of the three transactions were sent to two different Bitcoin addresses and were cashed out by one user. S/A Luedke described that the October 23, 2019 transaction was for $172.09 worth of Bitcoin, and the October 25, 2019 transaction was for $909.07 worth of Bitcoin. Tr. 43-44. S/A Luedke prepared a timeline of events to aid his testimony that was admitted as Exhibit 5.

S/A Luedke also testified that, in addition to submitting his search warrant application with affidavit to the Magistrate Judge, he first submits it to an Assistant United States Attorney, there is a back-and-forth where editing is done and then he is aware that the search warrant package is submitted for upper-level review after the line attorney's review. Tr. at 51-52; 103-105. S/A Luedke testified that he is aware that the search warrant packages he submits receive multiple levels of review by the time he executes them. Tr. at 105.

Considering all of the foregoing, the warrant, when read comprehensively and in context, and with the benefit of the additional information known to the affiant but not all of which is contained within the affidavit, is not so "facially deficient … that the executing officers [could not] reasonably presume it to be valid." See *Leon*, 468

19

U.S. at 923. Suppression is required under *Leon* "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Leon*, at 926.

### E.    The Discord Search Warrant and Interview of the Defendant

Defendant claims without support that evidence obtained through execution of the Discord search warrant (Attached hereto as Exh. 6)[2] and interview of the defendant should also be suppressed as fruit of the poisonous tree. The United States concedes that the Discord warrant resulted from information seized from the Premises search warrant and the interview of the defendant occurred upon execution of the search warrant. Thus, should the evidence from the Premises search warrant be suppressed, so too should the fruits of the Premises search warrant.

WHEREFORE, the United States respectfully requests that this Court deny defendant's Amended Motion to Suppress Physical Evidence and Statements.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

*/s/ Kelly S. Karase*
By:  KELLY S. KARASE
Assistant United States Attorney, #134
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Tel:    (904) 301-6300 / Fax: (904) 301-6310
E-mail: Kelly.Karase@usdoj.gov

---

[2] Exh. 6 to continue numbering from the Hearing exhibits for ease of reference.

**U.S. v. Mark Manuel Angeles Marino     Case No. 3:20-cr-94(S2)-J-32JRK**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 29, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Thomas M. Bell, Esq.


*/s/ Kelly S. Karase*
KELLY S. KARASE
Assistant United States Attorney