UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                          CASE NO.: 3:20-cr-94(S2)-J-32JRK

MARK MANUEL ANGELES MARINO
_____/

**DEFENDANT MARINO'S REPLY MEMORANDUM
IN SUPPORT OF AMENDED MOTION TO SUPPRESS**

The Defendant, Mark Manuel Angeles Marino, by and through the undersigned attorney, pursuant to this Court's order of December 10, 2020, files this reply memorandum in support of the Amended Motion to Suppress (Doc. 47).

**OVERVIEW**

Not only does the search warrant in this case lack probable cause (evidence particularized to the target of the search); it is stale too. In other words, while staleness can serve as an alternative finding as the government suggests in its response, this warrant is so devoid of probable cause that the Court should not have to reach the staleness question as an alternative.

**PROBABLE CAUSE**

Mr. Marino identified a number of cases in the original memorandum which support his argument that this warrant lacks probable cause. Before the evidentiary hearing on December 10, 2020, he provided by Notice of Supplemental Authority the case of US v. *Touset,* 890 F.3d 1227 (11th Cir. 2018). (Doc 44). The government references *Touset* in its response. (Doc 54-9). The government's reliance on *Touset* is misplaced.

If anything, there is less evidence to support probable cause in this case than there

was evidence of reasonable suspicion in *Touset*. The reasonable suspicion in *Touset* is summarized as follows: "the government knew that Touset had sent three "low money transfers" of $35.00, $35.00, and $37.00 to a Western Union account; that the Western Union account was associated with a Philippine phone number that was associated with the email account of iloveyousomuch0820@yahoo.com; that the email account contained an image of child pornography; that the Philippines was a source country for child pornography; that the pattern of frequent low money transfers is associated with child pornography and that Touset was traveling with nine electronic devices. Together, this evidence provided reasonable suspicion for the forensic searches of Touset's electronic devices". Id, at 1237.

In contrast, the search warrant here references only one "low money transfer" of $55.00. Unexplained in the affidavit is the glaring inconsistency between the advertised minimum price for pictures of child pornography, €150 or roughly three times the amount of the $55.00 bitcoin transfer. The affidavit specifically informs the magistrate judge it is fairly common for individuals who have an interest in children to also possess "child erotica" (Doc. 47-1-20). This assertion concerning child erotica, unlike many others in the affidavit, seems to have empirical support. (Doc.48-68;149).

The government suggests the portion of the advertisement which references additional offers for those interested in a cam show may explain the $55.00 transfer. (Doc. 54-8). The Court should reject this contention. There are only two explicit references to pricing in the affidavit. The first is a long passage on page 26 of the affidavit which begins with "Philippine girls: only for serious men with good economy … One week including one girl for normal sex (omitted) 8,000 Euros. …" (Doc. 47-1-26). Several paragraphs later, the affidavit again references prices: "included in the same email was a

list of prices of 150 Euros, 800 Euros, 1200 Euros, 1600 Euros, paid in Bitcoin (BTC) for various images or videos of "sexy, nude poses of your choice…" (Doc.47-1-28). There is simply no logical reading of either of these passages which permits the inference that 5 pics of child pornography would be available for $55.00.

The proposition that the one-time transfer of $55.00 to a bitcoin address owned by the same entity under investigation by the New York investigators amounts to probable cause to justify the issuance of a search warrant assumes the site only provided images of child pornography. Yet the affidavit mentions one transfer to the undercover agents which contained 14 images. Many of those 14 images did not contain images of child pornography. (Doc.48- 95). This fact also was not disclosed to the magistrate. Had this fact been disclosed, the magistrate may have been alerted to the issue that the amount transferred was significantly less than the minimum fee for services described in the advertisement because non pornographic images may have been available on the site.

All these inferences of course presuppose Mr. Marino's alleged October 2019 transfer to the bitcoin address is intended to go the same site as the one under investigation by the agents in New York. The only evidence to support this conclusion is this one-time transfer is to a bitcoin account that appears to be controlled by the same people who were communicating with the agents in New York.

In contrast to the evidence in support of the reasonable suspicion described in *Touset*, there is no assertion in the four corners of this search warrant "that the Philippines is a source country for child pornography." *Touset*, at 1237. Absent more evidence, it is not reasonable to conclude Mr. Marino is dealing with the same site as the agents simply because those people may control the same Bitcoin account.

The evidence described in four corners of this affidavit does provide probable

cause, however it is defined, to conclude that some people in the Philippines are producing and distributing child pornography. What is missing however is evidence "particularized to the target of the search" in Jacksonville. See, *United States v. Falso*, 544 F.3d 110, 124 (2nd. Cir. 2008). The discussion of reasonable suspicion in *Touset* and the cases cited in the original memorandum demonstrate no matter how fluid the concept of probable cause may be, it is not fluid enough to include the facts of this case.

## **STALENESS**

But for the misleading, if not outright false misrepresentations in the standard search warrant template concerning collectors/hoarders and that evidence of a crime (and everything else) is stored virtually in perpetuity in computers, this single suspected criminal act would be considered stale for purposes of issuing a search warrant. Much of the testimony at the December 10, 2020, hearing addressed the agent's basis for swearing under oath in the affidavit that the boilerplate allegations in the search warrant concerning 'collectors/hoarders' and 'evidence of a crime contained on computers can be recovered indefinitely' was true. It turns out there is little to no scientific evidence to support the first claim and, while the second claim may have been true in the past, it is not an accurate statement of current computer hardware and technology.

Richard Connor empirically tested the first proposition. He uses the criteria provided by the government in the affidavit. (Doc.48-157). Mr. Connor categorizes the class of "many individuals" who "tend to maintain or hoard their pornography for long periods of time." (Doc.48-157). Mr. Connor is not aware of any information which suggests the government has ever empirically tested this proposition. (Doc.48-142). His study of over 330 child pornography cases since 2006 reveals only roughly 17% of those cases could be characterized as collectors and another 14% could not be categorized.

(Doc.48-140). This left over 65% or two-thirds of the sample of child pornography cases he examined who were not considered collectors. Mr. Connor also researched the term's origin of the collector hoarder language. (Doc.48-135). He said he "never found the origin of it…it's unchallenged, it's taken as accepted fact." (Doc.48-155). "Deep down," he continues, "I did not think it was true that the collector language did not apply to the majority of my clients." *Id.*

Mr. Connor also opines about paragraph 17 of the affidavit. This paragraph, in sum, avers, inconsistent with the hoarders' claim, that with faster internet access, more people who access prohibited images delete those images but then goes on to suggest the evidence of computer activity remains accessible to forensic techniques almost indefinitely because of the nature of computer design and technology. Mr. Connor explains "hard drive technology and storage technology is changing drastically." (Doc. 48-146). "Solid state technology often times renders data or a drive no longer forensically recoverable." (Doc.48-148). Finally, relying on his experiences as a forensic examiner, he testifies, "you can get anything on these (other than child pornography), including "child erotica" on dark websites". (Doc.48-149).

The premise that the staleness doctrine does not apply to child pornography cases is entirely dependent upon these two principles, 1) "Pedophiles rarely, if ever, dispose of child pornography"; 2) "Deleted files can be recovered from electronic devices." *Touset* at 1238. Without a factual basis to support the belief that evidence of a single suspected criminal event would be present on a device seven months after the fact renders any probable cause that may have existed stale.

## *FRANKS* AND *LEON*

Mr. Marino combines the discussion of the *Franks* issues and the *Leon* analysis.

The testimony and evidence reveal a number of misleading if not outright false statements or omissions made in the affidavit. There are three omissions directly attributable to Agent Leudke. One is the admission concerning the 14 images sent by the Philippine provider to the agents in New York. A number of those 14 images were not child pornography. This admission is material. Had it been disclosed, the magistrate would have had the opportunity to consider that even if it were the same site and even if the person who controlled the bitcoin address was the same person the agents were communicating with, there were images that were not child pornography provided to the agents.

Agent Leudke failed to disclose the test amount. The agents in New York sent almost the same amount of bitcoin currency as Mr. Marino is alleged to have sent. The test amount was not for child pornography. (Doc.48-121). This omission is material. Had the magistrate judge been advised of this fact, it may have alerted him, among other things, to the discrepancy between the transaction amount and the advertised services in the affidavit.

There is no evidence in the affidavit that Mr. Marino possessed any of the characteristics of a collector. The standard proposition that "many individuals tend to collect, hoard" child pornography (if it was true) is only meaningful if there is some evidence the target fits the class of many individuals who collect or download child pornography. Prior to executing the warrant, the agent conducted a background investigation of Marino and found no evidence of "collector characteristics." (Doc.48-85). Mr. Marino contends that the weight of the evidence, including the affidavit itself, suggest these omissions were recklessly made. Had these omissions been included in determining probable cause, this warrant would not have been issued.

There are several other misstatements or omissions in the affidavit that are more difficult to categorize. These are the ones concerning "collectors hoard child pornography for long periods of time" and evidence remains on computers and electronic devices indefinitely. The *Leon* analysis and factors focuses on the conduct of the affiant and the agents who execute the warrant.  Mr. Marino contends that it is Agent Leudke who must be "constructively responsible" for what are, in effect, certainly the negligent, if not reckless, institutional failures of law enforcement collectively in making the representations concerning collector/hoarders.

The Court noted, it is likely Agent Leudke (and many others) believe the proposition "that many individuals who collect/hoard child pornography for long periods of time" is true. (Doc. 48-170-171). However, as it is increasingly evident in the disinformation age, there is no substitute for facts to support propositions. Regrettably, it is not only Agent Leudke, but the law enforcement community in general, including law enforcement forensic examiners, prosecutors and others, who have failed to question this central notion of search warrants for electronic devices that many people who collect child pornography tend to hoard it for long periods of time. The end result of the agent's individual omissions and misstatements and the institutional neglect of the failure to test the most basic propositions is a search warrant which is extremely misleading.

The United States maintains the *Leon* good faith exception should apply if the Court finds ( as it should) that this warrant lacks probable cause. It suggests that the Court consider other evidence Agent Leudke possessed, but did not disclose to the magistrate, in support of a finding he relied in good faith on the validity of the warrant. That evidence includes the fact that one of the posted advertisements has no specific reference to price. (Doc. 54- 17). Defendant responds, as noted earlier when discussing the affidavit itself,

that when reading the advertisement in context, it simply defies logic and belief to believe that contraband could be had for less than 150 Euros. (Doc.46-6).

The result of both the deliberate, individual material omissions and institutional neglect is the production of a search warrant that is, at best, inexcusably misleading. Over 30 pages long, the magistrate judge is provided with a fairly standard template for a search warrant in the Middle District of Florida. What is missing however, is evidence (of a crime, not identity) particularized to the target of this search warrant in Jacksonville, Mark Marino. The *Leon* good faith exception cannot save this warrant.

Mr. Marino respectfully moves the Court to issue a report and recommendation that the motion to suppress be granted and any evidence seized as a result of the unlawful search be excluded from any trial as fruit of the poisonous tree.

Respectfully submitted,

*S:// Thomas M. Bell*
THOMAS M. BELL, #0615692
301 West Bay Street, Suite 1460
Jacksonville, Florida 32202
Telephone (904) 354-0062
Telecopier (904) 353-1315
tbellesq@bellsouth.net
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 10, 2021, I electronically filed the foregoing with the clerk of the Court by using CM/ECF system which will send a notice of electronic filing to Kelly Karase A.U.S.A.

*S:// Thomas M. Bell*
Thomas M. Bell