# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                    Case No. 3:20-cr-94(S2)-TJC-JRK

MARK MANUEL ANGELES MARINO

_____

## REPORT AND RECOMMENDATION[1]

### I.   Status

This cause is before the Court on the Amended Motion to Suppress Physical Evidence and Statements, and Memorandum of Law (Doc. No. 47; "Motion"), filed December 16, 2020. On October 9, 2020, Defendant filed his initial Motion to Suppress Physical Evidence and Statements, Request for Evidentiary Hearing, and Memorandum of Law (Doc. No. 31; "Initial Motion"). An evidentiary hearing on the Initial Motion was held on December 10, 2020. See Clerk's Minutes (Doc. No. 46); Transcript of December 10, 2020 Evidentiary Hearing (Doc. No. 48; "Tr."), filed January 7, 2021.

---

[1]   "Within 14 days after being served with a copy of the recommended disposition [of a motion to suppress evidence], . . . a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Crim. P. 59(b)(2). "Failure to object in accordance with this rule waives a party's right to review." Id.; see also 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Order (Doc. No. 3), No. 8:20-mc-100-SDM, entered October 29, 2020, at 6.

The instant Motion was thereafter filed to conform to the evidence presented at the hearing. <u>See</u> Tr. at 185-87. On January 29, 2021, the Government responded in opposition to the Motion. <u>See</u> United States' Amended Response in Opposition to Defendant's Amended Motion to Suppress (Doc. No. 54; "Response").[2] With leave of Court, <u>see</u> Tr. at 184, Defendant replied and the Government sur-replied, <u>see</u> Defendant Marino's Reply Memorandum in Support of Amended Motion to Suppress (Doc. No. 59; "Reply"), filed February 10, 2021; United States' Amended Sur-Reply in Opposition to Defendant's Amended Motion to Suppress Physical Evidence and Statements (Doc. No. 62; "Sur-Reply"), filed March 2, 2021.[3]

## II.   Background

On June 17, 2020, agents with Homeland Security Investigations ("HSI") executed a federal search warrant on Defendant's residence ("the Residence"), Defendant was arrested, and a Criminal Complaint (Doc. No. 1) was filed. <u>See</u> Affidavit in Support of Complaint at 4. The Criminal Complaint charged Defendant with receiving materials involving a visual depiction of a minor

---

[2]        The amended Response was filed because the initial response (Doc. No. 52), also filed January 29, 2021, exceeded the page limit imposed by Local Rule 3.01(b), United States District Court, Middle District of Florida. <u>See</u> United States' Motion for Leave to File Out of Time and to File an Amended Response to Defendant's Amended Motion to Suppress (Doc. No. 53), filed January 29, 2021.

[3]        The amended Sur-Reply was filed to correct a scrivener's error in the initial sur-reply (Doc. No. 61), filed February 24, 2021. <u>See</u> Sur-Reply at 1 n.1.

engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2). Criminal Complaint at 1.

On the same date, Defendant made his initial appearance before the Honorable Monte C. Richardson, United States Magistrate Judge. See Clerk's Minutes (Doc. No. 2). Following a detention hearing conducted on June 24, 2020, the Court ordered Defendant detained. See Clerk's Minutes (Doc. No. 13); Order (Doc. No. 15), entered June 25, 2020.

On July 8, 2020, the grand jury returned a two-count Indictment (Doc. No. 16), charging Defendant with one count of knowingly receiving a visual depiction of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1), on or about October 25, 2019; and one count of possessing one or more matters containing visual depictions of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2), on or about June 17, 2020.

Upon the return of the Indictment, the case was assigned to the undersigned. Defendant was arraigned on July 15, 2020, and he entered a plea of not guilty. See Clerk's Minutes (Doc. No. 21).

On August 19, 2020, the grand jury returned a six-count Superseding Indictment (Doc. No. 26), charging Defendant with one count of knowingly attempting to entice a minor to engage in a commercial sex act, knowing and in reckless disregard of the fact that the minor was under the age of fourteen, in

violation of 18 U.S.C. §§ 1591(a)(1) and 1594(a), between on or about March 19, 2019 and on or about January 7, 2020 (Count One); three counts of enticing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, in violation of 18 U.S.C. § 2251(a) and (e), on or about March 21, 2019 (Count Two), September 30, 2019 (Count Three), and October 22, 2019 (Count Four); one count of knowingly receiving a visual depiction of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1), on or about October 25, 2019 (Count Five); and one count of knowingly possessing one or more matters containing visual depictions of a minor under the age of twelve engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2), on or about June 17, 2020 (Count Six).

Defendant was arraigned on the Superseding Indictment on August 25, 2020, and he entered a plea of not guilty. See Clerk's Minutes (Doc. No. 28). Thereafter, the Initial Motion was filed, and the evidentiary hearing was set. See Order (Doc. No. 35), entered November 5, 2020.

On November 19, 2020 (before the evidentiary hearing was held), the grand jury returned a seven-count Second Superseding Indictment (Doc. No. 39), charging Defendant with one count of knowingly attempting to entice a minor to engage in a commercial sex act, knowing and in reckless disregard of the fact that the minor was under the age of fourteen, in violation of 18 U.S.C.

§§ 1591(a)(1) and 1594(a), between on or about March 19, 2019 and on or about January 7, 2020 (Count One); three counts of enticing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, in violation of 18 U.S.C. § 2251(a) and (e), on or about March 21, 2019 (Count Two), September 30, 2019 (Count Three), and October 22, 2019 (Count Four); two counts of knowingly receiving a visual depiction of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1), on or about September 30, 2019 (Count Five) and October 25, 2019 (Count Six); and one count of knowingly possessing one or more matters containing visual depictions of a minor under the age of twelve engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2), on or about June 17, 2020 (Count Seven).

On November 24, 2020, Defendant was arraigned on the Second Superseding Indictment, and he entered a plea of not guilty. <u>See</u> Clerk's Minutes (Doc. No. 42). Thereafter, the evidentiary hearing was held and the instant Motion, Response, Reply, and Sur-Reply were filed. The Motion is now ripe for consideration.

### III.   Summary of Issues Raised in Motion and Recommendation

The Motion involves the search of the Residence on June 17, 2020 that, as noted, was conducted pursuant to a search warrant. The warrant was issued by Judge Richardson on June 16, 2020. In general, Defendant seeks to suppress

all evidence obtained from the execution of the search warrant, including any child sexual abuse material (also referred to as child pornography) and statements made by Defendant. Defendant challenges the search warrant on two bases: 1) the affidavit supporting the application for the search warrant ("Affidavit") lacked probable cause; and 2) any probable cause that existed was stale because the alleged unlawful activity occurred about seven months before the search warrant was issued. In making these arguments, Defendant asserts the Affidavit omitted certain information material to a finding of probable cause and contained a number of material misrepresentations, including that individuals who traffic in child sexual abuse material collect such material and that deleted data can be recovered from digital devices. Additionally, Defendant contends the good faith exception does not apply because the Affidavit was devoid of probable cause and the Affidavit's misrepresentations and omissions misled the issuing judge.

For the reasons set out below, the Motion is due to be denied. The undersigned finds that the information set out in the Affidavit supplied probable cause for the search warrant; that the probable cause was not stale; and that any misrepresentations or omissions do not defeat probable cause. Alternatively, suppression is not warranted because Agent Luedke reasonably and in good faith relied on a facially valid search warrant.

# IV.   Evidentiary Hearing[4]

The Government presented one witness at the evidentiary hearing: Special Agent Benjamin J. Luedke, who submitted the Affidavit.[5] See Dec. 10, 2020 Minutes. In addition, the Government submitted five exhibits (Doc. Nos. 46-2 to 46-6) that were received into evidence with no objection from Defendant. See id. Defendant presented one expert witness: Richard D. Connor, Jr.[6] See id. Defendant submitted two exhibits (Doc. Nos. 46-8 & 46-9) that were received into evidence with no objection from the Government. See id.

---

[4]      Unless otherwise noted, the undersigned credits each witness's testimony in all material respects. In making these credibility determinations, the undersigned considered various factors including the witnesses' demeanor, the consistencies or inconsistencies within the witnesses' testimony, and any interest the witnesses may have in the outcome of the hearing; but, the undersigned did not consider the official rank or status of the witnesses. United States v. Ramirez-Chilel, 289 F.3d 744, 749-50 (11th Cir. 2002); see also Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985) (indicating various factors to consider when making credibility determinations, such as demeanor, inflection of voice, and whether the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it").

[5]      Benjamin Luedke is a Special Agent with HSI and has been a Special Agent for more than eighteen years. Tr. at 12. Agent Luedke conducts child exploitation investigations, including "investigations involving possession, receipt, and distribution of child sexual abuse material; production and attempted production of child sexual abuse material; online enticement cases, which involve mainly chatting; as well as undercover investigations involved with chatting online." Tr. at 12. At the time of the evidentiary hearing, Agent Luedke had been conducting child exploitation investigations for about three years. Tr. at 50. Agent Luedke has been the affiant for a number of search warrant applications in child exploitation cases. See Tr. at 13, 63, 105, 113. Prior to becoming a Special Agent with HSI, Agent Luedke was a police officer with the United States Capitol Police for about two years. Tr. at 12. Agent Luedke is the agent assigned to Defendant's case. Tr. at 14.

[6]      Richard Connor "practice[s] computer and digital forensics," Tr. at 124, and has been doing so full-time since 2006, Tr. at 126. He has obtained a number of certifications in digital and computer forensics. Tr. at 126; see Def.'s Ex. 1 (Doc. No. 46-8) (Mr. Connor's curriculum vitae). Prior to getting involved in this type of forensics, Mr. Connor practiced law for about "12 or 15 years . . . ." Tr. at 129. Although he no longer practices law, he maintains his Florida Bar license. Tr. at 129.

The undersigned initially summarizes the information set out in the Affidavit and Agent Luedke's testimony.[7] This discussion is divided into four parts: 1) the investigation leading to the application for the search warrant and to Defendant's arrest; 2) the drafting of the Affidavit; 3) the Affidavit's statements regarding "collectors" of child sexual abuse material; and 4) the Affidavit's assertions about the ability to recover deleted digital data. Mr. Connor's testimony and his affidavit (received into evidence as Defendant's Exhibit 2 (Doc. No. 46-9; "Connor Affidavit"))[8] are then summarized.

## A.   The Investigation

In March 2020, Agent Luedke learned from HSI New York Special Agent Joshua Croft that "HSI New York's Child Exploitation Investigations Unit ha[d] been investigating a dark web user advertising the sale of child sexual abuse material over the [I]nternet, as well as offering to provide a child for hands-on sexual abuse." Affidavit at 25-26. The assertions made in the Affidavit regarding this investigation are based on information provided to Agent Luedke

---

[7]     A court's after-the-fact review to determine whether probable cause existed to issue a search warrant is limited to the four corners of the affidavit submitted as part of the application for the search warrant, absent a finding or showing that the affidavit contained misleading or false information or omitted material information. See United States v. Lockett, 674 F.2d 843, 845 (11th Cir. 1982); see generally Franks v. Delaware, 438 U.S. 154, 156-71 (1978). Accordingly, the information contained in Agent Luedke's Affidavit is set out in detail. In addition, given the arguments made by the parties (including those regarding the alleged misrepresentations/omissions and the good faith exception to the exclusionary rule), Agent Luedke's testimony is summarized as well.

[8]     Mr. Connor's affidavit was also filed as an exhibit to the Motion. See Motion at Ex. 2 (Doc. No. 31-2).

by Agent Croft and Detective Damon Gergar with the New York Police Department and the HSI New York Task Force. See generally id. at 25-33.

## 1.  The Advertisement

### a.  *Affidavit*

The Affidavit states as follows. In around September 2019, HSI New York identified a "dark web user" who was posting advertisements on "known child exploitation forums on the dark web."[9] Id. at 26. The advertisements offered "'camshows' and meetings" with children "in exchange for Bitcoin."[10] Id. One of the advertisements ("the Advertisement") directed "interested parties" to contact Philippinegirls@secmail.pro ("the Email Account"). Id. The domain name "secmail.pro" is an "anonymous email service that uses private servers to provide its users protection for anonymous use." Id. (By way of background, Defendant is not the user of the Email Account. As explained later, he is alleged to have received child sexual abuse material from the user of the Email Account.)

---

[9]      The Affidavit states the "dark web" is a "partition of the Internet that includes an extensive, sophisticated, and widely used criminal marketplaces operating on the Internet which allow participants to buy and sell illegal items such as child sexual abuse material, drugs, firearms, and other hazardous materials with greater anonymity than is possible on the traditional Internet . . . ." Affidavit at 11.

[10]     Bitcoin is a popular type of cryptocurrency. Affidavit at 12. Cryptocurrency is "an online digital currency that allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems." Id. Cryptocurrency has "a unique 'public address' and [is] accessed using a unique 'private key.'" Id. "When cryptocurrency is transferred from one user to another, it moves from the sender's unique public address to the recipient's unique public address." Id.

Detective Gergar provided Agent Luedke with a copy of the Advertisement, and Agent Luedke reviewed it. Id. The Affidavit quotes the following from the Advertisement:

> PHILIPPINE GIRLS: Only for serious men with good economy and who know how to be descrete [sic]. OFFER 1 Meeting with girls aged 4-12 in Philippines. We provide luxury house with swimming pool. One week including one girl for normal sex . . . 8000 Euro. Each additional week or any extra girl is 4000 Euro a week. Rough sex cost [sic] more.

Id. The Advertisement listed other "offers," including a "[c]amshow," "[v]ideo of the girl," and "proof of girl." Id. at 26-27.

### b. *Agent Luedke's Testimony*

Agent Luedke testified as follows regarding the Advertisement. Agent Luedke confirmed that the Affidavit does not quote the Advertisement in its entirety. Tr. at 19. The Affidavit quotes only "Offer 1." Compare Affidavit at 26, with Govt.'s Ex. 2 (Doc. No. 45-3) (Advertisement). "Offer 2" states, "Camshow with a girl from 400 Euro." Tr. at 21; Govt.'s Ex. 2. "Offer 3" reads, "Video of the girl. Describe action and length of video and you get a quote in return." Tr. at 21; Govt.'s Ex. 2. In addition, the Advertisement states, "Proof of girl will of course be sent once we have the girl you like." Tr. at 22; see Govt.'s Ex. 2. There were no specific prices associated with "Offer 3" or with the "proof of girl." Tr. at 22; see generally Govt.'s Ex. 2. Agent Luedke did not believe that Offer 3 was

an offer for child erotica because in his "training and experience," individuals do not pay for child erotica. Tr. at 110.[11]

The Advertisement was posted on August 15, 2019 by a user with the name, "Anon." Tr. at 22-23; see Govt.'s Ex. 2. According to Agent Luedke, "Anon" is "short for anonymous." Tr. at 22-23. In addition, as Agent Luedke indicated in the Affidavit, the Advertisement was posted on the dark web, which according to Agent Luedke, can be used to promote anonymity. Tr. at 23-24. Agent Luedke testified he did not know whether the user of the Email Account had other email addresses or other advertisements unrelated to child sexual abuse material. Tr. at 100-01.

### 2. Undercover Communications

#### a. *Affidavit*

On September 16, 2019, Detective Gergar began to communicate via email with the Email Account. Affidavit at 27. Using an undercover email address, Detective Gergar sent the Email Account the following message: "Interested in one night with the girl. Would like a pic first." Id. (emphasis omitted). On the same date, the Email Account responded, "Here isa [sic] photo." Id. (emphasis omitted). Attached to the response was an image of a girl.

---

[11]     According to the Affidavit, child erotica "means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, illegal or that do not necessarily depict minors in sexually explicit poses or positions." Affidavit at 6.

Id. Agent Croft gave the image to Agent Luedke, and Agent Luedke reviewed it. Id. The Affidavit contains Agent Luedke's description of the image. See id. Agent Luedke represented in the Affidavit he had "probable cause to believe, based on [his] training and experience, that the image constitutes child pornography, that is, a visual depiction of a minor engaged in sexually explicit conduct as set forth in 18 U.S.C. § 2256." Id.

Detective Gergar sent the following message to the Email Account on September 17, 2019: "Definitely interested. She is beautiful. How do I arrange a night with her?" Id. (emphasis omitted). The Email Account did not respond at that time. See id. at 27-28.

On November 12, 2019, Detective Gergar sent the Email Account the following message: "Is the girl still available? I have 5000 usd [sic] in [B]itcoin." Id. at 28 (emphasis omitted). The Email Account did not respond until December 19, 2019, when it sent an email describing a ten-year-old "Philippine girl." See id. (some capitalization omitted). The email then stated, "Only for serious men with good economy and who know how to be discreet [sic]. All payments in [B]itcoin." Id. (emphasis omitted). The email included a list of prices (€150, €800, €1200, and €1600) and "TOR browser links[12] to preview an

_____

[12]     The TOR (or "Tor") browser is a "major dark-web browser designed to access the "Tor network." Affidavit at 12. This network is "a special network of computers on the Internet, distributed around the world, that is designed[ ]to conceal the true Internet Protocol ('IP')

(Continued...)

image and a video." Id. Detective Gergar was able to access the video but was unable to access the image. Id.

Agent Croft provided Agent Luedke with the video, which Agent Luedke reviewed. Id. The video is three minutes long and is titled, "philippine girl 10yo." Id. The video directs viewers to email the Email Account if they "want to see more[.]" Id. at 28-29. The Affidavit contains Agent Luedke's description of the video. See id. Agent Luedke stated in the Affidavit he had probable cause to believe that the person depicted in the video "is a child due to the overall body size, very minor breast development, lack of pubic hair, child-like facial features, and overall size of the child's body." Id. at 29. In describing the video, Agent Luedke indicated the minor engaged in sexual activity at the direction of "the person recording the video." See id. at 28.

On January 13, 2020, Detective Gergar sent the following message to the Email Account: "I'm interested but can't seem to get the download of the video. The girl is definitely beautiful. Do you have other girls by chance?" Id. at 29 (emphasis omitted). On January 27, 2020, the Email Account sent an email stating, "Video is still there. She come [sic] back tomorrow and stay one week if you want to try video and/or cam this time." Id. (emphasis omitted). The email

---

addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users." Id. at 11-12. An IP address is a "unique number used by a computer to access the Internet and is associated with a physical address." Id. at 9.

also included "instructions similar to the email received on December 19, 2019 and the same two TOR browser links." Id.

On February 5, 2020, the Email Account sent an email with three TOR browser links with instructions similar to those contained in the December 19, 2019 and the January 27, 2020 emails. Id.[13] Detective Gergar downloaded fourteen images from one of the links and a video from another. Id. "Nothing was downloaded from the third link." Id. Agent Croft provided Agent Luedke with "the image and video," and Agent Luedke reviewed "it." Id. The Affidavit contains Agent Luedke's description of the video but not of the images. See id. at 29-30. Agent Luedke represented in the Affidavit that based on his "training and experience," he had probable cause to believe "that the image[14] constitutes child pornography, that is, a visual depiction of a minor engaged in sexually explicit conduct as set forth in 18 U.S.C. § 2256." Id. at 30-31.

Detective Gergar sent a message to the Email Account on February 6, 2020, stating, "I want the 20 minute video of the girl. Will pay now. Send me the bitcoin address." Id. at 31 (emphasis omitted).[15] Two days later, Detective

---

[13]     The Affidavit mistakenly states the links and instructions were similar to those sent in the January 13, 2019 email. See Affidavit at 29. Agent Luedke is likely referring to the email sent on January 27, 2020.

[14]     The reference to the "image" appears to have been a typographical error.

[15]     As noted above, supra note 10, "[w]hen cryptocurrency is transferred from one user to another, it moves from the sender's unique public address to the recipient's unique public address." Affidavit at 12.

Gergar received an email from the Email Account with a Bitcoin address (the "Target Wallet"). Id. The email also included the following message: "As soon as we see the money in, we will make the video. Let us know what you want to see her do and say during the video." Id. (emphasis omitted).

### b.   Agent Luedke's Testimony

According to Agent Luedke's testimony, some of the images contained in one of the TOR links sent on February 5, 2020 were images of a minor but did not constitute child sexual abuse material. Tr. at 95, 103. (This is not explained in the Affidavit.) One of the images was a collage that included child sexual abuse material. Tr. at 95, 103. As to the third TOR link, Agent Luedke confirmed that nothing was downloaded from it. Tr. at 102. According to Agent Luedke, the third TOR link "was delineated as a backup link." Tr. at 102-03. Agent Luedke testified that "[n]one of the images or videos that were provided by the person behind [the Email Account] would be what, in [his] training an experience, would be called child erotica." Tr. at 111.

Agent Luedke testified that Detective Gergar used two undercover email addresses to communicate with the Email Account. See Tr. at 25-26. (The Affidavit does not state Detective Gergar used two email addresses, and the communications between the second email address and the Email Account are not set forth in the Affidavit. Tr. at 109; see generally Affidavit.) Detective Gergar assumed a different persona for each email address "to corroborate that

it's not just one person [the user of the Email Account is] talking to; it's multiple people." Tr. at 26. Agent Luedke explained this is a "general practice with [undercover] agents . . . ." Tr. at 26. At the time the search warrant was executed, Agent Luedke knew the Email Account had sent child sexual abuse material to Detective Gergar's second undercover email address. Tr. at 109.

According to Agent Luedke, Detective Gergar began using the second email address on February 8, 2020. Tr. at 27. The "initial communication" from this email address (which, as noted, is not set out in the Affidavit) "was just kind of saying, 'Hey, I heard you have some material. Let me know how much,' and talking about Bitcoin." Tr. at 29. Agent Luedke indicated at the hearing that the next day, February 9, 2020, the second email address received child sexual abuse material from the Email Account. Tr. at 27.

On February 10, 2020, Detective Gergar (communicating via the second email address) initiated a "test transfer" whereby he transferred to the Target Wallet the equivalent of $55.00 in Bitcoin "to ensure that the Bitcoin address provided by [the Email Account] was legitimate." Tr. at 29, 31; see also Tr. at 121 (This transfer is not mentioned in the Affidavit. See Tr. at 59; see generally Affidavit.) Prior to this transfer, no money had been exchanged. See Tr. at 32. Detective Gergar did not want to send the full amount because he did not "want the child to be abused and end up getting a video for what would amount to the full amount of what [the Email Account was] asking for." Tr. at 32. Detective

Gergar told the user of the Email Account that he could not make the full payment because he was "still waiting on other funds to be made available on Coinbase."[16] Tr. at 32.

### 3.   The Blockchain Analysis

#### a.   *Affidavit*

HSI New York analysts used blockchain analysis [17] to search for cryptocurrency transactions involving the Target Wallet (the Bitcoin address the user of the Email Account provided to Detective Gergar). Affidavit at 31. The blockchain analysis revealed that the Target Wallet was contained in a "cluster" with a second Bitcoin address ("Second Bitcoin Address"). Id. "Clusters" are groups of transactions contained in "large databases" created by blockchain analysis companies to investigate Bitcoin transactions. Id. at 14. These "clusters" are composed of Bitcoin addresses that are "included as 'inputs' in the same transaction." Id. Computer scientists use "clusters" to "analyze clues in how Bitcoins are typically aggregated or split up to identify [Bitcoin] addresses and their respective account owners." Id. at 15. The Affidavit represents that "[t]hrough numerous unrelated investigations, law enforcement

---

16      Coinbase is a cryptocurrency exchange that "allow[s] users to trade cryptocurrencies for other currencies, including U.S. dollars." Affidavit at 13.

17      A "blockchain" is a "cryptocurrency public ledger that records all cryptocurrency transactions." Affidavit at 13. Bitcoin logs transactions in this format. Id. A blockchain "essentially provides a list of all transactions that have ever occurred." Id.

has found the information provided by these [blockchain analysis] companies to be reliable." Id. at 14.

"Through their investigation[,] HSI New York analysts identified a transaction that occurred on or about October 29, 2019, involving the Second Bitcoin Address." Id. at 31. The transaction had a unique "transaction hash ID"[18] ("October 29, 2019 Hash ID") that was associated with a payment of "approximately" $55.00 worth of Bitcoin to the Second Bitcoin Address. Id.

"The 'cluster' containing the Target Wallet and the Second Bitcoin Address subsequently transferred Bitcoin, in a single cospend transaction, into a single Bitcoin address . . . ." Id. at 32. In a cospend transaction, Bitcoin is spent from multiple addresses at the same time. Id. at 13-14. When Bitcoin is spent from an address, the person spending it must provide the "private key" for that address to prove the person owns that address. Id. at 14. So, a person cospending must know the private key of each address from which Bitcoin is being spent. Id. The cospend transaction involving the Target Wallet and the Second Bitcoin Address thus indicated the addresses were "controlled by the same user." Id. at 32.

---

[18] A transaction hash is a "unique address on a blockchain that records the sender's [cryptocurrency's] public address, [the] recipient's [cryptocurrency's] public address, [the] transaction amount, and [the] transaction date and time." Affidavit at 13. Every transaction on a blockchain has a unique transaction hash. Id.

The October 29, 2019 Hash ID was in turn "linked" to a Coinbase account. <u>Id.</u> Coinbase "requires users who want to open or maintain accounts on the exchange to provide information and supporting documentation about their identities, finances, and sources of cryptocurrencies, among other things." <u>Id.</u> at 13. On February 24, 2020, Agent Croft "caused a summons to be issued to Coinbase," requesting records related to the October 29, 2019 Hash ID. <u>Id.</u> at 32. Coinbase produced the records to Agent Croft on February 26, 2020. <u>Id.</u> "The information was provided to [Agent Luedke] on March 12, 2020, and [he] reviewed it in its entirety." <u>Id.</u>

According to the Affidavit, the records obtained from Coinbase contained Defendant's name and date of birth, the address of the Residence, and a photograph of Defendant's driver's license (containing the address of the Residence). <u>Id.</u> at 32-33. The records also indicated that the Coinbase account was created on September 15, 2019 and that Defendant sent $56.38 in Bitcoin on October 29, 2019. <u>Id.</u>[19] The notes associated with the October 29, 2019 transaction showed a secmail.pro email address and the notation, "5pics." <u>Id.</u> (Whether by coincidence or not, the amount of Bitcoin that Defendant sent on October 29, 2019 is similar to the amount that Detective Gergar sent to the Target Wallet as a "test transfer" on February 10, 2020.)

---

[19]   This is a similar amount to the amount the Affidavit states was associated with the October 29, 2019 Hash ID ("approximately" $55.00). Affidavit at 31; <u>see</u> <u>supra</u> p. 18.

The Affidavit states that "[f]urther review of the [Coinbase] account documents" showed that the same IP address [20] was associated with Defendant's Coinbase account, the October 29, 2019 transaction, and "numerous additional account activity." Id. at 33. After additional investigation (set out in the Affidavit), Agent Luedke confirmed that the IP address was associated with the Residence and that Defendant was the subscriber assigned to the IP address. See id.

### b.   *Agent Luedke's Testimony*

A list of Defendant's Coinbase transactions (produced by Coinbase) was admitted into evidence as Government's Exhibit 3 (Doc. No. 46-4). See Tr. at 36. Specifically, they show that on October 29, 2019, Defendant sent 0.00599236 BTC (around $56.38) to a Bitcoin address starting with 1G7V.[21] See Govt.'s Ex. 3 at 1-2; Tr. at 37-38, 42. According to Agent Luedke's testimony, this transaction is the October 29, 2019 transaction involving the Second Bitcoin Address that is referenced in the Affidavit. See Tr. at 42, 97 (testifying the Second Bitcoin Address starts with "1G7V"). Agent Luedke indicated the Coinbase records show that an individual (apparently the account holder) can enter notes about each transaction. Tr. at 39; see Govt.'s Ex. 3 at 1. The records

---

[20]     As noted, an IP address is a "unique number used by a computer to access the Internet and is associated with a physical address." Affidavit at 9.

[21]     The Bitcoin addresses referred to herein consist of a series of letters and numbers. For ease of discussion, only the first four letters/numbers are provided.

have the following note associated with the October 29, 2019 transaction: "fhinami@secmail.pro 5pics." Govt.'s Ex. 3 at 1; see also Tr. at 39. Agent Luedke explained the notation "pics" refers to "pictures," Tr. at 39, but he did not know what "fhinami" was, Tr. at 44.

As Agent Luedke indicated at the hearing, the Coinbase records also show two other transactions that include a "secmail" email address: one conducted on October 23, 2019 and one on October 25, 2019. See Govt.'s Ex. 3 at 1; Tr. at 39-40. (These transactions are not mentioned in the Affidavit.) The October 23, 2019 transaction was a payment of 0.02154204 BTC (around $172.09) to a Bitcoin address starting with "13t1" ("13t1 Bitcoin Address"). Govt.'s Ex. 3 at 1-2; Tr. at 44. The following note was entered with respect to that transaction: "fhinami@secmail.pro." Govt.'s Ex. 3 at 1. The October 25, 2019 transaction was a payment of 0.08850258 BTC (around $909.07) also to the 13t1 Bitcoin Address. Id. at 1-2; Tr. at 44. The following note was entered in connection with that transaction: "fhinami@secmail.com." Govt.'s Ex. 3 at 1. Agent Luedke did not know why the email address in that note was a ".com" address and not a ".pro" address. See Tr. at 45.

Agent Luedke testified the October 23, 2019 and October 25, 2019 transactions were not included in the Affidavit because at the time he applied for the search warrant, the "relevance of those transactions" was not "clear." Tr. at 44. Agent Luedke testified the Bitcoin that was sent on October 29, 2019 to

the Second Bitcoin Address (the address that starts with 1G7V) and the Bitcoin sent to the 13t1 Bitcoin Address on October 23, 2019 and October 25, 2019 was "cashed out by the same user at the same place, which indicates that that user . . . controls those two separate Bitcoin addresses." Tr. at 40; <u>see also</u> Tr. at 41. The 13t1 Bitcoin Address, however, was not contained in the same "cluster" as the Target Wallet. <u>See</u> Tr at 44.

## B.   Agent Luedke's Testimony About the Drafting of the Affidavit

Agent Luedke testified it took about a month to draft the Affidavit. Tr. at 83; <u>see also</u> Tr. at 104. He indicated that he used a search warrant affidavit from a prior case as a template, but that the template was "constantly tailored." Tr. at 61, 82, 117; <u>see also</u> Tr. at 118. He testified his "common practice is to speak to the [Assistant United States Attorney ('AUSA')] and describe what kind of investigation it is, and then [they] discuss which prior affidavit to go off of." Tr. at 117. Agent Luedke testified that when he drafts search warrant affidavits, he "usually" uses the "most recent" affidavit he has done as a template. Tr. at 62.

Agent Luedke testified that from "the beginning," the drafting of the Affidavit was an ongoing, "collaborative effort with the other agents that [he] spoke to during th[e] investigation and [the AUSA assigned to the case] or another AUSA." Tr. at 62; <u>see also</u> Tr. at 52, 104. According to Agent Luedke, he had "numerous discussions" with "the New York agents" and the AUSA

assigned to the case "regarding the drafts of the [A]ffidavit." Tr. at 83. At some point, the AUSA told Agent Luedke that she thought there was probable cause for a search warrant. Tr. at 52.

The Affidavit, however, was not reviewed by a supervisor or co-worker of Agent Luedke. Tr. at 51; see also Tr. at 64-66. Agent Luedke testified, "My supervisor knows what I'm doing, but we don't run a specific affidavit by the supervisor unless they ask." Tr. at 64.

## C.   Collectors of Child Sexual Abuse Material

### 1.   Affidavit

Agent Luedke stated in the Affidavit that "[b]ased on [his] experience, training, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, [he] know[s] that certain common characteristics are often present in individuals who collect child pornography." Affidavit at 20. For example, "[m]any individuals who traffic in and trade images of child pornography also collect child pornography." Id. In turn, "[m]any individuals who collect child pornography . . . also collect child erotica, which may consist of images or text that do not meet the legal definition of child pornography, but which nonetheless fuel their deviant sexual fantasies involving children." Id. at 20-21.

The Affidavit goes on to state as follows:

> Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage. These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet. As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations.

Id. at 22. Additionally, Agent Luedke stated in the Affidavit that based on his training, experience, and "conversations with other experienced law enforcement officers," he "know[s] that individuals who collect and trade child pornography often do not willfully dispose of their child pornography collections, even after contact with law enforcement officials." Id. at 22-23.

On the other hand, Agent Luedke also asserted in the Affidavit that based on his training and experience, he knows that because of "faster Internet" and the growth of platforms for individuals to trade child sexual abuse material, "individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis." Id at 23-24. But, "evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools." Id. at 24. Moreover, "even in instances in which an individual engages in a cycle of downloading, viewing, and deleting images, a selection of favorite images involving a particular child or act is often maintained on the device." Id.

###   2.   Agent Luedke's Testimony

Agent Luedke testified that digital files containing child sexual abuse material have been found in eighteen out of the twenty child pornography cases in which he has sought a search warrant. Tr. at 113-14; see also Tr. at 50-51. Agent Luedke indicated this was partly why he decided to include in the Affidavit the information about "collectors." Tr. at 51. Agent Luedke provided an example of a case in which the subject of the search warrant distributed child sexual abuse material using a social media application in April 2019, and when the search warrant was executed almost a year later in March 2020, "the image" that had been distributed in April 2019 was found on the subject's devices. Tr. at 113. In one of the two cases in which no child sexual abuse material was found, the individual had purchased a new cellphone about two weeks before the search warrant was executed. Tr. at 115. The other case involved an "online enticement chat-based search warrant." Tr. at 115.

According to Agent Luedke, the information included in the Affidavit regarding "collectors" has been in child pornography search warrant affidavits for many years. Tr. at 119-20. Agent Luedke did not know of any publication confirming that individuals who possess child sexual abuse material "hoard" such material. See Tr. at 80. Agent Luedke indicated that when he applied for the search warrant in this case, there was no specific evidence that Defendant had any of the characteristics of a "collector" or "hoarder" of child sexual abuse

material. See Tr. at 82, 84, 85-86. There was also no evidence that Defendant was a convicted sex offender, had any significant criminal history, or had a history of domestic violence or child abuse complaints. Tr. at 85. Agent Luedke testified the Affidavit includes the information regarding "collectors" and "hoarders" of child sexual abuse material because this is something that agents have "always done and provided to the magistrate judge to ensure that [he or she is] provided with kind of an overview of [the agent's] experience, . . . training, and what [the agent has] learned as law enforcement in all these investigations." Tr. at 89.

Agent Luedke acknowledged that the statements in the Affidavit regarding the tendency of some individuals to routinely download and delete child sexual abuse material contradict the representations about individuals who "collect" or "hoard" this material and never delete it. See Tr. at 87. Agent Luedke explained:

> [I]n my training and experience, we've had the ones where you find thousands and thousands of images, and you also find individuals that do this particular situation, but we find the images resident -- were resident on the device at a certain time but aren't necessarily -- or were deleted at some point or another, is what I'm trying to say.

Tr. at 87.

### D.   Ability to Retrieve Deleted Data

#### 1.   Affidavit

Agent Luedke stated in the Affidavit that "[b]ased upon [his] training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, [he] know[s] that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other." Affidavit at 15. A "computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography." Id. at 16. "[H]ard disk drives" in computers "can store hundreds of thousands of images at very high resolution." Id. Agent Luedke asserted in the Affidavit that "[b]ased on [his] training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, [he] know[s] that computer forensic techniques can often recover files, including images and videos of child pornography, that have long been 'deleted' from computer media by a computer user." Id. at 19.

#### 2.   Agent Luedke's Testimony

Agent Luedke testified the statement in the Affidavit regarding the ability to recover deleted data through computer forensic techniques has been in child pornography search warrant affidavits "in the three years that [he has] been doing child exploitation cases." Tr. at 72-73. He testified, "I know that we have techniques that our analysts have used that have found previously deleted

images on electronic devices that were seized." Tr. at 74. Agent Luedke indicated that during the year prior to the execution of the search warrant, he had success working with forensic analysts to recover deleted data from cellphones. Tr. at 116. Agent Luedke indicated multiple times on cross-examination that no one has told him newer technology makes it more difficult, and sometimes impossible, to recover deleted files. See Tr. at 72, 74, 86-87, 88.

## E.   Mr. Connor's Affidavit and Testimony

As noted, Mr. Connor "practice[s] computer and digital forensics." Tr. at 124. He has "been retained to forensically examine thousands of cell phones, computers, and computer hard drives." Connor Affidavit at 3.[22] He "has been retained in more than 1,400 cases involving computer forensic-related issues," and he has "testified in more than 170 cases." Id. He has testified at more than 35 trials. Id. at 3.

Mr. Connor is retained by defendants for different reasons.[23] Sometimes he is retained because a defense attorney does not "want to be charged with or have the argument made that he didn't hire a forensic expert." Tr. at 151-52. Other times, a defendant is willing to "spend whatever he can to hire somebody like [Mr. Connor] to try to get him out of it." Tr. at 152. Mr. Connor testified his

---

[22]     The Connor Affidavit contains unnumbered pages. Citations to it follow the pagination assigned by the Court's electronic filing system (CM/ECF).

[23]     Mr. Connor has not been retained by the Government in criminal cases. Tr. at 166-67.

goal is not "to get them off or to say something favorable." Tr. at 168. Instead, he analyzes the data, and "tell[s] it like it is." Tr. at 168. Mr. Connor's hourly rate is $300.00. Tr. at 175. Mr. Connor received a retainer in Defendant's case. Tr. at 175-76.

Since 2006, Mr. Connor has worked on more than 330 cases involving child sexual abuse material. Tr. at 140; Connor Affidavit at 4. He "recently reviewed all of those cases to determine if the defendants were 'collectors' as defined by the language in the [A]ffidavit . . . ." Connor Affidavit at 4. This review revealed the following: 58 of those defendants (17.37%) "could be categorized as collectors"; 220 of those defendants (65.87%) "could not be categorized as collectors"; and in 48 cases (14.37%), Mr. Connor "did not have enough information to determine if the defendant was a collector." Id.; see also Tr. at 140-42, 157.[24]

To determine whether a defendant was a "collector," Mr. Connor used the following language from the Affidavit as criteria: "Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials," and "they tend to maintain or 'hoard' their visual depictions of child pornography for long periods of time." Connor Affidavit at 4; Tr. at 141. Mr. Connor testified that his determination of whether a defendant met this criteria

---

[24]      These cases actually total 326.

was "somewhat subjective" but that he "tr[ied] to do it in as objective a manner as [he] could . . . ." Tr. at 161.

Mr. Connor explained that in most of the cases in which he could not make a determination, the reason was "lack of data." Tr. at 162. Specifically, there were cases in which the defendant pled "before [Mr. Connor] really did any work" on the case or older cases in which Mr. Connor had already deleted the data. Tr. at 162. Other cases in which he could not make a determination involved situations where the defendant had child sexual abuse material "for a long period of time, but there's a lot of deletions, and [Mr. Connor] couldn't really make a judgment call." Tr. at 162.

Mr. Connor was not aware of any literature testing the assertion that many individuals who possess child sexual abuse material tend to collect or hoard it. Tr. at 139-40; see also Tr. at 171. He testified that a "couple" of years ago, he tried to determine the origin of this assertion. Tr. at 133. Mr. Connor never found it, but he testified it "seemed" to him that "what happened was at some point a judge cited that language in terms of why child porn[ography] search warrants are never stale, and so now they cite to that case and it's become gospel. It's unchallenged. It's taken as accepted fact." Tr. at 135. Mr. Connor did not remember the name of the case in which the judge "cited that language," but he testified it was from the 1990s. Tr. 136. Mr. Connor testified he "never got beyond that." Tr. at 136. In the past, Mr. Connor has suggested to

his clients that they should challenge the above assertion about collectors, but this is the first case in which he has testified about it. Tr. at 175.

Mr. Connor testified in substance that the means through which child sexual abuse material is obtained have "changed in the 15 years [he has] been doing this, yet [the] language [used in search warrant affidavits] is the same." Tr. at 136. Mr. Connor stated that based on his experience, child sexual abuse material "is much more readily accessible, so people are downloading it and deleting it, and then whenever they want to look at it again, they download it again." Tr. at 138. According to Mr. Connor, this is the case with "a lot of [his] clients." Tr. at 138. He stated that "it is not unusual to find artifacts such as file names and search terms indicative of child pornography on electronic devices after suspected images of child pornography have been deleted . . . ." Connor Affidavit at 5; see also Tr. at 144-45. According to Mr. Connor, however, "those artifacts are not always a reliable basis to infer prohibited content was on the device" because "[i]t is not unusual for file names to misrepresent the actual content of the files." Connor Affidavit at 5; see also Tr. at 145. For this reason, "law enforcement relies primarily on hash values, not file names, during their investigations." Connor Affidavit at 5; see also Tr. at 145. Mr. Connor explained that "[a] hash value is like a digital fingerprint . . . ." Tr. at 145.

Mr. Connor testified that although "[t]here may be artifacts left behind after something is deleted," the recovery of the deleted data "is an issue." Tr. at

144. He explained that the technology surrounding hard drives and storage "is changing drastically." Tr. at 146. According to Mr. Connor, the statement in the Affidavit that deleted files can be recovered from computers is "less true today that it was ten years ago." Tr. at 150.

Mr. Connor explained that ten or fifteen years ago, "all computer hard drives were spinning disks." Tr. at 146. Files stay on those hard drives, even after the user deletes them, until they are "overwritten by newer data." Tr. at 146. Because of this, files can stay on these types of hard drives for "years." Tr. at 146.

Nowadays, "more and more drives on computers" no longer have spinning disks. Tr. at 146. Instead, they have "solid-state drives" (also referred to as "SSD drives") that "greatly diminish[ ]" the "ability to recover deleted data." Tr. at 146, 148. These solid-state drives have "nozzles that open and close to allow electrons to pass through to write to the chip." Tr. at 146. These nozzles are weak and "wear out before anything else does." Tr. at 146. Solid-state drives are divided into what Mr. Connor called "blocks." Tr. at 146-47. For example, a ten-gigabyte drive has ten blocks. Tr. at 147. Mr. Connor explained the process through which solid-state drives store and delete data:

> [I]f you just kept writing at the beginning of the drive and you're only using the first block, eventually those nozzles are going to wear out, and that first block is not going to work anymore.

So now you're going to have to start writing on block 2, and instead of having a 10 gigabyte drive, you now have a 9 gigabyte drive.

So what people came up with in this technology and decided to do was we're not going to do that. We're going to write to block 1 one time, then we're going to write to block 2, then block 3, all the way to block 10 and then go back to block 1. So we're going to write an equal amount of times so that all the nozzles will wear out at the same time.

And when that happens is -- so you write to block 1. So say on block 1 we download -- my user downloads some child porn[ography] and then deletes it. And so block 1 gets written one time. So now what the drive does is it takes all the existing files on block 1 and copies them to block 2 and starts writing to block 2.

Now, the deleted file on block 1 was deleted, so it's not copied to block 2. It only sits on block 1, and at that point in time, it's still available to be forensically recovered, just like the old drives.

However, when the data is moved from block 1 to block 2, the drive knows that I'm going to be coming back to use block 1 again. So it zeros out block 1, zeros out, wipes it, so that any deleted data that had been on block 1 is now no longer forensically recoverable. It's all zeros. There's nothing left to recover.

Tr. at 147-48.

Therefore, according to Mr. Connor, the likelihood of recovery depends on a number of factors, including the "usage of the drive," the type of drive (spinning disk or solid-state drive), and the storage capacity of the drive. Tr. at 150-51. If the computer has a solid-state drive, the "chances of recovering deleted pictures or videos is close to nil." Tr. at 150-51.

With respect to the general language used in the Affidavit, Mr. Connor testified it is "the same" as other affidavits in the Middle District of Florida, "except for the specific facts of the case" and other information—like the cryptocurrency information—that was added based on the nature of the case. Tr. at 137; see also Tr. at 153-54.

## V.   Discussion

Defendant argues suppression is warranted on two grounds: 1) the Affidavit lacked probable cause; and 2) any probable cause that existed was stale by the time Agent Luedke applied for the search warrant. Additionally, Defendant asserts the good faith exception to the exclusionary rule does not apply. The undersigned addresses each issue in turn below.

### A.   Probable Cause

#### 1.   Parties' Arguments

Defendant does not contest that the Affidavit supports an inference that he transferred $56.38 in Bitcoin on October 29, 2019 and used a device located at the Residence to do so. Instead, Defendant argues the Affidavit did not supply the issuing judge with probable cause to believe that the Bitcoin transfer involved the user of the Email Account or that Defendant received child sexual

abuse material (as opposed to child erotica or something else) in exchange for that Bitcoin payment. Motion at 8;[25] see also Reply at 3.[26]

In support, Defendant makes the following two main arguments. First, Defendant contends the amount of Bitcoin transferred on October 29, 2019 was much less than what was quoted in the Advertisement and in the prices the Email Account provided Detective Gergar. See Motion at 3, 8; Reply at 2-3. Second, Defendant argues the Affidavit omits certain information material to determining whether Defendant received child sexual abuse material in exchange for the Bitcoin payment. See generally Reply at 2-4, 6. Specifically, Defendant asserts the Affidavit omits the material fact that not all of the fourteen images Detective Gergar received on February 5, 2020 constituted child sexual abuse material. Id. at 6. Defendant also argues the Affidavit omits the $55.00 "test transfer" made by Detective Gergar. Id. According to Defendant, this omission is material because if the issuing judge had "been advised of [the test transfer], it may have alerted him, among other things, to the discrepancy between the [October 29, 2019] transaction amount and the advertised services in the [A]ffidavit." Id.

---

[25]   The Motion contains unnumbered pages. Citations to it follow the pagination assigned by the Court's electronic filing system (CM/ECF).

[26]   The Reply contains unnumbered pages. Citations to it follow the pagination assigned by the Court's electronic filing system (CM/ECF).

Responding, the Government contends the Affidavit establishes Defendant interacted with the user of the Email Account and received child sexual abuse material. See Response at 7-9. The Government asserts that "the notes section of the [October 29, 2019] transaction indicates a secmail.pro email address . . . and references '5pics,' which is an abbreviation for five pictures." Id. at 7. The Government contends that although some of the images Detective Gergar received on February 5, 2020 did not depict child sexual abuse material, "child pornography was commingled within the non-pornographic images, all of which were sent in a single transaction." Sur-Reply at 2. According to the Government, "[t]here was not one instance described in the [Affidavit] or at the [evidentiary] hearing . . . in which [t]he Email Account sent pictures to [Detective Gergar] that did not include child pornography or links to child pornography along with any other pictures transmitted." Id. (emphasis omitted). As to the $55.00 "test transfer," the Government argues it was "nearly to the dollar the Bitcoin value of the transfer [Defendant] made on October 29, 2019, [which] strengthens rather than weakens the probable cause for the issuance of the search warrant." Id. at 3.

## 2. Applicable Law

A search warrant is supported by probable cause if "given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." United

States v. Trader, 981 F.3d 961, 969 (11th Cir. 2020) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)); see also United States v. Lebowitz, 676 F.3d 1000, 1010-11 (11th Cir. 2012). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232.

When law enforcement seeks a warrant to search a person's residence, "the affidavit must supply the [issuing judge] with a reasonable basis for concluding that [the d]efendant might keep evidence of his crimes at his home." Lebowitz, 676 F.3d at 1011 (quoting United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009)). In the absence of "an allegation that the illegal activity occurred at the location to be searched, for example the home, . . . 'the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.'" Kapordelis, 569 F.3d at 1310 (citing United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002)).

An issuing judge's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (citation omitted) (observing that "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review"); see also United States v. Joseph, 709 F.3d 1082, 1093 (11th Cir. 2013) (stating that "[w]e afford great deference to the determination of a[n issuing] judge that a search warrant

affidavit is supported by probable cause, and we uphold the determination of the [issuing] judge so long as he had a substantial basis for concluding that a search would uncover evidence of wrongdoing" (citation and internal quotation marks omitted)). Review of the sufficiency of the evidence supporting probable cause is generally limited to the information that was presented to the judicial officer who issued the warrant. Lockett, 674 F.2d at 845.

A search warrant is void if the affidavit supporting the warrant contains "deliberate falsity or . . . reckless disregard" for the truth and if "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." Franks, 438 U.S. at 156, 171; see also Madiwale v. Savaiko, 117 F.3d 1321, 1326 (11th Cir. 1997). "The reasoning in Franks also applies to information omitted from warrant affidavits." Madiwale, 117 F.3d at 1326. So, if an affidavit "contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit,'" a warrant may be invalidated. Id. at 1326-27 (quoting United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980)). "A party need not show by direct evidence that the affiant [made] an omission recklessly," because if "facts omitted from the affidavit are clearly critical to a finding of probable cause," then "recklessness may be inferred from proof of the omission itself." Id. at 1327 (quoting Martin, 615 F.2d at 329). On the other hand, "[o]missions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant." Id.

(citations omitted). "Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Id. (citation omitted).

### 3. Analysis

For the reasons set out below, the Affidavit provided sufficient evidence to establish a fair probability that child sexual abuse material would be found at the Residence. See Trader, 981 F.3d at 969.

The Affidavit contains probable cause supporting the inference that Defendant interacted with the user of the Email Account. The Affidavit establishes, and it is undisputed, that on October 29, 2019, Defendant (using a device at the Residence) transferred $56.38 in Bitcoin from his Coinbase account. See Affidavit at 31-33. The Affidavit describes how blockchain analysis revealed that this transaction involved a Bitcoin address (the Second Bitcoin Address) that was contained in the same "cluster" as the Bitcoin address the user of the Email Account provided Detective Gergar (the Target Wallet). Id. at 31-32. The Affidavit states this "cluster" then transferred Bitcoin in a cospend transaction. Id. at 32. As the Affidavit explains, this cospend transaction shows that the Second Bitcoin Address and the Target Wallet are controlled by the same user because the individual who conducted this transaction had to know the private key of both the Second Bitcoin Address and the Target Wallet in order to cospend from both Bitcoin addresses. See id. There is thus probable

cause to believe that on October 29, 2019, Defendant sent Bitcoin to the user of the Email Account.

Moreover, the Affidavit contains sufficient evidence to conclude that it was fairly probable the Bitcoin Defendant transferred on October 29, 2019 was sent in exchange for child sexual abuse material. The Affidavit states that Coinbase records showed "notes" associated with the transfer that contained a secmail.pro email address and the notation, "5pics." Id. at 32-33. Defendant's argument that he could have received anything other than child sexual abuse material is unavailing. The Affidavit establishes the user of the Email Account sold child sexual abuse material, not child erotica. And, although it is true that some of the images received by Detective Gergar were not child sexual abuse material (and this information was omitted from the Affidavit), see Tr. at 95, 103, Detective Gergar did not pay for these images. In addition, as the Government points out, child sexual abuse material was nonetheless sent each of the four times the Email Account sent Detective Gergar images or videos. See Affidavit at 27 (initial September 16, 2019 email); id. at 28-29 (December 19, 2019 email); id. at 29 (January 27, 2020); id. at 29-31 (February 5, 2020 email). As such, even though Agent Luedke failed to mention in the Affidavit that not all of the images sent constituted child sexual abuse material, the inclusion of this immaterial information would not have defeated probable cause. See Madiwale, 117 F.3d at 1327.

The undersigned disagrees with Defendant that the "discrepancy" between the amount of the October 29, 2019 transaction and the prices quoted by the user of the Email Account is fatal to a finding of probable cause. The Affidavit quotes one of the offers listed on the Advertisement: a one-week stay in the Philippines at a "luxury house with [a] swimming pool" and a "meeting" with an underage minor for €8000.[27] Affidavit at 26. The Affidavit, however, indicates the Advertisement listed other offers, including a "camshow," a video of the minor, and "proof" of the minor. Id. at 26-27. The Affidavit did not specify the prices associated with these other offers, but based on the nature of these offers, they certainly would not be as high as the one for a one-week "luxury" stay in the Philippines. As noted, in December 2019, Detective Gergar also received an email from the Email Account that listed the following prices: €150, €800, €1200, and €1600.[28] Id. at 28. That email, however, was in response to Detective Gergar's inquiry about "arrang[ing] a night with" a minor, id., not for "pics," a video, or "proof of girl."

---

[27]     In September 2019, when the Advertisement was posted, €8000 was the equivalent of around $8,700.00. Treasury Reporting Rates of Exchange, Bureau of the Fiscal Service, https://www.fiscal.treasury.gov/files/reports-statements/treasury-reporting-rates-exchange/ratesofexchangeasofseptember302019.pdf (last updated Sept. 30, 2019).

[28]     In December 2019, when the Email Account sent the email, €150 equaled around $170.00; €800 equaled around $900.00; €1200 equaled around $1,350.00; and €1600 equaled around $1,800.00. Treasury Reporting Rates of Exchange, Bureau of the Fiscal Service, https://www.fiscal.treasury.gov/files/reports-statements/treasury-reporting-rates-exchange/ratesofexchangeasofdecember312019.pdf (last updated Oct. 19, 2020).

For these reasons, the undersigned further finds that Agent Luedke's omission of Detective Gergar's $55.00 "test transfer," even if intentional, was not material. See Madiwale, 117 F.3d at 1327. In any event, even though Detective Gergar did not obtain any child sexual abuse material in exchange for the "test transfer," he had already received child sexual abuse material on a number of occasions prior to this transfer and at no cost. See generally id. at 27-31. So, it is also fairly probable that Defendant had received child sexual abuse material from the user of the Email Account before the October 29, 2019 transaction.[29]

## B.  Staleness

### 1.  Parties' Arguments

As noted, Defendant contends any probable cause that existed was stale because it was based on one alleged instance of unlawful activity (the October 29, 2019 transaction) that occurred around seven months before Agent Luedke

---

[29] On December 7, 2020 (prior to the evidentiary hearing), Defendant filed a Notice of Supplemental Authority (Doc. No. 44) to "apprise the Court" of United States v. Touset, 890 F.3d 1227 (11th Cir. 2018). In Touset, the United States Court of Appeals for the Eleventh Circuit found in relevant part that there was reasonable suspicion to search the defendant's devices for child sexual abuse material because law enforcement knew that: 1) the defendant "had sent three low-money transfers of $35, $35, and $37" to a bank account "associated with a Philippine phone number" that was in turn affiliated with an email account containing child sexual abuse material; 2) "the Philippines was a source country for child pornography"; and 3) "a pattern of 'frequent low money transfers' is associated with child pornography." 890 F.3d at 1237. To the extent Defendant argues the evidence in Touset was stronger than that present here, see Reply at 1-4, the Eleventh Circuit merely found that such evidence was sufficient to establish reasonable suspicion in that case, not that it was necessary to find reasonable suspicion.

applied for the search warrant. See Motion at 4, 9;[30] Reply at 4-5. Specifically, Defendant argues that "[b]ut for the misleading, if not outright false misrepresentations in the [Affidavit] concerning collectors/hoarders and that evidence of a crime (and everything else) is stored virtually in perpetuity in computers," the October 29, 2019 transaction "would be considered stale for purposes of issuing a search warrant." Reply at 4. Relying on Mr. Connor's testimony and opinions, Defendant argues that "there is little to no scientific evidence to support the first claim and, while the second claim may have been true in the past, it is not an accurate statement of current computer hardware and technology." Id. Defendant also contends that even if the statements about the traits of collectors and hoarders were true, "the omission of any evidence or allegation that [Defendant] possessed any of the characteristics of an individual who collects child pornography constitutes a deliberate omission from the [Affidavit] made with reckless disregard for its truthfulness." Motion at 3.

Responding, the Government argues Defendant has not "establish[ed] an intentional or reckless omission that was made with the purpose of misleading the judge issuing the warrant." Response at 13. The Government also contends that "[g]iven the manner in which child pornography crimes are committed and the information [Agent] Luedke advised the Court about child pornography

---

[30]     In the Motion, Defendant mistakenly states the October 29, 2019 transaction occurred ten months before Agent Luedke applied for the search warrant.

collector characteristics, a 7-month delay from [D]efendant's financial transaction to the execution of the . . . search warrant should not be cause for concern." Id. at 10. The Government does not address Defendant's argument regarding the ability to recover deleted data from computers.

### 2. Applicable Law

The probable cause standard is not satisfied unless it is shown that the items to be seized are likely to be found in the place to be searched at the time the warrant issues. United States v. Bervaldi, 226 F.3d 1256, 1264-65 (11th Cir. 2000); United States v. Domme, 753 F.2d 950, 953 (11th Cir. 1985). Whether the information in an affidavit is too stale to support a probable cause finding is not determined "merely by counting the number of days between the facts relied upon and the warrant's issuance." Domme, 753 F.2d at 953; see also United States v. Goldstein, 989 F.3d 1178, 1193 (11th Cir. 2021). Rather, "evaluating staleness requires a fact-intensive inquiry based on the totality of the circumstances, including the 'nature of the suspected crime . . . , habits of the accused, [and] character of the [information] sought.'" Goldstein, 989 F.3d at 1193 (second and third alterations in original) (quoting Bervaldi, 226 F.3d at 1265).

### 3. Analysis

The undersigned finds the probable cause set forth in the Affidavit was not stale because, based on the nature of the crime and the character of the

items sought, it was likely that child sexual abuse material (or evidence thereof) would be found at the Residence, whether or not the material had been previously deleted by Defendant. <u>See</u> <u>Goldstein</u>, 989 F.3d at 1193; <u>Bervaldi</u>, 226 F.3d at 1264-65.

As noted, Agent Luedke asserts in the Affidavit that the information regarding collectors of child sexual abuse material is based not only on his own experience and training, but also on "conversations with other experienced agents who investigate cases involving the sexual exploitation of children . . . ." Affidavit at 20. Indeed, it is well-recognized by courts and law enforcement across the country that many individuals who possess child sexual abuse material rarely dispose of it and tend to collect or hoard it. <u>See, e.g.</u>, <u>Touset</u>, 890 F.3d at 1238 (recognizing other "circuits have repeatedly rejected staleness challenges in appeals involving child pornography" and noting that "[t]hey have observed that 'pedophiles rarely, if ever, dispose of child pornography'" (collecting cases)); <u>United States v. Bosyk</u>, 933 F.3d 319, 330 (4th Cir. 2019) (recognizing the "'widespread view' that 'collectors and distributors of child pornography value their sexually explicit materials highly, rarely if ever dispose of such material, and store it for long periods in a secure place, typically in their homes'" (quoting <u>United States v. Richardson</u>, 607 F.3d 357, 370 (4th Cir. 2010))), <u>cert. denied</u>, 140 S. Ct. 1124 (2020); <u>United States v. Contreras</u>, 905 F.3d 853, 858 (5th Cir. 2018) (observing that HSI Special Agent "attested

that evidence in child pornography cases may be kept for years because people who collect child pornography typically maintain those materials for a long time"); United States v. Notman, 831 F.3d 1084, 1088 (8th Cir. 2016) (recognizing that "[g]iven the compulsive nature of the crime of possession of child pornography and the well-established hoarding habits of child pornography collectors, there is no 'bright-line' test for determining when information is stale or the probative value of all suspected child pornography activities"); United States v. Elbe, 774 F.3d 885, 890 (6th Cir. 2014) (observing that "child pornography is not a fleeting crime" (citation omitted)); United States v. Irving, 452 F.3d 110, 125 (2d Cir. 2006) (recognizing that "[w]hen a defendant is suspected of possessing child pornography, the staleness determination is unique because it is well known that 'images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes'" (quoting United States v. Lamb, 945 F. Supp. 441, 460 (N.D.N.Y. 1996) (observing that "[t]his proposition is not novel in either state or federal court: pedophiles, preferential child molesters, and child pornography collectors maintain their materials for significant periods of time (collecting cases))); United States v. Rubinstein, No. 09-20611-CR-GOLD, 2010 WL 2723186, at *5 (S.D. Fla. June 24, 2010) (unpublished) (recognizing that "[n]umerous courts have taken notice of the fact that persons who trade in child pornography often make efforts to collect and store those images, and those who

do so via the Internet typically keep that information on their personal computer, a relatively secure and accessible storage medium"), <u>report and recommendation adopted</u>, No. 09-20611-CR-GOLD, 2010 WL 2681364 (S.D. Fla. July 7, 2010) (unpublished). As Mr. Connor recognized, this proposition has been apparently unchallenged (at least in court) until now. <u>See</u> Tr. at 135, 175.

When viewed against this background, Mr. Connor's study of 326 cases is of little probative value. First, the sample size of the study is too small when compared to the combined experience of Agent Luedke and law enforcement agents across the country, as well as the widespread recognition among courts that individuals who possess child sexual abuse material rarely dispose of it. Second, the cases reviewed by Mr. Connor included only cases in which he was retained by defense counsel. The cases are thus not representative of the relevant population. Third, Mr. Connor acknowledged that even though he tried to be as objective as possible when conducting his study, his determination of whether a defendant was a collector was "somewhat subjective." Tr. at 161.

Accordingly, the undersigned is not inclined to find that Agent Luedke's representations in the Affidavit about collectors are inaccurate. Contrary to Defendant's assertion that the Affidavit omits any evidence that he possessed any of the traits of a collector, <u>see</u> Motion at 3, the Affidavit establishes a fair probability that Defendant collected child pornography and rarely disposed of this material. This finding is based on the "compulsive nature of the crime of

possession of child pornography[,] the well-established hoarding habits of child pornography collectors," Notman, 831 F.3d at 1088, the sophisticated manner in which Defendant allegedly obtained and paid for the child sexual abuse material, Agent Luedke's observations of individuals who traffic in child pornography, and the fact that the Affidavit sets forth sufficient evidence to establish a fair probability that Defendant was involved in child sexual abuse material, see supra pp. 39-42.

With respect to the ability to recover deleted digital data, Agent Luedke explained in the Affidavit that his statement about deleted files being recoverable was based on his own training and experience and on "conversations with other law enforcement officers and computer forensic examiners . . . ." Affidavit at 19. In line with Agent Luedke's statement that deleted files can be recovered, the Eleventh Circuit recently recognized in 2018 that "probable cause of involvement in electronic child pornography remains even longer because deleted files can remain on electronic devices." Touset, 890 F.3d at 1238 (citation omitted); see also, e.g., Contreras, 905 F.3d at 858 (recognizing that "forensic experts can frequently recover evidence of deleted files"); Bosyk, 933 F.3d at 331 (observing that "digital media files persist for a long time and can often be forensically recovered even after being 'deleted'" (citation omitted)); Elbe, 774 F.3d at 890 (recognizing that in cases involving child sexual abuse material, "agents can recover erased, hidden or encrypted

files" (citation omitted)); <u>United States v. Valley</u>, 755 F.3d 581, 587 (7th Cir. 2014) (observing that "investigators looking for digital evidence can assume it remains on the hard drive because modern computers by default retain the data" (citation omitted)). Mr. Connor merely testified that ten or fifteen years ago, "all" computers had spinning hard disk drives and that nowadays, "more and more" computers have solid-state drives, which make it almost impossible to recover deleted data. <u>See</u> Tr. at 146, 148. There was no indication either in Mr. Connor's testimony or his affidavit that most computers now have solid-state drives. Mr. Connor's assertions do not necessarily translate into a finding that Defendant's computer likely had a solid-state drive.

Moreover, Mr. Connor recognized that "it is not unusual to find artifacts such as file names and search terms indicative of child pornography on electronic devices after suspected images of child pornography have been deleted . . . ." Connor Affidavit at 5; <u>see also</u> Tr. at 144-45. Mr. Connor stated such "artifacts are not always a reliable basis to infer prohibited content was on the device" because file names sometimes "misrepresent" the content of the file. Connor Affidavit at 5; <u>see also</u> Tr. at 145. Although this may be true, file names <u>are</u> sometimes indicative of the content of the file and are therefore evidence that child sexual abuse material was present at some point in the device searched.

Accordingly, the undersigned finds the Affidavit provided sufficient evidence to establish a fair probability that any child sexual abuse material deleted by Defendant (or evidence thereof) could be recovered through forensic tools. Further, Agent Luedke's statements in the Affidavit regarding collectors of child sexual abuse material and the ability of forensic tools to recover deleted data from digital devices do not amount to "deliberate falsity" or a "reckless disregard" for the truth. Franks, 438 U.S. at 156, 171.[31]

## C.   Good Faith Exception

### 1.   Parties' Arguments

Defendant lastly contends the good faith exception to the exclusionary rule does not apply because: 1) the Affidavit was "devoid of probable cause"; and

---

[31]    In the Motion, Defendant discusses a number of out-of-circuit cases to support his arguments regarding probable cause and staleness. See Motion at 10-20. An in-depth analysis of these cases is not warranted as one of the cases is cited for the propositions set out in the dissent, see Motion at 11, 14-17 (discussing dissent in Bosyk, 933 F.3d 319), and the rest are readily distinguishable from the instant case, see United States v. Perkins, 850 F.3d 1109, 1116-19 (9th Cir. 2017) (search warrant affidavit not supported by probable cause in part because agent omitted that Canadian charges were dropped after Canadian law enforcement officer concluded images found in the defendant's devices were not child sexual abuse material); United States v. Edwards, 813 F.3d 953, 961-69 (10th Cir. 2015) (assertion that the defendant possessed child erotica was insufficient to establish he was a collector of child sexual abuse material); United States v. Falso, 544 F.3d 110, 121 (2d Cir. 2008) (no probable cause where the defendant's email address was found on a child pornography website because there was no allegation that he actually subscribed to the website or that he downloaded child sexual abuse material; "only that it 'appear[ed]' that he 'gained access or attempted to gain access' to the non-member . . . website" (alteration in original)). In any event, to the extent the undersigned's findings differ from the ones reached in these cases and other non-binding opinions, the undersigned respectfully declines to follow them (based mainly on the circumstances presented here).

2) the Affidavit "contained deliberate misrepresentations or omissions which were material to this warrant." Motion at 9, 20; see also Reply at 8.

Responding, the Government argues that even if probable cause were lacking, law enforcement acted in good faith when executing the search warrant. Response at 13. The Government asserts the Affidavit was "not so devoid of indicia of probable cause as to make reliance upon it entirely unreasonable . . . ." Id. at 15. The Government also argues the issuing judge was not misled by information Agent Luedke knew to be false or would have known was false except for his reckless disregard for the truth. Id. According to the Government, Agent Luedke included the information regarding collectors of child sexual abuse material based on his experience. Id. The Government argues that "[t]here has been no evidence that this was information [Agent] Luedke knew to be false." Id.

### 2. Applicable Law

Even if a search warrant is not supported by probable cause, exclusion of the evidence seized during its execution is not necessarily required. There is an exception to the Fourth Amendment exclusionary rule when law enforcement officers reasonably and in good faith rely on a facially valid search warrant issued by a neutral judicial officer that is later determined to be invalid. United States v. Leon, 468 U.S. 897, 922-23 (1984). "The Leon good faith exception applies in all but four limited sets of circumstances," Martin, 297 F.3d at 1313:

(1) where the issuing judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing [judge] wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

Goldstein, 989 F.3d at 1196 (second alteration in original) (internal quotation marks omitted) (citing Martin, 297 F.3d at 1313). In determining whether officers reasonably relied on a search warrant, the focus is "on a reasonably well-trained officer and is based upon the totality of the circumstances." Martin, 297 F.3d at 1318 (citation omitted); see also United States v. Morales, 987 F.3d 966, 976 (11th Cir. 2021). In addition, a court may "look beyond the four corners of the affidavit and search warrant to determine whether" officers' reliance on the search warrant was reasonable. Martin, 297 F.3d at 1318.

### 3.  Analysis

Even if the search warrant were defective, suppression is unwarranted. Based on the totality of the circumstances, the undersigned finds that Agent Luedke reasonably and in good faith relied on a facially valid search warrant issued by a neutral federal magistrate judge. See Leon, 468 U.S. at 922-23; Martin, 297 F.3d at 1318. Agent Luedke is an experienced investigator of crimes related to child sexual abuse material and sexual exploitation of children. See Affidavit at 1. Agent Luedke testified he has been the affiant for a number of

search warrant applications in such cases. See Tr. at 13, 63, 105, 113. As Agent Luedke prepared the Affidavit, he was provided with Agent Croft's and Detective Gergar's reports from the undercover investigation and the images and videos the Email Account sent to Detective Gergar. See generally Affidavit at 25-33; Tr. at 83. Agent Luedke testified that although he used a prior search warrant affidavit as a template for the Affidavit, it was "constantly tailored." Tr. at 61, 82, 117; see also Tr. at 118. He explained that the drafting of the Affidavit was a "collaborative effort" among him, Agent Croft, Detective Gergar, and the AUSA assigned to the case. Tr. at 62. In addition, the AUSA told him she thought there was probable cause for a search warrant. Tr. at 52.

For the reasons stated supra pp. 39-42, the undersigned finds that the Affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." See Goldstein, 989 F.3d at 1196. In addition, as already noted, the omissions pointed out by Defendant (that not all of the images received by Detective Gergar were child sexual abuse material and that Detective Gergar sent a $55.00 "test transfer) do not defeat such probable cause. See supra pp. 40-42.

The undersigned further finds that the issuing judge was not misled by information that Agent Luedke "knew was false or would have known was false except for his reckless disregard for the truth." Goldstein, 989 F.3d at 1196. The Affidavit's statements regarding collectors of child sexual abuse material were

not made with the knowledge that they were false or with a reckless disregard for the truth. Agent Luedke based this information on his experience and that of other law enforcement officers. <u>See</u> Tr. at 50-51, 75. Specifically as to his own experience, Agent Luedke testified that digital files containing child pornography have been found in eighteen out of the twenty child sexual abuse cases in which he has sought a search warrant. Tr. at 113-14.

With respect to Agent Luedke's statements regarding the ability to recover deleted digital files, the evidence shows that Agent Luedke did not know that newer technology made it more difficult, and sometimes impossible, to recover deleted files from digital devices. <u>See</u> Tr. at 72, 74, 86-87, 88. It thus follows that any arguable misrepresentation with respect to this issue does not amount to an intentional misrepresentation. In other words, Agent Luedke could not have included information not known to him.

In light of the totality of the circumstances and the reasons stated above regarding probable cause, the undersigned finds alternatively that a reasonably well-trained officer would have been justified in relying on the search warrant of the Residence. <u>See</u> <u>Morales</u>, 987 F.3d at 976; <u>Martin</u>, 297 F.3d at 1318. Thus, even if the search warrant were deficient, exclusion of the evidence found as a result of the search of the Residence is not appropriate under the <u>Leon</u> good faith exception.

## VI.   Conclusion

Based on the foregoing, the search warrant was supported by probable cause, and the probable cause was not stale. Alternatively, suppression is not warranted because Agent Luedke reasonably and in good faith relied on a facially valid search warrant issued by a neutral federal magistrate judge. Accordingly, after due consideration, it is

**RECOMMENDED**:

That the Amended Motion to Suppress Physical Evidence and Statements, and Memorandum of Law (Doc. No. 47) be **DENIED**.

**RESPECTFULLY RECOMMENDED** in Jacksonville, Florida on May 24, 2021.

JAMES R. KLINDT
United States Magistrate Judge

bhc
Copies to:

Honorable Timothy J. Corrigan
Chief United States District Judge

Assistant U.S. Attorney (Karase)
Thomas M. Bell, Esquire