IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,          Jacksonville, Florida

                    Plaintiff,          Case No. 3:20-cr-94-TJC-LLL

   vs.                              October 31, 2022

MARK MANUEL ANGELES MARINO,          10:05 a.m.

                    Defendant.          Courtroom No. 10D
_____


SENTENCING HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE


GOVERNMENT COUNSEL:

         **KELLY KARASE, ESQ.**
         U.S. Attorney's Office - FLM
         300 North Hogan, Suite 700
         Jacksonville, Florida  32202


DEFENSE COUNSEL:

         **THOMAS M. BELL, ESQ.**
         Thomas M. Bell, PA
         301 West Bay Street, Suite 1460
         Jacksonville, Florida  32202


COURT REPORTER:

         Shannon M. Bishop, RDR, CRR, CRC
         221 North Hogan Street, #150
         Jacksonville, Florida  32202
         Telephone:  (904)549-1307
         dsmabishop@yahoo.com


     (Proceedings recorded by mechanical stenography;
transcript produced by computer.)

1                    P R O C E E D I N G S

2    October 31, 2022                          10:05 a.m.

3                         - - -

4            COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in and for the Middle District of Florida is now

6    in session, the Honorable Timothy J. Corrigan presiding.

7            Please be seated.

8            THE COURT:  Good morning.  *United States versus Mark*

9    *Marino*, 3:20-cr-9- -- yeah, 3:20-cr-94.

10           Ms. Karase represents the government.

11           HSI Special Agent Luedke is here today.

12           You're not still contagious, are you?

13           AGENT LUEDKE:  No, sir.

14           THE COURT:  Okay.  Because you were with me a week

15   ago, and then I was told after the hearing that you had COVID.

16           AGENT LUEDKE:  Yes, sir.

17           THE COURT:  Are you sure you're not -- are you sure

18   you're supposed to be here?

19           AGENT LUEDKE:  Yes, sir.

20           THE COURT:  All right.  How you feeling?

21           AGENT LUEDKE:  I feel fine, sir.  I can . . .

22           THE COURT:  That's fine.  I just -- you know,

23   obviously we want to be smart about this.

24           Mr. Bell -- I'm sorry, Ms. Karase.

25           MS. KARASE:  Your Honor, if I may.  He did notify our

1  office on Wednesday that he was -- Wednesday evening, I

2  believe, that he was feeling ill.  On Thursday morning is when

3  he had his positive test.  But since it's been five days since

4  he first exhibited symptoms, with a mask I advised that it was

5  all right for him to attend.

6          But if Your Honor would prefer -- he said that he's

7  feeling well.  He did exercise over the weekend at home.  But

8  if Your Honor would prefer that he be excused, I certainly can

9  excuse him.

10          THE COURT:  Yeah.  I -- I think it's all right.

11          MS. KARASE:  Yes, Your Honor.

12          THE COURT:  I guess we're all trying to figure out

13  what this is going to look like from now on, but -- but I

14  think -- I think it's all right, as long as you keep your mask

15  on, please.

16          AGENT LUEDKE:  Yes, sir.

17          THE COURT:  Mr. Bell is representing Mr. Marino.  And

18  he's present in the courtroom.

19          We're here today for sentencing in this case.

20          I've reviewed the PSR.  It may be the most complex

21  sentencing guideline application that I can recall.  I have

22  gone over it carefully and reviewed it with the probation

23  officer carefully, and so I'm prepared to proceed on it.

24          And so we'll do that first.  Then I'll arrive at the

25  guidelines that I'm going to apply in the case, and then we'll

1   proceed with the remainder of the -- of the sentencing, as we

2   usually do.

3         So, Mr. Bell, I have reviewed your objections and

4   reviewed your memorandum.  And so I -- and I'm kind of going

5   based on the addendum of the pretrial -- I mean, of the

6   probation officer as to what the objections were, just to have

7   a place to be able to look at it.  And so the first objection

8   is to paragraph 37, which is the grouping rules.

9         As I understand it, instead of having a number of

10   groups, you think there ought to be just one group for Counts

11   One through Six, because it involves the same victim.  So I

12   understand that argument, I think.  And I've looked at that

13   with the officer, and also independently.

14         Secondly, you're objecting, in paragraphs 61 and 70,

15   to the use of computer enhancement.  And I understand that

16   objection as well and will rule on it.

17         And then, finally, you're objecting as being double

18   counting, paragraph 69 and paragraph 80, under U.S. Guideline

19   2G2.2(b)(5) and 4B1.5(b).  And I understand that objection as

20   well.

21         So let me start, Mr. Bell, by asking you:  Have I

22   captured the -- your objections so that we're all at least

23   talking the same thing here?

24         MR. BELL:  Yes, Your Honor, you have.  That is an

25   incredibly accurate summary of kind of the essence of it.  I

1    think it's a little bit more complicated beneath the surface.

2           But, Judge, if I could -- I don't expect to do a

3    whole lot in terms of arguing today.  I think my arguments

4    about those objections are kind of outlined in both the

5    addendum the Court's referring to, to the presentence report,

6    which is document 94 -- and my letter to the probation officer

7    September 9th, '22, is 43 and 44 of that.

8           I also kind of summarized and recast those objections

9    in the document numbered 96, which kind of revisits those, and

10   then essentially rely in large part on the mitigation letters

11   set forth in 100.

12          But I don't expect to add a whole lot to that today.

13   I would like to touch on just one subject about -- kind of the

14   grouping -- one victim/separate incidents kind of, because

15   that's really the essence of what we're doing here.

16          And both the government and the probation office

17   relied very heavily on the notes, which suggested -- you know,

18   if there are two separate shooting episodes or if there were

19   two kind of rapes, for lack of a better -- sexual batteries,

20   two separate instances would be essentially grouped separate --

21   there would be separate groups.  They would not be aggregated

22   for purposes of the guidelines.

23          And that is essentially, as I'm understanding the --

24   both the probation office's and the government's position, the

25   essence of this.  Because there were three distinct episodes in

1     their view, that that brings it outside the usual aggregate --

2     the grouping rules, and gets us to where the probation office

3     is, is there's three or four groups.

4          So I broke this down over the weekend -- or Friday

5     last week, just to kind of identify and isolate what the -- the

6     separate instances of harm, which is kind of the underlying,

7     kind of, essence of the government's position here.

8          And my notes reflect this.  If the Court looks

9     at document -- we're looking at 94, pages 9 and 10 of the

10    probation office -- of the presentence report.

11         As I understand all this -- and it is -- both the --

12    factually and legally somewhat complex -- is there's a series

13    of calls, from March 19th to March 22nd, which would constitute

14    Count Two, and, of course, Count One underlying all this.

15         But at least as I read this, and my memory of all

16    this evidence is correct, there was no picture or video

17    actually sent.  And there's no real indication that there was

18    any direct communication with anybody other than the person on

19    the other end of the internet, whoever was kind of organizing

20    and leading this thing in the Philippines.

21         So essentially there was no rape.  There was no

22    shooting at a law enforcement officer.  There was no event.

23    There was a crime committed.  We don't dispute that.  But

24    the -- the victim, which kind of -- in my view is kind of

25    really -- whether we aggregate all this conduct together or

1   have separate instances of it and separate grouping rules --

2   for the March 19th, 22nd -- through 22nd series of calls -- I

3   don't know that there was a picture, photograph, video that was

4   made contemporaneously with those events that was communicated.

5   I don't think any -- any child abuse material was forwarded on

6   that series of events.

7           The second episode in the larger send, although I

8   simply argue that all of them could be theoretically considered

9   one episode -- but just for purposes of argument, if you look

10  at 94, page 11, there's a separate series of calls or

11  communications, e-mails, from September 30th through October

12  3rd.  And those constitute Counts Three through Five.

13          Now, there was a photo sent -- transmitted on that.

14  And, again, I'm not disputing that the crimes were committed,

15  just in terms of identifying the separate instances of harm.

16          Now, there's a photo that was sent, as I understand

17  it, but we don't -- my understanding of the evidence, we don't

18  know when that was taken.  We don't know that that was taken

19  specifically for purposes of transmitting to Mr. Marino in

20  answer to the solicitation.

21          And my understanding of it, at least, essentially --

22  we just can't identify that that's a separate instance of harm

23  done specifically for purposes of the production of a

24  photograph -- happened as a result of those exchanges.

25          And, lastly, on, I guess, the -- October 20- -- and

1    this is on page 13, the October 21, October 24 series of

2    exchanges, which produces Counts Four and Six, there was a

3    video.  And apparently the video for that one was dated -- I

4    have it -- I can't read my own writing.  I apologize.  I think

5    that's October 25th.

6              So that -- that was a -- and that, as I understand,

7    was specifically sent in response to the exchanges between

8    Mr. Marino and this person in the Philippines.  So essentially

9    that is one harm.  There's no question about that.

10             But the two earlier episodes, we can't really

11   identify -- there were crimes committed.  But we can't identify

12   in the sense that -- that the government's analogy -- that

13   there was a separate rape, there was a separate shooting

14   episode causing a victim identifiable harm.  And so that, in my

15   view, kind of supports my argument that -- that these should be

16   considered essentially in the aggregate; and Counts One through

17   Six, grouped as one; Count Seven grouped as another.

18             And I won't spend a lot of time on this.  If the

19   Court applies the pattern enhancement, which I concede there's

20   one legitimate pattern enhancement, that it should go on the

21   Count Seven grouping.  So that produces essentially the bottom

22   line for me, which is a 42 plus 1 for grouping, less 2 for the

23   acceptance, getting us in the 364 to 405 box.

24             But essentially I don't -- I'm going to rely on the

25   arguments and the legal arguments, but I did want to address

1    factually what I understood the government's position and the

2    probation office's position of -- because that, you know,

3    obviously makes some superficial sense.

4            Well, this is much more analogous to a bank robbery,

5    a shooting episode, where there's multiple events and,

6    therefore, you know, we apply those grouping rules rather than

7    the aggregate conduct grouping rules that you would in a drug

8    case.

9            But if you look at -- break down -- at least as I

10   understand the evidence in this case, the October -- the late

11   October exchange is the only one that produced a video that's

12   identifiable as to having been made specifically at -- as a

13   result of the exchange between the two.

14           There may have been a video -- a picture sent in the

15   earlier one, but we don't know when that happened.  And so

16   that's my argument on the -- on the grouping.

17           I have obviously some mitigation evidence.  And I do

18   have one other objection, I'm afraid, that was not identified

19   in the earlier ones.  I will address that whenever the Court

20   feels it --

21           THE COURT:  Well, I think what we're doing now is

22   trying to get the guidelines.  So if you have a guidelines

23   objection, I need to hear it.

24           MR. BELL:  Well, it's not really to the guidelines.

25   It's to the factual assertions in the presentence report.

1   There's one.  It's at paragraph 26.  This is actually fairly

2   straightforward.  Ms. Karase may not agree.

3          But in the -- essentially paragraph 26, the language

4   is PhilipinneGirls and Marino agree that Marino would send an

5   additional 50 euros for five photographs of child pornography.

6          As the Court may recall from the search warrant

7   litigation, the depiction on the exchange that formed the basis

8   for the search warrant was 50 euros for five photographs.  And

9   that was the specific exchange of e-mails.

10          Now, Ms. Karase maintains, and I don't disagree for

11   purposes of this -- in the larger context of knowing all the

12   evidence that we have now, that we know those five photographs

13   were -- four were for or of child pornography.

14          But for -- my issue is, of course, there's going to

15   be an appeal of the search warrant issue, and I don't want to

16   admit that there was a -- that he specifically said five

17   photographs of child pornography in that communication.

18          And I object to that language.  If you want to say

19   for five photographs, that's fine, or other language that would

20   suggest there's a distinction between the two.  But that

21   constitutes the only factual objection that I have that's not

22   outlined.

23          And just lastly, Judge, just in terms of argument --

24   I promise I wasn't going to go on much longer.  But the pattern

25   enhancement, which I typically object to -- in this instance, I

1  think there's a factual basis for it.  I just don't think you

2  count it twice.  You don't get it in -- I mean, by that logic,

3  Judge, you should count vulnerable victims for all these girls,

4  too.

5          Those are kind of built in to what we're doing here,

6  in -- in my view.  So that is -- that is my arguments, in

7  addition to what I've outlined in the motion, Your Honor.

8          THE COURT:  Thank you.

9          Ms. Karase?

10         MS. KARASE:  Yes, Your Honor.

11         Well, I'll start with the last point first with

12  regard to that factual assertion regarding paragraph 26 and the

13  presentence investigation report.

14         If Your Honor looks at the amended stipulation -- of

15  course, this was a stipulated facts bench trial.  And the

16  amended stipulation sets forth the chronology of events.

17         And specifically paragraph 10 of the amended

18  stipulation talks about the conversation that took place over

19  the course of these days.  Specifically, on October 27th of

20  2019, at 9:01 p.m., you have --

21         THE COURT:  I apologize.  I don't have the amended

22  stipulation in my packet here.  What's the doc number on that?

23         MS. KARASE:  Let me grab it for you.

24         THE COURT:  Well, we can -- we can find it.  Let's

25  see.

1           PROBATION OFFICER:  It might be 81.

2           THE COURT:  Doc 81, can you print that for me,

3    please, Kerri.  It's doc 81.  We're going to print it here.

4           MS. KARASE:  You can stand up here.  That's fine.

5           With respect to -- you want me to wait for you to get

6    it -- a copy in front of you?

7           THE COURT:  No.  I'll -- you can go ahead.

8           MS. KARASE:  Okay.

9           THE COURT:  But I just wanted to get it.

10          MS. KARASE:  So when you get it, it's on page 13,

11   paragraph 10.

12          PhilipinneGirls responded on October 27th saying,

13   Seriously, question mark?  22 e-mails in one day, question

14   mark?

15          He's kind of complaining about all of the contacts

16   that the defendant had with him.

17          And then October 28th, 2019, at 5 a.m. the defendant

18   wrote:  Sir -- don't forget, sir, the video is 30 minutes of

19   deep f-u-c-k p-u-s-s-y, only with a different angle, different

20   position, mostly missionary with French kissing.  Cream pie at

21   the end showing it overflow.  Showing her face, every thrust of

22   the d-i-c-k.  Just add more, sir.  Just make it a good video

23   scene.  Thanks.

24          So that's the context that we have.  And then the

25   very next paragraph says:  PhilipinneGirls and the defendant

1   agreed that the defendant would send an additional 50 euros for

2   five photographs of child sexual abuse material, which the

3   defendant did in the form of additional Bitcoin in the amount

4   of $56.38 equivalent on October 29th, 2019.

5           I understand Mr. Bell's point, and that was

6   litigated.  And I think the record is clear that his contention

7   that the note "five pics" didn't specify five pics of what in

8   the coin-based transaction.

9           But with respect to what that actually was for, we

10  know.  We know what that's for, because of -- after the

11  execution of the search warrant, the material that we have

12  viewed now from the defendant's devices and from his accounts

13  and from his statements, we know exactly what that $56.38

14  equivalent transaction was for.  And it was for five photos of

15  child sexual abuse material.

16          THE COURT:  Okay.

17          MR. BELL:  I have nothing further on that, Judge.

18  Just the point for -- not being bound by the admission of

19  having made that representation in the -- in the communication

20  that was the subject of the search warrant, is my exclusive

21  point here.

22          THE COURT:  Okay.  Well, it seems to me that we've

23  got the amended stipulation and we've got your statement on the

24  record now, that you're objecting to that.  I don't -- I'm not

25  sure that it requires an amendment to the PSR, because it seems

1    to me that -- I mean, I don't know.

2           But it seems to me that your objection to it now,

3    which I understand -- and it's in the context of litigating the

4    motion to suppress, I think.  Seems to me that you've made that

5    record; don't you think?

6           MR. BELL:  Yes, sir.

7           THE COURT:  All right.

8           Go ahead, Ms. Karase.

9           MS. KARASE:  All right.  And then continuing to work

10   backwards, with respect to the double counting, or what the

11   defense alleges that is double counting --

12          THE COURT:  Ms. Karase, I -- I apologize.

13          Agent Luedke, I do kind of feel like maybe we ought

14   to -- we ought to excuse you today.  I'm sure it's fine, but,

15   you know, we've got other people in the courtroom.  And I

16   just . . .

17          AGENT LUEDKE:  No problem, Your Honor.

18          THE COURT:  All right.  I hope -- I hope you

19   understand.

20          AGENT LUEDKE:  Yes, sir.  No problem.

21          THE COURT:  All right.  Thank you.

22          MS. KARASE:  And I apologize, Your Honor.  I know

23   this has been continued several times.  I probably should have

24   notified the Court that he was the agent on today's case.  So I

25   apologize for that.

1    THE COURT:  That's all right.  It just -- and I'm

2  sure it's fine, but I just -- I feel like if I -- I feel like I

3  owe it to everybody in the courtroom to be as safe as we can

4  be.  And if we -- we know somebody had it five days ago, I just

5  feel like we probably ought to be on the safe side.  I hope

6  he'll understand, but . . .

7    MS. KARASE:  Yes, Your Honor.  Thank you.

8    THE COURT:  And it will help me concentrate better,

9  so -- which we need to do in this case, so . . .

10    MS. KARASE:  Yes, Your Honor.

11    THE COURT:  All right.  Go ahead.

12    MS. KARASE:  All right.  With respect to the last

13  point -- the noted objections, anyway, the written objections,

14  the -- the defense alleges that it's double counting to apply

15  the 2G2.2(b)(5) enhancement, as well as the 4B1.5(b)(1)

16  enhancement.

17    However, there is specific language within the

18  guidelines -- that's in Note 4 of Section 1B1.1 -- that if

19  there are enhancements under --

20    THE COURT:  Let me -- let me save you a little

21  trouble here, because we -- because I looked at this pretty

22  hard.

23    There's -- the two objections -- the use of the

24  computer objection is one that I know Mr. Bell makes.

25  Sometimes I'll take that into account in a variance scenario or

1    so forth.

2              But in terms of the guidelines being properly scored

3    on that, I think it -- they clearly are.  And there's Eleventh

4    Circuit case law that has upheld that.

5              Secondly, on this so-called double-counting issue,

6    there appears to be Eleventh Circuit case law that specifically

7    disagrees with Mr. Bell's position.  I'm looking at *United*

8    *States versus Rogers*, 989 F.3d 1255, at 1263; and, also -- and

9    that's a published case, Eleventh Circuit.

10             But there is a -- it's a F.App'x case, so it's not

11   binding, but it goes into it in pretty good detail.  It's *U.S.*

12   *versus Roscoe*, 853 F.App'x 479, at 482, 483.

13             And just to -- I'll just quote you a little bit here:

14             Here Roscoe has not shown that the application of

15   both enhancements constituted impermissible double counting.

16   The provisions themselves reflect that the commission intended

17   them to apply cumulatively.  Section 4B1.5(b) states that five

18   levels should be added to offense levels determined under

19   Chapters 2 and 3; meaning the five levels are in addition to

20   any Chapter 2 enhancement, such as 2G2.2(b)(5); thus, the plain

21   language of the guidelines shows that the commission intended

22   for the 4B1.5 enhancement, quote, to apply cumulatively to any

23   other enhancements from Chapter 2 and 3, closed quote, citing

24   back to that *U.S. versus Rogers* case that I just -- that I just

25   referenced.

1          And it goes on to say:  These two sections also

2   address conceptually different harms.

3          So, anyway, I'm not going to read the whole case.

4   But I'm pretty satisfied that -- both on the -- both on the

5   face of the guidelines themselves and also based on the

6   Eleventh Circuit case law, that the objection as to -- I think

7   it's paragraphs 69 and 80.  Let me get that to make sure.

8          Yeah.  So the -- I'm going to overrule the objection

9   as to paragraph 61, use of computer.  I'm going to overrule the

10  objection as to paragraph 70 as to use of computer.

11         Unless, Ms. Karase, you want to say anything else,

12  I'm prepared to overrule the objections to paragraphs 69 and

13  paragraph 80, which is the 2G2.2(b)(5) and 4B1.5(b)

14  enhancements that are alleged to be double counted.

15         As I understand Mr. Bell's argument, you should be

16  able to count one, but not the other, because they -- they are

17  really capturing the same or similar conduct.  But that

18  Eleventh Circuit case law that I just read, in addition to the

19  language of the guidelines, disagrees with that.  And so I'm

20  prepared to overrule those as well.

21         I assume that's the government's position; is that

22  right?

23         MS. KARASE:  Yes, Your Honor.

24         THE COURT:  Okay.  Is there anything else you want to

25  say about it?

1          MS. KARASE:  No, not about those.

2          THE COURT:  Okay.  So I'm going to overrule the --

3     the objection to paragraph 69 and paragraph 80.  It's not --

4     it's not a -- I understand why Mr. Bell makes the argument.

5     Perhaps it's something that can be discussed by way of a

6     variance argument.  But in terms of the way the guidelines are

7     constructed, I think it is not impermissible double counting.

8          So that leads us to the one that I do want to hear

9     about from you, and that's the way that these are grouped.

10          This is a very unusual situation.  I think probation

11     has done a really good job of trying to figure this out.  But

12     it's -- this is an issue that I don't think has as clear of an

13     answer as the others.  And I want to -- I think ultimately it's

14     not going to make any difference in terms of the guidelines,

15     but -- but I still have to decide what to do about it.  So I'll

16     hear from you on that, on the paragraph 37 grouping argument.

17          MS. KARASE:  Yes, Your Honor.  And, of course, I

18     filed some -- a response to this objection at docket 99, where

19     I cited some case law and went through the analysis of the

20     facts that I believe support the separate grouping of this

21     conduct.

22          And particularly what you have are breaks in time,

23     and you have requests for different things.  So in March we're

24     dealing with -- the defendant sent a note -- or sent a request

25     for a photograph of the child holding a note that said, "Eat me

1  now," requested specific camshow, and specified that he wanted

2  the 11YO.

3      He continues to engage, but it seems that he kind of

4  was a little bit too much for the abuser in the Philippines to

5  deal with.  And so that person kind of cut off ties.  And we

6  have a period of about six months that goes by.

7      But I submit that the request for -- the multiple

8  requests that take place in March, where the defendant is

9  repeatedly asking for specific files, 9YO to 11YO being

10  sexually abused, is an instance of harm.  Certainly he was

11  intending and attempting to harm the children.  He wasn't

12  ultimately successful, at least as far as we know, because he

13  didn't get the files that he wanted.

14      But, still, as Mr. Bell concedes, the crime was

15  committed, and he did at least engage in attempt to harm a 9-

16  to 11-year-old child in a significant way, by requesting visual

17  depictions of that child being raped.

18      We move on to September, late September, when we have

19  more requests.  And there is, as I said, a significant break of

20  time in -- over a period of six months when the defendant

21  reengages with PhilipinneGirls and sends requests, this time

22  asking for the child to be laid down in a diaper and the sexual

23  assault to continue from there.  That did result in the

24  transmission of videos -- or of files, rather.

25      Let me get the dates that those actually were

1  transmitted.  And maybe not per -- as Mr. Bell said, we didn't

2  have this specific tailor-made like we did in October, where

3  she's holding the sign that says his username fhinami, but

4  there were files that were sent that depict the abuse of

5  children.

6          Now, that, of course, is a separate harm to a child.

7  When you are taking recordings of that sexual abuse of a child

8  and you're transmitting them to another individual, that's an

9  instance of abuse to the child, so that's harm that comes to

10  that child.

11          And it wasn't by happenstance that Mr. Marino

12  received it.  It was by request -- by repeated requests that he

13  got a -- a particular file.  Specifically, it was received on

14  October 24th of 2019.  He received a link to a video with a

15  password.  It was a 2-minute-and-34-second color video.  And

16  it's described in paragraph 7 of the amended stipulation that's

17  on page 11.  But essentially it includes the sexual abuse of a

18  child.

19          If I may have just a minute, Your Honor.

20          Sorry.  I'm looking for the dates that the

21  actual . . .

22          Okay.  That was -- that was when the video was sent

23  that had the child that's described in paragraph 7.  It's got a

24  file title of "philippine nature.mp4."  And that one is

25  actually showing the child with the "fhinami 10/25/2019 I do

1    any thing for you" sign.

2            But then later we have photographs that are sent that

3    depict the sexual abuse of a child, that were sent later on in,

4    actually -- I'm sorry.

5            My timeline has all of the Homeland Security

6    investigations of -- New York investigation as well.  And so

7    there were a lot of files that were sent embedded within.  So

8    I'm trying to get that specific date.

9            We know the defendant received a collage of multiple

10   children that showed the sexual abuse of children.  And he

11   acknowledged having sent that -- received that in October of

12   2019 and having sent Bitcoin for that particular collage.

13           That's described in paragraph 15 of the amended

14   stipulation.  And it shows a child laying on a bed, her legs

15   spread open, exposing her bare vagina.  It has her name and a

16   date that's included there, along with multiple other images.

17           THE COURT:  So are we focused here on -- I'm just

18   trying to make sure I'm understanding.  Are we focused on -- on

19   the grouping issue here?  Is that what we're talking about?

20           MS. KARASE:  Yes.  So we're talking about the

21   separate instances of harm to children.  And so the point being

22   that -- that we have Mr. Marino, who is requesting files on

23   multiple different occasions, and that is -- each time that

24   he's requesting files from PhilipinneGirls, that is the harm or

25   attempted harm to those children, because he's requesting

1    specific sexual acts to be performed to the children.

2          And even if he's not, when he's requesting, for

3    example, lascivious exhibition of the genitals, and files

4    depicting child pornography get sent to him, that is a harm to

5    the children as well.

6          So it's separated both by breaks in time and

7    different solicitations by Mr. Marino made to PhilipinneGirls

8    for the receipt of this child sexual abuse material.

9          He talks about -- I think it's important to note that

10   he talks about that he wants to be a good customer, that he

11   wants to have a continuous line of communication with

12   PhilipinneGirls, and that he wants to build his collection.

13         So this isn't a one-time thing, where Mr. Marino is

14   reaching out intending to get one file and be done.  He talks

15   about the continued nature of the relationship that he is

16   endeavoring to establish.

17         And that's evidenced by the multiple times he's

18   reaching out, also the breaks in time when he reaches out to

19   PhilipinneGirls.

20         So for all of that, I think that that's --

21         THE COURT:  So here's my -- here's my concern.

22         MS. KARASE:  Yes, Your Honor.

23         THE COURT:  So here's my concern.  I've never seen

24   this before.  I've never, to my knowledge, done this before in

25   this specific way, to have these groupings -- to have -- to

1    have, I guess, three different groups -- really, four groups

2    all trying to compete in the same space for -- for conduct

3    that's -- that Mr. Marino has been convicted of.

4             I think one of the reasons this likely happened this

5    way, it played out this way -- and I think this is very

6    complex.

7             My understanding is that it was staffed at all kinds

8    of levels in probation and the Sentencing Commission, because

9    they -- it's just not something that we deal with very often,

10   if at all.

11            And so -- and so because of that, and because there

12   doesn't appear -- unlike the other guidelines issues I just

13   ruled on a moment ago, there doesn't really appear to be any

14   case law on this or anything that would really help us to know

15   we were heading in the right direction.  And if I'm

16   understanding it correctly, it's not going to make a darn bit

17   of difference.

18            And so I'm wondering, in the interest of fairness to

19   Mr. Marino, but also in the interest of -- why create an issue

20   in the record that doesn't need to be created?  I'm wondering

21   whether -- because of the unusual nature of this, whether I

22   ought not to just sustain the objection for Mr. Bell.  Not

23   necessarily because I think he's right, but because I think it

24   is a difficult, complex sentencing calculation that, even

25   though everybody's done the best they can to figure it out, is

1  subject to interpretation.

2  MS. KARASE:  Yes, Your Honor.  I understand the

3  Court's position.  And I would accept that.  The reason for

4  persisting, I suppose, in the response opposing the objection

5  is to account for the separate harms that -- that come to these

6  victims.  And to lump this all into one category almost feels

7  like the additional sexual abuse of these children doesn't

8  matter.

9  THE COURT:  See, I guess I don't -- I don't see it

10 that way, because, to me, this is a highly technical sentencing

11 guideline issue.  It really -- and the result, if I'm

12 correct -- and I think I'm correct -- is that -- since I've

13 already overruled the other objections of Mr. Bell, the result

14 is going to be identical.  Because you can't get higher than

15 43.

16 And so I think you can argue whatever you want to

17 argue in terms of what I ought to do, in terms of a sentence.

18 And Mr. Bell, I'm sure, is going to argue some mitigation.

19 But if we're going to end up at 43/I anyway, then I'm

20 just not sure that I am sure enough about the correctness of

21 this calculation -- even though I think -- I think they --

22 probation has done everything they possibly can to be correct

23 about it, I think I'm inclined to sustain the objection.

24 That does not at all -- as I say, I want -- I want

25 you to tell me in your presentation -- because you're -- you

1  tell me you're going to be asking for a life sentence.  I want

2  to -- I'm going to need to hear why.  And that's going to give

3  you an opportunity to tell me everything you want to tell me

4  about these crimes and these victims and so forth.

5              MS. KARASE:  Yes, Your Honor.

6              THE COURT:  So let's do it that way.  I'm going to

7  sustain the objection to paragraph 37, the grouping decision

8  that was made, again, in an abundance of caution.

9              I am not saying that probation was incorrect.  It may

10  well be they're exactly correct.  But in the interest of not

11  creating an issue -- because it's ultimately not going to make

12  any difference in terms of the guidelines calculation.

13             And so, therefore, I'm going to sustain the grouping

14  objection.  And I -- in anticipation of potentially doing so, I

15  have looked at -- I'm at page 21 of the PSR.

16             So instead of having four groups, we're only going to

17  have two.  So Count Group Number 1 will be adjusted offense

18  level 42 with a unit of 1.0.

19             MR. BELL:  I'm sorry, Judge.  I lost you there for a

20  minute.  Which paragraph are you on, page 21?

21             THE COURT:  76.

22             MR. BELL:  Okay.

23             THE COURT:  So we're just going to have one count

24  group.  So it's count group 1.  And the adjusted offense level

25  is 42, because that's the highest level.  So that's a 1.0 unit.

1    Then we're going to have count group number 2, which goes to

2    Count Seven of the indictment.  And that's at a 36.  That gives

3    a .5 count.

4            Paragraph 77, now -- I'm sorry.  Total number of

5    units -- still in paragraph 76.  Instead of being 3.5 is now

6    1.5.

7            So paragraph 77 remains at 42.

8            Paragraph 78 now becomes 1, instead of plus 4.  So

9    it's plus 1, instead of plus 4.

10           Paragraph 79 now becomes 43.

11           Paragraph 80, which is the five-level Chapter 4

12   enhancement that I've already ruled on, is applied.

13           Now we're at 48.

14           Acceptance of responsibility gives us a two-level

15   reduction.  We're now at the 46.

16           This is paragraphs 80, 81, and 82.

17           And the total offense level at 46 exceeds the maximum

18   under the guidelines.  And it reverts to a 43.  And so my

19   guidelines would be 43/I.

20           So understanding that I've sustained the objection on

21   the grouping, are there any further objections to the Court's

22   calculation now that that objection has been sustained?

23           In other words, is there -- do either the government

24   or Mr. Bell feel like I have not -- once I've sustained that

25   objection, is there any argument that I haven't correctly

1  calculated the grouping?

2          MS. KARASE:  None from the United States, Your Honor.

3          MR. BELL:  No.  Not as to the grouping, Your Honor.

4  No.

5          THE COURT:  Okay.  All right.  And, of course, I've

6  already overruled your other objection.  So I think -- so I

7  sustained one.  I've overruled the others.

8          Have I now ruled on all your guidelines objections,

9  Mr. Bell?

10         MR. BELL:  Yes, sir.

11         THE COURT:  All right.  Then the Court will be guided

12  as follows:  Total offense level 43, Criminal History

13  Category I.

14         That recommends life imprisonment.  The supervised

15 release is five years to life.  Restitution has not been given

16 to me as being stipulated to or where we are on that, so I'll

17 just hold that open for now.

18         The fine range is 50,000 to $250,000.  Special

19 assessment is $700.  There is JVTA and AVAA assessments.

20 However, given Mr. Marino's financial situation, I'm likely to

21 waive those at the time of sentencing.

22         Are there any -- just so I'm clear, Ms. Karase, are

23 there any forfeiture issues in the case?

24         MS. KARASE:  No, Your Honor.  All of the items were

25 administratively forfeited.  So there's nothing for the Court.

1          THE COURT:  Okay.  All right.

2          MR. BELL:  Your Honor, could I have just a moment?

3          THE COURT:  Yeah, yeah.  Sure.

4       (Counsel confer.)

5          MR. BELL:  Judge, we were discussing restitution.

6   Obviously he's completely indigent.  You know, whatever other

7   claims I may have about some of the restitution-related issues

8   are -- are not as significant as they might have been in some

9   other cases.  I don't intend to raise any arguments.

10          If you want to resolve the restitution issue today,

11   consistent with what's set forth in the presentence report, we

12   do not object.

13          THE COURT:  All right.  All right.  I'll tell you

14   what -- let me see here.

15          Is there a paragraph on restitution?  What paragraph

16   is that?

17          PROBATION OFFICER:  The itemized requests are listed

18   in paragraph 30.

19          THE COURT:  30?

20          PROBATION OFFICER:  And then the summary is listed

21   between paragraphs 145 and 147.

22          THE COURT:  Well, it looks like we have a request for

23   $163,500 in paragraph 30, when you add them all up.  The

24   mandatory restitution would be $87,000, according to probation.

25          So which one are you agreeing to, Mr. Bell?

1          MR. BELL:  The 163,500, Judge.

2          THE COURT:  Okay.  All right.  I'll just make that --

3          MR. BELL:  I had the opportunity to at least peruse

4     the specific claims and the case law.

5          THE COURT:  Yeah.  Okay.

6          MR. BELL:  In an ideal universe, Judge, I might fight

7     about some of this.  But we've got other issues to resolve

8     today.

9          THE COURT:  Sure.  Is that acceptable to the

10    government?

11         MS. KARASE:  Yes, Your Honor.  There were 224 series

12    identified.  So there were a number of victims in the

13    defendant's collection.  And those are the ones that happened

14    to have submitted restitution requests.  So, yes, that seems

15    reasonable.

16         THE COURT:  Okay.  All right.

17         All right.  I'm going to -- as part of my judgment,

18    I'm going to enter restitution -- a restitution amount of

19    $163,500.

20         Ms. Karase, you'll have to work with Ms. Hatfield to

21    get the names of the lawyers and so forth, so that we can put

22    it in the judgment correctly.  I don't know that we'll have all

23    this information in there, but we'll -- we can do that

24    post-hearing.  All right?

25         MS. KARASE:  Yes, Your Honor.

1      THE COURT:  All right.  So now I'm going to hear from

2  the government.  And so now I've established the guidelines,

3  established the restitution.  I've read out the rest of the --

4  the markers we're on.  I guess I should give one other marker;

5  that is, that there are minimum mandatory sentences at play

6  here.

7          Count One is a 15-year minimum mandatory, up to life.

8          Counts Two through Four are minimum mandatory of 15

9  years, up to 30 years.

10          Counts Five and Six are minimum mandatory of five

11  years, up to 20 years.

12          Count Seven does not have a minimum mandatory.  It's

13  just a 20-year statutory maximum.

14          So there are minimum mandatories at play here that

15  the Court will be -- be contending with as we -- as I try to

16  impose an appropriate sentence in this case.

17          Ms. Karase, what -- what's the -- how is the

18  government intending to proceed?  Are you just going to make an

19  oral presentation on -- by way of 3553(a) and a recommendation?

20          MS. KARASE:  Yes, Your Honor.

21          THE COURT:  Okay.  So we've been going about an hour.

22  Let's just take a five-minute break and then we'll get -- we'll

23  get going again.  Five minutes.

24          COURT SECURITY OFFICER:  All rise.

25      (Recess from 10:57 a.m. to 11:01 a.m.; all parties not

1  present.)

2  COURT SECURITY OFFICER:  All rise.  This Honorable

3  Court is now in session.

4  Please be seated.

5  THE COURT:  You'd think I -- after all these years,

6  you think I'd realize there's no such thing as a five-minute

7  recess.

8  (Mr. Bell and the defendant enter the courtroom.)

9  THE COURT:  All right.  We have everybody assembled

10  again.

11  And, Ms. Karase, you may proceed.

12  MS. KARASE:  Your Honor, as I recognized in the

13  filing that's at docket 99, it is somewhat unusual for the

14  United States to be requesting a life sentence.  This is a

15  serious -- serious penalty, indeed, but it's befitting of a

16  serious crime which the defendant committed in this instance.

17  When you look at -- and it's not just this instance.

18  It's the manner in which he carried himself both through his

19  interactions with PhilipinneGirls, both what he did on his

20  computers when he wasn't communicating with PhilipinneGirls,

21  and also through his communication with a local 12-year-old

22  here in Jacksonville and how he affected that girl's life.  And

23  I'll get into that in just a little bit.

24  The offense conduct starts in March of 2019.  And

25  that is when the defendant engages for the first time with

1    PhilipinneGirls.  And during that engagement he immediately is

2    requesting -- in response to an advertisement, he's requesting

3    visual depictions of sexual assault of children.

4         When he receives a photograph of a 9-year-old little

5    girl holding a teddy bear, a sweet photo, his immediate

6    reaction is to think about not only sexual contact with that

7    child, but really the torture and abuse of that child.

8         He talks about how he -- it's not enough for simple

9    penetration of the child, but it was important that he wanted

10   to know whether the penetration can go all the way inside the

11   child and how far inside the child.

12        He talks about his use of an alias in that first

13   contact with the child, that he had a fake account set up on

14   Facebook that he can use in order to communicate further with

15   PhilipinneGirls so that he can stay protected from discovery of

16   his contact.

17        He starts requesting specific depictions.  He asks

18   about the talents or capabilities of the children he's

19   communicating about.  And he talks about the amount of money

20   that he's willing to pay to see these children abused and to

21   have these children abused at his request.

22        And this is a man who was working at Amazon, was

23   living at home, had relatively modest means, but yet he's

24   willing to pool his money and send his savings in order to have

25   children abused at his direction.  And for him to write the

1    screenplay for these children to be raped, that's a serious and
2    horrific offense.
3           He talks about how he wanted to hear sound in the
4    videos and he wanted to hear the children crying.  It wasn't
5    enough to just watch the activity taking place, but he actually
6    wanted to hear the sound of the children and the pain that was
7    coming to them from the sexual assault that he was paying to
8    see.
9           He really was relentless in his pursuit of this
10   conduct.  He reached out multiple times to PhilipinneGirls, and
11   many times was reaching out 5, 6, 8 -- 22 we know in the one
12   instance, when he sent 22 e-mails that I referenced earlier,
13   without getting a response from PhilipinneGirls.
14          His behavior really was obsessive to see these
15   children get raped.  It wasn't enough that he sends -- sends
16   one request.  He sent dozens of requests in order to see
17   specific files.
18          He did, indeed, receive files that he requested.  He
19   received still images of children engaged in sexually explicit
20   conduct, but he also received a video.
21          Now, he complained in his post-*Miranda* statement that
22   he had paid for a 30-minute video, he paid nearly $1,000 for a
23   30-minute video, but he only received a four-minute video.
24          And when you think about the time and the sexual
25   assault of a child that goes on for 30 minutes, that's --

1    that's a lot.  That's quite intense.

2            Not that four minutes is -- or a still image is

3    something that should ever be tolerated.  But to complain about

4    only seeing the sexual assault of a child for four minutes

5    instead of a full 30 minutes, that is something that is

6    next-level of abuse.

7            And we know that he wanted not only the sexual

8    assault, but also the degradation and defiling of these

9    children in the form of completion from the sexual abuser.

10           He also talked about that he wanted to see an adult

11   specifically engaging in the sexual assault of the child.  And

12   I'm specifically referencing paragraph 23 of the presentence

13   investigation report, where the defendant said that he wanted

14   that 30-minute video of a child being raped by an adult to

15   include --

16           THE COURT:  Excuse me one second.  What page is that

17   on, of the --

18           MS. KARASE:  Page 16.

19           THE COURT:  Paragraph 20- --

20           MS. KARASE:  23, Your Honor.

21           THE COURT:  All right.  Go ahead.

22           MS. KARASE:  Where he asks for the 30-minute video of

23   a child being raped by an adult, to include directions for --

24   the person who will "F" her should be adult, not same age as

25   her.  And it continues from there, that he wanted -- well, you

1    can read it yourself in the paragraph.

2            I mention that -- that this continued over more than

3    a six-month period of time.  The initial contact was in March.

4    Then it picks back up in September.  And it goes through

5    October, until the end of October.

6            But we know that that's not the only contact -- or

7    conduct that Mr. Marino was engaged in.  He also was engaged in

8    the collection of child sexual abuse material that -- that he

9    obtained from Telegram, from Facebook, from other applications.

10   And he had amassed quite a collection, thousands of images and

11   videos.

12           When you correlate the number of videos to the 75

13   images per video, it's more than 70,000 files of child sexual

14   abuse material that he had.

15           THE COURT:  Before we get to that, can you go back --

16   and I don't -- I'm not sure what your presentation is going to

17   be, but -- so -- because it's hard -- when you read all this,

18   there's so much of it, it's hard to keep it all straight,

19   but -- so what did he actually end up receiving?  What -- based

20   on his requests, what did he actually end up receiving?

21           MS. KARASE:  So he received -- in March he

22   received -- and I assume that you want me to only focus on the

23   contraband, not -- because he got images of the clothed victim

24   as well.

25           THE COURT:  Yeah.  I was talking about illegal

1 material.

2          MS. KARASE:  Yes.

3          So in September was when he got the first files of

4 child sexual abuse material.  That was four color photographs

5 that each depicted a nude prepubescent child in various poses

6 displaying genitals or anus.

7          And then he continued to request files.  He got a

8 video in late October.  I believe it was October 21st.  But

9 I'll confirm that.

10          MR. BELL:  25th.

11          MS. KARASE:  25th.  And that's the one with the video

12 that was titled "philippine nature.mp4."  And that was the

13 four-minute video holding the fhinami sign, what he referenced

14 was a four-minute video that he complained about when he paid

15 for the 30-minute video.

16          THE COURT:  And what -- and, you know, you don't have

17 to give me graphic detail.  But what was the content of that

18 video?  Did it -- did it depict the victim in sexually explicit

19 ways?  Was there an actual sexual assault depicted in the

20 video?  What's in the video?

21          MS. KARASE:  It's the child touching -- the child

22 alone and she's touching herself.  She's lifting up her skirt

23 and she's touching her genitals.  And then she's holding the

24 sign that says, "fhinami I do any thing for you."

25          And that's described on page 15 of the PSR in

1    paragraph 22.

2              And then we also know from the defendant's statement

3    that he received the collage that I had described earlier that

4    had the nine different images of -- of the victim.  And not all

5    of the images are child sexual abuse material, but there --

6    there is child sexual abuse material in some of the images that

7    were part of that collage.  And he describes that as having

8    seen that as an advertisement that led him to reach out to

9    PhilipinneGirls initially.

10             THE COURT:  And I guess what I'm trying to understand

11   is -- so there were requests by Mr. Marino to have videos of

12   the child victim actually being assaulted or raped and so

13   forth.  Did he ever actually receive material in -- that met

14   those requests in the materials that he received from this

15   individual?

16             MS. KARASE:  He did not.  And he was very specific

17   about exactly what he wanted to see, down to the -- the color

18   of crayon that he wanted to be used and the particular drawings

19   that he wanted to have on the signs.

20             It seemed -- each time he was reaching out, he was

21   requesting a different depiction or a slightly different

22   depiction.  But he did not ever receive the full sexual assault

23   of the child by the adult male with the sound that he had

24   requested.

25             THE COURT:  So he's, in essence -- and this -- I'm --

1    this is all so grotesque it's hard to -- hard to talk -- have a
2    conversation about it.  But we have to in order to proceed here
3    today.
4            He, in essence -- it seems to me that what's being
5    depicted here is he's requesting these grotesque, inhumane
6    things, and what he's being given in return is -- is certainly
7    exploitative of the child, and -- and certainly would be
8    considered -- would certainly have victimized the child, but he
9    wasn't receiving everything that he asked for.
10           Is that -- is that a fair way to say it?
11           MS. KARASE:  That's correct, Your Honor.
12           THE COURT:  And to the point that he, in some ways,
13    was a dissatisfied customer?
14           MS. KARASE:  That's right.  That's right.  And he was
15    complaining about that to PhilipinneGirls.
16           At one point on October 3rd of 2019, he talks about
17    that he has a lot of producers that give him video as a proof
18    and that he pays them a good amount for every request he asks
19    for them.
20           And he says that, "I'm a producer on my own but not
21    filipino girls.  So . . . if you don't trust me, I can save my
22    money than sending it without proof."
23           And it's a little bit of broken English there.  But
24    the point, I believe, that he was making -- he was trying to
25    get free content from PhilipinneGirls, what he called as

1     proof -- he was requesting PhilipinneGirls to send him that.

2     And he was saying that he's got his own sources, that he can go

3     elsewhere.

4           Now, that was -- that predated the time that he sent

5     the Bitcoin -- that was nearly $1,000 in Bitcoin -- for the

6     video that he did indeed receive.

7           THE COURT:  But based on the evidence, we don't have

8     any doubt -- we don't have any reason to doubt that he wanted

9     to receive what he was asking for?

10          MS. KARASE:  Correct, Your Honor.  And I believe that

11    that is evidenced by the collection that he had that we found

12    forensically.  There were files of -- all of the

13    sadistic/masochistic conduct, penetration, full sexual assault,

14    children engaged in sexual conduct with adult males, thousands

15    of files that were found that he had amassed from many

16    different sources.

17          THE COURT:  You said -- did you say 70,000 files?

18          MS. KARASE:  Yes.  That's when you change the --

19    convert the videos into numbers of still images.  But even

20    without doing that, we have -- I believe it's 4,000 --

21          THE COURT:  So in your experience, as you -- in terms

22    of just -- if you just isolate the child pornography -- and I

23    take it, just from looking at the restitution request and so

24    forth, this is the horrible stuff that we see in many of these

25    cases, like you said, sadomasochistic, very young children,

1    all -- all of that?  Is that right?

2              MS. KARASE:  Yes, Your Honor.  And the victim impact

3    statements that are attached to the presentence investigation

4    report certainly talk about the horrific conduct that these

5    victims endured and that was filmed.

6              The 8 Kids series submitted several victim impact

7    statements that talk about the anal penetration and sexual

8    abuse that those boys suffered at the hands of their abuser.

9              THE COURT:  And on what devices was all this found,

10   and in just -- and I recognize I'm just asking you for an

11   opinion.  And I'll understand that.  And Mr. Bell can have a

12   different opinion if he wants to.

13             But were these devices -- were these materials in

14   some type of active use, as far as you could tell?  What type

15   of devices?

16             And the second question would be:  In your judgment,

17   given the number of cases you've had over the years, where does

18   this collection rank in terms of the amount of material?

19             MS. KARASE:  So in terms of where the items were

20   contained, it was almost all on a laptop that he kept

21   underneath his bed.  He had 4,814 image files on that and 904

22   video files.  He also had an iPhone, on which he had four

23   images of contraband.

24             And in terms of how -- how recent, I mean, by his own

25   admission, he talked about that this is something he engaged in

1    regularly.  It wasn't a situation where he did this and then a

2    period of time went by and he stopped -- stopped downloading

3    files or continuing to get more files.

4            And then in terms of the number of victims, I

5    mentioned before there were 224 known series identified.  So

6    that's different series, understanding that's different than

7    how many people have requested restitution.  But that's a

8    pretty significant number.

9            So where we are in terms of collection -- I don't

10   think I've ever seen a three-page child identification report

11   that lists the number of series that -- it takes -- it takes

12   three pages to identify the number of series.  And he had

13   multiple images from most of these series.  For instance --

14           THE COURT:  Is "series" another way to say "person"?

15           MS. KARASE:  So the way that the National Center For

16   Missing and Exploited Children categorizes images, it's by

17   series.  And so, yes, it's by victim depicted, usually, or by

18   groups of victims.

19           So, for instance, there's the 8 Kids series.  And

20   there -- I think that there's just five who are requesting

21   restitution.  But it's a group of children who appear in images

22   that are kind of taken around the same time or taken together

23   by the same abuser.

24           THE COURT:  So when you say "224 known series," does

25   that mean there would be -- is there any overlaps?  I mean, do

1    we know how many victims that would represent?  Would it be

2    more than 224 victims?

3         MS. KARASE:  It would be more than 224, because these

4    are just the known -- the known victims.  And there are

5    multiple victims in some of these series.  So the Blues Pink

6    series, for instance, has more than just one victim.  The

7    8 Kids obviously has more than just one victim.

8         THE COURT:  So this is -- if I was characterizing it,

9    this is a serious, hard-core collection of child pornography?

10        MS. KARASE:  Absolutely, Your Honor.  Yes.  And the

11   number is high.  I mean, we're well over the 600 images for the

12   maximum enhancement level provided for in the guidelines.

13        That's not that unusual, to get over the 600.  But we

14   are, you know, 70- -- 70,000, which is a significant number.

15        But we also -- and let me just tell Your Honor a

16   little bit about the victim that was depicted in the files from

17   the Philippines, because this is something that you may be

18   curious about, and it certainly was something that was

19   difficult.

20        So that child was actually being abused at the hands

21   of her mother.  The person with whom the defendant was

22   communicating was paying the mother in order to produce a lot

23   of these files, or paying the mother in order to transport the

24   child for the sexual assaults that he had promised and

25   advertised.

1          The child was removed from the mother's care.  The

2     mother was arrested and is being prosecuted in the Philippines.

3     Unfortunately, the proliferation of child abuse in the

4     Philippines is so prevalent that, unless there is evidence that

5     there is a child in the home of a particular person at a

6     particular time, it is very difficult to get the cooperation of

7     law enforcement.

8          So even though the -- and the investigation is

9     continuing.  But even though we believe we know who the person

10    was who was communicating with Mr. Marino, to date, he has not

11    been arrested.

12         The child is in state custody.  And there hasn't been

13    any contact or requests for restitution as indicated in the

14    PSR.

15         Now, Mr. Marino has a local victim.  And this

16    victim -- the conduct is described in quite detail at paragraph

17    83.  And that is an individual -- she's identified by her

18    initials.  And she was 12 years old at the time that the chats

19    took place that are summarized at pages 23 all the way through

20    32.  And that really just give s a flavor of the relationship

21    that Mr. Marino had with this child victim.

22         As I said, she was 12 years old.  And he believed

23    himself to be in a relationship with this individual.  And you

24    can tell by the nature of the communication.  And I know some

25    of these -- the way that kids speak these days, or maybe people

1   who are just online all these times, and the abbreviations can

2   be a little bit hard to follow, but probation did a good job of

3   translating that.  She says MK a lot, like okay.

4            But in any event, he is -- Mr. Marino -- when he's

5   communicating with her, he's really demanding sexually explicit

6   photos and videos, and telling her specifics of what he wants

7   to see.

8            "It has to be a two-minute video.  It has to be fast

9   and deep."

10           He is telling her that he wants to see all the way

11  through to completion and that -- even when she is resisting,

12  he's continuing to pressure her to send these made images -- or

13  videos to him.

14           And I think that it's really telling what -- and this

15  is getting into the history and characteristics of the

16  defendant's portion of the 3553 factors.

17           But what she says in the last line here -- after he

18  has been pestering her and coercing her to send this particular

19  file that he wants for his own sexual satisfaction, this adult

20  male, who's communicating with a 12-year-old

21  child -- and she says, "I'm going to hate this for the rest of

22  my life."

23           I'm reading on page 32.

24           "I feel so sad about it and I want it to be over.  I

25  just went to sleep right after because I don't know how I feel

1    when I finish it.  But if I do finish, I think I'm going to

2    feel very ashamed of myself for doing this.  And I feel like

3    I'm hurting myself.  I feel forced doing this.  And I will

4    never do this again.  I never wanted this in the first place.

5    I feel weak.  I really don't want to do this anymore.  I don't

6    want this.  I don't need this.  I really don't like this."

7            And then paragraph 84, you'll see in the PSR, talks

8    about a law enforcement interview of that particular victim

9    where she told law enforcement that she was actually 10 or 11

10   the first time that she engaged in contact with Marino, that

11   she told him her true age and that she believed that they were

12   in a relationship.

13           He had sent her photographs of his penis, according

14   to the child, and that she, in turn, had sent him photographs

15   of her genitals on approximately -- or less than 10 occasions

16   that same year.

17           I think that that conduct really describes the -- the

18   type of person that Mr. Marino is, the lengths that he's

19   willing to go to, and the actual victimization that he

20   inflicted upon this child.

21           Now, you might be wondering, "Well, why isn't she

22   here?"

23           And I'll tell you the way that -- that this kind of

24   went.  When Agent Luedke and his partner approached the

25   family -- and it's a terrible conversation to have to have,

1   right, to let someone know that your little girl has been

2   victimized online by a predator and been truly sexually

3   exploited.  And, unfortunately, we have to have these

4   conversations a lot.

5          But this particular mother was so -- so ashamed of

6   the fact that her daughter had communicated with Mr. Marino,

7   and kind of, of course, had blame to point at Mr. Marino, but

8   also held her daughter responsible, this 12-year-old child, for

9   engaging in the conduct with Mr. Marino.

10          Now, of course, we had a victim witness specialist on

11  hand and individuals in order to try to explain how children

12  can be victimized and the disparity between adults interacting

13  with children and how truly terrible it can be, especially when

14  someone is subject to grooming.

15          And I think that the family got it to some extent,

16  but, nonetheless, they opted to not be informed, not

17  participate in the prosecution at all, and to try to put that

18  matter behind them and move on with their lives from here.

19          Suffice it to say, though, the conduct that

20  Mr. Marino engaged in with that child, as evidenced from the

21  paragraph in the presentence investigation report, will stay

22  with that child and with that family for the rest of their

23  lives.  The child really came to hate herself for having done

24  the things that Mr. Marino demanded that she do.

25          Similarly, when we're talking about the 3553 factors,

1   getting back to the nature and circumstance of the offense,

2   there's a lot of different ways that one can entice a child.

3   There's a lot of different ways that one can produce child

4   sexual abuse material.

5           But the thoughts that Mr. Marino had and the desires

6   that he had, that he relayed the things that he wanted, the

7   things that he wanted done to a child -- he wanted to see pain.

8   He wanted to make sure that it was an adult/child relationship.

9           And the fact that he became so obsessive with this,

10  that he was in constant communication with PhilipinneGirls, the

11  fact that he was willing to pay nearly $1,000 -- more than

12  1,000 if you add up the three separate payments he sent to

13  PhilipinneGirls -- is evidence of the danger that he is and

14  that he presents to the public.

15          Your Honor, I am requesting a life sentence.  I think

16  that it's warranted here.  But I'm asking the Court -- no

17  matter the sentence that Your Honor decides to impose, that you

18  require a life term of supervised release.

19          THE COURT:  Thank you, Ms. Karase.

20          MR. BELL:  Thank you, Your Honor.  May it please the

21  Court.

22          Judge, I'm not going to belabor the point that he's a

23  are very, very troubled young man.  I will adopt the arguments

24  for a downward variance/departure outlined in the document 96.

25          I would note the Court's also had the opportunity to

1    review, which I know it does, all the letters of support that

2    have been provided from not only his mother and his sister,

3    several other relatives.  They are referenced in document 100

4    of the filing.

5           His mother and sister have joined us today and are in

6    the audience.  They don't intend to speak today.  Obviously

7    this is very, very troubling.  As outlined, this is a young man

8    who came to the United States recently from the Philippines.

9    He's a Philippine native.  And -- and it's -- it's hard to kind

10   of describe the nature of the crimes and -- that have been

11   committed.

12          Under any construction of it -- I think as I framed

13   it in the -- in the memorandum, a lonely young man, kind of

14   loses focus on what's real and what's not real.

15          The only issue I would suggest to the Court is what's

16   a sufficient, but not greater than necessary sentence?  That's

17   easier to say than -- for this Court to kind of make the final

18   decision on.  You have a whole range of options.  A 15-year

19   sentence would ordinarily be incredibly significant and

20   sufficient almost in and of itself.

21          The range is from 15 to life, as the Court well

22   knows.  The other factors, just the sentencing maximums on

23   Counts -- I think it's Two through Six -- or Two through --

24   Two, Three, and Four are 30 years.  Then we have some five to

25   20s.

1    And it is Count One, the commercial sex trafficking,

2    that provides -- that authorizes a sentence of up to life with

3    a sentencing minimum of 15.  Counts -- yeah.  It's Counts Two,

4    Three, and Four, which I believe all have 15-to-30-year

5    maximums.

6         Judge, I think the -- probably -- without belaboring

7    it, as the Court -- as I've argued many times before this

8    Court, I think the sentencing guidelines tend to overstate the

9    seriousness of the charge.  They tend to overestimate the

10   seriousness of the conduct, the images, particularly in the

11   computer age, and the video are enhancements that I don't -- I

12   would argue don't give the Court an appropriate weight of

13   the -- of the potential conduct, although in this case, with

14   the number of videos and images, it's pretty staggering.  The

15   use of computer is an enhancement that I would suggest

16   artificially raises the floor.

17        I -- as I argued earlier, the pattern enhancement,

18   which I concede should be applied in some context in this case,

19   shouldn't -- by adding five levels at the other end, it take s

20   us even further into the stratosphere.

21        But the -- maybe the best guidepost for the Court, in

22   terms -- in determining the appropriate sentence in this case,

23   is the commission findings for production offenses, which were

24   just released relatively recently, back October of 2021, that

25   the typical sentence nationwide for a production-related

1    offense, which this would be characterized, where the

2    individual is not in direct contact with the -- with the

3    victim, as opposed to the -- you know, the father -- the

4    mother/father type of scenario, where the victims are in the

5    house, is 234 months, which is just shy of 20 years, a very,

6    very significant sentence in its own right.

7            My recollection of the nationwide sentence for a

8    production-related offense for -- where the -- the victims are

9    actually in the household in some capacity of -- of -- of the

10   perpetrator was -- I want to say it's 300.  I don't remember

11   off the top of my head, 300 months, which is, you know, between

12   25 and 30 years, which is a significant -- significant

13   sentence.

14           I do note on page 10 of my motion for downward

15   variance that it is not at all unusual for courts for

16   non-government sponsored -- to grant non-government sponsored

17   motions for variance in some recognition that a life sentence

18   for a young man with essentially no criminal history, despite

19   the horrific nature of the crimes, despite all the other

20   factors, is disproportionate.

21           And that's really what we're talking to -- talking

22   about here, Judge, is -- as the Court is well aware, 3553(a)

23   requires that the Court not impose unwarranted sentencing

24   disparities between similarly situated individuals.

25           And I would certainly suggest to the Court that

Mr. Marino, given his age and lack of criminal history and lack of experience in the system, would -- would fall at the lower end of that continuum.

You always look for other examples.  I hate to rely on other clients, but there -- but they're well past that.  The two cases that are probably similarly situated, that I've had any experience with in this court -- there was an individual a number of years ago on a production-related offense.

Mr. Brown and I had -- he was only charged with one count.  That was more or less by agreement.  It was a production-related offense where the individual had contacted a mother in Romania to perform live sex on a 10-year-old child. I think she was prosecuted in Romania as well.

Judge Davis imposed a sentence of 30 years.  And essentially that was the maximum available.  There were more counts that could have been charged, but were not.  The -- my recollection is the guidelines were also life in that case. But the statutory maximum sentence was imposed.

The only other -- kind of what I would characterize even remotely analogous sentence is one this Court imposed not too long ago on an individual that Mr. Stone tried in this courtroom.  I had handled some of the preliminary proceedings.

That case involved an individual who had a prior sex history, where I believe the minimum mandatory was 25 years in that case, and this Court -- this was one where a video

1  surveillance system was installed in his natural daughter's

2  bedroom.  And the sentencing exposure was at least -- at the

3  maximum may have been 50.  I don't know what the guidelines

4  ultimately came out to be in that case.  And this Court imposed

5  a sentence of 35 years.

6          One critical distinction, I would argue, is that

7  those individuals were, one, much older, 40, 45 years old, in a

8  position to have -- know better and not be in any way confused

9  by the underlying nature of the conduct.

10          But I would think at the upper end of the continuum,

11  between 15 and 30 years -- that would be at the higher end.  I

12  would certainly argue that a -- a life sentence would be

13  substantively unreasonable, disproportionate, way more than is

14  sufficient or necessary in this case.

15          My only comment about a life of -- a sentence of life

16  supervised release, he is not a United States citizen.  He will

17  be subject to removal at the completion of the sentence and

18  will have to return to the Philippines many years from now.

19          So I don't know that a sentence of supervised

20  release -- and I would suggest to the Court a life sentence of

21  supervised release would be unnecessary in this case.

22          I don't know if Mr. Marino -- I don't believe he

23  wishes to address the Court.

24          THE COURT:  Well, I need to ask him.

25          So, Mr. Marino, the law gives you the right to speak

1  on your own behalf.  You are not required to do so, but I want

2  to give you that opportunity.

3          Do you wish to speak?

4          THE DEFENDANT:  No, Your Honor.

5          MR. BELL:  Judge, if I could have just a moment, I

6  think that covers what I wanted to . . .

7          Thank you, Your Honor.

8          THE COURT:  Thank you.

9          Ms. Karase, anything further?

10          MS. KARASE:  Your Honor, the only thing that I'll say

11  is, drawing on Mr. Bell's comparison to the -- I believe it was

12  the *Butler* case he was referencing, where the child was

13  surreptitiously filmed in her bedroom, and *Butler* was a sex

14  offender.

15          I mean, this -- the facts are so different here,

16  talking about the physical torture and rape of children,

17  compared to a surreptitiously placed camera that was the facts

18  of the *Butler* case.

19          And then with regard to the Romania case that he

20  mentioned, the judge gave the statutory maximum in that case.

21  That's what I'm asking for here.

22          THE COURT:  Any legal bar to the imposition of

23  sentence, Ms. Karase?

24          MS. KARASE:  No, Your Honor.

25          THE COURT:  Mr. Bell?

1          MR. BELL:  No, Your Honor.

2          THE COURT:  All right.  I'm going to take a recess,

3    consider the matter, and I'll be out as soon as I -- as soon as

4    I can.

5          Mr. Bell, while I'm thinking of it, you've got a

6    motion to withdraw here, and so -- so I take it that I'll

7    sentence Mr. Marino, you'll file his notice of appeal, and then

8    you want to be relieved at that point; is that right?

9          MR. BELL:  Yes.

10         THE COURT:  All right.  So I'm just going to refer

11   that to Judge Lambert.  And then she'll -- she'll get you an

12   order after -- after the sentencing, then.

13         MR. BELL:  Very good.  Thank you, Your Honor.

14         COURT SECURITY OFFICER:  All rise.

15      (Recess from 11:43 a.m. to 11:59 a.m.; all parties

16   present.)

17         COURT SECURITY OFFICER:  All rise.  This Honorable

18   Court is now in session.  Please be seated.

19         THE COURT:  The Court has considered this matter

20   carefully.  All sentencings are difficult.  Obviously one in

21   which the government is seeking a life sentence is -- brings a

22   heightened sense of awareness and scrutiny to the Court's

23   consideration.

24         But I'm going to endeavor to use the tools given to

25   me under 18, U.S.C., Section 3553(a) to try to impose a

1    sentence that's sufficient, but not greater than necessary.

2            I start with the nature and circumstance of the

3    offense.  You know, Mr. Bell, rightfully so, tried to cite me

4    some precedence both from a case I had and a case Judge Davis

5    had.

6            I've had way too many of these sexually related cases

7    over the years, and have had all different manner of -- of

8    conduct, some of which resulted in de facto life sentences,

9    even if they weren't called life sentences, some of which I

10   have agreed with the contention that the guidelines were too

11   robust and have varied, and sometimes varied substantially if I

12   thought it was appropriate to do so, because I don't think

13   that -- even though no right-thinking person in society can

14   countenance crimes against children, I still, nevertheless,

15   think that the law has to look at each case individually and

16   look at each defendant individually and try to come to an

17   appropriate conclusion and not just say one size fits all.  And

18   I -- I think I've demonstrated that over the years that I've

19   been doing this.

20           But I would say that there is something about this

21   crime that is -- and I don't think I've ever had anything

22   precisely like this, but something about this crime that is

23   particularly disturbing.

24           The idea that Mr. Marino would be insistently trying

25   to pay for someone to provide him ready-made scenarios of the

1    sexual abuse of a 9-year-old girl, and do so with such

2    specificity, ask and agree to pay for acts to be performed upon

3    this child of the grossest manner and the most inhumane

4    manner -- and while the material that he got back for his

5    efforts didn't quite reach the level that he had requested, it

6    was still bad enough.  It still involved the sexual

7    exploitation of that child.  And it wasn't for lack of trying

8    that it wasn't even worse.

9            Mr. Marino wanted what he wanted.  And what he was

10   asking for was visual depictions of child rape in a very

11   specific way and with very specific criteria.  It's just -- I

12   don't know how to describe that.  I'm not really sure there's

13   words for that.

14           And as I said, he was insistent, to the point that

15   the people he was dealing with, which horrifically turned out

16   to be the child's mother and some other third party, who I hope

17   will one day be brought to justice -- to the point that they

18   got tired of him.

19           But he kept coming back.  He kept asking and

20   demanding what he wanted.  He kept the conversation going.  And

21   it's just -- when you read it all, it's just -- it's just hard

22   to even understand, hard to understand how people on the other

23   end could be party to it, especially the girl's own mother, for

24   goodness' sake, but also how Mr. Marino was just obsessed with

25   this.

1    And he did receive material of child sexual

2    exploitation as he wished to do.  And it is -- it is clear, at

3    least from one of the scenarios, that it was in direct reaction

4    to his request.  It may not have been all he wanted, but it was

5    in district response to his request, which means the girl was

6    victimized at his specific direction, probably more than once.

7    And I know we probably wouldn't call that a contact

8    offense, but it's probably the virtual version of it.  It has

9    everything -- everything but the fact that they weren't in the

10   same room with each other.  It has the same intent, same

11   result.

12   And then, if that's not enough, Mr. Marino, on more

13   than 20 occasions between March 18th and August 11th, 2019, was

14   involved with a local 12-year-old -- I say local.

15   Ms. Karase, where was the victim located?

16   MS. KARASE:  Yes, Your Honor.  She was in the Greater

17   Jacksonville area.

18   THE COURT:  -- a local 12-year-old victim.

19   And in this situation Mr. Marino is dealing directly

20   with this 12-year-old, grooming her, and then getting her to do

21   sexual acts, always bringing her back to it if she complained,

22   or if she expressed discomfort or dissatisfaction with what she

23   was doing, used the fact that he was older than her and had the

24   ability to persuade her, coerce her, to continue acting out as

25   he wished.

1          It's hard to read; saying things to her like, "Please
2   stop.  You're being a bitch again," to this 12-year-old girl.
3          She says, "Because I really dislike the video thing.
4   It stressed me out so much."
5          Mr. Marino said, "Please get used to a video."
6          And she says, "All I want to say is this is the only
7   time I'm doing this."
8          And he says, "I will not ask any more video, but this
9   time do it well.  And please don't be mad at me after it."
10          And then he describes exactly the things he wants her
11   to do to herself.
12          And as Ms. Karase pointed out, and I happened to be
13   reading exactly the same passage that she was when she read it,
14   at the end here the -- the 12-year-old says she's going to hate
15   this for the rest of her life, and goes on to talk about how
16   ashamed she is, how she felt forced to do it.
17          And to hear that her family is blaming not only
18   Mr. Marino, but the child victim as well, or at least feeling
19   shame in the family, really -- it really is too bad, because,
20   of course, Mr. Marino is the only one that bears any
21   responsibility.  That's why we have laws that protect children,
22   because they can't protect themselves.
23          And then on top of that, Mr. Marino had a very
24   significant child pornography collection, a significant-enough
25   collection that even if that had been his only crime, he'd be

1  facing significant penalties.

2          I agree with Ms. Karase that I don't know if I've

3  seen a longer list of restitution claims, because of the number

4  of victims that are portrayed in the child pornography that was

5  in Mr. Marino's possession, and in his active -- available to

6  him actively.

7          So I'm sure I've had worse sex cases, but this is

8  right up there.

9          I look at the history and characteristics of

10  Mr. Marino and -- I have been provided -- and maybe perhaps

11  there is no explanation.  There doesn't appear to be substance

12  abuse.  There doesn't appear to be mental health issues,

13  although certainly anybody who would engage in this type of

14  activity has to be considered disturbed, at least.  But there's

15  no documented mental health history or problem.

16          He has previously contemplated suicide, but he denied

17  any history of mental health.  And I have to tell you truly,

18  when I -- when I -- as I always do when I'm preparing, I -- I

19  go through everything and I make notes to myself, questions I

20  have, or things that I want to remember.  And at the end of all

21  this, I just wrote one word up at the very top, which was

22  "Why?"

23          We have no idea why.

24          Mr. Marino, as his right, chose not to speak to me.

25  I don't know what his state of mind is right now.  I know he's

1    very young.  He's not -- not -- he's certainly age of majority.

2    I mean, he was, I guess, in his mid 20s at the time these

3    crimes were committed.  He's now 27.  So certainly way old

4    enough to know better, but still young.

5         My guess, just based on how things played out in his

6    life, is that he's maybe relatively immature.  If I had to

7    guess, I would say his adjustment from the Philippines to the

8    United States may have been problematic.  I -- I'm just kind of

9    guessing, because I don't have any -- anything -- I have no

10   professional diagnosis of him.

11        I have no -- really nothing to -- in his background

12   that would suggest that he would be so involved in child

13   pornography and in the production of child pornography through

14   the ways that we've already discussed.

15        And so on one hand you'd say, "Well, he has no other

16   criminal history.  He has no other really aggravating factors

17   in his background."

18        On the other hand, he clearly has engaged in what can

19   only be described as predatory conduct.  And without an

20   adequate explanation, there's no -- I have no basis upon which

21   to be optimistic that he would not be a danger to the community

22   and to other children.

23        And, of course, affording adequate deterrence to

24   criminal conduct from protecting the public from further crimes

25   of Mr. Marino is part of what I need to -- to do.

1          You know, of course, you'd like to think that -- and

2   I think there was a -- where is the statement in the PSR

3   concerning -- Mr. Marino's statement about his participation in

4   the crime?  What -- you know, there's that . . .

5          MS. KARASE:  It's paragraph 17, Your Honor.

6          THE COURT:  17?  Thank you.

7          MS. KARASE:  On page 7.

8          THE COURT:  Thank you.

9          MS. KARASE:  You mean his post-*Miranda* statement?

10         THE COURT:  Yeah.  Hold on a second.

11         I'm talking about the -- thank you, Ms. Karase.

12         I'm talking about the -- where he -- where the

13  defendant is asked to make a statement.  Is there an expression

14  of remorse in here?  That's what I'm looking for.

15         PROBATION OFFICER:  Yeah, paragraph 33.

16         THE COURT:  33.  Okay.

17         Of course, Mr. Marino, as was his right, decided

18  to -- because he wants to contest the Fourth Amendment issue,

19  he stipulated to the essential factual elements of the

20  conviction and went to a stipulated bench trial.  And so he's

21  in a little different position than somebody who has accepted

22  responsibility, and -- and we proceed from that premise.

23         But through counsel he did reaffirm his factual guilt

24  and expressed remorse for his conduct, but, of course, he chose

25  not to speak today, which, again, is his right.

1          But I don't have -- as I said, I don't have any

2     insight at all, either from him or from anybody else, as to his

3     current state of mind or why I would be comforted that he would

4     not in the future engage in this same type of predatory

5     conduct, especially given how pervasive and insistent he was

6     with the crimes that he committed in this case.

7          And so I do think I have to be concerned about

8     affording adequate deterrence to criminal conduct, protecting

9     the public from further crimes of the defendant.

10          I also need to provide just punishment for the

11     offense and to reflect the seriousness of it and to promote

12     respect for the law.

13          And I do think that these two child victims, whether

14     they ever know it or not, are entitled to accountability for

15     Mr. Marino.  And I do -- I think society is also owed a debt by

16     Mr. Marino that needs to be paid.

17          I, of course, consider the guidelines.  The

18     guidelines do recommend a life sentence.  And we've been

19     through the litigation on that.  And I believe the guidelines

20     are correctly scored.  And they do recommend a sentence of

21     life.

22          I need to avoid unwarranted sentencing disparity

23     among defendants with similar records who have been found

24     guilty of similar conduct.

25          And, as I said, I view Mr. Marino's case -- you know,

1    I view his case as not quite to the level of cases that I've

2    had where I have, in essence, imposed de facto life sentences

3    because the guidelines were in the thousands of months.  And I

4    think I've done that at least twice.

5           I don't view him quite in that category.  But I also

6    don't view him, as Mr. Bell was trying to suggest, as somebody

7    who's deserving of having the guidelines be kind of given much

8    less weight in this -- than they sometimes might be in

9    sex-related cases.

10          I have had cases where I felt like the guidelines

11   really did stack up way too high, but I -- I think this case is

12   not really one where I am feeling that, as I have in other

13   cases.

14          So I am going to impose a sentence in this case.  I

15   think it's difficult to know what the actual correct sentence

16   should be.  It has to be sufficient to meet all the things that

17   I talked about.

18          And I do think protection of the public, and

19   especially children, from further crimes of Mr. Marino has to

20   be at the top of my mind, especially in the absence of any

21   insight into his situation.  I do think there has to be

22   accountability for these extremely serious offenses.

23          And so I'm just going to do my best to impose a

24   sentence that I believe to be sufficient, but not greater than

25   necessary.  And I hope that the record will bear out that I've

1   done my level best to try to determine that, what that should
2   be.
3            Mr. Marino, on November 16th of 2021, after a
4   stipulated bench trial, the Court found you guilty of Counts
5   One through Seven of the second superseding indictment.
6            I'm not going to take the time to read all the counts
7   out loud.  The record is clear what they are.  But -- well,
8   maybe I should since -- since I have to fashion the sentence
9   appropriately.
10           So you have been found guilty of Count One, which
11  charges you with attempted sex trafficking of a child who had
12  not attained the age of 14 years, in violation of 18, U.S.C.,
13  Section 1591(a)(1) and 1594.
14           Counts Two through Four, each charging you with
15  employing, using, persuading, inducing, enticing, and coercing
16  a minor to engage in sexually explicit conduct for the purpose
17  of producing visual depictions of such conduct, in violation of
18  18, U.S.C., Sections 2251(a) and (e); Counts Five and Six each
19  charging you with receipt of child pornography, in violation of
20  18, U.S.C., Section 2252(a)(2) and (b)(1); and Count Seven,
21  charging you with possession of child pornography, in violation
22  of 18, U.S.C., Section 2252(a)(4)(B) and (b)(2).
23           The Court has previously adjudged you guilty of these
24  offenses and the Court now imposes a sentence as follows.  And
25  the Court having been fully advised, the Court now imposes a

1    sentence in the Bureau of Prisons for a term of 660 months.

2            This term consists of 660 months as to Count One; a

3    360-month term as to Counts Two through Four; and 240-month

4    term as to Counts Five through Seven, all such terms to run

5    concurrently, for a total term of 660 months.

6            Upon release from imprisonment, you shall serve a

7    life term of supervised release.  That is a life term as to

8    Counts One through Seven, all such terms to run concurrently.

9            I am going to recommend you for imprisonment in

10   what's called a SOMP facility, which is a sexual offender

11   facility.  I'll recommend you for sexual offender treatment.

12   I'll recommend you for mental health treatment as well, and

13   vocational and educational programming.

14           When you get out on supervised release, assuming you

15   serve the supervised release and you're not deported, I will

16   direct that in addition to the standard conditions, that you

17   participate in a mental health program specializing in sexual

18   offender treatment.

19           I'll also require you to register with the state

20   sexual offender registration agency, as required.  And

21   probation will be providing that information to the Florida

22   authorities.

23           You'll have no direct contact with any minor under

24   the age of 18 without express approval of probation and will

25   refrain from entering into any areas where minors congregate.

1    You're prohibited from possessing, subscribing to, or

2    viewing any images, videos, magazines, literature, or other

3    materials depicting children in any nude or sexually explicit

4    position.

5    There's a lengthy prohibition against computer usage

6    without express approval of probation.  I won't read that out

7    loud, but it basically requires probation to give you express

8    written consent concerning the scope of your computer usage.

9    You are subject to a search condition.  You'll be

10   prohibited from incurring new credit.  You will provide

11   probation access to financial information.

12   If you were to be deported, you could not enter the

13   United States without express permission of the appropriate

14   authorities.

15   DNA collection is required.

16   Drug testing mandatory requirements are suspended.

17   Restitution will be in the amount of $163,500, as

18   previously agreed to earlier this morning.

19   Is that the right number?

20   PROBATION OFFICER:  (Nods head affirmatively.)

21   THE COURT:  Is that the right number, Ms. Karase?

22   MS. KARASE:  Yes, Your Honor.  I'm sorry.

23   THE COURT:  That's all right.

24   MS. KARASE:  I didn't know you were asking me.  Yes,

25   Your Honor.

1          THE COURT:  So -- and I will -- we'll -- Ms. Karase

2     will work with Ms. Hatfield to try to make sure that we've got

3     that correct in the judgment, in terms of where the restitution

4     will be paid to, which lawyers and so forth are representing

5     these folks.  That's how we normally do it.

6          And that restitution -- I have no idea -- and, of

7     course, we don't really have any good reason to think it will

8     ever be paid, but I'll just start it at $100 a month following

9     30 days after release from custody.  It can be adjusted, of

10    course, if circumstances require it.

11         No fines, no forfeiture matters.

12         Special assessment, $700.

13         I'm not going to impose any special AVAA or JVTA

14    assessments because of indigency.

15         Anything else?

16         PROBATION OFFICER:  (Shakes head negatively.)

17         THE COURT:  Anything else, Kerri?

18         COURTROOM DEPUTY:  No.

19         THE COURT:  Sir, you have the right to appeal my

20    judgment and sentence within 14 days from the entry of

21    judgment.  Failure to appeal within that time would give up

22    your right to appeal.

23         Mr. Bell has already said that he will file the

24    notice of appeal on your behalf on a timely basis.  Once he

25    does that, then I will appoint a new lawyer for you to handle

1    your appeal.

2           So Mr. Bell will file your notice of appeal on time.

3    He will be relieved.  And then your new lawyer will handle your

4    appeal and will be in contact with you.

5           Do you understand?

6           THE DEFENDANT:  Yes.

7           THE COURT:  The Court having pronounced sentence,

8    does anyone wish to object to the Court's sentence or the

9    manner in which the Court has pronounced sentence at this time?

10          MS. KARASE:  Not from the United States, Your Honor.

11          MR. BELL:  Your Honor, respectfully, a couple of

12   objections to -- procedural at this point.  One is the Court's

13   finding on the enhancement, the -- the -- the 4(b) enhancement,

14   for what I'll characterize as pattern or repeat.  That would be

15   the one outstanding objection that may have affected the bottom

16   line.

17          My second procedural objection is this, Judge --

18   maybe I misunderstood the Court.  But the Court did give some

19   weight to the fact that he declined to provide a statement in

20   the fashioning of the sentence, in violation of his right to

21   remain silent.  I would suggest to the Court -- and to the

22   extent that that was a factor, I would assert a procedural

23   objection to that.

24          And, lastly, I would object on the basis that it was

25   substantively unreasonable, the 660 -- 660-month sentence.  And

1    I have one question.  I don't know the answer to this.

2          But the Court imposed concurrent terms of life

3    supervised release.  Just to make sure, we may want to

4    double-check the statute as to the possession.  I don't know if

5    it's a supervised -- if that provides for a maximum life on

6    the -- on the possession count.

7          THE COURT:  Yeah.  Let me take a look.  I've got the

8    sheet.

9          MR. BELL:  I think it does on all the others.  And

10   don't -- I guess I would object, to the extent that that --

11   that's substantively unreasonable.  But that may be beyond the

12   bounds of the statute.  Just to double-check.

13         PROBATION OFFICER:  I have to check the statute, but

14   I believe it's still 35 to life on those.  But if I could

15   borrow the book to double-check.

16         THE COURT:  Sure.  Go ahead.

17         MR. BELL:  And I guess, just to be safe, I'll object

18   on substantively unreasonable grounds as to the supervised

19   release.

20         THE COURT:  All right.  We'll double-check on that.

21         MR. BELL:  And, lastly, Judge -- I know it's a

22   difficult case.  And I have filed the motion to withdraw.  I

23   don't know that he's ever been declared indigent.  He certainly

24   would be.  I don't know if the Court could make a finding he's

25   indigent for --

```
1              THE COURT:  Were you retained?
2              MR. BELL:  Yes.
3              THE COURT:  Oh, I -- yeah.
4              So, Mr. Bell, as an officer of the court, if you'll
5    just tell me he's indigent and just give me just a little brief
6    summary of the situation, then I'll -- I'll make the proper
7    declaration.
8              MR. BELL:  And, Judge, I think there was a financial
9    section of the presentence report, which I referred to in the
10   motion, that there are no resources.  He had a job.  He has not
11   since he's been arrested over two years ago.
12             And he had a little bit of interest in this property
13   which he shared with his sister, but that has long since been
14   exhausted.
15             The family had paid me over -- he and family have
16   paid me over the course of the two-plus years I've represented
17   him now.  And there are essentially no more resources, at least
18   he individually has, that I have any knowledge of whatsoever,
19   no reason to believe that he would have any.
20             THE COURT:  Yeah.  I don't have any reason to believe
21   it either, so -- and I'll accept that representation.  And so
22   I'll -- for purposes of appointing new counsel on appeal, I'll
23   make a finding that Mr. Marino is indigent within the meaning
24   of the Criminal Justice Act and he is eligible for CJA counsel.
25   And I'll ask Judge Lambert to appoint counsel.
```

1          MR. BELL:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          So -- and I don't -- the first procedural objection

4     you raised, I don't think that I need to address that.  I mean,

5     I made my ruling, and obviously it's subject to review.  But

6     I've made the ruling.

7          With respect to your second procedural objection, I

8     want to be clear, I'm not -- and I think I even said so.

9     Mr. Marino has every right not to allocute.  He has every right

10    not to say anything.  I'm not holding that against him.

11         But when I am evaluating whether he remains a danger

12    to the community or the public, when I am evaluating his

13    history and characteristics, I do think that I'm entitled to --

14    the absence of any information about Mr. Marino and why he

15    conducted himself the way he did and what his current state of

16    mind is, I do think is a fair matter for me to take into

17    account in determining an appropriate sentence.  But I'm not --

18    I did not impose a higher sentence against Mr. Marino because

19    he chose not to speak.  And I understand he has a right not to

20    do so.  I've had plenty of other cases where defendants chose

21    not to speak.

22         So I understand what you're saying.  And I know you

23    want to preserve your objection.  But I wanted the record to be

24    clear as well.

25         MR. BELL:  Yes, sir.

1          THE COURT:  Thank you.

2          PROBATION OFFICER:  With regard to the supervised

3    release under 18, U.S.C., 3583(k) any offense under Section

4    2252, which is Count Seven, does authorize five to life.

5          THE COURT:  Okay.  So I'm fortified by the probation

6    officer that the sentence of the Court is appropriate in terms

7    of the supervised release.

8          Now, I understand there may be a substantive

9    objection to it.  But in terms of legal objection, the

10   supervised release sentence of life supervision on Counts One

11   through Seven, all of them to run concurrently, would stand.

12         I would point out that even if Count Seven was not

13   life, I'm still running the others concurrently, which are

14   life, so the result would be the same.  But I think -- I think

15   we're on solid ground there as well.

16         Ms. Karase, is there anything else that you feel

17   needs to be on the record or any -- anything that you're --

18   that you have any concern about the way in which the Court has

19   proceeded?

20         MS. KARASE:  No, Your Honor.

21         THE COURT:  And, Mr. Bell, you've said your piece,

22   sir?

23         MR. BELL:  Yes, sir.  Thank you.

24         THE COURT:  Mr. Marino, I'm searching for something

25   constructive to say to you.  I try to always say something

1    constructive.  And I guess it would be this.

2         I -- I hope that you'll -- while you're serving your

3    sentence, I hope you'll be able to come to terms with -- with

4    this.  I hope that you'll be able to get some treatment.  I

5    hope you'll be able to -- within the best of your ability, to

6    find some answers and to be a productive person even -- even

7    while you're incarcerated.  There are many people that are.

8         And even though I think the crimes you've committed

9    are very serious and hurt innocent children, I nevertheless

10   always want to, going forward, wish you well.  I know this must

11   be terrible on your family.  And I want to wish them well.

12        And I hope -- I hope in some way that you-all can

13   find some peace.

14        We're in recess.

15        COURT SECURITY OFFICER:  All rise.

16      (The proceedings concluded at 12:39 p.m.)

17                           - - -

18

19

20

21

22

23

24

25

### CERTIFICATE

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 18th day of November, 2022.




            s/Shannon M. Bishop
            Shannon M. Bishop, RDR, CRR, CRC