```
            IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                   JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,       Jacksonville, Florida

            Plaintiff,          Case No. 3:20-cr-94-TJC-LLL

  vs.                           June 24, 2020

MARK MANUEL ANGELES MARINO,     1:34 p.m.

            Defendant.          Courtroom No. 5C
_____
```

DIGITALLY RECORDED DETENTION HEARING
BEFORE THE HONORABLE MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

GOVERNMENT COUNSEL:

**KELLY KARASE, ESQ.**
U.S. Attorney's Office
300 North Hogan Street, Suite 700
Jacksonville, Florida  32202

DEFENSE COUNSEL:

**THOMAS M. BELL, ESQ.**
Thomas M. Bell, PA
301 West Bay Street, Suite 1460
Jacksonville, Florida  32202

COURT REPORTER:

Shannon M. Bishop, RDR, CRR, CRC
221 North Hogan Street, #150
Jacksonville, Florida  32202
Telephone:  (904)549-1307
dsmabishop@yahoo.com

(Proceedings recorded by mechanical stenography;
transcript produced by computer.)

# T A B L E   O F   C O N T E N T S

<u>Page No.</u>

WITNESSES FOR THE GOVERNMENT:

**DETECTIVE RYAN ELLIS**
Direct Examination.................................   5
Cross-Examination.................................  12
Redirect Examination..............................  28


WITNESSES FOR THE DEFENDANT:

**MARI BETH CALUBAQUIB**
Direct Examination.................................  43
Cross-Examination.................................  49


<u>N O   E X H I B I T S   R E C E I V E D</u>

1          P R O C E E D I N G S

2     June 24, 2020                                1:34 p.m.

3                          - - -

4          COURT SECURITY OFFICER:  All rise.  The United States

5     District Court in and for the Middle District of Florida is now

6     in session, the Honorable Monte C. Richardson presiding.

7          Please be seated.

8          THE COURT:  We're here in Case No. 3:20-mj-1221-MCR,

9     *United States of America versus Mark Marino.*

10         And who speaks for the United States?

11         MS. KARASE:  Good afternoon, Your Honor.  Kelly

12    Karase on behalf of the United States.  With me at counsel

13    table is Detective Ryan Ellis with the Clay County Sheriff's

14    Office and a task force officer with Homeland Security.

15         THE COURT:  Welcome, Counsel.  And for the defense?

16         MR. BELL:  And good afternoon, Your Honor.  Tom Bell

17    for Mr. Marino.  And I'm here -- he's here with me.  And he has

18    some family members as potential witnesses and third-party

19    custodian.

20         THE COURT:  Welcome, Mr. Bell.  And we're

21    scheduled --

22         MR. BELL:  Thank you.

23         THE COURT:  -- this afternoon for a detention

24    hearing.

25         Is the government ready to proceed with the hearing?

1          MS. KARASE:  Yes, Your Honor.  And I would ask

2   that -- if Your Honor is willing, to first proceed with the

3   preliminary examination hearing.

4          THE COURT:  Mr. Bell, are you ready to proceed with

5   that?

6          MR. BELL:  Yes, sir.

7          THE COURT:  All right.  Do you wish to have a

8   preliminary hearing?

9          MR. BELL:  Well, yes, sir.  I think it would be

10  appropriate, and probably help with the -- kind of transition

11  into the detention hearing portion of it from there.

12         THE COURT:  All right.

13         MR. BELL:  It may help the Court with the weight of

14  the evidence.  And I think we're entitled to one.  And we're

15  ready.

16         THE COURT:  You are.

17         Counsel?

18         MS. KARASE:  Yes, Your Honor.  The United States will

19  call Detective Ellis to the stand.

20         THE COURT:  Come forward, sir.  If you can take the

21  stand.

22         COURTROOM DEPUTY:  Sir, if you'd step into the

23  witness box and remain standing and be sworn in.

24         Raise your hand, please.

25         Do you solemnly swear that the testimony you are

1 about to give before this Court will be the truth, the whole

2 truth, and nothing but the truth, so help you God?

3           THE WITNESS:  I do.

4           COURTROOM DEPUTY:  Please be seated and state your

5 full name for the record and spell your last name.

6           THE WITNESS:  Detective Ryan Ellis, E-l-l-i-s.

7           **DETECTIVE RYAN ELLIS, GOVERNMENT'S WITNESS, SWORN**

8                        **DIRECT EXAMINATION**

9 BY MS. KARASE:

10 Q.   Good afternoon.  Please tell His Honor how you're

11 employed.

12 A.   With the Clay County Sheriff's Office, as well as a task

13 force officer with Homeland Security Investigations.

14 Q.   How long have you been in law enforcement in general?

15 A.   Approximately 15 years.

16 Q.   And what are your current duties and responsibilities as a

17 detective and task force officer?

18 A.   Currently I'm assigned to the special victims unit, and

19 specifically working Internet Crimes Against Children, where

20 I've worked crimes against children for the last ten years.

21 And I as well -- I mirror those duties with Homeland Security

22 Investigations.

23 Q.   And do you partner and work closely with Homeland Security

24 Investigations Special Agent Benjamin Luedke?

25 A.   Yes.

1    Q.    Have you spoken with Agent Luedke about an investigation
2    that led to your execution of a search warrant at 6936 Longleaf
3    Branch Drive here in Jacksonville?
4    A.    I have, on numerous occasions.
5    Q.    Did you review the search warrant?
6    A.    I have.
7    Q.    And was everything that Special Agent Luedke told you
8    consistent with what you read in the search warrant affidavit?
9    A.    Yes, it is.
10   Q.    Were you present when the search warrant was executed?
11   A.    I was.
12   Q.    When was that?
13   A.    It was executed June 17th of this year.
14   Q.    And what was your role during the execution of the search
15   warrant?
16   A.    I assisted up front with surveillance.  And then I
17   assisted with the interview of Mr. Marino.
18   Q.    And let's talk about that interview.  Was that interview
19   audio recorded?
20   A.    It was.
21   Q.    Was Mr. Marino advised of his *Miranda* warnings prior to
22   beginning of the interview?
23   A.    Yes.
24   Q.    Did he agree to speak with you and Agent Luedke?
25   A.    Yes, he did.

1    Q.   And we'll get into the depth of the interview in a moment.

2    But are you aware of a Coinbase account having some relevance

3    to this investigation?

4    A.   I am.

5    Q.   Can you explain that for us just briefly.

6    A.   A brief synopsis, from the onset of the investigation,

7    Homeland Security Investigations-HSI in New York received

8    information that subjects were utilizing the internet, the dark

9    web, to exchange and to solicit child sexual abuse material,

10   and potentially even hands-on offenses with children.

11          During that investigation, HSI New York gathered a

12   lot of intelligence and information on different subjects

13   throughout the area that they believe were exploiting children.

14          They ended up discovering that Bitcoin cryptocurrency

15   was being utilized to potentially buy and -- and be a vessel

16   for the distributing or the exchanging of child sexual abuse

17   material.

18          And throughout the investigation, through summons or

19   subpoenas, it ended up revealing information that an IP address

20   and a Bitcoin account -- a Coinbase account was linked back to

21   the Jacksonville, Florida, area, and subsequently Mr. Marino's

22   residence.

23   Q.   And was this Coinbase account used to send Bitcoin to

24   someone believed to be related to the child exploitation

25   offenses that seemed to be occurring in the Philippines?

1    A.    Yes.

2    Q.    And elsewhere?

3    A.    Correct, yes.

4    Q.    And that Coinbase account -- have you reviewed records

5    produced by Coinbase pertinent to that account?

6    A.    Yes, I have, an entire spreadsheet.

7    Q.    All right.  And that's the one that came back to

8    Jacksonville.  That's the one I'm referring to.  You understand

9    that?

10   A.    Yes.

11   Q.    In whose name was that account held?

12   A.    To Mark Marino.  And then it specifically even provided

13   a -- driver's license information and a home address, which is

14   the previous one you stated, in Jacksonville.

15   Q.    Okay.  And that was the address where you executed the

16   search warrant?

17   A.    Yes.

18   Q.    And was that the address where Mark Marino was living?

19   A.    Yes.

20   Q.    And do you see Mr. Marino in the courtroom today?

21   A.    I do.

22   Q.    Okay.  And could you point him out for us.

23   A.    He's the gentleman in the orange suit and with a

24   bluish-colored mask.

25   Q.    And turning back to the interview, this is the gentleman

1    that you interviewed last week?

2    A.    Yes.

3    Q.    And after you had advised him of his *Miranda* rights and

4    proceeded with the interview, did Mr. Marino admit to receiving

5    child pornography over the dark web?

6    A.    Yes, he did.

7    Q.    And the dark web is a component that utilizes the

8    internet, the facility of interstate commerce; is that right?

9    A.    That's correct.

10   Q.    Did Mr. Marino make any admissions during the interview

11   about paying for child pornography in October of 2019?

12   A.    Yes, he did.

13   Q.    Did he acknowledge using his Coinbase account in

14   particular to pay in Bitcoin for images and videos of child

15   pornography?

16   A.    Yes, he did.

17   Q.    Did you show Mr. Marino any images of child pornography

18   during the interview?

19   A.    I did not personally, but Agent Luedke did.  And I was

20   sitting directly next to him.  Yes, he was shown an image of

21   child sexual abuse material.

22   Q.    Okay.  And is this image described in the criminal

23   complaint affidavit, a collage or series of images?

24   A.    Yes, a collage.  Yes.

25   Q.    And you've had an opportunity to review the complaint

1  affidavit that had the search warrant affidavit; is that right?

2  A.   Yes, I did.

3  Q.   And was that consistent with your knowledge of the

4  investigation, both as relayed to you by other officers and

5  from your firsthand gathering of information through your

6  interview of Mr. Marino?

7  A.   Yes.  I was able to review the description listed in the

8  actual affidavit, and then the information provided to me by

9  the agent.  And then while on scene during the interview, I

10  also viewed the collage.  And I believed it to be one and the

11  same.

12  Q.   All right.

13        MS. KARASE:  And, Your Honor, I'd ask the Court to

14  take judicial notice of the criminal complaint and its

15  attachments for purposes of the preliminary hearing here today.

16        THE COURT:  The Court will do so for the record.

17  BY MS. KARASE:

18  Q.   Detective Ellis, that description, based on your training

19  and experience, and your review of the collage itself that's

20  described on page 7 of the criminal complaint, do you believe

21  that that is child sexual abuse material or child pornography?

22  A.   Yes, it is.

23  Q.   And did Mr. Marino say that he recognized that particular

24  collage that's described on page 7 of the criminal complaint as

25  being child pornography he received?

1  A.    Yes.  He acknowledged that that was what he received.

2  Q.    Are you aware that there were also forensic agents who

3  were on scene and conducting forensic exam of electronic

4  devices while you were interviewing Mr. Marino?

5  A.    Yes, I was aware.  Yes.

6  Q.    Did you have a chance to speak with those forensic agents,

7  along with Agent Luedke, after you concluded, or maybe during a

8  break of the interview with Mr. Marino?

9  A.    I did.

10  Q.    And did they locate any child pornography on a laptop

11  computer found in Mr. Marino's bedroom?

12  A.    Yes, they did.

13  Q.    And during your interview, did Mr. Marino admit that there

14  was child pornography that he had stored on that laptop

15  computer that he kept under his bed?

16  A.    Yes, he did.

17  Q.    And the video -- well, were you able to view one of the

18  files that was recovered during the forensic review of that

19  laptop?

20  A.    Yes.  I reviewed a video file.

21  Q.    And was that the one that's described on page 4 and 5 of

22  the criminal complaint affidavit that's titled "Little Asiagirl

23  get a Bodycum"?

24  A.    Yes.  From the description in the affidavit and from the

25  video, it appears to be one and the same, yes.

1  Q.   And based on your training and experience, was that a file
2  that constitutes child pornography?
3  A.   Yes.
4  Q.   And the criminal complaint affidavit that was -- I think
5  I've already asked you this.  But that was consistent with the
6  information that you learned firsthand during your
7  investigation, correct?
8  A.   That's correct.  Yes.
9         MS. KARASE:  Nothing further at this time.
10        THE COURT:  All right.
11        Cross-examination, Mr. Bell?
12        MR. BELL:  Thank you, Your Honor.
13                        **CROSS-EXAMINATION**
14  BY MR. BELL:
15  Q.   Yes, sir.  Good afternoon --
16  A.   Good afternoon.
17  Q.   -- Detective Ellis.
18        You mentioned that Mr. Marino was advised of his
19  *Miranda* rights before any questions were asked of him there at
20  the scene during the execution of the search warrant?
21  A.   Yes.
22  Q.   All right.  So he was in custody?
23  A.   He was detained at that time during an execution of a
24  search warrant, yes.
25  Q.   Handcuffed?

1    A.   He was initially handcuffed during the initial execution.

2    However, after the execution, he was taken out of handcuffs.

3    And during the interview and the advisement, he was not in

4    actual handcuffs.

5    Q.   All right.  And at one point he -- he was asked for the

6    password for accessing the computer?  It was password

7    protected?

8    A.   He was asked for several different passwords of several

9    different devices during the course of the interview.

10   Q.   One -- at least on one of the devices and one of the

11   passwords, he initially declined to provide that?

12   A.   That's correct.

13   Q.   All right.  And essentially there's some indication

14   that later on he changed his mind in some capacity and, as I

15   understand it, provided the password that permitted the

16   forensic person on the scene to access the computer device?

17   A.   I would have to go back and listen to the interview again

18   specifically with your question.  If I understand your question

19   correctly -- and if I don't, please correct me.

20         But the passcode to the cell phone is -- I believe is

21   what he objected to.  I don't believe there was an objection to

22   the passcode to the laptop.

23         And maybe off topic, but forensically the hard drive

24   could be potentially accessed without the passcode.  But I

25   believe the objection was to the cell phone.

1    Q.    Okay.  And ultimately he provided a password and it was

2    opened, permitted access?

3    A.    Yes.

4    Q.    And I guess my question to you is -- describe for me

5    what's your recollection, as we speak today, of -- of what

6    transpired that changed his mind.

7    A.    I'm not sure what he was thinking or what transpired to

8    change his mind.  I just know that when we had asked again and

9    throughout the interview that he agreed to provide the

10   passcodes.

11   Q.    Well, I -- and I'm sorry to interrupt you.

12           I am more focused on what you said, rather than his

13   mind.  At some point he provided it.  What's your recollection

14   of what yourself or -- is it Luedwick?

15   A.    Luedke.  Agent Luedke.

16   Q.    Luedke?

17   A.    Yes.

18   Q.    -- said to him that resulted in him providing the

19   password?

20   A.    I know for some of the passwords that we ended up asking

21   him again for the passcode.  And then there was a conversation

22   about trying to access, and also see potentially other people

23   that are abusing children on the internet.  And we had asked a

24   second time.

25   Q.    But there is an audio recording of it, so we'll have, I

1  guess, a contemporaneous account of the events?

2  A.   Yes.

3  Q.   At some point -- and you mentioned to Ms. Karase, for the

4  government, that he was shown some images that -- that -- your

5  recollection is that he acknowledged having received those via

6  some type of internet transmission?

7  A.   Yes.

8  Q.   I guess my question to you is -- is in respect of the

9  potential advertisement or the -- there was some exchange with

10 some people in the Philippines, a service -- about providing

11 services of child sexual abuse.

12       Was he shown the particular ads from the -- I guess

13 the vendor in the Philippines?

14 A.   He was shown an ad, yes.

15 Q.   Okay.  And let me ask you this.  I guess, did you -- you

16 determined at some point that he was from the Philippines?

17 A.   Yes.

18 Q.   I mean, you would have actually known that from the

19 surveillance before you arrived?

20 A.   Correct.

21 Q.   And you would have had -- in terms of the background.  You

22 could communicate with Mr. Marino?  Did he seem to understand

23 English well enough and understand the -- what you were

24 communicating with him?

25 A.   Absolutely.

1   Q.   All right.  And did you read him *Miranda* rights off a
2   form?  Or did you read it to him -- advise him verbally off a
3   preprinted card?
4   A.   Agent Luedke advised him off of a pre-prepared, preprinted
5   card.
6   Q.   Did he execute a form of some sort, having had the
7   opportunity to read it in English?
8   A.   Not in my presence, no.
9   Q.   But did he struggle at all in seeming to kind of
10  understand, I guess, the questions that yourself or Special
11  Agent Luedke put to him?
12  A.   I don't believe so.  We went through clarifying and we
13  went over *Miranda*.  And we engaged in an entire conversation to
14  make sure and assure that he understood his rights.  And if he
15  had any questions whatsoever, that we would explain anything in
16  any different way.
17  Q.   Did you ask him if English was his native tongue?
18  A.   I didn't get into what his native tongue was.  I would
19  only assume that his native tongue would be English -- I
20  apologize, Filipino.  But he did speak English.  And we had no
21  issue communicating.
22  Q.   Okay.  If I could -- just to clarify a couple of points
23  here, in terms of the probable cause of this, you indicated
24  you're familiar with the search warrant application, which is
25  referred to in -- and the judge took judicial notice, so it's

1    in evidence for purposes of this hearing.

2            There's a mention here in -- on page 14 of the search

3    warrant application, paragraph (u), a cluster, where it defines

4    cluster.

5            Are you familiar with what a cluster is?  Or to

6    refresh -- does --

7    A.   If I could refresh my memory.  I could find it.  But if

8    you have it already available.

9            Yes, this is referring to cryptocurrency.

10   Q.   Okay.

11           MR. BELL:  Judge, if I could retrieve it --

12           THE COURT:  Of course.  Yes, sir.

13           MR. BELL:  -- because I'm not sure I could ask the

14   questions without it.

15           THE COURT:  Yes.  Go ahead.

16           MR. BELL:  Thank you.

17   BY MR. BELL:

18   Q.   All right.  So, essentially -- this is some type of

19   algorithmic formulas that commercial companies provide for law

20   enforcement to help identify the Bitcoin transactions?

21   A.   It's cryptocurrency.  And then the specific type of

22   cryptocurrency is Bitcoin.  I won't sit here and testify that

23   I'm an expert to cryptocurrency.  But I'll try to answer your

24   questions on that, if I can.

25   Q.   Well, there's a representation in here about the

1   reliability of the -- of the analysis here.

2          "Numerous unrelated investigations has found the

3   information provided by these companies to be reliable."

4          And you're not familiar with the extent and scope of

5   the number of investigations that have been done with this --

6   with this form of commercial blockchain analysis?

7   A.    I've participated in other investigations where

8   cryptocurrency, similar to what we refer to as Bitcoin, has

9   been used in investigations.  I've been to trainings involving

10  cryptocurrency, and specifically Bitcoin.

11  Q.    Right.

12  A.    And I've also been a part of other investigations and

13  personally investigated cases involving the use of

14  cryptocurrency to further criminal activity.

15  Q.    All right.  I'm with you on all that.  I guess my question

16  I'm focusing on -- this cluster business, in terms of how they

17  break this down and identify, you know, how a blockchain or a

18  Bitcoin transaction might be kind of traced back to a specific

19  IP address.

20          If I'm understanding your most recent answer, you may

21  be familiar with how Bitcoin works in general terms, but you

22  haven't had personal experience with -- with this commercial

23  service that breaks down the blockchain analysis?

24  A.    I have never had anything technically to do with that, no,

25  sir.

1   Q.   All right.  So, I mean, essentially -- and I appreciate

2   it's all hearsay today.  But you don't really have any direct

3   knowledge on the reliability of any of this analysis?

4   A.   No.

5   Q.   On page 28 of the search warrant affidavit -- and this

6   is to kind of give you an overview here, so hopefully expedite

7   this a little bit.

8          This seems to be the portion of the discussion where

9   the task force officer in New York is describing his operation

10  which led to the -- the -- the co- -- whatever it's called, the

11  co-pay formula.  But he's setting up how he got to be there.

12         And he mentions on page 28 that the suspected, I

13  guess, vendors of child abuse material had sent him something

14  that he downloaded, but he couldn't access the image.

15  A.   I'm going to refer to this.  Yes, sir, I see that.

16  Q.   All right.  And essentially, as I read that -- does that

17  mean that he couldn't confirm that there was child pornography

18  on there?  Or -- or that -- do you have any idea what prevented

19  him from essentially viewing or -- unable to accessing the

20  image?

21         Do you understand what he means by that?

22  A.   I don't.  I can only assume what he's referring to, and

23  just what it states, that he received potentially a file, and

24  either the file -- there was an error in the file or the file

25  didn't load, or potentially the file was completely empty upon

1  receipt.

2  Q.   All right.  And if I'm understanding, to kind of summarize

3  just kind of how local law enforcement got involved with this,

4  is New York's got some type of sting operation going with the

5  people in the Philippines, the vendors, for however they came

6  to be there.

7        And as they kind of continued through the process and

8  ultimately induced these people in the Philippines to --

9  engaging in transactions with them, and they sent him some

10 money, they contacted this coin -- they were ultimately able to

11 access this Coinbase company's database and track the IP

12 address back to Marino's house?

13       Is that a fair summary of how we got there?

14 A.   I'll try to summarize it in a little bit better terms.

15 HSI New York was doing an online undercover investigation.  And

16 they found subjects exploiting children online.

17       When they ended up getting to this Coinbase account,

18 they served a summons to that account.  And then post summons,

19 the Coinbase, which is just a digital wallet for

20 cryptocurrency, such as Bitcoin, they were able to receive

21 information post summons that listed that Bitcoin wallet

22 information, and then within that is logged IP addresses,

23 internet provider addresses, which led us back to Mr. Marino.

24 Q.   All right.  And have you had any experience with this

25 Coinbase operation before?

1   A.    I'm familiar with Coinbase, yes.

2   Q.    And have you personally had an investigation involving

3   Coinbase, where you've obtained information from them by

4   summons?

5   A.    Not specifically with Coinbase with summons, but I am

6   familiar with Coinbase.  I personally have a Coinbase.  I know

7   what it is.  And I'm familiar with how it works.

8   Q.    Okay.  And essentially, generally speaking, somebody would

9   have to provide some identifying information to Coinbase.  And

10  are you able to kind of verify their transactions?  Is that

11  kind of the concept here?

12  A.    That is the concept.  And from my personal experience,

13  there are multiple verification steps.  And it is more

14  complicated than setting up a personal savings account.

15  Q.    To set up a Coinbase?

16  A.    Yes.

17  Q.    Because it's all supposed to be surreptitious after all?

18  A.    Not necessarily.  But it is meant to be secure and to

19  prevent people from being able to access that wallet and to

20  take, potentially, your money.

21  Q.    Steal all your Bitcoin?

22  A.    Your digital money, yes.

23  Q.    All right.  Now, in terms of the execution of this search

24  warrant, if we could come back to that for just a minute, it

25  was determined that -- well, I guess how many people, by your

1  recollection, were believed to reside at the address?

2  A.    From my recollection, there was Mr. Marino, his mother,

3  and his father, and his sister.  So four individuals.

4  Q.    And I believe his sister is listed as a co-owner of the

5  residence?

6  A.    That I'm not sure.  I don't know.

7  Q.    All right.  I mean, it would have been some pre-search

8  warrant execution background investigation about the -- but you

9  didn't participate in that?

10  A.    I conducted surveillance on the residence on numerous

11  occasions.  And I was aware from the get-go.  But I wasn't

12  aware exactly, via the property appraiser, who actually owned

13  the home, no.

14  Q.    All right.  Somebody would have done that.  And if it's in

15  the search warrant, then you assume that's probably reliable?

16  A.    Absolutely, yes.

17  Q.    It represents his sister as a co-owner.

18  A.    Yes.

19  Q.    All right.  And essentially -- and how many people --

20  there were some friends and relatives that came by during the

21  course of execution of the search warrant?

22  A.    I'm not sure who all came by.  I was in the interview with

23  Mr. Marino.

24  Q.    You didn't have any direct contact -- where was he

25  interviewed?  Was he inside the house in a bedroom or . . .

1  A.    He was interviewed on a back lanai, like a screened-in

2  patio.

3  Q.    All right.  And it's yourself and Special Agent --

4  A.    Luedke.

5  Q.    -- Luedke.  Thank you.

6          And there would have been numerous other agents out

7  and about throughout the property?

8  A.    Inside the residence, yes.

9  Q.    All right.  So, you know, if other people in -- the

10  friends and relatives come by and had some contact with law

11  enforcement, they very well may have been there, but you may

12  not have had any contact with them?

13  A.    I won't dispute that, yes.

14  Q.    All right.  And essentially, what, the team is usually

15  about 20 agents that participate in these warrant executions,

16  in that neighborhood?

17  A.    That's a great variable.

18          MS. KARASE:  Your Honor, I'm going to object to just

19  getting beyond the determination of probable cause at this

20  point.

21          THE COURT:  Mr. Bell?

22          MR. BELL:  Judge, I'll move on.

23          THE COURT:  All right.  Thank you.

24  BY MR. BELL:

25  Q.    Oh, well, actually, it was relevant to the -- in part, to

1  the number of people that might have had some contact.  But you

2  don't -- and just to kind of summarize, if people would have

3  come by the house and had some contact with law enforcement,

4  you wouldn't have personally known them, or didn't personally

5  know them?

6  A.    Correct.

7  Q.    All right.  How many devices altogether, maybe, were in

8  the house, computer devices, laptops, hard drives, that type of

9  thing?

10  A.    I'm not aware on a final count.  I would simply be

11  guessing.

12  Q.    And, you know, of course, in most modern homes there will

13  be an IP address which generally will be responsible for all

14  the particular devices in a -- in a home, or whatever the IP

15  address is in the --

16  A.    Maybe.  Possibly.

17  Q.    And there could be -- there can be multiple units and

18  devices using a -- a specific IP address?

19  A.    There could.  And then there could not be.  But, yes.

20  Q.    And we don't know if there were any other devices in the

21  house that may not have been seized?

22  A.    I'm not -- can you ask me that question one more time?

23  Q.    Well, it -- there was a device seized from his bedroom.

24  A.    Multiple, yes.

25  Q.    And there may have been other devices in the house that

1  were determined not to be -- by some investigation of law

2  enforcement left in the house?

3  A.    If there was a forensic triage done by a forensic examiner

4  and they were able to determine that there was no contraband or

5  something relative to the case, they could have, through the

6  case agent, made the decision to leave the device.

7  Q.    I didn't see the search warrant affidavit.  But we don't

8  know at this point.  There may have been some -- some other

9  devices there?

10  A.    Possibly.  I'm not sure what the final count was.

11         MR. BELL:  Judge, if I can have just a minute, that

12  may be it.

13         THE COURT:  Yes, sir.

14  BY MR. BELL:

15  Q.    Oh, I did have one more question about the search warrant

16  affidavit.  You mentioned that the -- the target wallet is

17  where I guess the Bitcoin money is sent to when a transaction

18  is being made and then somehow Coinbase is responsible for it?

19  A.    I'm not the author of it, but I am familiar with it and I

20  have read it, several times.  I believe what you're referring

21  to is the wallet -- it's extremely difficult to explain, but

22  the wallet is the -- it's a digital wallet instead of an actual

23  tangible item.  It is a digital wallet that contains accounts,

24  currency amounts, and basically the cryptocurrency inside of

25  the wallet.

1  Q.   Okay.  And then Coinbase has -- identifies the particular

2  entities involved with owning the Bitcoin?

3  A.   For the Bitcoin, yes, sir.  The wallet can be unique to an

4  individual or whoever you -- would have access to that specific

5  wallet.  And Coinbase is just one of the many providers and

6  applications, or cyberbanks, for lack of better words, that

7  maintain an application that can house the wallets for

8  cryptocurrency.

9  Q.   All right.  And I guess the -- the focus of the

10  question, and I'll probably wrap on this, is -- I understand a

11  summons was issued for Coinbase.

12  A.   Yes.

13  Q.   How was the target wallet accessed to begin with?

14  A.   Are -- are you asking how Coinbase accessed the target

15  wallet?

16  Q.   No.  Well, I got that part, I think, from the affidavit

17  and your earlier answers.  But as I read the affidavit, it

18  suggested initially -- there was identified a target wallet

19  that I -- I would have had -- all the money -- as I understood

20  it, would have had all the money packaged up to send to the

21  vendor.

22           And that was accessed and identified that Coinbase

23  was one of the providers of the wallet, and then he got a

24  summons.

25  A.   So --

1  Q.    My question is:  How did you get in the target wallet?
2  How was that done?
3  A.    So the wallet is maintained by Coinbase.  For example, you
4  could have another application that houses cryptocurrency and
5  you could have a separate account through them.
6        The Coinbase keeps the record of the IP addresses and
7  the account information.  So when you send the subpoena to
8  Coinbase to find out who's behind this transaction or this
9  unique ID or account number, that's how the information is
10 returned.
11 Q.    Thank you.  That answers my question.
12       I have one more.  I guess in the course of the
13 investigation there, there was the transaction that's, I
14 believe, mentioned in the complaint, which is an October 2019
15 event?
16 A.    Yes.
17 Q.    And essentially the investigation at the scene revealed
18 that there may have been another attempted transaction in March
19 of 2020, or somewhere thereabouts?
20 A.    I don't recall the exact date back in March or --
21 Q.    February/March?
22 A.    Yeah, I'm not -- I'm not sure.
23 Q.    But at least one more that you -- that seemed to be
24 revealed at the scene?
25 A.    I'm not sure.  I'd have to go back and look at that entire

1  sheet.  There's a lot of data on that return.  I am positive

2  that there was a transaction in October that took place and

3  post summons came back to the residence.

4  Q.   Well, not to add to the mix here, but I just -- the kind

5  of real setup for the question is this, is that there were no

6  other transactions other than the potential one that -- earlier

7  this year that you're aware of as we speak today?

8  A.   As far as me being personally aware of, correct.

9  Q.   Very good.

10       MR. BELL:  Judge, I believe that will do it by way of

11  cross-examination.  Thank you, Your Honor.

12       THE COURT:  All right.

13       Any redirect, Ms. Karase?

14       MS. KARASE:  Your Honor, just regarding the

15  voluntariness of the statement, if I just may clarify with

16  Detective Ellis?

17       THE COURT:  Yes.

18                   **REDIRECT EXAMINATION**

19  BY MS. KARASE:

20  Q.   You were asked some questions on cross-examination about

21  your ability to communicate with Mr. Marino.  And you told us

22  that you advised him of his *Miranda* rights.

23       Did he choose not to answer certain questions that

24  tended to elicit a more inculpatory answer?

25  A.   That is correct.  After Agent Luedke read him his *Miranda*,

1  his constitutional rights, he even asked, and we clarified,

2  that if there were questions that he did not feel comfortable

3  answering that he did not have to.  And on several occasions he

4  chose to do that.

5  Q.   And did that include, at least at the beginning, when he

6  was asked how many times he looked at child pornography -- is

7  that one that he indicated he chooses to remain silent?

8  A.   That's one of several, yes.

9  Q.   And, similarly, initially when he was asked about how

10 often he'd seen -- similar question, but how often he'd seen

11 child pornography videos and photos, is that one that he chose

12 to stay quiet about?

13 A.   Yes.

14 Q.   But then later, throughout the course of the interview,

15 did he, in fact, acknowledge to sending and receiving child

16 pornography over the internet?

17 A.   Yes, he did.

18 Q.   And based on your 15 years of law enforcement experience,

19 do you sometimes see individuals start out in an interview

20 providing limited information and then expand to provide a more

21 thorough confession or admission to you?

22 A.   Hundreds of times, yes.

23 Q.   And at any point did you doubt whether Mr. Marino could

24 understand the English words that you were speaking?

25 A.   Absolutely not.  I believe I even asked him if he

1  understood everything that we were communicating with.  And if

2  I would have thought there was something that he didn't

3  understand as far as the English language, I would have made

4  sure that he did and we would have clarified it.

5  Q.   Thank you.

6          MS. KARASE:  Nothing further.

7          THE COURT:  All right.  Anything else, Mr. Bell?

8          MR. BELL:  No, Your Honor.

9          THE COURT:  All right.  You can step down, sir.

10          THE WITNESS:  Thank you, sir.

11      (Witness excused.)

12          THE COURT:  Any additional witnesses, Ms. Karase?

13          MS. KARASE:  No, Your Honor.

14          THE COURT:  Mr. Bell?

15          MR. BELL:  None, Your Honor, as to -- as to the

16  preliminary hearing.

17          THE COURT:  Argument?

18          MS. KARASE:  Your Honor, I believe that the United

19  States has sufficiently established probable cause that

20  Mr. Marino has committed the offense charged in the criminal

21  complaint.

22          I do have a proffer, though, when we're ready to

23  transition to the detention hearing, some things that weren't

24  within the four corners of a probable cause determination of

25  the offense charged, but things that are relevant to detention

1    that I'd like to proffer.

2            THE COURT:  Mr. Bell?

3            MR. BELL:  Judge, I'll waive any argument as to the

4    preliminary hearing.

5            THE COURT:  The Court is satisfied there's probable

6    cause to believe that the defendant received the visual

7    depictions using interstate commerce, the production of which

8    involved minors engaging in sexually explicit conduct.  And

9    that's consistent with Title 18, U.S. Code, Section 2252(a)(2).

10   So we believe -- the Court does believe there's probable cause.

11           With regard to the matter of detention, Ms. Karase?

12           MS. KARASE:  Yes, Your Honor.

13           Your Honor is familiar with the facts from the

14   criminal complaint and also those presented here today in

15   court.  But to just provide a little bit of additional

16   information, at the time, on June 17th of last week, that the

17   search warrant was executed, agents noted that they had to

18   knock on the defendant's bedroom door multiple times and

19   announce and that he was clutching tightly on to his cellular

20   telephone even as they made entry.

21           He later suggested during the interview that that was

22   because he was speaking with a relative on the phone, but he

23   was not immediately compliant with instructions by law

24   enforcement.

25           He was interviewed and provided a statement.  You

1    heard a little bit about that today.  He was advised of his

2    rights.  He was not handcuffed during the interview.

3          He indicated that he has been living in the United

4    States since he was 21 years old, that he traveled to the

5    Philippines last year, and was there for approximately a month.

6          That was consistent with travel records that Homeland

7    Security obtained.  They indicated that he departed the country

8    from JFK in New York on January 24th of 2019.  And he returned

9    on February 27th, 2019.

10          He had entry into Hong Kong.  But we know from the

11   interview that that was -- we believe that that was the

12   ultimate destination, was the Philippines.  His travel also

13   reflects travel into Tokyo in 2016.  And that may have been

14   another trip where the ultimate destination was the

15   Philippines.

16          During the interview he indicated that he does still

17   have family located in the Philippines, that he has wireless

18   service at his house, that it's password protected.  And he, of

19   course, knows the password and accesses his wireless service

20   there.

21          He acknowledged that the phone that he held in his

22   hand at the time that the agents entered his bedroom was an

23   iPhone 8 Plus.  He indicated he did not wish to reveal the

24   password because that was his private information.

25          He said that he has a laptop that he keeps hidden

1    under his bed.  He acknowledged to being in the country in

2    October and November of 2019, which is, of course, when --

3    agents were aware that it was late October when the Bitcoin

4    payments were made to the Bitcoin wallet connected to the

5    individual purportedly in the Philippines with access to the

6    Filipino children who were being sexually abused.

7            He acknowledged being on the dark web and utilizing

8    the dark web and that he has seen child pornography videos and

9    photos utilizing the dark web.

10           He told agents that they would see a lot of child

11   pornography on his laptop because someone would tell him on

12   occasion to, "Hey, watch this," and that people from the dark

13   web would send him child pornography.

14           He claimed not to be sexually attracted to children.

15   But when asked about whether he achieved a physical erection

16   when watching child pornography, he chose to stay quiet and not

17   answer that question.

18           He acknowledged making Bitcoin payments that

19   specifically were for child pornography.  He told the agents

20   that he used his Coinbase account to send Bitcoin currency for

21   child pornography.  And he said he sent a total of three

22   different Bitcoin transactions.  And that was consistent with a

23   return from the Coinbase account.

24           It first indicates a transaction of October 23rd,

25   2019, in the amount of $172.09.  And that's the U.S. dollar

1  equivalent of the portion of the Bitcoin that was sent that was

2  the value of the transaction at that particular time.  But the

3  currency used was a fraction of the Bitcoin.

4          He said that he first learned about the individual --

5  and I'll talk to you about each of the three transactions in a

6  moment.  But he first learned about the individual through an

7  ad that he saw on the dark web, particularly on Rindexxx, and

8  that he saw an ad for child pornography.

9          He said that he keeps sticky notes in his laptop that

10  has child pornography sites that he visits.  When the agents

11  clarified, "What do you mean?  Like a Post-it you had stuck to

12  your laptop, or what?" he clarified that he meant electronic

13  digital sticky notes through a program -- a digital program,

14  and that that would be something that the agents could find to

15  see the list of child pornography sources that he visited.

16          He talked about, as I said, seeing the ad for child

17  pornography and that he didn't make all that much money working

18  at Amazon, but he saw an ad that had an offer with child

19  pornography for sale.

20          Specifically, he saw one that provided -- and Agent

21  Luedke actually read to him a portion of the ad.  And he

22  confirmed that this was it.  The portion Agent Luedke read was:

23  Option 1, you pay 150 euro in Bitcoin to receive five photos of

24  the girl holding a handwritten note in her hand, with words of

25  your choice, in sexy, nude poses of your choice.  You can also

1  choose a five-minute-long introduction video for 200 euro

2  instead if you want.  She strip, and show body and speak words

3  of your choice.

4       Mr. Marino acknowledged that he saw an ad with an

5  offer that sounded similar to that and that he wanted that

6  four-minute-long intro video of the child stripping and showing

7  body where she speaks words of his choice, but he paid -- that

8  first transaction for $172.09 was intended for proof of an

9  eight-year-old child.

10      Agent Luedke showed him the collage that was

11  described in the complaint affidavit.  And he said, yes, that's

12  what he recognized, and he was paying for proof of that

13  particular girl.

14      He then made a second transaction on October 25th.

15  And that is an amount of a Bitcoin or a fraction of a Bitcoin

16  that was valued at U.S. currency $909.07.  He said that that

17  was intended to be for a 30-minute video of the girl, but that

18  he only received a four-minute video.

19      He said that he complained.  And he was told by the

20  point of contact in the Philippines, the person on the dark

21  web, that he needed to pay again for proof.

22      So just four days later, on October 29th, he sent a

23  third Bitcoin transaction that was in the value of U.S.

24  currency $56.38.  And in exchange he was expecting to receive

25  five pics.  He only received three pictures, and that in each

1   instance he was sending the money in exchange for child

2   pornography.

3        He was expecting to receive child pornography in

4   exchange, but he felt that he had gotten scammed because he

5   didn't receive the number of images that he paid for or the

6   length of the video that he was expecting.

7        So here we have a young man with no criminal history,

8   appears to have steady employment and family support, but he's

9   spending more than $1,000 in exchange for child pornography.

10        And this isn't just some collection of child

11   pornography.  Instead, he's communicating with someone over the

12   dark web who has access to children that Mr. Marino estimated

13   to be 8 and 10 years old.

14        He also admitted to using the platform Telegram,

15   which is a communication application -- files can be traded

16   using Telegram.  We often see it in child pornography

17   investigations -- to send three videos of child pornography,

18   and that he also received child pornography via Telegram.

19        He described one particular file that involved a

20   child between the ages of 9 and 13 years old who was engaged in

21   sex, was being raped by an adult male.

22        So this is something that he has done utilizing the

23   dark web.  It's something he's done utilizing the Telegram app.

24   And he was unapologetic when he was advising agents of what he

25   had been engaged in.

1    He talked about how he had also communicated with an

2  individual utilizing Facebook.  And he said that he had a dummy

3  account set up on Facebook.  He said he had his normal social

4  media, this-is-me Facebook account, but he also had a dummy

5  account that he used, and he had been communicating with

6  someone who claimed to have access to children and could also

7  provide child pornography.

8    My understanding is that Mr. Marino proposes to be

9  released to the custody of his mother, who we'll inquire of, I

10  expect.  But the house where he would purport to live is close

11  by a community park.  It's three miles away from a community

12  park.

13    It's one mile away from the neighborhood clubhouse

14  pool, certainly where children would tend to congregate.

15  There's also several schools in the area, including a middle

16  school that's just less than five miles away from the home.

17  There's numerous daycares in the area, with the closest one

18  being approximately three miles away.

19    Mr. Marino is a danger to the community in light of

20  the conduct that he's engaged in.  He has sought out and has

21  been willing to pay in excess of $1,000 to see children being

22  abused.

23    He has demonstrated his level of sophistication

24  through his use of the dark web, through his use of dummy or

25  fake accounts.

1          He also had a secure e-mail address that was

2    "fhinami@secmail.pro."  Secmail.pro, as is set forth in the

3    search warrant affidavit, is an e-mail provider that prides

4    itself on being an encrypted or anonymous way to communicate.

5    And that was what Mr. Marino was using.

6          He has recent travel to the Philippines and family

7    who lives out of the country, specifically in the Philippines.

8    So he -- I believe that he is a risk of flight.  He also has

9    some mental health issues that are explained in the pretrial

10   services report that are of concern to the United States.

11         He has a history with suicidal ideations, and

12   certainly has indicated that as recently as June 17th, when he

13   was being transported last week, that he had additional

14   thoughts.

15         But these are preexisting.  He had those thoughts as

16   long as two years ago, and then most recently just from last

17   week.  Certainly suicide is the ultimate risk of

18   non-appearance, Your Honor.

19         For all of these reasons, I believe that there are no

20   conditions that can assure the Court of Mr. Marino's appearance

21   and the safety of the community.

22         THE COURT:  Thank you, Counsel.

23         Mr. Bell?

24         MR. BELL:  Thank you, Your Honor.

25         Judge, if I could do three things.  One, kind of

1   shift the focus from the weight of the evidence, which I think

2   the Court has made a finding of probable cause.  And I won't

3   belabor that part.

4          And partially agree with Ms. Karase and the

5   government in the sense of you have a young man who, regardless

6   of -- regardless of the outcome of the case, is a stable

7   homeowner.  He's been here four years, worked regularly, has

8   family in the community, and may or may not have some mental

9   health issues that certainly could be counseled that are

10  certainly not going to get any better while he's incarcerated

11  in the jail system.

12         I would suggest that his acumen with social media

13  accounts is probably pretty consistent with what most young --

14  people of his generation are pretty familiar with.

15         We'll have to see what the evidence unfolds in terms

16  of the other relevant conduct.  But for purposes of today, I

17  would suggest that the Court can't find there's clear and

18  convincing evidence that there's no combination of conditions.

19         I would suggest that -- that the record that the

20  Court already has, which I'm going to add his mother -- have

21  his mother come up and testify very briefly as to her role as a

22  third-party custodian, and to help maybe answer some of the

23  Court's questions, but --

24         THE COURT:  All right.

25         MR. BELL:  -- they have -- they own the home.  He has

1    three other family members living there.  As the Court may

2    recall, I asked the agent a couple of questions about other

3    people who came by.  He said an uncle and other relatives in

4    the community that are -- stopped by and readily available to

5    provide the resources.

6         I -- I haven't heard any evidence that he had any

7    physical contact, as the forensic psychologists like to say in

8    these -- there's no evidence that he's a risk of -- of a

9    contact offense, or was ever engaged in a contact offense,

10   regardless of the nature of the exchanges over the internet.

11        He is from the Philippines.  The evidence will show,

12   Your Honor, that his parents have been here for considerably

13   longer and they have more community ties.  He has been here

14   four years.

15        He did return to the Philippines last year with his

16   sister to visit some relatives.  He is prepared to surrender

17   his passport, needless to say, in the event that the Court can

18   find some conditions of release.

19        And I would respectfully suggest to the Court that --

20   that electronic monitoring with three people, one of whom can

21   always be in the house and limit his access, needless to say,

22   to any electronic devices or communications, put severe

23   restrictions on his mobility and access to the internet, order

24   him to get some mental health counseling during the course of

25   the case, would certainly -- there's no evidence that he's ever

1   acted out on any of the remarks that he -- he may have made to

2   the -- in transit the last -- last week.

3          But I would respectfully suggest to the Court -- and,

4   Judge, I'll say this now, just by way of my closing an opening.

5   I think one factor the Court has to be very sensitive to in

6   this age is we can't escape the coronavirus pandemic.

7          It's just now starting to permeate the local jails.

8   My understanding as of yesterday -- or the last communication I

9   had with people at Baker is that there's no known instance

10  of -- of coronavirus in Baker County, but it's -- obviously

11  it's made its way to the Duval County Jail.  It's only a matter

12  of time that it gets there.

13         And what we are -- regardless of where we end today,

14  we're left with a presumptively innocent individual in the

15  United States who should -- who has an Eighth Amendment right

16  to be -- to some -- a privilege against excessive bail.  He

17  also has a right against cruel and unusual punishment.

18         And you take a young man who has -- regardless of the

19  weight of the evidence at this stage, hasn't been formally

20  indicted or convicted, and you put him in maybe one of the most

21  dangerous environments that -- in the country, in the closed

22  confines of a -- of a jail and -- and expose him to a potential

23  deadly disease.

24         I would respectfully suggest to the Court that is

25  a -- a condition that's got to be considered.  And if there is

1   some reasonable means to prevent him from having access to the

2   internet and -- and engaging in any behavior that's potentially

3   dangerous, and I would respectfully suggest there is, the Court

4   should -- should give that -- those factors even greater weight

5   than it ordinarily would.

6        Because as the Court is well aware, and can virtually

7   take judicial notice, countries virtually shut down over

8   judicial notice just the transporting.  And this is unusual

9   that we're even having a live hearing today.  And it's pretty

10  much the exception over the last three months.

11       And what we're doing is we're taking a young man here

12  who -- and putting him in a position where he's going -- going

13  to be exposed in some capacity -- whether he gets it, whether

14  he -- whether he can get through it okay -- but it's the fear

15  and the anxiety and the punishment that that inflicts on an

16  individual is a factor that I think very much -- very much a

17  variable in the consideration under 3142, I guess it is, or 43.

18  I always forget the statute number.

19       Your Honor, if I could call just in terms of

20  evidence -- and I don't know that I'll have a whole lot of

21  argument on the other side of this.

22       I'm going to call his mother up just to assure the

23  Court that they're -- a little bit about the nature of his ties

24  to the community and to verify essentially the information of

25  the pretrial services.  I cannot pronounce her last name, so

1    I'm not going try yet.  I'll spell it.  It's Mari Beth --

2            THE COURT:  Come forward, ma'am.

3            COURTROOM DEPUTY:  And if you'll step to the witness

4    box and remain standing to be sworn in, please.  Raise your

5    right hand.

6            Do you solemnly swear that the testimony you are

7    about to give before this Court will be the truth, the whole

8    truth, and nothing but the truth, so help you God?

9            THE WITNESS:  Yes, sir -- yes, ma'am.

10           COURTROOM DEPUTY:  Please be seated.  And state your

11   full name for the record and spell your last name.

12           THE WITNESS:  I am Mari Beth Calubaquib,

13   C-a-l-u-b-a-q-u-i-b.

14           MR. BELL:  With the Court's permission?

15           THE COURT:  Yes, sir.

16       **MARI BETH CALUBAQUIB, DEFENDANT'S WITNESS, SWORN**

17                      **DIRECT EXAMINATION**

18   BY MR. BELL:

19   Q.   Ma'am, I see you're wearing a mask.

20   A.   Uh-huh (affirmative).

21   Q.   And the point of it is you understood you were needed --

22   were ordered to wear a mask to come into court today?

23   A.   Yes, sir.

24   Q.   And so you comply with orders that authority figures such

25   as the judge would give you?

```
 1   A.   Yes, sir.
 2   Q.   And we've -- and the young man sitting here at the table
 3   with me is your son?
 4   A.   Yes.  That's (unintelligible).
 5   Q.   And --
 6             THE COURT:  I need you to speak up a little louder,
 7   ma'am.
 8             THE WITNESS:  Okay.  Sorry.
 9             THE COURT:  That's all right.
10   BY MR. BELL:
11   Q.   And, ma'am, tell me a little bit how long he's been in the
12   United States.
13   A.   He been here for four years.
14   Q.   All right.  How long have you been here?
15   A.   Six years.
16   Q.   All right.  And you're a resident alien?
17   A.   Yes, I'm permanent resident.
18   Q.   All right.  And, ma'am, where do you work?
19   A.   Amazon.
20   Q.   And he works at Amazon as well?
21   A.   Yes.
22   Q.   And how long has he worked at Amazon?
23   A.   Two years.  Two years.
24   Q.   Two years?  Okay.  And who else -- where do you live?
25   A.   6936 Longleaf Branch Drive, Jacksonville, Florida.
```

1  Q.   And is it -- is it true that your son and your daughter

2  are the -- I guess the homeowner?

3  A.   Yes, sir.

4  Q.   And so they have an interest in that property here in

5  Jacksonville?

6  A.   Yes, sir.

7  Q.   And you live there with your husband and his father?

8  A.   Yes, sir.

9  Q.   All right.  Does he have other family members in the

10  Jacksonville area?

11  A.   Yeah.  My in-laws -- my mother-in-laws and my

12  brother-in-laws, sister-in-law.

13  Q.   Okay.  And his uncle is here with your husband?

14  A.   Yes, sir.

15  Q.   Okay.  And so -- and, in short, he's got plenty of family

16  support in the community?

17  A.   Come again, sir.

18  Q.   He's got plenty of relatives that live in the Jacksonville

19  area?

20  A.   Yes, sir.

21  Q.   All right.  And if the judge were to release him and order

22  him to stay at the house, would there be somebody there all the

23  time who -- to make sure that he's doing what the judge orders

24  him to do?

25  A.   Yes, sir.  My husband work in the morning.  And before we

1    go to work at the evening, he been there.  And then for -- he

2    go to the work.  And we also there.

3    Q.    All right.  So somebody -- rotating shifts.  So somebody

4    would always be home?

5    A.    Yes, sir.

6    Q.    All right.  And -- and we discussed yesterday the

7    possibility that sometimes if the judge -- you've offered your

8    services as what's called a third-party custodian, meaning that

9    you would promise the judge that you would help be responsible

10   for making sure he does what he's supposed to do?

11   A.    Yes, sir.

12   Q.    And if you found out that he was -- had broken the judge's

13   rules, would you have any difficulty in calling the authorities

14   and letting them know that -- that he was not doing what he was

15   supposed to?

16   A.    Surely, sir.

17   Q.    All right.  And, now, obviously, you didn't know, you

18   know, that -- you've heard what the government has said today

19   about the nature of the crimes he's committed.

20   A.    Yes, sir.

21   Q.    Obviously you don't know anything about that.

22   A.    I don't know anything about that.

23   Q.    And -- but, nevertheless, now that you've been aware that

24   these serious accusations have been made, you would be very

25   sensitive to make sure he didn't, you know, use electronic

1   devices, such as cell phones or computers, if the judge ordered

2   him not to?

3   A.   Because of traumatic incident, I make sure 100 percent --

4   I will not allow him to use any of the devices.

5   Q.   I'm sorry.  I did not understand you.

6   A.   Because of that traumatic incident, I make sure that he

7   never touches any computers or any devices that make it -- make

8   it happen again.

9   Q.   Very good.  And I understand -- and I don't mean to insult

10   you in any way, but your English is a little broken.

11   A.   Yes, sir.

12   Q.   But you understand what I'm saying?

13   A.   Yes, sir, I understand.

14   Q.   And understood essentially what the judge has communicated

15   today?  If he were to communicate to you that you needed to do

16   this, that, or the other, you would be able to comply with

17   that?

18   A.   Yes, sir.

19   Q.   All right.  Now, the day of the event people were

20   concerned that there were -- the authorities were there

21   executing a search warrant on the house.  Some of -- some of

22   the relatives came to see if they could help him.

23   A.   Yes, sir.

24   Q.   And there were a number of people present that day?

25   A.   Yes, sir.

1  Q.   But that's an example of the people in his family were
2  prepared to help him and come to his assistance?
3  A.   Yes, sir.
4  Q.   Let me ask you another question.  Do you have any
5  knowledge of whether he went to the Philippines last year?
6  A.   Yes, sir.
7  Q.   And why and where did he go, as far as you know?
8  A.   Yeah.  They -- they been there to visit my mom and my
9  sister and to some vacation.
10 Q.   Okay.
11 A.   That's it.
12 Q.   And he returned?
13 A.   And then he -- then he returned.
14 Q.   All right.  And he has a passport that you can surrender,
15 as directed by the judge?
16 A.   Yes, sir.
17 Q.   You heard some reference that he had discussed essentially
18 suicide, was the nature of the -- when he was being
19 transported.  If the judge directed that he gets -- well, one,
20 had he ever -- has he ever talked about anything like that?
21 A.   No, sir.
22 Q.   And obviously that upset you a little bit.
23 A.   Yes, of course.
24 Q.   If the judge directed that he gets some mental health
25 treatment and counseling during the course of the case, would

```
1   you make sure he followed through with that?
2   A.   Yes, sir.
3          MR. BELL:  Judge, I believe that does it.  Thank you
4   very much.
5          THE COURT:  Cross-examination?
6          MS. KARASE:  Yes, Your Honor.
7          THE COURT:  Ms. Karase.
8                    CROSS-EXAMINATION
9   BY MS. KARASE:
10  Q.   Hi.  Good afternoon.
11  A.   Good afternoon.
12  Q.   Can you please tell us how many family members he has in
13  the Philippines.
14  A.   My mom, my sister and husband, and my niece.
15  Q.   How old is your niece?
16  A.   25.
17  Q.   And he visited the Philippines for a month, correct?
18  A.   Yes, ma'am.
19  Q.   And that was in January of last year?
20  A.   Yes, ma'am.
21  Q.   Did you know he paid for sex while he was in the
22  Philippines?
23  A.   I don't know.
24  Q.   You didn't know --
25  A.   I don't know.
```

1    Q.   -- he told the agents that he had done that?

2    A.   I don't know.

3    Q.   He's in good physical health, correct?

4    A.   Yes, ma'am.

5    Q.   Okay.  He doesn't have any asthma or respiratory problems

6    that you know of?

7    A.   No.

8    Q.   There are children who come over to your house

9    occasionally, right?

10   A.   Yes.

11   Q.   Who are those children?

12   A.   My nephew.  Yes, ma'am.  My nephew and my nieces.

13   Q.   And how old are those children?

14   A.   6 -- 18 -- they -- the eldest is 18, because there's a lot

15   of children.  Their father has a lot of children.  That's why I

16   don't remember the ages.

17   Q.   But the youngest is how old?

18   A.   The youngest is 3 -- 3 years old.

19   Q.   Okay.  And he mentioned that he has family friends with

20   young children who he's around.  Do you know who this would be?

21   A.   Here?

22   Q.   Your son told agents that he had family friends -- that he

23   had friends with children.

24   A.   Uh-huh (affirmative).

25   Q.   Do you know who -- what other children he's around besides

1    your nieces and nephews?

2    A.    No.

3    Q.    Okay.  Do you have a Facebook account?

4    A.    Yes.

5    Q.    Do you know if your son does?

6    A.    Yes, but I think he -- he's not active in Facebook.  He's

7    not my friend.

8    Q.    Do you know if he has an account in his name or in another

9    name, or both?

10   A.    His name.

11   Q.    Okay.  So you don't know about a dummy account --

12   A.    No.

13   Q.    -- that he has?

14   A.    No, no.

15   Q.    Did you know that he had been viewing child pornography?

16   A.    No.

17   Q.    Do you know how to access the dark web?

18   A.    No.

19   Q.    Do you know a lot about the internet and different --

20   A.    No.

21   Q.    -- ways to use devices?

22   A.    No.

23   Q.    Is your son pretty sophisticated when it comes to

24   technology?

25   A.    Yes.

1   Q.   And does your son stay in touch with the relatives that he

2   has in the Philippines?

3   A.   No.

4   Q.   No?

5   A.   No.

6   Q.   He just spent a month with them last year.

7   A.   Yeah.  They spend -- yeah.  But when he's here, he -- he

8   did not keep in touch with them.

9   Q.   Okay.

10        MS. KARASE:  All right.  Nothing further at this

11   time.

12        THE COURT:  Any redirect?

13        MR. BELL:  No, Your Honor.

14        THE COURT:  All right.  You can step down, ma'am.

15        THE WITNESS:  Thank you.

16    (Witness excused.)

17        THE COURT:  Any other witnesses, Mr. Bell?

18        MR. BELL:  No, Your Honor.  I would just note for the

19   record that -- his father is to the left of the Court, I

20   believe.  And his uncle is to the right there in the audience.

21        THE COURT:  All right.

22        MR. BELL:  And they would be available, I could say

23   by way of proffer, to help support the mother in maintaining

24   her third-party custodian.

25        Judge, I think she would be an outstanding

1    third-party custodian.  Obviously if the allegations are true,

2    it wouldn't be the least bit unusual that the parents are the

3    last to know.

4            That doesn't mean that they -- that if they're

5    sensitive to the issue that they can't really provide the

6    services that we expect of them.

7            Judge, I'll rely on the earlier arguments by -- I

8    made a proffer.  I don't know that I can add a whole lot more

9    than -- I think the evidence is that she would be certainly an

10    excellent third-party custodian.

11            And the government -- it's a serious charge.  There's

12    no question about it.  But under many circumstances that might

13    be enough.  I just would respectfully suggest to the Court that

14    the -- you know, the environment has changed substantially.

15            And sending him to jail or prison if he's convicted

16    is different than to hold on to him under -- under the

17    excessive bail clause of the Eighth Amendment, with all due

18    respect to the usual statutory findings, when there's some

19    other alternative but to expose him to a potential death

20    sentence.

21            Thank you, Your Honor.

22            THE COURT:  Thank you, Counsel.

23            Ms. Karase?

24            MS. KARASE:  Yes, Your Honor.  Just with respect to

25    the last remark about a potential death sentence, Mr. Marino's

1    in good health.  It says so in the pretrial services report.

2    His mother reiterated that here today.  He's been held in

3    custody, I believe, at the Baker facility the entire time for

4    the past week.  And he doesn't appear to be at any greater risk

5    than any of us for contracting the coronavirus.

6              With respect to the 3142 factors, this is a

7    presumption case.  There's a presumption of detention.  I

8    submit that he's not rebutted that presumption that exists.

9    The crime that he committed is a crime of violence.  And it was

10   more than just kind of passively downloading child pornography.

11             He's actually communicating with a person who's

12   representing to have access to children between the ages of, in

13   Mr. Marino's words, 8 and 10 years old, as well as

14   communicating with other individuals via other facets of the

15   internet to receive child pornography, and even to send child

16   pornography.  Certainly the nature and circumstances of the

17   offense are very serious and support a finding of detention.

18             The weight of the evidence is very strong in this

19   case, particularly in light of Mr. Marino's reported admissions

20   and the preliminary forensic review of his laptop computer.

21             The history and characteristics do indicate ties to

22   the United States, but those are ties that are just from the

23   last four years.

24             And he does have extensive ties to the Philippines,

25   where he used to reside, along with extensive travel and close

1  relatives who are there.

2         He did tell agents during the interview that he had

3  engaged -- that he paid for sex when he was in the Philippines.

4  He claimed with an adult at a massage parlor.  And we don't

5  have evidence that it was a minor.  But I do think that that

6  promiscuity is something that the Court can consider in

7  deciding detention.

8         And then, of course, I've already addressed the

9  mental health concerns prior to hearing from his mother.

10         Thank you, Your Honor.

11         THE COURT:  Thank you, Counsel.

12         Anything else, Mr. Bell?

13         MR. BELL:  No, Your Honor.

14         THE COURT:  Mr. Sheridan.

15     (Judge confers with pretrial services officer off the

16  record.)

17         THE COURT:  Any objections to the pretrial services

18  report?

19         MR. BELL:  No, Your Honor.

20         THE COURT:  And the Court has had an opportunity to

21  review the pretrial services report and argument from counsel.

22  And the Court does take a variety of factors into account in

23  determining whether release is appropriate, including the

24  nature and circumstances of the offense, criminal history, ties

25  to the community, and other factors.

1        The government indicates that this is a presumption

2   case and proffer that the defendant was involved in obtaining

3   images, and also using apparently Bitcoin transactions to

4   receive child pornography over the dark web.

5        And according to the United States, there were

6   multiple transactions via Bitcoin to receive these images over

7   the web.

8        During the search warrant, according to the

9   government, when the authorities approached the defendant's

10  door, bedroom door, he was clutching his cell phone.  And

11  according to the United States, he was not immediately

12  compliant, although, according to counsel, apparently he was

13  talking to relatives over the phone.  He had a laptop as well

14  as a cell phone; as I indicated before, numerous images

15  reflecting child pornography.  During interviews with the

16  authorities he did admit accessing the dark web and viewing

17  child pornography online.

18       According to the United States, he paid $1,000 via

19  Bitcoin to receive these images, and also ID'd the collage

20  that's indicated in the package of materials that the

21  government provided for the search warrant.  So he did ID the

22  collage as well.

23       And under the dangerousness prong, the government

24  indicates that he has a secure e-mail which makes restricted

25  access -- or I guess ability to access very difficult.

1       He does have ties to the Philippines and, of course,

2   ability to travel, apparently.  I do understand that this is

3   his -- he has no prior offenses.  However, this is a

4   significant offense if he is convicted.

5       And the Court finds he has not rebutted the

6   presumption that he is a flight risk or a danger, and as such

7   will be remanded to the custody of the U.S. Marshal pending

8   resolution of this case.

9       Anything else we need to address at this time,

10  Ms. Karase?

11      MS. KARASE:  No, Your Honor.

12      THE COURT:  Mr. Bell?

13      MR. BELL:  I guess we don't need an arraignment date

14  yet since we don't have an indictment.  So we're good on that.

15      No, that should do it, Your Honor.  Thank you.

16      THE COURT:  All right.  Very well.  Court will be in

17  recess.

18      COURT SECURITY OFFICER:  All rise.

19  (The digitally recorded proceedings concluded at

20  2:47 p.m.)

21                          - - -

22

23

24

25

**CERTIFICATE**

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )


      I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.


      DATED this 16th day of December, 2022.



      s/Shannon M. Bishop

      Shannon M. Bishop, RDR, CRR, CRC